UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

| | |
|---|---|
| V.W., a minor, by and through his parent and natural guardian DERECK WILLIAMS; R.C., a minor, by and through his parent and natural guardian SANDRA CHAMBERS; C.I., a minor, by and through his parent and natural guardian VERTELL PENDARVIS; M.R., a minor, by and through his parent and natural guardian KAREN RAYMOND; F.K., a minor, by and through his parent and natural guardian KASHINDE KABAGWIRA; and J.P., a minor, by and through his parent and natural guardian ALISSA QUIÑONES; on behalf of themselves and all others similarly situated, | **CLASS ACTION COMPLAINT** 9:16 -CV- 1150 (DNH/DEP) |

Plaintiffs,

v.

EUGENE CONWAY, Onondaga County Sheriff, in his official capacity; ESTEBAN GONZALEZ, Chief Custody Deputy of the Onondaga County Justice Center, in his official capacity; KEVIN M. BRISSON, Assistant Chief Custody Deputy, in his official capacity; and SYRACUSE CITY SCHOOL DISTRICT,

Defendants.

-------------------------------------------------------------x

## PRELIMINARY STATEMENT

1.     This class-action civil-rights lawsuit challenges the solitary confinement of 16-
and 17-year-olds, most of whom have not been convicted of any crime, at the Onondaga County
Justice Center.  Despite an emerging consensus that solitary confinement places juveniles at risk
of serious harm—including suicide, psychosis, and post-traumatic stress disorder—and despite a
national abandonment of solitary confinement of juveniles, the Onondaga County Sheriff's

Office has embraced the frequent and arbitrary use of solitary confinement.  As the Sheriff's Office is well aware, these practices are exposing the young people held at the so-called "Justice Center"—who are predominantly Black or Latino—to serious harm, to the point that a number of them have threatened suicide.  Compounding the profound consequences of the Office's wanton use of solitary confinement, Sheriff's Office officials also are denying juveniles basic educational services and programming, including services needed to address their disabilities.

2.     At the Justice Center, 16- and 17-year-olds are routinely confined alone in tiny, barren cells—typically about 7' x 9'—for 23 hours a day or more for weeks and even months on end for alleged misbehavior.  These children, many of whom already have mental illnesses, have little to nothing to do in the cells: no meaningful human interaction, no education or programming, no music or television, and limited reading materials.  If they try to talk to other children outside their cells, they risk additional discipline.  Jail staff occasionally come by, at best to ask if the juveniles are feeling homicidal or suicidal.  Adults who are housed in the same area threaten to douse them in feces and urine and to sexually assault them.  The children are given at most one hour each day for "recreation," which might take place in empty, chain-linked, filthy indoors cages not much bigger than their cells.  Juveniles who reach their breaking point and say that they want to kill themselves are moved to a mental health unit and confined there on suicide watch until being returned to solitary to continue their punishment.

3.     The Sheriff's Office is imposing or extending solitary confinement for minor misbehavior that is not unusual for teenagers, especially those with mental health disabilities.  One juvenile was placed in solitary for 32 days for speaking loudly and refusing to be quiet and another for 20 days for being loud, disrespectful, and throwing juice; one juvenile already in solitary received an additional 60 days for throwing water through the slot of his cell door and

another received an additional 20 days for banging on her cell door and yelling.  And when children try to appeal their placement in solitary or to complain about the conditions of their confinement, Sheriff's Office staff routinely ignore them, tell them no complaint forms are available or go so far as to tear up or throw away forms that juveniles are able to complete.

4.     Sheriff's Office staff members have sent juveniles to solitary for seemingly sadistic reasons.  One deputy made each teen on a basketball court pick a number and told them that if he made a jump shot the boy with the number closest to a number the deputy had in mind would have to go to solitary.  The deputy made the shot, and K.D. was sent to solitary because he picked the number closest to the deputy's.  And this basketball-shot solitary has happened on other occasions, to named plaintiff M.R. and to other children at the jail.

5.     Potentially dangerous for anyone, solitary confinement can be especially harmful for juveniles, who are still developing physically, psychologically, and socially.  Isolating children so that they have minimal meaningful social contact can cause trauma, depression, anxiety, and psychosis, increase the risk of suicide and self-harm, and permanently interfere with a child's psychological and social development.  For juveniles with mental illnesses or disabilities, the risk of harm from isolation is even greater because those illnesses or disabilities can worsen.

6.     Having recognized in a 2012 report that "[n]owhere is the damaging impact of incarceration on vulnerable children more obvious than when it involves solitary confinement," the U.S. Department of Justice recommended that the use of solitary confinement for juveniles in federal prisons be prohibited, and President Obama adopted that recommendation.  The American Medical Association, the American Academy of Child and Adolescent Psychiatry, and the National Commission on Correctional Health Care all have called on correctional facilities to

halt the use of solitary confinement of juveniles for disciplinary purposes, otherwise referred to as disciplinary isolation.

7.      Not only is it harmful to deprive a child of meaningful social interaction or mental stimulation, it also is counterproductive to the goals of ensuring safety, security, and good order. Research shows that isolating children results in increased agitation and an increased risk of misbehavior.  Facilities that have reduced their reliance on disciplinary isolation and instead adopted more appropriate techniques for managing juveniles have seen reductions in rates of violence and misbehavior.  Most of these facilities allow for short-term separation—measured in *hours*, not days, weeks, or months—as a last resort when other options fail to diffuse situations which pose an acute risk of harm to the juvenile or others.

8.      Adding to the harm being inflicted on juveniles detained at the Justice Center by solitary confinement is the routine practice of denying these children basic educational services. The most any juvenile in isolation receives is a packet of worksheets in their cell, which is no substitute for the classroom and which is particularly inappropriate and damaging for juveniles with learning disabilities.

9.      The Defendants have violated and continue to violate the Plaintiffs' rights under the Eighth Amendment and the Fourteenth Amendment of the U.S. Constitution, as well as the Individuals with Disabilities Education Act.  The Plaintiffs seek declaratory and injunctive relief that will end the barbaric policies and practices inside the Onondaga County Justice Center.

## PARTIES

**The Named Plaintiffs**

10.      V.W. is an African-American 17-year-old boy detained at the Justice Center, where he is currently in disciplinary isolation.  V.W. has received at least 9 different disciplinary

isolation sanctions for a total of over 115 days.  V.W. does not have a high school diploma.  He appears in this action through his father and guardian Dereck Williams.

11.     R.C. is an African-American 17-year-old boy detained at the Justice Center, where he is currently in disciplinary isolation.  R.C. has received at least 3 different disciplinary isolation sanctions for a total of over 30 days.  R.C. does not have a high school diploma.  He appears in this action through his mother and guardian Sandra Chambers.

12.     C.I. is an African-American 17-year-old boy incarcerated at the Justice Center. C.I. has received at least 8 different disciplinary isolation sanctions for a total of over 75 days. C.I. does not have a high school diploma.  He appears in this action through his mother and guardian Vertell Pendarvis.

13.     M.R. is an African-American 17-year-old boy detained at the Justice Center, where he is currently in disciplinary isolation.  M.R. has received at least 8 different disciplinary isolation sanctions for a total of over 80 days.  M.R. does not have a high school diploma.  He appears in this action through his mother and guardian Karen Raymond.

14.     F.K. is an African 17-year-old boy detained at the Justice Center.  F.K. has received at least 2 different disciplinary isolation sanctions for over 40 days.  F.K. does not have a high school diploma.  He appears in this action through his mother and guardian Kashinde Kabagwira.

15.     J.P. is a Hispanic 17-year-old boy detained at the Justice Center, where he is currently in disciplinary isolation.  J.P. has received at least 4 different disciplinary isolation sanctions for a total of over 30 days.  J.P. does not have a high school diploma.  He appears in this action through his mother and guardian Alissa Quiñones.

**The Defendants**

16.    Eugene J. Conway is the Sheriff of Onondaga County and head of the Onondaga County Sheriff's Office, an administrative arm of Onondaga County.  The Custody Department of the Sheriff's Office manages the Patrick J. Corbett Onondaga County Justice Center.  Sheriff Conway has final policy-making authority for Onondaga County for all policies that govern the Justice Center.  Sheriff Conway also has supervisory authority over the Justice Center and is personally involved in authorizing and maintaining the unlawful policies and customs challenged by Plaintiffs, including those relating to discipline and to the provision of education and related services.  Sheriff Conway is sued in his official capacity.

17.    Esteban M. Gonzalez is the Chief Custody Deputy for the Onondaga County Sheriff's Office.  Chief Gonzalez is responsible for the management of the Justice Center and is personally involved in authorizing, maintaining, and enforcing the unlawful policies and customs challenged by Plaintiffs, including those relating to discipline and to the provision of education and related services.  Chief Gonzalez is sued in his official capacity.

18.    Kevin M. Brisson is the Assistant Chief Custody Deputy for the Onondaga County Sheriff's Office.  Assistant Chief Brisson is responsible for the management of the Justice Center, and is personally involved in authorizing, maintaining and enforcing the unlawful policies and customs challenged by Plaintiffs, including those relating to discipline and to the provision of education and related services.  Assistant Chief Brisson is sued in his official capacity.

19.    The Syracuse City School District (the "District") is the public school district for the city of Syracuse, where the Justice Center is located.  It is the educational provider for incarcerated individuals at the Justice Center.  The District receives federal financial assistance under the IDEA.

## FACTS

*Solitary Confinement at the Onondaga County Justice Center*

20.     Located in downtown Syracuse, the Onondaga County Justice Center is a 671-bed correctional facility that houses pre-trial detainees, sentenced individuals, and technical parole violators.   It is overseen by defendant Onondaga County Sheriff Eugene Conway, with defendants Chief Custody Deputy Esteban Gonzalez and Assistant Chief Custody Deputy Kevin Brisson having day-to-day responsibility for the facility (collectively the "Sheriff's Office").

21.     Because New York is one of only two states in the country that prosecutes children as adults as soon as they turn 16, the Justice Center houses 16- and 17-year-old juveniles as well as adults.   Typically, about 30 juveniles are held at the facility at any given time.   Most of them have not been convicted of a crime but instead are being held pending disposition of their cases.

22.     The Justice Center has not always housed juveniles.   Because of overcrowding and other concerns at the Justice Center, in 2014 juveniles were transferred from the Onondaga County Justice Center to Jamesville Correctional Facility, run by the Onondaga County Department of Correction.   At Jamesville, many of the juveniles were kept in disciplinary isolation for weeks or months at a time.   In the fall of 2015, the Alliance of Communities Transforming Syracuse ("ACTS"), a local advocacy organization, drew attention to the suffering of juveniles and pushed county officials to end the practice of solitary confinement for juveniles. The County Executive intervened and transferred juveniles back to the Justice Center, where they supposedly would not be subject to the same abusive practices.   Media reports about Onondaga County's end of juvenile solitary were glowing.   But the celebration was premature.

23.     At the Justice Center, normal out-of-cell time for juveniles is approximately 11 hours.  That time is used for recreation, showers, accessing the library, and, during weekdays, attending GED educational classes, vocational programming like painting and computer repair lessons, and other programming like parenting classes and programs led by volunteers from religious organizations.

24.     The Justice Center's disciplinary policies and practices draw no distinctions between adults and juveniles and authorize the isolation of juveniles for *any* rule violation.  As the website of the Sheriff's Office states: "There is a low threshold for unacceptable behavior" and "[i]nmates who do not behave, in accordance with the rules, will be locked in 23 hours a day."  For any alleged violation juveniles may be immediately "locked-in" to their cells in the juvenile unit or, pending a disciplinary hearing, confined in "administrative segregation" for up to 15 business days after which they may be sentenced to additional "punitive segregation." Administrative segregation and punitive segregation can be served in the jail's "Segregation Housing Unit" (SHU) or in the jail's juvenile unit cells in "lock-in."  The Sheriff's policy gives wide discretion to deputies to decide whether isolation is an appropriate punishment and whether it should be served in lock-in or the SHU.  Whether the Sheriff's Office labels it "lock-in," "punitive segregation," or "administrative segregation" and whether served in the SHU or in lock-in, it all amounts to solitary confinement: 23 hours a day of isolation with no meaningful social interaction, environmental stimulation, or human contact.

25.     The jail's dimly lit SHU consists of approximately 30 to 40 cells arrayed on two floors surrounding a barren center area and houses adults and juveniles alike.  SHU cells at the Justice Center are small and stark.  A typical cell is about 7' x 9' and contains a stainless steel toilet, sink, and shelf; a mattress; an overhead fluorescent light; and a small raised window with

fixed metal slats.  The cell floors are concrete, and the dark green walls are marred by scratch marks from previous occupants.  The cell door is solid with two narrow vertical rectangular-shaped plexiglass windows and a horizontal piece of plexiglass that covers two small openings below the windows where air, sound, and papers can pass through.  The cell door also has a wide metal panel slot that can only be unlocked from outside.  The cells have no phones, radios, or televisions, and, other than one book, people are prohibited from having personal property such as photos, old personal letters, or magazines in the cell.

26.     Juveniles in the jail's SHU cells are locked in these spaces for weeks on end with little or no out-of-cell time.  They are taken out of their cells for one hour of so-called "recreation" and a 15-minute shower every other day.  But even recreation time isn't regular.  Deputies will deny recreation for minor reasons, like if the juvenile hasn't fully made his bed.  Robbed of their only hour out of cell, some juveniles are kept in 24-hour isolation.

27.     Juveniles locked in SHU cells have virtually no meaningful human interaction.  Jail rules prohibit inmates in the cells from speaking with each other.  As for interactions with jail staff, they are often limited, as deputies normally remain in an office only to emerge for their required obligations, like feeding the juveniles.  Mental health workers occasionally walk through the SHU to ask inmates whether they are feeling homicidal or suicidal.  Juveniles can make one phone call to a family member when they are first taken to the SHU but then are barred from all family calls.  Though jail rules permit short family visits, jail staff often cancel them because the jail is on lockdown due to short-staffing.

28.     Nearly every aspect about the SHU is dehumanizing.  When juveniles are first brought to the SHU, they are strip-searched and told to lie down naked on the floor of their cells until staff return with their orange jumpsuits.  Cell floors are sometimes still soaked in urine

from the previous occupant.  Before being able to leave a cell, the juvenile must place his hands through the metal slot in the door to be handcuffed.  "Recreation" consists of being placed in a small, barren cage with a concrete floor and nothing else.  Showers take place in a smaller cage, with the stalls being open to the SHU's common area; because the stall side walls are only about 6 feet high, adults sometimes toss their feces on juveniles, called a "shitdown," while others "shoot their piss" on them.

29.     Night time rarely provides a respite from the dehumanizing conditions.  The teenage boys in the SHU don't normally sleep at night.  Adults keep them awake by shouting their plans to "get at them" in the shower cells or the recreation cages.  The SHU echoes.  The ceiling, floor, and walls amplify screams and voices like a loudspeaker.  At any hour of the night, threats like "I'mma make you suck my d**k" or "I'mma shoot piss on you in the shower" boomerang off the walls so loud they can be heard down the hall from the SHU through the unit's locked doors.

30.     Unable to sleep at night in the SHU because of the noise, some juveniles lose track of days and the time.  Many sleep during the day, only to be awoken by deputies at meal time.  Breakfast is confused with dinner.  Lunch is confused with breakfast.  Some try to adapt by marking down the days since their last court date but still remain in this state of disorientation.  Staff will walk by cells around 7:30 a.m. to sign people up for recreation; juveniles who are sleeping—and they regularly are—get no recreation because deputies make no effort to wake them, which means the teenagers end up spending all 24 hours of the day in their cells.

31.     Jail officials also use cells in the jail's separate juvenile unit for disciplinary isolation.  These cells are virtually identical to the SHU cells, and juveniles confined to them

suffer the same deprivation: 23 hours a day or more routinely locked in the cell with essentially no meaningful interaction with people.  And because jail officials also use the juvenile unit to house adults, juveniles in disciplinary isolation in that unit face threats from adults like the threats in SHU.

32.     Sixteen- and seventeen-year-olds at the Justice Center are routinely locked into SHU and juvenile-unit cells for about 23 hours a day or more for weeks and months on end. Since October 2015, when the Sheriff, his Chief, and Assistant Chief Custody Deputy began routinely housing pre-trial and sentenced 16- and 17-year-olds at the Justice Center, they have placed at least 86 different juveniles into isolation over 250 times.  One teenage boy was sentenced to 400 consecutive days in isolation, another to 104 days, and teenage girl to 102 days.

33.     Juveniles are regularly placed in isolation at the jail for alleged misbehavior that is minor.  "Misbehavior" like not addressing a staff member by his proper title, annoying the staff, being loud, violating the dress code, or not keeping a clean cell can result in weeks in disciplinary isolation.  Sheriff's Office staff even throw juveniles in solitary for the fun of it: playing games like basketball-shot solitary to determine which unlucky kid gets put in isolation.

### Juveniles Are More Vulnerable to the Harms of Solitary

34.     Defined by the National Commission on Correctional Health Care as "the housing of an adult or juvenile with minimal to rare meaningful contact with other individuals," solitary confinement can harm both adults and juveniles.  But juveniles and adults are fundamentally different.  Because juveniles are still developing psychologically, neurologically, and socially, they are especially susceptible to psychological harm when they are isolated from other people.

35.     Juveniles in isolation face a significant risk of serious mental harm.  Solitary confinement negatively impacts juveniles by perpetuating, worsening, or precipitating mental

health concerns, including but not limited to post-traumatic stress disorders, psychosis, anxiety disorders, major depression, hypervigilence, agitation, general lack of trust, suicidal ideation, suicidal intent, self-mutilation, and suicidal behavior.  Research shows that almost all suicides within juvenile correctional facilities occur when the child is in some type of isolation.

36.     These mental health concerns can cause long-term harm.  Solitary confinement can lead to chronic conditions like depression, which, in teenagers, can manifest as anger or as self-harm.  In addition, children who experience depression and anxiety in their teenage years are at a higher risk of presenting with these diagnoses again.  Damage associated with low self-esteem, vegetative features, and hopelessness associated with depression can similarly be long-standing.  Depression has a 10% to 15% mortality rate associated with it, and solitary confinement increases the risk of suicide substantially compared to the general population.

37.     Solitary confinement of juveniles can also lead to long-term trust issues with adults, including paranoia, anger, and hatred.  Unlikely to trust others, juveniles emerging from solitary have trouble forming the therapeutic relationships necessary to address the mental health concerns resulting from solitary confinement.

38.     Medical research on adolescent brains explains why juveniles are more vulnerable to the risk of long-term harm.  In the adolescent brain, the connections between the frontal lobe and the mid-brain have not fully developed.  If an adolescent is traumatized in certain ways, it can cause permanent changes in brain development and create a higher risk of developing permanent psychiatric conditions like paranoia and anxiety.  Trauma from solitary confinement has a high likelihood of causing these permanent changes.

39.     The risk of harm from solitary is made worse by the disproportionately high incidence of preexisting trauma and mental health concerns among juveniles in the criminal

justice system.  Research shows that over 60% of the youth in correctional settings have an underlying major mental illness.  Stress from isolation can compound past trauma and exacerbate mental illnesses and disabilities.  For those juveniles with mental illnesses or disabilities, the risk of harm is especially great.  People with mental illnesses and disabilities already have cognitive deficits in their brain structure or biochemistry.  They already have weakened defensive mechanisms, are at a higher risk for further mental health complications, and are more susceptible to significant trauma from social isolation.  Trauma from social isolation will be more long-lasting for those with mental illnesses or disabilities than for those without.

40.    In a series of Eighth Amendment cases involving the death penalty and life without parole sentences, the Supreme Court has held that the Constitution requires that children not be punished like adults without first accounting for the unique traits that make them children.  Accounting for one such trait—a child's greater vulnerability to harm—a number of institutions have echoed the Supreme Court's principle that children cannot be treated like adults.  The National Commission on Correctional Health Care, for example, issued a statement articulating their position that juveniles should not be placed in solitary confinement for any duration and highlighted juveniles' particular vulnerability to adverse reactions from isolation.  The World Health Organization, the United Nations, and other international bodies have also recognized that solitary confinement is particularly harmful to a child's psychological well-being and cognitive development.  Acknowledging the high risk of mental illness as well as the higher rates of suicide and self-harm for youth in solitary confinement, the U.N.'s Special Rapporteur on Torture, in a 2015 report, condemned solitary confinement of children for any duration, calling it torture.

*Solitary Confinement at the Justice Center Is Seriously Harming Juveniles and Exposing Them to a Substantial Risk of Serious Harm*

41.     The use of solitary confinement at the Justice Center is inflicting serious harm on juveniles and exposing them to a substantial risk of serious harm.  Solitary confinement is causing juveniles at the Justice Center to suffer from suicidal ideation or intent, anxiety, depressive symptoms, post-traumatic symptoms, and worsening behavior.  And the threats and harassment that these juveniles face from adults while in solitary confinement only serve to increase these harms.

42.     T.S., a 16-year-old boy, was sentenced to over 270 days in the SHU, despite a history of mental health treatment.  When he reached his breaking point, he threatened to commit suicide.  After a brief stint in the behavioral health unit under constant suicide watch, T.S. was returned to the "Box," which is what many juveniles call the SHU.

43.     R.P. got into an argument with another juvenile over a basketball and was sent to the SHU, despite having previously told the mental health staff that he had tried to commit suicide when he was eleven.  After one day in solitary confinement, he was so depressed that he tried to cut his wrist with a pencil.  He was then moved into constant suicide watch in the behavioral health unit, after which he would have returned to solitary confinement, but he was liberated when his mother bailed him out.

44.     A.C., a teenage boy when confined to the Box in May 2016, felt depressed and anxious there.  Like other juveniles in the Box, A.C. couldn't call his family because the Sheriff's Office prohibits personal calls after an inmate's first day in the Box.  A.C. was constantly harassed by adults in the SHU.  One adult spit on him while A.C. was coming out the shower.  Another adult masturbated while watching A.C. walk to the showers and called out to A.C. to let him know it.

45.     Though the juveniles at the Justice Center are primarily boys, girls are occasionally detained there, are subject to the same disciplinary penalties, and can be placed in a separate 4-cell SHU that is essentially identical to the main SHU.  In addition to the profound isolation they experience, girls placed in the separate SHU suffer the humiliation and danger of having to shower in a stall fully visible to male staff.  One male deputy, for example, told an adult woman housed in the SHU that C.C., a 16-year-old girl, "looks better in the shower than you do."  C.C. tried to get grievance forms to complain, but was repeatedly denied.  Out of frustration, she flooded her cell by clogging her toilet.  The deputies made her stay in the flooded cell for 48 hours without recreation.

### Not Just Harmful, Solitary Confinement is Counterproductive

46.     Solitary confinement is not only harmful to juveniles, it does not reduce future misbehavior.  In fact, psychological research has shown the opposite: placing juveniles in solitary confinement can exacerbate the agitation and behavior that led to discipline in the first place.

47.     In Ohio, the Director of the Department of Youth Services ("DYS") found that solitary confinement "does not prevent violence or reduce assaults on staff and youths; instead . . . it actually increases violence."  Analysis of five years of data showed that as the rate of solitary confinement increased, so did acts of violence—and that when DYS cut its use of solitary confinement for juveniles by 89%, it saw a 22% drop in violent acts.  As DYS found, placing juveniles in solitary confinement makes it difficult for staff to provide youth with meaningful treatment and education, causes youth trauma, and causes youth to act out in anger.

48.     States have been banning the use of disciplinary isolation for children held in juvenile detention facilities.  So far, at least twenty-one states, including New York, have

prohibited juvenile detention facilities from using disciplinary isolation for juveniles.  Juvenile justice organizations, like the Juvenile Detention Alternatives Initiative and the Performance-based Standards Learning Institute, have also adopted standards for eliminating the use of isolation for any reason other than to temporarily address behavior that threatens acute harm to the juvenile or others.

49.     State and city officials are implementing similar bans in adult jails and prisons. For example, in North Carolina, the only other state that prosecutes children as adults as soon as they turn 16, the state's prison commissioner has agreed to ban solitary confinement for juveniles in state prisons starting this fall.  One of the commissioner's motivations was that other states saw reductions in violence against guards after limiting solitary confinement, and he hopes North Carolina will see similar results.  At Rikers Island, the second largest jail in the country, the City Corrections Commissioner and Mayor banned the use of solitary confinement for juveniles in 2014.  A number of other jurisdictions, including New York, Mississippi, and Los Angeles, have also recently adopted reforms that abolish or reduce disciplinary isolation of juveniles, and, at the time of filing, there is legislation pending in California to expand those reforms statewide.

50.     The recommendations of experts and the actions taken by corrections officials and legislatures reflect a growing consensus that disciplinary isolation is harmful for juveniles and unnecessary for safety.  Many experts, correction officials, and legislatures agree that when isolation is used it should not be used as punishment, should be for the shortest period of time necessary to gain control of a security threat, should be under strict controls, and should involve the continual monitoring of the juvenile.

***The Sheriff's Office Is Fully Aware of the Risks of Disciplinary Isolation and Has Deliberately Chosen to Ignore Those Risks***

51.     By virtue of complaints, internal reports, a lawsuit, meetings with advocates, and even a recent policy pronouncement by its own accrediting agency, the Sheriff's Office repeatedly has been put on notice of the substantial risk of serious harm posed by its use of disciplinary isolation.  Notwithstanding this notice, the Sheriff's Office continues its regular use of disciplinary isolation and has gone so far as to destroy complaints filed by juveniles.

52.     At a September 24, 2015, Ways and Means Committee meeting of the Onondaga County Legislature, county legislators questioned the use of solitary confinement at Jamesville. Defendant Gonzalez was present at the meeting and was asked to compare the practices at the Justice Center to those at Jamesville.  He acknowledged being aware of "many studies done on mental health and the effects of the deprivation from any contact from anybody coming to their cell."  He attempted to distinguish practices at the Justice Center by saying that individuals in lock-in are next to another cell so they have contact with one another.

53.     In November 2015, shortly after juveniles were returned to the Justice Center, Legal Services of Central New York (LSCNY) wrote Chief Gonzalez on behalf of a 16-year-old boy held in solitary confinement and warned Gonzalez that putting "a 16-year-old with history of mental health concerns in solitary confinement is cruel and inhumane and violates the U.S. Constitution as well as the Americans with Disabilities Act."  Chief Gonzalez wrote back to Legal Services, copying the Sheriff, and acknowledged that solitary confinement is inhumane but claimed that the 23-hour confinement of the juvenile in the jail did not amount to solitary confinement.  LSCNY then filed suit against Sheriff Conway and Mr. Gonzalez, alleging that putting a juvenile in solitary confinement "has the very real likelihood to cause him severe developmental and psychological harm."

54.     Local advocates met with Sheriff Conway and Chief Gonzalez to warn them personally about the dangers of disciplinary isolation for juveniles at the jail.  In December 2015, ACTS members met with Chief Gonzalez and the then-Assistant Chief Custody Deputy at the Justice Center and urged them to end the use of solitary confinement for juveniles.  In January 2016, ACTS members met with Sheriff Conway in his office and urged him to do the same. Both times ACTS warned the Sheriff's Office that solitary confinement is harmful to a juvenile's brain development and mental health.  Both times ACTS received no commitment to change.

55.     In April 2016, the organization that accredits the Justice Center—the National Commission on Correctional Health Care (NCCHC)—adopted a position statement that all juveniles should be excluded from solitary confinement of any duration because isolation is particularly harmful for juveniles.  Upon information and belief, officials at the Sheriff's Office were made aware of this position through NCCHC's publications.

56.     Teenagers routinely try to bring the conditions at the Justice Center to the attention of the Sheriff's Office, but the Sheriff's Office has systematically ignored those complaints and even have gone so far as to stonewall the children who try to complain.  Deputies routinely deny juveniles grievance forms—or give them the forms only to later dump them in the trash.  The few juveniles who have been able to get a hold of grievance forms to file complaints have complained to jail officials about the conditions of their disciplinary isolation.  They wrote about how solitary confinement was harming them and how it is seriously harmful to any juvenile.  Nothing changed.  Some juveniles objected to their sanctions or administrative segregation status writing that solitary confinement is particularly damaging to them because they are juveniles with mental illnesses or disabilities.  These juveniles asked to be released from solitary, but jail officials did not respond or denied their requests.

57.     Staff at the Justice Center are required to document and report through the chain of command any inmates who appear to them, or any staff member, to be in need of mental health services.  Upon information and belief, jail staff, including mental health staff, informed the Sheriff's Office that K.P. and T.S., two teenage boys, became suicidal in the Box and that mental health removed them from the Box and put them under suicide watch.  Nonetheless, once K.P. and T.S.'s acute suicidal thoughts subsided, the Sheriff's Office returned them to the Box. Upon information and belief, the Sheriff's Office has ignored the cries for help from juveniles at the Justice Center.  At least five juveniles have threatened or attempted self-harm while they were in disciplinary isolation, and a number of others told staff that they were experiencing profound psychological symptoms.  C.C., for example, filed a grievance and administrative segregation appeal to tell jail officials that she was depressed from being kept in her cell for 22 to 23 hours each day.  Nothing changed.

### *Denying Juveniles in Disciplinary Isolation Appropriate Education Under New York State Law Without Due Process*

58.     In addition to being placed at risk of serious harm, juveniles in isolation are also denied New York state-mandated educational services without due process.

59.     County jails, along with the county's local school district, must provide educational services to juveniles including, at minimum, three hours of individual or small group instruction.  Only under specific, limited circumstances, and following a detailed process, can this right to instruction be restricted.  Placement in disciplinary isolation, alone, is never a justification for shutting a juvenile out of the classroom.  Yet it is the Defendants' policy and practice to deny instruction solely because a juvenile is placed in disciplinary isolation.

60.     The Sheriff's Office's policies bar juveniles in disciplinary isolation from attending school and from receiving tutoring or other individualized instruction or classroom

services.  Instead, these children are offered "cell study," which consists of a packet, including newspaper clippings, crossword puzzles, and GED-related worksheets.  Teachers or deputies will walk by a child's cell and toss this packet through a slot in their locked door.  Some children wake up to see a newspaper, crossword puzzles, and some worksheets splayed out on their cell floor.  As a routine matter, packets are not collected, and instructional staff never review them. Many juveniles don't complete the worksheet packet because they know it will not be reviewed by teachers, graded, or get them any school credit.

61.     When juveniles are informed that they will be subject to disciplinary isolation, the Sheriff's Office and the District don't evaluate the impact of the discipline on their schooling. They receive no notice when charged with misbehavior that isolation will result in a complete denial of educational instruction or that they will be cut off from their regular class work.  For students placed in administrative segregation, they are denied access to education—sometimes for weeks at a time—without any adjudication of their guilt of the misbehavior charges.

62.     When the disciplinary hearing finally does happen, the hearing officer makes no finding that the misbehavior was related to the Justice Center's educational program.  Nor does the hearing officer make an affirmative finding that the juvenile's continued presence in school would pose a threat to anyone.  Aside from appealing the underlying disciplinary decision, there is no process for reviewing the denial of educational services.

63.     Because disciplinary isolation is used so cavalierly, Defendants take away educational services for any small reason.  A child who sleeps in late, fails to properly make his bed, or causes a deputy to be annoyed can be locked in a cell and denied access to school.  Even though these infractions have nothing to do with school, juveniles are removed from all education and related services and programming without any notice or opportunity to be heard.

*Denying Juveniles with Disabilities in Disciplinary Isolation a Free and Appropriate Public Education Required by the IDEA*

64.     Juveniles with qualifying disabilities under the IDEA are also subjected to the Defendants' policy and practice of cutting off educational instruction to juveniles in disciplinary isolation.  Once in disciplinary isolation, juveniles with disabilities, like their non-disabled peers, simply receive a worksheet packet dropped off through the slot of their cell door.  Those that have difficulty reading because of dyslexia or other disabilities, for example, have to make do or give up trying to learn.  The teachers don't help.  The deputies don't help.  No one helps.

65.     Upon information and belief, this education-by-worksheet approach does not comply with the Individualized Education Programs ("IEP") of children with qualifying disabilities under the IDEA.  Students with emotional disabilities and learning disabilities need specialized instruction and accommodations in order to access education.  For example, ADHD affects attention, hyperactivity, and impulsivity.  One major IEP modification for children with ADHD is to break up large assignments into smaller parts.  Handing a child with ADHD a bundle of worksheets does not serve to make education more accessible to him or her.  In addition, these packets do not make education more accessible to those students who have significant difficulties with reading.  These cell packets hardly count as education, much less special education.

66.     Upon information and belief, most members of the putative class, including all of the named Plaintiffs, attended school in the Syracuse City School District.  Therefore, the District has access to the IEPs of juveniles with disabilities at the Justice Center who attended District schools.  The District is thus on notice that most juveniles with disabilities incarcerated at the Justice Center require special education and related services pursuant to their IEPs.

Nonetheless, Defendants deny juveniles with disabilities the free and appropriate education required by law.

67.     Moreover, upon information and belief, Defendants fail to properly determine whether a juvenile's alleged misbehavior is a manifestation of their disabilities.  Under the IDEA, a juvenile with disabilities is entitled to procedural protections if they will be excluded from school for 10 consecutive days or more or if the juvenile is subjected to a series of removals totaling more than 10 days in a school year based on a pattern of behavior.  In that event, a meeting of the relevant members of the juvenile's IEP team must be held, after inviting the juvenile's parents, to determine if behavior resulting in the discipline is a manifestation of the juvenile's disability.  If so, the school must return the juvenile to class, and develop appropriate supports to address the behavior.   Upon information and belief, none of these procedural protections are provided to juveniles with disabilities at the Justice Center.

## NAMED PLAINTIFFS' INDIVIDUAL ALLEGATIONS

**Named Plaintiff V.W.**

68.     Seventeen-year-old V.W. likes hip hop, playing football, and often draws when he is bored.  V.W. grew up with five siblings and loves spending time with his family.  V.W. was primarily raised by his dad.  His father's house recently burned down and V.W. is worried about staying in contact with him.  He misses his girlfriend, who he's known for most of his life, and he hopes he gets out of the Justice Center in time for their one year anniversary.  One of V.W.'s friends was shot and killed while V.W. was detained at the Justice Center.  When V.W. gets out of the Justice Center, he wants to go back to school, and then get a job and one day buy his own apartment.

69.     V.W. has been diagnosed with ADHD.  Before being detained at the Justice Center, he was in 9th grade at G.W. Fowler High School in the Syracuse City School District. He struggles with math and social studies, and he failed some of his 9th grade classes.

70.     V.W. is a pre-trial detainee and has been held at the Justice Center since February on bail that his family is too poor to pay.  His next court date is not until November, at which point he will have been at the Justice Center for almost 9 months.

71.     Since February 2016, V.W. has received at least 9 different disciplinary isolation sanctions for a total of over 115 days.  V.W. has been in the Box three times, and has been placed in disciplinary isolation even for minor alleged misbehavior.  In August, he was put in the Box for banging on his cell door to get the deputy's attention so he could tell him he felt suicidal. He was later thrown in lock-in for six days for standing on a basketball in the recreation yard of the juvenile unit.  Since September 8, V.W. has been in the Box for fighting with another boy after the boy made jokes about V.W.'s murdered friend.

72.     In the SHU, V.W. has had little to do.  During his current confinement in the Box, he had nothing to read for one week.  When he goes to recreation in the SHU cages, he walks in circles or just stays still until the deputy comes to handcuff him and return him to his cell.  He wishes he had photos of his family and his girlfriend in his cell, but jail rules prohibit him from having personal pictures in the SHU.  Though jail rules don't permit talking in the Box, he often can't sleep at night because of all the yelling and screaming.  Sometimes at night, stuck in his cell with nothing to do, V.W. passes time by drawing.  For at least 8 days in the Box, the deputies refused to give him a change of clothes or launder his clothes, so V.W. would also pass the time washing his own underwear and socks in the sink.

73.     The first time V.W. was in the Box, the conditions were particularly terrible.  The deputies shut down the water to the SHU because some individuals flooded their cells.  For hours at time the whole unit would smell of urine because inmates were unable to get the deputies to turn the water back on.  V.W. would sometimes urinate in the vent of the recreation cage to avoid having to sleep next to a stinky toilet.

74.     V.W. has struggled in lock-in as well.  His ADHD makes it difficult for him to remain still or calm.  He has gotten agitated and yelled out of his cell, which has gotten him into further trouble.  The deputies took away his chair for being loud while locked in on the juvenile pod.

75.     V.W. exhibits symptoms that directly correlate with his placement in solitary confinement.  He expressed suicidal ideation while in lock-in.  And he feels stressed in both lock-in and the Box.  He loses weight each time he is put the Box.  In disciplinary isolation, V.W. has not been able to get any meaningful therapy or counseling services.  Mental health professionals only come to his cell to ask if he is feeling ok and if he is suicidal or homicidal.

76.     In the Box and in lock-in, V.W. cannot attend education classes or any programming.  He had no notice or opportunity to be heard about the Defendants' decision to cut him off from education classes as a sanction for the rules violations that he was charged with. One day during the week of September 12, 2016, V.W. woke up and found scattered crossword puzzles, a newspaper, and worksheets on his cell floor.  No teacher ever helped him with the worksheets, and no one asked him to turn them in to be reviewed or graded.

77.     V.W.'s disciplinary hearing for his current misbehavior charges is scheduled for the week of September 26.  He received an administrative segregation notice informing him that he could submit a response to his administrative segregation designation, which requires him to

be confined until his hearing.  So V.W. submitted a response to complain that he shouldn't be on administrative segregation because he isn't a threat.  In his response, V.W. also complained about how being in solitary confinement is harming him mentally.  No one got back to V.W. about his complaints.  During his current sanction in the Box, V.W. has also asked for several grievance forms to complain about the conditions of his confinement.  The deputies have ignored his requests or denied him forms.  When V.W. was in the Box last month, he also asked for grievances several times, and the deputies would not give him one.

**Named Plaintiff R.C.**

78.     Seventeen-year-old R.C. loves getting people to smile and laugh by making jokes. He used to work at an outdoor experiential learning and retreat center, where he helped train and nurture horses, and helped lead group activities like tours and trust building exercises.  R.C. grew up in a household with his mother, a cancer survivor who has struggled to take care of him, his siblings, and his late aunt's two teenagers.  When R.C. gets out of jail, he wants to go back to school and continue working with horses and giving tours.

79.     R.C. has a long history of mental health treatment and needs special education services.  He has been diagnosed with ADHD.  And he also has anger issues associated with his inability to concentrate.  He's been evaluated for an acute mental health concern in an emergency room.  R.C. has an IEP, and, before being detained at the Justice Center, he had been taking 9th and 10th grade classes at McCarthy at W.R. Beard, a program operated by the Syracuse City School District that provides specialized services for students with social, emotional, behavioral, and academic concerns.

80.     R.C. is a pre-trial detainee and has been at the Justice Center for over a month, and cannot be released because of an alleged probation violation.  He will be held at the Justice Center on a probation hold until his criminal case is resolved, which could take months.

81.     Since early August, when he was detained, R.C. has received at least three disciplinary sanctions, for a total of over 30 days.  R.C. is currently in the Box and has been in the Box since August 29.  He is in the Box for singing Whitney Houston's "I Will Always Love You" at night in his cell, refusing to stop when ordered by deputies, and allegedly touching a sprinkler head in his cell as deputies entered the cell to make him stop singing.  He will remain in the Box for this "misbehavior" until September 30.  R.C. had also previously been in lock-in for swatting toilet paper out of a deputy's hand.

82.     R.C. has little to do in the Box.  To pass the time in his cell, he sometimes plays with the dead flies on the windowsill.  When he gets really bored, he likes to sing to himself.  He had one book in his cell in the Box, but he couldn't understand it because it was above his reading level.  Even in recreation, he has nothing to do.  He just walks around the cage or stands until recreation time is over.  He has lost weight and is losing his hair.  Because jail rules prohibit R.C. from having moisturizers while in the Box, he has been using the facility-issued deodorant to try to alleviate his graying, flaking, and sometimes bleeding skin.

83.     Since he got to the Box, R.C. has been worrying about adult harassment.  In the Box, he saw someone get "piss shot on him" by an adult in the shower cells.  The deputy in the Box saw this and did nothing.  R.C.'s SHU cell is on the first floor of the Box.  The adult who used to be directly above him was stomping throughout the night and yelling things to R.C., like "I'm gonna stab you in the showers," "I'm gonna shoot piss on you," and "I'm gonna make you suck my d**k."  Everyone in the Box could hear the adult, including the deputies.  The deputies

did nothing to stop this harassment and instead moved the adult to a cell adjoining R.C.'s on first floor of the Box.  R.C. asked a few deputies to be moved to another cell, but they have not moved him.  The adult next to R.C. continues to threaten to hurt him during recreation.  R.C. has refused to go to recreation twice for fear of being in a cage next to him.

84.    On Tuesday, September 20, R.C. decided to go to recreation.  The adult who harasses him was in the neighboring cage.  From his own cage, R.C. noticed the adult removing a plastic cup from the crotch area of his orange jumpsuit.  Moments later, R.C. felt warm fluid hit his cheeks—the adult had used the cup to throw his urine in R.C.'s face.

85.    R.C. exhibits symptoms that directly correlate with his placement in solitary confinement.  R.C. is feeling stressed and disconnected from reality in the Box.  He's lost track of how long he has been there.  Even though he never talked to himself before he came to the Box, he's resorted to talking to himself to pass the time.  He'd rather hear his own voice than the voices of adults.  He thinks he's lost more than ten pounds since being in the Box.  In disciplinary isolation, R.C. has not been able to get any meaningful therapy or counseling services.  Mental health staff only come to his cell to ask if he is feeling ok and if he is suicidal or homicidal.

86.    In the Box and in lock-in, R.C. cannot attend education classes or any programming.  He had no notice or opportunity to be heard about the Defendants' decision to cut him off from education classes as a sanction for the rules violations that he was charged with. Instead, R.C. receives packets of worksheets that no teacher ever helps him with, and no one has asked him to turn them in to be reviewed or graded.  R.C. has already missed a week and half of school and will likely miss at least 10 consecutive days of school.  Neither he nor his family has

been contacted to discuss his IEP.  Upon information and belief, the practice of giving R.C. cell packets without providing any assistance does not comply with his IEP.

87.    R.C. submitted a response to his administrative segregation designation to complain that he shouldn't be on administrative segregation because he isn't a threat.  In his response, R.C. also complained about how being in solitary confinement is harming him mentally.  Since being in the Box, R.C. has also asked for several grievance forms to complain about the conditions of his confinement.  For days, the deputies ignored his request for a grievance.  So R.C. flooded his cell to get their attention.  The deputies responded by shutting off the water to his cell for several days.  His cell stunk because he hadn't been able to flush the toilet for two days.

88.    A deputy eventually gave R.C. a grievance form, and he submitted it with his complaints on September 9.  According to the Sheriff's policies, deputies are supposed to try to resolve complaints within 24 hours of receiving the grievance.  But the deputies haven't responded to it.  No one has.  R.C. thinks the deputies threw his grievance away.  R.C. also appealed his most recent sanction for signing a Whitney Houston song in his cell on the juvenile pod.

**Named Plaintiff C.I.**

89.    Seventeen-year-old C.I. likes to play basketball and draw comics, but he has often struggled with his home life.  C.I. was raised by a single mother who lives with cerebral palsy and two of C.I.'s friends have died from gun violence.  When C.I. gets out of the Justice Center, he wants to go back to school and hopes to one day own a bodega where people can hang out.

90.    C.I. has been diagnosed with ADHD.  As a young boy, C.I. received special education services in elementary school because of severe delays in his speaking abilities.

Before being detained at the Justice Center, he had been in the 9th grade at Nottingham High School in the Syracuse City School District.

91.     C.I. is sentenced on a criminal conviction and has been in the Justice Center since February 2016.  At the earliest, he will not be released until March 2017.

92.     C.I. has been sanctioned with disciplinary isolation at the Justice Center at least 8 times for a total of over 75 days.  He was in the Box last month for nearly 10 days before his charges were dismissed because the deputy wrongly accused C.I. of being involved in a large fight that happened while C.I. was locked in his cell.  But while he was wrongly in the Box, the deputies charged him with being loud at night and he was sentenced to 7 additional days of lock-in as punishment.  C.I. has also been in lock-in several other times, too.  He served a 45-day lock-in sanction for getting in a fight.  Deputies later held C.I. in lock-in for seven straight days without letting him out for recreation because C.I. kept talking through his cell door and engaged in allegedly disruptive behavior.  He is currently in the juvenile unit.  And he remains at risk of being placed in disciplinary isolation again.

93.     C.I. was in the Box less than three weeks ago.  He had nothing to do other than sleep for most of the day.  Despite feeling this way, C.I. would sometimes refuse recreation.  He wanted to avoid being in cages next to adults, and he didn't like the cages because it made him feel like a zoo animal.  So instead he would sometimes remain in his SHU cell for 24 hours a day.

94.     C.I.'s time in lock-in has also been difficult.  C.I. had his 17th birthday while he was in lock-in.  While in lock-in he can see other juveniles in the unit playing basketball and talking to each other but he can't interact with them.  He watches them go to school, but he can't go with them.  He watches them eat meals, but he eats alone in his cell.  While serving a lock-in

sentence, C.I. was forced to sleep on the box bed because the deputies took his mattress, chair, and property bins as punishment for talking and yelling.

95.     C.I. exhibits symptoms that directly correlate with his placement in solitary confinement.  C.I. feels stressed, irritable, and hopeless, consistent with a moderate to severe major depression.  He is so agitated that he has to keep moving around or do something to keep busy.  He doubts his self-worth and blames himself now for anything that goes wrong.  When C.I. was last in the Box, or at any previous time when he was in disciplinary isolation, he did not receive any meaningful therapy or counseling services.  Mental health staff would just come by his cell and ask him if he was feeling ok and if he was suicidal or homicidal.

96.     Each time C.I. has been in disciplinary isolation, either in lock-in or the Box, he could not attend education classes or any programming.  He had no notice or opportunity to be heard about the Defendants' decision to cut him off from education classes as a sanction for the rules violations that he was charged with.  When he was in disciplinary isolation, C.I. received packets of worksheets as education.  No teacher ever helped him with the worksheets, and no one asked him to turn them in to be reviewed or graded.

97.     C.I. tried to file grievances at the Justice Center, but the deputies either refused to give him grievance forms or crumpled up the completed forms and threw them away.  Once, a deputy drew a picture of a penis on C.I.'s grievance form before throwing it away.  In March 2016, C.I. was locked in for mouthing off to a deputy.  After another juvenile called the deputy a "fatass," the deputy ordered everyone in the juvenile pod to lock in.  C.I. complained about the lock-in, telling the deputy that he would "grieve your fat ass."  C.I. never got a grievance form.  Instead, the deputy gave C.I. 20 days of lock-in.

98.     When C.I. was last in the Box, he asked for grievances multiple times but never received one.  C.I. wrote a response to his administrative segregation designation to Defendant Gonzalez, complained about how being in solitary confinement is harming him mentally, about how he should not be placed in disciplinary isolation because he is not a threat, and about how his ADHD makes it difficult for him to be quiet when he is isolated.  When he received his 8 day lock-in sanction for being loud in the Box, he submitted a disciplinary appeal making the same complaints.  But he still had to serve out his sanction.

**Named Plaintiff M.R.**

99.     Seventeen-year-old M.R. loves his mom, who always looks out for him.  His father passed away in 2014, and it's still hard for him to talk about his grief.  M.R. recently passed the GED test.  When he gets out of jail, he wants to go to community college and then transfer to a four-year college.  Eventually, he wants to become a criminal defense attorney to help out kids like him.

100.     M.R. was diagnosed with ADHD and oppositional defiant disorder when he was in elementary school.  Since then, he has been taking medication for his mental health concerns. Jail officials are aware of M.R.'s mental health needs.  At the Justice Center, the mental health staff provide him with Seroquel, an antipsychotic medication used to treat depression, his other mental health concerns, and to help with his difficulties sleeping.  Before being detained at the Justice Center, he had been taking 9th and 10th grade classes at the Twilight Academy program at Henninger High School in the Syracuse City School District.  In school, he used to receive help with his classes because of his disabilities.

101.    M.R. is a pre-trial detainee and has been in the Justice Center since November 2015.  He is being held without bail until his sentencing hearing in October 2016, at which point he would have spent about 10 months at the Justice Center.

102.    M.R. has been sanctioned with disciplinary isolation at the Justice Center at least 8 times for a total of over 80 days.  He is currently in lock-in serving a 14-day sanction for talking out of his cell door and allegedly refusing to be quiet when he was in the Box in August. He will remain in lock-in until October 2.  M.R. has also been placed in disciplinary isolation for apparent sadistic reasons.  Once, he had to lock-in after a deputy told him if the deputy made a jump shot then M.R. had to lock-in.  The deputy made the shot.  He has also been placed in disciplinary isolation several times for minor alleged misbehavior.  A deputy once gave him 20 days of lock-in for spraying another inmate with water from a bottle.  M.R. has also been locked in for becoming loud and disruptive over a disagreement over a cup of juice, wearing his shower shoes outside the shower instead of his issued crocs, speaking with other people on lock-in, and for covering the window on his cell in the juvenile pod with tissue so the adults could not see him using his toilet.

103.    M.R. was in the Box less than three weeks ago.  It was tough for him to be alone and not be able to call his family.  So to pass the time, he'd do pushups or try to sleep most of the day away.  Even when he left his cell for recreation, there was nothing to do.  He would be in an empty cage, which he didn't like because he felt like a caged animal.  At night, people screamed, yelled, and kicked their cell doors so loudly that it made it hard to sleep.

104.    In lock-in, M.R. felt restless and agitated.  It's hard for him to sit quietly for days. He has gotten in trouble for yelling at the guards to ask when he would be allowed out for his recreation time.

105.    M.R. exhibits symptoms that directly correlate with his placement in solitary confinement. M.R. feels stressed, sad, agitated, irritable, and restless.  These symptoms are all consistent with major depression.  In isolation, he slept a lot during the day.  When M.R. was last in the Box, or at any previous time when he was in disciplinary isolation, he did not receive any meaningful therapy or counseling services.  Mental health staff would just come by his cell and ask him if he was feeling ok and if he was suicidal or homicidal.

106.    Each time M.R. has been in disciplinary isolation, either in lock-in or the Box, he could not attend education classes or any programming.  He had no notice or opportunity to be heard about the Defendants' decision to cut him off from education classes as a sanction for the rules violations that he was charged with.  Last school year, when he was in disciplinary isolation, M.R. received packets of worksheets and newspaper articles as education.  No teacher ever helped him with the worksheets, and no one asked him to turn them in to be reviewed or graded.  He turned them in anyway, but does not know what happened to them.

107.    M.R. tried to file grievances about the conditions of his confinement, but the staff would deny him forms, refuse to file the forms, or tear them up in front of him instead of passing them to the sergeant.  One deputy responded to his complaints by telling M.R. to "shut up" or he would "bash" his skull.  A sergeant told him that discipline is not grievable and tore up the form that M.R. had filled out.

108.    When M.R. was last in the Box, he asked for grievance forms from the deputies more than twenty times.  The deputies ignored him or told him he couldn't have one, except for the one time that a deputy finally gave him two grievance forms.  M.R. first used one grievance form to complain about being in solitary confinement and the conditions of solitary, but no one ever responded.  After no one responded, M.R. filed a second grievance about the same

conditions, but no one responded to that grievance either.  Sometime after he returned to the juvenile pod M.R. again asked for a grievance, but the deputy told him, "You know I don't give out grievances."  After receiving 14 days in lock-in for talking, M.R. appealed that sanction.

**Named Plaintiff F.K.**

109.   Seventeen-year-old F.K. fled a civil war in his home country when he was five years old and arrived in the U.S. with his family as a refugee. When F.K. gets out of the Justice Center, he wants to go back to school and perform music live at open mic events.  F.K. eventually hopes to own a car dealership selling foreign cars.

110.   F.K. was diagnosed with ADHD and with bipolar disorder.  Before he was detained at the Justice Center, F.K. was prescribed antidepressants as well as bipolar disorder medication. Before being detained at the Justice Center, he was in 10th grade at Henninger High School in the Syracuse City School District.  F.K. needs special education services and has an IEP.  In 2013, he tested at a 2nd grade reading level.

111.   F.K. is a pre-trial detainee and has been at the Justice Center since May 2016.  He is being held at the Justice Center because of a hold resulting from a Family Court case.  He also has bail set in his criminal case.

112.   F.K. has been sanctioned with disciplinary isolation at the Justice Center at least two times for a total of over 40 days.  The most recent time, in late August, a deputy sent him to the Box for fighting.  Before then, F.K. had been in the Box one other time in early May for fighting an adult on the juvenile pod who had been telling F.K. to "suck his d**k" and saying that he was going to have sex with F.K.'s mother.  F.K. is currently in the juvenile unit.  He is at risk of being placed in disciplinary isolation.

113.    F.K. was in the Box less than two weeks ago.  He had little to do in the Box. When he had recreation, deputies brought him to an empty cage.  The first time he went to the Box, there was urine on the floors of the cages.  All he could do during recreation was to stand in the cage for an hour.  F.K. tried to sleep most of the day in the Box to escape from reality.

114.    F.K. exhibits symptoms that directly correlate with his placement in solitary confinement.  F.K. feels disappointed in himself, struggles with concentrating, has feelings of wanting to cry but is unable to, and is restless and more irritable.  These symptoms are all consistent with a diagnosis of major depression of moderate severity.  When F.K. was last in the Box, or at any previous time when he was in disciplinary isolation, he did not receive any meaningful therapy or counseling services.  Mental health staff would just come by his cell and ask him if he was feeling ok and if he was suicidal or homicidal.

115.    In the Box, F.K. could not attend education classes or any programming.  He had no notice or opportunity to be heard about the Defendants' decision to cut him off from education classes as a sanction for the rules violations that he was charged with.  When he was in disciplinary isolation, F.K. received packets of worksheets that no teacher ever helped him with, and no one asked him to turn them in to be reviewed or graded.  F.K. missed at least 10 consecutive days of school while in disciplinary isolation, but neither he nor his family was contacted to discuss his IEP.  Upon information and belief, the practice of giving F.K. cell packets without providing any assistance did not comply with his IEP.

116.    When F.K. was last in the Box, he asked deputies on several occasions for grievance forms to complain about his conditions of confinement.  The deputies never gave him the requested forms.

**Named Plaintiff J.P.**

117.    Seventeen-year-old J.P. loves his family, but his family's life has been shaped by violence and trauma.  Three of his siblings—a sister and two older brothers—were shot before he started high school.  J.P. cleaned his brother's stomach wound and changed his bandages, and he frequently helped his sister around the house because she could no longer walk without the help of a walker after getting shot.  Two extended family members have also died while in custody: one while incarcerated in the state system and one while detained in jail.  J.P. worries that he might one day also die in the Justice Center.

118.    J.P. has struggled with behavioral and learning issues since he was very young. J.P. was diagnosed with ADHD at an early age.  Before coming to the Justice Center, he received counseling for anger management.  He was also evaluated for an acute mental health concern in an emergency room.  J.P.'s mental and behavioral health challenges were often so severe that he could not remain in school long enough to get evaluated for an IEP.  Before being detained at the Justice Center, J.P. was in 9th grade at Corcoran High School in the Syracuse City School District.

119.    J.P. is a pre-trial detainee and has been at the Justice Center since around early July 2016.  He will be held at the Justice Center on a probation hold at least until his criminal case is resolved, which could take months.

120.    J.P. was sanctioned with disciplinary isolation at least 4 times for a total of over 30 days of solitary confinement.  He is currently in lock-in serving a 14-day sanction for talking out of his cell door and allegedly refusing to be quiet when he was in the Box in August.  He will remain in lock-in until October 2.  He was in the Box from the middle of August to early September for a fight.  While in the Box, towards the end of August, he was also sanctioned for talking out of his cell door.  J.P. has also been sanctioned with a lock-in for a minor infraction.

121.    J.P. was in the Box less than two weeks ago.  In the Box, J.P. had little to do in his cell other than doing pushups and reading a book.  After he finished the book, he was not allowed to get a new book.  At first, J.P. tried to sleep as much as possible so he could make the time go faster, but he couldn't sleep at night in the Box because people were often stomping, yelling, and screaming.  Sometimes, it seemed like both the deputies and the detainees would make noise just when J.P. was starting to fall asleep.  It was very cold in his cell, and sometimes the guards made it even colder by putting fans in the center of the room and pointing them at his cell.  If J.P. had recreation, deputies brought him to an empty cage.  Because J.P. could not call his family, he would get very worried that someone had been shot or hurt when he would overhear other people shouting gossip about shootings on the outside.

122.    J.P. exhibits symptoms that directly correlate with his placement in solitary confinement.  J.P. is irritable and agitated consistent with worsening ADHD and worsening disruptive mood dysregulation disorder (DMDD).  He has lost most of his interest in other people or things and feels more discouraged about his future than he used to.   When J.P. was last in the Box, or at any previous time when he was in disciplinary isolation, he did not receive any meaningful therapy or counseling services.  Mental health staff would just come by his cell and ask him if he was feeling ok and if he was suicidal or homicidal.

123.    Each time J.P. has been in disciplinary isolation, either in lock-in or the Box, he has not been allowed to attend education classes or any programming.  He had no notice or opportunity to be heard about the Defendants' decision to cut him off from education classes as a sanction for the rules violations that he was charged with.

124.    J.P. has tried to address his conditions and discipline through administrative channels but to no avail.  For instance, in late August, around when he was sanctioned while in

the Box for talking out his cell, J.P. asked for grievance forms twice to address his conditions of confinement and his placement in the Box.  Both deputies who he asked refused to give him a form.  J.P. also witnessed a deputy inform another detainee near his cell that even if they gave a form to that inmate, they would throw the grievance away upon receipt.

125.    On August 30, J.P. submitted a response to his administrative segregation notice complaining that it was not fair that he was locked in for 23 hours per day, that his ADHD makes it very hard for him to be quiet and stay still, and that he should not have been placed on administrative segregation status for talking in the SHU because he is not a threat.  In his response, J.P. also complained about how being in solitary confinement is harming him mentally. The response was given back to him and he was told that he needed to file a "yellow slip," a referral form that is used to request things like laundry services.  He later submitted the same complaints on a yellow slip, but jail officials did not grant his request for release from SHU.  J.P. also asked for a grievance in September, but was ignored by the deputies.  After receiving 14 days in lock-in for talking, J.P. appealed that sanction.

126.    The Defendants' actions or inactions have been taken under color of law.

## CLASS ALLEGATIONS

127.    All Plaintiffs bring the First and Second Causes of Action pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking declaratory and injunctive relief on behalf of a class of all present and future 16- and 17-year-olds incarcerated at the Justice Center. All class members face a substantial risk of serious harm as a result of the Sheriff's Office's disciplinary isolation policies and practices, and all class members face an unlawful denial of educational services without due process.

128.    Plaintiffs R.C. and F.K. bring the Third Cause of Action pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking declaratory and injunctive relief on behalf of a subclass of all current and future 16- and 17-year-olds with disabilities, as defined by the Individuals with Disabilities Education Act, incarcerated at the Onondaga County Justice Center who are in need of special education and related services ("IDEA Subclass").

129.    All four requirements of rule 23(a) are satisfied:

a.     *Numerosity*: Joinder of all class members is impracticable because of the size of the class and the characteristics of the class members.   At any given time, all of the juveniles incarcerated at the Justice Center are at a significant risk of unconstitutional disciplinary isolation and unlawful denial of educational services.   Between October 2015 and August 2016, more than 86 juveniles were placed in disciplinary isolation at the Justice Center. Every month, additional class members cycle in and out of the Justice Center.   Many of these juveniles are unable to file lawsuits on their own because of their youth, disabilities, and lack of financial resources.

b.     *Commonality*: There are questions of law and fact common to all members of the class, including but not limited to: whether the Defendants' policies and practices of placing 16- and 17-year-olds in disciplinary isolation have resulted in and will continue to result in a violation of the class members' Eighth and Fourteenth Amendment rights; whether the Defendants have unlawfully denied educational services in violation of the class members' Fourteenth Amendment rights; and whether the Defendants have violated the IDEA subclass members' rights under the IDEA.

c. *Typicality*: The claims of the named Plaintiffs are typical of those of the class.  All named Plaintiffs are incarcerated at the Justice Center.  Each named Plaintiff has been subjected to and injured by the challenged policies and practices.

d. *Adequacy of Representation*: The named Plaintiffs, their representatives, and class counsel will fairly and adequately represent the interests of the class.  The named Plaintiffs and their representatives have no interests in this matter that are antagonistic to other class members.  Class counsel have many years of experience in civil rights and class action litigation.

130. Class-wide declaratory and injunctive relief are appropriate under rule 23(b)(2) because the Defendants have acted or refused to act on grounds generally applicable to the class as a whole.

## JURISDICTION AND VENUE

131. This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983, and the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1482. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

132. This Court has jurisdiction to issue the declaratory relief requested pursuant to the Declaratory Relief Act, 28 U.S.C. §§ 2201 and 2202.  This Court may also grant injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.  This Court has authority to award costs and attorneys' fees under 42 U.S.C. § 1988 and 20 U.S.C. § 1415.

133. Venue is proper in the Northern District of New York pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2).  Defendants have their official residence in the Northern District of New York, and a substantial part of the events and omissions giving rise to the claims in this action occurred in this district.

## CAUSES OF ACTION

### First Cause of Action

134.   The Sheriff's Office's actions or inactions have violated and continue to violate the named Plaintiffs' and putative class members' rights under the Eighth Amendment and Fourteenth Amendment of the United States Constitution.

### Second Cause of Action

135.   The Defendants' actions or inactions have violated and continue to violate the named Plaintiffs' and putative class members' rights under the Fourteenth Amendment.

### Third Cause of Action

136.   The Defendants' actions or inactions have violated and continue to violate the rights of named Plaintiffs R.C. and F.K. and the rights of the putative IDEA Subclass members under the Individuals with Disabilities Education Act, 20 USC §§ 1400 et seq.

## REQUESTS FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request that this Court:

a.   Declare that Defendants' acts and omissions violate the named Plaintiffs' and class members' rights under the Eighth and Fourteenth Amendments;

b.   Declare that Defendants' acts and omissions violated named Plaintiffs R.C. and F.K. and IDEA Subclass members' rights under the IDEA, 20 U.S.C. §§ 1400-1482;

c.   Enter all necessary and appropriate injunctive relief (including, but not limited to, policies, procedures, training, supervision, and monitoring) to end the ongoing violations of the U.S. Constitution and federal law;

d.   Award the Plaintiffs reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and 20

U.S.C. § 1415; and

e.   Grant any other relief that the Court deems necessary and proper.

Respectfully submitted,

 s/ Philip Desgranges
Philip Desgranges (Bar No. 519350)
Aimee Krause Stewart*
Mariko Hirose (Bar No. 520250)
Mariana Kovel*
Christopher Dunn (Bar No. 513828)
NEW YORK CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 19th Floor
New York, N.Y. 10004
Tel:  (212) 607-3300
Fax:  (212) 607-3318
pdesgranges@nyclu.org


 s/ Joshua T. Cotter
Joshua T. Cotter (Bar No. 518217)
Susan M. Young (Bar No. 102862)
Samuel C. Young (Bar No. 508916)
LEGAL SERVICES OF CENTRAL
NEW YORK
221 S. Warren Street, 3rd Floor
Syracuse, N.Y. 13202
Tel:  (315) 703-6500
jcotter@lscny.org

*Attorneys for Plaintiffs*

On the Complaint: Noah Breslau

Dated: September 21, 2016
        New York, New York

*\*Pending submission of application
for admission or pro hac vice
admission*