UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

V.W., a minor, by and through his parent
and natural guardian DERECK WILLIAMS;
R.C., a minor, by and through his parent and
natural guardian SANDRA CHAMBERS;
C.I., a minor, by and through his parent and
natural guardian VERTELL PENDARVIS;
M.R., a minor, by and through his parent and
natural guardian KAREN RAYMOND;
F.K., a minor, by and through his parent and
natural guardian KASHINDE
KABAGWIRA; and J.P., a minor, by and
through his parent and natural guardian
ALISSA QUIÑONES; on behalf of
themselves and all others similarly situated,

              Plaintiffs,

       v.

EUGENE CONWAY, Onondaga County Sheriff,
in his official capacity; ESTEBAN GONZALEZ,
Chief Custody Deputy of the Onondaga County
Justice Center, in his official capacity; KEVIN M.
BRISSON, Assistant Chief Custody Deputy, in
his official capacity; and SYRACUSE CITY
SCHOOL DISTRICT,

              Defendants.

-------------------------------------------------------------x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

16-CV-1150 (DNH) (DEP)


**DECLARATION OF LOUIS J. KRAUS, MD**

1

I, Louis J. Kraus, declare as follows:

      1.     This declaration is submitted in support of the Motion for Class Certification filed by Plaintiffs. If called upon to testify, I could and would do so competently as follows.

## QUALIFICATIONS

      2.     I am currently Professor and Chief of Child and Adolescent Psychiatry at Rush University Medical Center in Chicago, Illinois. In that capacity, I supervise and train child and adolescent psychiatry fellows in various placements, including in in-patient, residential treatment, and outpatient programs for children, adolescents, and young adults. I am also currently the Psychiatric Director at the Sonia Shankman Orthogenic School, a residential treatment program for children and adolescents in need of support for profound emotional issues; the Director of the Autism Assessment, Research, Treatment and Services Center at Rush University Medical Center; and the Medical Director of the Chicago Metropolitan Easter Seals Therapeutic School, a school providing a continuum of services for children with autism. I also have a private practice where I assess and treat children and adolescents and provide therapy and psychopharmacological services.

      3.     I have worked with juveniles in correctional settings for the past 26 years, including for nine years from 1990 to 1999 as the treating psychiatrist at the Illinois Maximum Security Youth Center in Joliet, Illinois. From 2003 to 2004, I was a consultant to the Civil Rights Division of the United States Department of Justice on a Civil Rights of Institutionalized Person Act ("CRIPA") investigation in Maryland. I also consulted with the American Civil Liberties Union of Illinois in a case challenging conditions in the Cook County Juvenile Temporary Detention Center, which resulted in system-wide restructuring of mental health

services for juveniles held in pre-trial detention. I have served as a consultant on various other correctional and juvenile justice matters.

4.      I have been appointed to serve as monitor in consent decrees involving reform in juvenile justice systems in Arizona and Illinois, both of which included reform to the use of solitary confinement against juveniles in those systems. In my role in Illinois, which is currently ongoing, I am assessing and restructuring the mental health programming of the Illinois Department of Juvenile Justice. *See R.J. v. Bishop*, No. 1:12-cv-07289 (N.D. Ill.). In the Arizona case, I assisted the Department of Justice from 2005 to 2008 in restructuring the mental health, medical services, and dental services in two state facilities. *See United States v. Arizona*, No. 2:04-cv-01926-EHC (D. Ariz.).

5.      I have also been involved in special education consulting and development of Individualized Education Programs ("IEPs") for the past twenty-two years. I am currently a consultant on special education issues to over fifteen school districts in Illinois. I typically complete one or two educational evaluations each week, assist with developing IEPs, and attend IEP meetings. I have testified regarding special education issues in due process hearings under the Individuals with Disabilities Education Act as well as in other civil cases.

6.      I have authored a number of publications on treatment of juveniles in correctional settings. I am the primary author of the American Academy Child and Adolescent Psychiatry's ("AACAP") Policy Statement on Solitary Confinement. I co-edited two monographs on juvenile justice reform for the AACAP, co-edited a book through Cambridge University Press entitled *The Mental Health Needs of Young Offenders*, and, most recently, edited a book through the Child and Adolescent Psychiatric Clinics of North America entitled *Adjudicated Youth*, published in January of 2016. I wrote the Practice Parameter for Child and Adolescent Forensic

3

Evaluations for child and adolescent psychiatry, which was published in the Journal of Child and Adolescent Psychiatry.

7.     I have served in a number of professional appointments in my field. From June 2014 to 2015, I served as the chair-elect of the American Medical Association's Council on Science and Public Health, and from 2015 to 2016, I served as chair. From May 2012 to May 2015, I was the chair of the American Psychiatric Association's Council on Children, Adolescents and Their Families, which I had served in for 18 years. From October 2000 to October 2015, I was the chair of the AACAP's Juvenile Justice Reform Committee, and from 2011 to 2013, I was chair of the AACAP Assembly.

8.     I was on the Board of Directors of the National Commission of Correctional Health Care ("NCCHC") from 1997 to 2003. I was appointed chairman of the NCCHC Committee on Juvenile Health Care from 1999 to 2003, and served as vice-chairman of the same committee in 1998.

9.     I obtained my Doctor of Medicine degree, M.D., from the Chicago Medical School in 1987 and my Bachelor of Science degree, B.S., from Syracuse University in 1983.

10.     I have included a copy of my Curriculum Vitae as Exhibit A.

## INVOLVEMENT IN THIS CASE

11.     In this present case, I was retained by the New York Civil Liberties Union Foundation and Legal Services of Central New York (together, "Plaintiffs' counsel") to perform professional services as an expert in connection with litigation challenging the use of solitary confinement on juveniles (16- and 17-year-olds) at the Patrick J. Corbett Onondaga County Justice Center (the "Justice Center"). The Justice Center is operated by the Onondaga County Sheriff's Office.

4

12.     For the purpose of preparing this declaration I reviewed a number of documents regarding the Justice Center provided to me by Plaintiffs' counsel, including the Justice Center's policies, data on the use of confinement against juveniles, and disciplinary records of juveniles. The documents that I reviewed regarding the Justice Center are listed at Exhibit B.

13.     I also visited the Justice Center on September 7 and 8, 2016, and completed evaluations of ten of the juveniles held at the facility, including the six named Plaintiffs in this action. The evaluation for each child was 40 to 60 minutes in length and consisted of a clinical interview, a mental health status exam, and a depression screening using the Beck Depression Inventory 2nd edition, or BDI-II. I was accompanied at all times by Philip Desgranges, Staff Attorney for the New York Civil Liberties Union.

14.     While I was at the Justice Center, I walked through the juvenile wing on the second floor (2A), the behavioral health units, and the Segregation Housing Unit ("SHU"). In those units, I observed security as they were performing tasks like supervising the youth, sitting at the control desk, and talking amongst themselves. I also had brief conversations with mental health staff in the behavioral health unit, seeking permission to speak with a juvenile there, and observed mental health staff making rounds.

15.     In forming my opinions below, I relied on my review of the documents, observations of the facility, and evaluations of the juveniles. I also relied on my academic and clinical experience, as well as the extensive body of literature regarding the psychiatric effects of solitary confinement, cognitive and behavioral development in adolescents, and juveniles in correctional settings, including those listed in Exhibit C.

16.     It is my understanding that as the litigation progresses I will be reviewing additional documents and information regarding the Justice Center and the detained juveniles,

and that I will be providing additional services and opinions based on those documents and information.

17.     I am being compensated at the rate of $250 per hour or $1,500 per day to prepare this declaration, and my compensation is not dependent on my opinions or the outcome in this matter.

## OPINIONS AND BASES OF OPINIONS

## I.     THE SHERIFF'S OFFICE HAS A POLICY AND PRACTICE OF USING SOLITARY CONFINEMENT TO PUNISH JUVENILES.

18.     It is the policy and practice of the Onondaga County Sheriff's Office to punish inmates, whether they are adults or juveniles, with disciplinary isolation for violating facility rules and regulations. For the juveniles, this discipline can be served in the SHU or in lock-in in the cells in the juvenile wing. In addition, juveniles who are charged with violating rules and regulations but awaiting their disciplinary hearing are held in what the Sheriff's Office calls "administrative segregation" status. Administrative segregation can last up to 15 business days and is served in the SHU or in lock-in.

19.     Of the ten juveniles who I evaluated during my visit, four were in SHU, one was in lock-in, three were on the juvenile pod, and two were in the behavioral health units. None of the juveniles I spoke to could give a clear explanation of what behaviors would be punished with SHU or lock-in. Based on the review of records and my conversations with the children, there does not seem to be much of a relationship between the rule infraction and whether the child is disciplined with the SHU or lock-in.

20.     All of the juveniles I evaluated, except one, had been in or were in the SHU. I walked into and observed a cell in the SHU. The room was approximately 7 to 8 feet wide and 9

to 10 feet long and dimly lit. There was a small window that looked out onto the wall of a building. There was a way to look into the cell even with the door closed. All of the cells in the SHU appeared to be similar.

21.     Most of the juveniles I spoke with had also been in or were in lock-in in their cells in the juvenile wing. I observed these cells from the outside. The cell was similar in size to the SHU. In the cell I saw a few personal items. There was a way to look into the cell even with the door closed. All of the cells in the juvenile wing appeared to be similar from the outside.

22.     Whether the juveniles are in the SHU or in lock-in, they are routinely locked into cells by themselves for about 23 hours each day. They are denied access to education and other programming. They eat alone in their cells.

23.     Whether the juveniles are in the SHU or in lock-in, they are only given at most one hour each day for "recreation" out of their cell. While in the SHU, the juvenile is placed in one of three side-by-side chain-linked indoor cages approximately the same size as their SHU cell during this one-hour period. There is no athletic equipment, like basketballs or gym equipment, available. There is nothing to do in the cages and no real "recreation" time. At least when the juveniles are in lock-in they are given one hour of recreation time in the open indoor area of the juvenile unit, but based on the interviews with the juveniles they were sometimes denied this time.

24.     Whether the juveniles are in the SHU or in lock-in, by rule they cannot talk to other juveniles from their cells. They could be punished with additional discipline when they try to talk to their friends outside of their cell, and those in general population can be punished for trying to talk to their friends on lock-in. Staff come to the door occasionally, but the juveniles can get in trouble if they yell to try to speak to security.

7

25.     Whether the juveniles are in the SHU or in lock-in, they do not have access to television or music while they are in their cells. Their access to reading material is limited.

26.     Both in the SHU and in lock-in, adults may be housed within sight and sound of the juveniles. Several juveniles who I interviewed reported being verbally abused or sexually harassed by the adults.

27.     The Sheriff's policy states that no form of solitary confinement is used anywhere in the Justice Center, but the reality of their policies and practices is synonymous with the definition of "solitary confinement" adopted by professional organizations in the field. The American Academy of Child and Adolescent Psychiatry defines solitary confinement as a form of discipline or punishment that places an incarcerated individual "in a locked room or cell with minimal or no contact with people, other than staff of the correctional facility." (A true and correct copy of this statement is attached to this declaration as Exhibit D.) The National Commission on Correctional Health Care defines solitary confinement as "the housing of an adult or juvenile with minimal to rare meaningful contact with other individuals." (A true and correct copy of this statement is attached to this declaration as Exhibit E.)

28.     It is my opinion that the Sheriff's Office's use of disciplinary segregation (including administrative segregation pending a disciplinary hearing), whether served in the SHU or in lock-in, is solitary confinement as the term is commonly used in the field of child and adolescent psychiatry. As policy statements in the above paragraph illustrate, what matters for whether discipline constitutes solitary confinement is the degree of meaningful social contact with other people and the degree of access to a regular daily curriculum. This is minimal both in the SHU and in lock-in, as the juveniles are alone in their cells for about 23 hours a day,

sometimes more, with no access to programming and little to no contact with anyone. Although they do have contact with the facility staff, these interactions cannot be considered meaningful.

## II.     THE SHERIFF'S OFFICE'S USE OF SOLITARY CONFINEMENT PUTS JUVENILES AT A SUBSTANTIAL RISK OF SERIOUS HARM.

29.     It is my opinion, within a reasonable degree of medical certainty, that all juveniles subjected to the Justice Center's policy and practice of solitary confinement as described above are at a substantial risk of serious harm to their social, psychological, and emotional development.

        A.     Juveniles In Detention Are As a Group More Vulnerable to the Risk of Serious Harm from Solitary Confinement.

30.     Solitary confinement can be dangerous for anyone, but juveniles as a group are particularly vulnerable to a substantial risk of serious harm from solitary confinement. Because juveniles are still developing socially, psychologically, and neurologically, they are especially susceptible to psychological harm when they are isolated from other people. Research, including research listed in Exhibit C, suggests that removing them from their regular routines, school, mental health treatment, and opportunities for interaction with peers can result in long-term lack of trust, hypervigilence, and paranoia.

31.     Solitary confinement negatively impacts juveniles by perpetuating, worsening, or precipitating mental health concerns, including but not limited to post-traumatic stress disorders, psychosis, anxiety disorders, major depression, hypervigilence, agitation, general lack of trust, suicidal ideation, suicidal intent, self-mutilation, and suicidal behavior. As research cited in Exhibit C demonstrates, almost all suicides within juvenile correctional facilities occur when the child is in some type of isolation.

32.      These mental health concerns can cause long-term harm. Solitary confinement can lead to chronic conditions like depression which, in teenagers, can manifest as anger or as self-harm. In addition, children who experience depression and anxiety in their teenage years are at a higher risk of presenting with these diagnoses again. Damage associated with low self-esteem, vegetative features, and hopelessness associated with depression can similarly be long-standing. Depression has a 10-15% mortality rate associated with it, and solitary confinement increases the risk of suicide substantially compared to the general population.

33.      Solitary confinement of juveniles can also lead to long-term trust issues with adults, including paranoia, anger, and hatred directed at others. This makes it difficult to create a trusting, therapeutic relationship and can lead to noncompliance with treatment in the future, making it hard for people to get the help that they need to address the mental health concerns resulting from solitary confinement.

34.      Medical research on adolescent brains, including those listed in <u>Exhibit C</u>, explains why juveniles are more vulnerable to the risk of long-term harm. In the adolescent brain, the connections between the frontal lobe and the mid-brain have not fully developed. The mid-brain, which is the part of the brain responsible for the flight-or-fight response, is firing away. If an adolescent is traumatized in certain ways, it can cause permanent changes in brain development and create a higher risk of developing permanent psychiatric sequelae (i.e., aftereffect of a disease) like paranoia and anxiety. Trauma such as what is induced by solitary confinement has a high likelihood of causing these permanent changes.

35.      Juveniles in jails are also vulnerable to a substantial risk of serious harm from solitary confinement for the additional reason that they are more likely than the general population to have diagnosed mental illnesses, learning disabilities, and a high incidence of

10

trauma. Research shows that over 60 percent of the youth in correctional settings have an underlying major mental illness. Females are identified as having an even higher incidence of mental illness and are at increased risk for victimization.

36.     There is a clear medical consensus that for those juveniles with mental illness, the risk of serious harm is especially great. People with mental illnesses already have cognitive deficits in their brain structure or biochemistry. They already have weakened defensive mechanisms, are at a higher risk for mental health sequelae, and are more susceptible to the significant trauma of social isolation. The trauma of social isolation that can occur for those with mental illnesses will be more significant and long-lasting than for those without a mental illness.

37.     Medical professionals, including organizations like the American Medical Association, agree that juveniles with mental illnesses should not be placed in solitary confinement for longer than one hour without a comprehensive evaluation from a physician. Solitary confinement should never be used to punish people with mental illnesses.

38.     This professional consensus is best reflected in long-standing accreditation standards for isolation in psychiatric hospitals. The Joint Commission, the most commonly used accreditation agency for psychiatric hospital systems, limits the use of seclusion to the least amount of time possible for the immediate protection of an individual, in situations where less restrictive interventions have been ineffective. Those standards require that, if a person is placed in seclusion of any kind, after 1 hour alone a physician must assess their well-being.

               B.    Juveniles at the Justice Center Are Experiencing Serious Harm and Are Exposed to a Substantial Risk of Serious Harm Correlated to the Use of Solitary Confinement.

39.     During my visit to the Justice Center I observed evidence of similar types of serious harm and a substantial risk of serious harm among juveniles who had been subjected to

11

solitary confinement. I also found through my clinical assessment of the youth, including a review of standardized rating scales and clinical history, that over half of the youth who I spoke with, including every named plaintiff, had mental illnesses. Out of the ten juveniles evaluated, one was on the mental health unit, on psychotropic medications, and continues to be quite symptomatic with agitation, depression, and irritability. At least three additional juveniles showed symptoms consistent with a Disruptive Mood Dysregulation Disorder ("DMDD"). Several juveniles showed symptoms consistent with a Major Depression. Five of the juveniles described a history of Attention Deficit Hyperactivity Disorder ("ADHD") and described previously being on different types of medication, though none of them were currently on medication for ADHD. All of them showed signs of ADHD through varying levels of inattention and proclivity for impulsive behavior.

40.    At least three of the ten juveniles who I evaluated had been or were presenting with suicidal ideations or intent. Two of the juveniles' suicidal intent was precipitated while in segregation in the SHU. After one juvenile reported suicidal intent to the staff, the juvenile was placed in the mental health unit and confined in the cell for about 23 hours a day for 12-days. The juvenile eventually saw a psychiatrist through Telepsychiatry, a video conference, and was released back to the SHU but never had additional mental health treatment. After another juvenile became acutely suicidal in the SHU, that juvenile was stripped of clothing and put into a cell in the behavioral health unit. This juvenile was significantly depressed and, in my opinion, at a high risk for suicide. Although both juveniles had been evaluated by mental health, from our interview it appeared that they were going to be released without any plans for community-based services.

41.     I also observed evidence in the juveniles of an increased level of anxiety, depressive symptoms, and post-traumatic symptoms, as well as worsening aggressive behaviors. Approximately half of the juveniles I spoke with showed signs of depression, anxiety, and behavioral difficulties. All of the children showed evidence of demoralization and low self-esteem. Most of the children described a decreased sense of trust in adults. Most described decreased interest in people. Most showed increased levels of hypervigilence and a desire for retribution. Named plaintiff V.W. had expressed suicidal ideations; C.I. expressed stress, irritability, hopelessness, and other symptoms consistent with moderate to severe major depression; F.K. expressed disappointment, restlessness, irritability, struggles with concentrating, and other symptoms consistent with major depression with moderate severity; M.R. expressed stress, sadness, agitation, irritability, and restlessness consistent with major depression; R.C. expressed being stressed and disconnected from reality; J.P. described irritability and agitation consistent with worsening ADHD, which he had previously been diagnosed with, and  worsening DMDD. As explained above, these are symptoms that can lead to long-term harm.

42.     Based on my experience, scientific research, and the clinical interviews, my opinion is that these symptoms directly correlate to being placed in solitary confinement. It is also important to note that the juveniles were likely minimizing their symptoms in our interviews because they were afraid of being placed in the mental health unit, which one juvenile described to me as a humiliating experience.

43.     I also observed fear and anxiety, which may lead to increased levels of hopelessness, resulting from the arbitrary nature of the punishment imposed at the Justice Center. The disciplinary records and interviews with the juveniles paint a pattern of punishing children with solitary confinement even for minor infractions, and sometimes for no infraction at all. This

sets up an anxiety-provoking situation even when the juveniles are not in solitary confinement, as they are unable to anticipate what behaviors will result in them being put in solitary confinement again.

44.    The reports of verbal abuse and sexual harassment from adults are concerning and further compound the harm and the risk of harm to the juveniles. The presence of adults threatening and harassing the children can also worsen anxiety, stress, depressive symptoms, and suicidal ideations for the children and potentially present them with other forms of psychic harm like post-traumatic stress disorder.

C.    The Sheriff's Office Is Not Assessing or Addressing the Serious Harm or Substantial Risk of Serious Harm Correlated to the Use of Solitary Confinement.

45.    Based on my interviews with the juveniles, it is my understanding that a mental health worker makes rounds in the SHU on occasion, conducting a very brief mental health screening of juveniles in the SHU. The juveniles consistently stated that mental health workers would spend somewhere between 3 and 5 minutes with them essentially asking if they are suicidal and a few other brief questions. These rounds are inadequate for assessing mental health concerns or the risk of suicide.

46.    The treatment and interventions described by the juveniles, including treatment in the mental health unit where they appear to receive little in the way of therapy or psychopharmacological treatment, are extremely limited and do not adequately address the mental health concerns that I observed in the juveniles. It is my opinion that the Sheriff's Office is failing to address the serious harm or substantial risk of serious harm that is correlated to the use of solitary confinement, especially for juveniles with mental health problems.

14

D.     The Sheriff's Office Exposes Juveniles to a Substantial Risk of Serious Harm.

47.     It is my opinion that all juveniles subjected to the policy and practice of using solitary confinement at the Justice Center are exposed to similar types of serious harm or a substantial risk of serious harm described above. I base this opinion on research demonstrating that juveniles as a group are vulnerable to the risk of serious harm from solitary confinement and research showing that a high percentage of juveniles in detention settings have mental illnesses that exacerbate those risks of harm. I observed these serious harms and risks of harms in the juveniles that I evaluated during my visit and I confirmed that a high percentage of the children in the facility had mental illnesses. I further found that mental health services provided are inadequate to mitigate the risk of harm.

48.     Even juveniles who had been or were in solitary confinement and were not currently exhibiting obvious serious harms during my visit are at a risk of harm.  Solitary confinement can lead to underlying anxiety, hypervigilence, and other signs of acute stress reactions, and some juveniles are better at minimizing or concealing those effects. Moreover, the juveniles are at risk of additional harm because they are or can be punished with additional solitary confinement for minor reasons or for no reason at all.

**III.     THE SHERRIF'S OFFICE'S USE OF SOLITARY CONFINEMENT VIOLATES THE CONSENSUS OF PROFESSIONAL ORGANIZATIONS IN THE FIELD.**

49.     The Sherriff's Office's use of solitary confinement violates the norms of professional organizations in the field. A number of organizations have condemned solitary confinement of children under the age of 18 as a categorical matter, recognizing that they are particularly vulnerable to the adverse psychiatric consequences of such confinement.

15

50.     The American Academy of Child and Adolescent Psychiatry opposes the use of punitive solitary confinement for juveniles in correctional facilities, recognizing the heinous nature of solitary relevant to adolescents' developmental vulnerabilities and that the majority of suicides in juvenile correctional facilities occur when the individual is isolated or in solitary confinement. (Exhibit D.)

51.     The National Commission on Correctional Health Care, a major accrediting agency, takes the position that juveniles should be excluded from solitary confinement. (Exhibit E).

52.     The American Medical Association has called for correctional facilities to halt the isolation of juveniles in solitary confinement for disciplinary purposes. (A true and correct copy of this statement is attached as Exhibit F.) The American Psychiatric Association has supported this position statement.

53.     The United Nations Rules for the Protection of Juveniles Deprived of their Liberty, which was approved by the general assembly in December of 1990 and supported by the United States, specifically prohibit the solitary confinement of juvenile offenders. (A true and correct copy of the rules is attached as Exhibit G.)

54.     World Health Organization has recognized that the UN and other international treaties call for a complete ban on solitary confinement for juveniles and young people, noting the particular vulnerabilities of children, who are developing physically, mentally and socially, and the high rates of mental illness and suicide amongst young people.

## IV.  THE SHERIFF'S OFFICE'S USE OF SOLITARY CONFINEMENT IS COUNTERPRODUCTIVE TO SAFETY.

55.    Based on my 23 years of academic and professional experience, experience of serving as a federal monitor of correctional facilities in Illinois and Arizona, review of academic research, and interviews of the juveniles at the Justice Center, my opinion is that the use of solitary confinement at the Justice Center is counterproductive to safety.

56.    Solitary confinement inhibits juveniles' ability to cope with stressful situations and leaves them angrier and more disturbed, and therefore leads to more misbehavior and rules infractions. At least half of the children that I evaluated were expressing increased anger, aggression, depression, anxiety, and vindictiveness correlated to being in solitary confinement. The juveniles feel victimized by being placed in solitary confinement and this leads to an increased desire for retribution. A more appropriate way of handling misbehavior in juveniles is through the engagement of appropriate de-escalation techniques, mental health interventions, and clear structures for imposing discipline.

## V.  THE SHERIFF'S OFFICE'S USE OF SOLITARY CONFINEMENT DEPRIVES JUVENILES WITH DISABILITIES OF THEIR SPECIAL EDUCATION AND SERVICES.

57.    Based on research over the years cited in Exhibit C, 60 to 70 percent of juveniles within detention facilities have an underlying mental illness. In association with significant mental health issues, these juveniles will also have underlying learning disabilities and other educational struggles. As a result, a large percentage of juveniles will have special education interventions and IEPs prior to placement into correctional facilities.

58.    Consistent with this, at least half of the ten juveniles who I interviewed described having a history of special education needs for years. These juveniles, including named Plaintiffs

R.C. and F.K., were eligible for special education services based on Specific Learning Disability (SLD), Emotional Disturbance (ED), or Other Health Impaired (OHI). Three of the juveniles, including F.K., had such significant learning disabilities that they could not comprehend the questions on the Beck Depression Inventory; I needed to read most, if not all, of the questions to them. F.K.'s testing results from 2013 show that he was at second-grade reading level at the time.

59.     Based on my conversation with the juveniles, it appears that the Sherriff's Office and the Syracuse City School District do not assess a child's special education eligibility and only conduct a screening test to allow the juveniles to study for a GED exam. This is not a reasonable assessment of a child's special education eligibility or special education needs.

60.     Not one of the juveniles I interviewed reported ever being notified of or attending any type of meeting at the Justice Center regarding special education services, including any meeting that could be characterized as a manifestation determination review related to their not being able to attend educational programming as a result of behavior that placed them in solitary confinement. None of the juveniles were aware of any actions taken by the facility to review and implement their IEPs.

61.     When the juveniles are in solitary confinement, they are not permitted to attend any educational programming. Instead, they are at most given a packet of worksheets ("cell packets") to review by themselves in their cell. My understanding based on my interviews of the juveniles is that, for juveniles in isolation, they are not reviewed or explained by a teacher.

62.     I reviewed several of these cell packets. They were photocopied worksheets, including chapters that appeared to be from a GED workbook. They were not individualized to the needs of each student or set up for students receiving special education services.

18

63.     It is my opinion that the policy and practice of leaving these cell packets with the juveniles in solitary confinement, without providing any instruction or assistance, will not comply with any reasonably and adequately written IEP of students with SLD, ED, or OHI secondary to ADHD. These students need specialized instruction and accommodations in order to access education. For example, about half of the juveniles I met with at the Justice Center had a clear diagnosis of ADHD. Because ADHD affects attention, hyperactivity, and impulsivity, one major IEP modification for children with ADHD is to break up large assignments into smaller parts. Handing a child with ADHD a bundle of worksheets does not serve to make education more accessible to him or her. In addition, these packets do not make education more accessible to those students who, as I described above, have significant difficulties with reading. These cell packets hardly count as education, much less special education.

I certify under penalty of perjury that the foregoing is true and correct.

Dated: September 19, 2016
      Chicago, Illinois

Louis J. Kraus, MD
Chief, Child and Adolescent
Psychiatry
Rush University Medical Center

20

## EXHIBIT A

### LOUIS JAMES KRAUS, M.D., DFAPA, FAACAP
Woman's Board Professor of Child and Adolescent Psychiatry
Chief, Section of Child and Adolescent Psychiatry
Rush University Medical Center

910 Skokie Boulevard, Suite 230
Northbrook, IL 60062
Office Telephone: (847) 559-0560
Cell: (847) 217-7755
Email: rkraus9@mac.com

**PERSONAL DATA:**

Louis James Kraus, MD
DOB:  12-3-1960 USA

**EDUCATION:**

| | |
|---|---|
| 1987 | M.D., University of Health Sciences, The Chicago Medical School |
| 1983 | B.S., Syracuse University |

**POSTGRADUATE TRAINING:**

| | |
|---|---|
| 7/1/92-6/30/94 | Child and Adolescent Psychiatry Fellow, The University of Chicago, Chicago, Illinois |
| 10/1/88-6/30/92 | Psychiatry Resident, Northwestern University, Chicago, Illinois |
| 7/1/91-12/31/91 | Chief Resident, Psychiatry, Northwestern University, Chicago, Illinois |
| 7/1/87-6/30/88 | Surgical Intern, Boston University, Boston, Massachusetts |

**ACADEMIC APPOINTMENTS:**

| | |
|---|---|
| July 2016 - Present | Professor of Clinical Psychiatry, Rush University Medical Center |
| July 2003 – June 2016 | Associate Professor of Clinical Psychiatry, Rush University Medical Center |
| March 2001 – 2002 | Visiting Associate Professor of Psychiatry, University of Illinois at Chicago |
| July 2001 – 2002 | Assistant Professor of Psychiatry, Northwestern University |
| November 1997 – July 2001 | Clinical Instructor, Dept. of Psychiatry, Northwestern University |

1

| July 1994 – August 1997 | Director of Child and Adolescent Forensic Psychiatry, University of Chicago |
|---|---|

**BOARD CERTIFICATION:**

| May, 2015 | Maintenance of Certification in Child and Adolescent Psychiatry, by The American Board of Psychiatry and Neurology, Certification No. 3956 |
|---|---|
| June, 1999 | Board Certified in Forensic Psychiatry, by the American Board of Psychiatry and Neurology, Certification No. 1079 |
| October, 1995 | Board certified in Child and Adolescent Psychiatry, by The American Board of Psychiatry and Neurology, Certification No. 3956 |
| December, 1993 | Board certified in General Psychiatry, by The American Board of Psychiatry and Neurology, Certification No. 38252 |

**LICENSE:**

| State of Illinois | No. 036-079584 | Expires: 09/31/2017 |
|---|---|---|
| State of Florida | No. ME 83084 | Expires: 01/31/2017 |
| State of Arizona | No. 33456 | Expires: 04/04/2017 |

**HONORS AND AWARDS:**
- Child and Adolescent Psychiatry, Award: "Scholarship and Perseverance in the Creation of our Practice Parameter for Child and Adolescent Forensic Evaluations", 58th Annual Meeting, Toronto, Canada, October 2011.
- Fellow, American Academy of Child and Adolescent Psychiatry (2006)
- Distinguished Fellow, American Psychiatric Association (2004)
- Woman's Board Professor of Child and Adolescent Psychiatry, Rush University Medical Center (2004)
- AMA Glaxo Welcome Emerging Leaders Development Program (1998)
- Top Doctor – 1997 - 2001
- Resident Fellowship of The American Psychoanalytic Association (1992)
- Laughlin Fellow, Northwestern University (1991)
- Magna Cum Laude, Syracuse University
- Phi Beta Kappa Honor Society
- Honors Program in Biology, Syracuse University

**PROFESSIONAL SOCIETY MEMBERSHIPS**
American Academy of Psychiatry and the Law
Illinois Society of Child and Adolescent Psychiatry
American Psychiatric Association
American Academy of Child and Adolescent Psychiatry
American Medical Association
Illinois State Medical Society
Chicago Medical Society
Illinois Psychiatric Association

**TEACHING EXPERIENCE:**

| | |
|---|---|
| May 2008 – Present | American Psychiatric Association Mentor for psychiatric residents through the Council on Children, Adolescents and Their Families |
| July 2006 – Present | Supervise Rush child and adolescent psychiatry fellows at the Sonia Shankman Orthogenic School (a residential school) |
| July 2002 – Present | Supervise general residents and child and adolescent fellows at Rush University Medical Center |
| July 2002 – Present | Developed forensic rotation at Rush University Medical Center for child and adolescent fellows allowing them to observe forensic evaluations in court, and the Cook County Juvenile Pre-Detention Facility |
| July 2002 – Present | Develop school consult didactics as well as didactics dealing with Autism; Supervise Rush University Medical Center's child and adolescent fellows in their school Autism rotation at the Chicago Metropolitan Easter Seals Therapeutic Day Schools |
| July 2002 - Present | Develop and teach the child and adolescent forensic psychiatry course for child and adolescent psychiatry fellows at University of Illinois at Chicago and Rush University Medical Center |
| July 2002 - Present | Teach and supervise medical students in clinical rotations through child and adolescent psychiatry at Rush University Medical Center |
| March 2001 – July 2002 | Supervise and lecture residents at University of Illinois |
| August 1997 – March 2001 | Teaching and lecturing to general psychiatry residents at Northwestern University |
| August, 1997 – March 2001 | Supervise child and adolescent psychiatry residents and general psychiatry residents at Northwestern University |
| August 1994 – 1997 | Provide child and adolescent forensic psychiatry course offered to residents and fellows at the University of Chicago |
| August 1993 – 1997 | Supervise child and adolescent psychiatry fellows, psychiatry residents and psychology trainees at the University of Chicago |
| July 1991- July  1992 | Supervise psychiatry residents at Northwestern University |

**ELECTED POSITIONS:**

| | |
|---|---|
| June 2016 – Present | Delegate for AACAP to AMA |
| June 2015 – June 2016 | Chair, Council on Science and Public Health, AMA |

| | |
|---|---|
| June, 2014 – 2015 | Chair Elect, Council on Science and Public Health, AMA |
| 2011 – 2013 | Chair, AACAP Assembly |
| 2011 – 2013 | AACAP Executive Committee |
| 2008 – June 2016 | AMA Council of Science and Public Health |
| 2009 – 2011 | Vice-Chair, AACAP Assembly |
| 2007 – 2009 | Treasurer |
| 2007 – 2013 | AACAP Council |
| 2002 – 2004 | AACAP Assembly Representative to the Executive Committee |

**REVIEWER:**
Guest Reviewer – Journal of The American Academy of Child and Adolescent Psychiatry

**TRAINEES AND MENTOREES:**

| | |
|---|---|
| 2005 – Present | Ongoing Mentoring for AACAP and APA Mentor Programs |
| 2005 – 2007 (Jada Johnson, MD) | Vice Chair, Psychiatry, Illinois Masonic Hospital |
| 2002 – 2004 (Shiraz Butt, MD) | Medical Director, Maryville Academy |
| 1998 – 2000 (Lucyna Puszkarska, MD) | Medical Director, River Edge Hospital |
| 1997 – 1999 (Joseph McNally, MD) | Medical Director, Streamwood Hospital |

**PROFESSIONAL SOCIETY APPOINTMENTS**

| | |
|---|---|
| May 2015 – Present | American Psychiatric Foundation (APF BOD), Board of Directors |
| June 2014 – Present | Chair Elect – Council on Science and Public Health (CSPH), American Medical Association |
| 2014 - Present | CMS District 1, Delegate to 2014 Illinois House of Delegates |
| May 2012 – Present | Chair – Council on Children, Adolescents and Their Families, American Psychiatric Association |
| May 2012 – May 2014 | Chicago Medical Society, District 1 Councilor |
| May 2012 – May 2013 | Chicago Medical Society District 1, Alternate Delegate to Illinois 2013 House of Delegates |
| November 2010 – June 2011 | APA Task Force on Prevention of Bullying. |
| 2009 – Present | APA Political Action Committee (PAC) Board |
| October 2000 – October 2015 | AACAP Committee on Juvenile Justice Reform |
| April 2008 – 2009 | Member APA Council on Children, Adolescents and Their Families. |
| 2008 – Present | AACAP Delegate to AMA House of Delegates |

4

| | |
|---|---|
| May 2007 – Present | Member – Council on Children, Adolescents and Their Families, American Psychiatric Association |
| September 2001 – Present | Co-chairman of the AACAP committee on Juvenile Justice Reform. |
| May 2001 – 2010 | Chairman of the American Psychiatric Association Committee on Juvenile Justice Issues |
| December 2000 - 2007 | AACAP Alternate Delegate to the AMA House of Delegates 2007 |
| June 2000 – June 2002 | President, Illinois Council of Child & Adolescent Psychiatry |
| December 1999 – December 2000 | AACAP Delegate for Young Physicians to the AMA |
| November 1999 - 2001 | Evanston Northwestern Healthcare Child Protection Committee |
| September 1999 – March 2001 | Member, Evanston Mental Health Board, Substance Abuse Task Force |
| June 1999 – 2001 | Member, AMA Advisory Board on Alcohol Intervention Project for Youth |
| January 1999 – January 2003 | Chairman, National Commission on Correctional Health Care, Committee on Juvenile Health Care |
| 1998- 2010 | Member of the American Psychiatric Association Committee on Juvenile Justice Issues |
| October 1998 – Present | Delegate, for The Illinois Council of Child and Adolescent Psychiatry to American Academy of Child and Adolescent Psychiatry  (AACAP) |
| September 1998 – 2000 | Clinical Advisor, Chicago Metropolitan Child and Adolescent Comprehensive Community Services Systems Network Advisory Council |
| April 1998 – December 1998 | Vice Chairman, National Commission on Correctional Health Care, Committee on Juvenile Health Care |
| April 1998 – December 1998 | Vice Chairman, National Commission on Correctional Health Care, Task Force for Revision of the NCCHC Standards for Health Services in Juvenile Detention and Confinement Facilities |
| June 1997 – January 1999 | Chairperson of AACAP Committee for New Physicians |
| June 1997 – January 2003 | Board of Directors, National Commission on Correctional Health Care |
| January 1997 – July 2000 | Program Chairman, Illinois Council for Child and Adolescent Psychiatry |

5

| | |
|---|---|
| July 1995 – July 1996 | Program Chairman for Chicago Society for Adolescent Psychiatry |
| September 1994 – October 1999 | AACAP Committee on Foster and Adoptive Families |
| March 1994 – December 1996 | AACAP Alternate Delegate for Young Physicians to the AMA |

**CONSULTING POSITIONS**

| | |
|---|---|
| January 2013-Present | Federal Consent Decree appointment, Assessment and restructuring of the mental health programming for the Illinois Department of Juvenile Justice (IDJJ) under a Consent Decree filed with the Attorney General's Office by the American Civil Liberties Union (ACLU) of Illinois in December 2012 (RJ v. Bishop) |
| February 2006 – Present | Consultant to the ACLU |
| May 2003 – 2008 | Consultant, United States Department of Juvenile Justice, Civil Rights Division |
| March 2001 – June 2002 | Director, Child and Adolescent Forensic Psychiatry, University of Illinois at Chicago |
| 1993 – Present | Forensic testimony in Juvenile Court (abuse/neglect & delinquency), Family Court focusing on custody and expert testimony in other state and federal cases. Previously worked as an Expert for the Cook County Public Guardian's Office and DCFS. |
| September 1992-1993 | Psychiatrist Chairperson of the Physician Review Board for the City of Chicago, Department of Mental Health – 1992 |
| 1992 - Present | Expert testimony in juvenile and domestic relations courts in a variety of cases ranging from transfer hearings, abuse including Munchausen by Proxy, Child Advocacy Focusing on Custody and "Best Interest" of the Child |
| April 1990 – June 1999 | Psychiatric Consultant to Illinois Youth Center, Joliet, Illinois; General Population and the Intensive Reintegration Unit |
| January 1990 - 1992 | City of Chicago, South East Community Mental Health Center |

**ADMINISTRATIVE SERVICES:**

| | |
|---|---|
| 2011 - Present | Development of the Autism Assessment, Research, Treatment and Services (AARTS) Center at Rush University Medical Center |
| 2006 - Present | Director of the Sonia Shankman Orthogenic School and Rush University Medical Center's clinical rotation for child and adolescent psychiatry fellows at Rush |

6

| | |
|---|---|
| 2006 – Present | Director of Psychiatric Services, Sonia Shankman Orthogenic School |
| 2002 – Present | Chief of Child and Adolescent Psychiatry, Rush University Medical Center |
| 1999 – Present | Medical Director of the Chicago Metropolitan Easter Seals Therapeutic Schools |

**CLINICAL SERVICE:**

| | |
|---|---|
| 2012 - Present | Director, Autism Assessment, Research, Treatment and Services Center at Rush University Medical Center |
| July 2005 – Present | Psychiatric Director Sonia Shankman Orthogenic School at Chicago |
| June 2005 – Present | Psychiatric Consultant to New Trier, Niles North and Niles West High Schools |
| February 2000 – June 2001 | Director, Child and Adolescent and Forensic Psychiatry, University of Illinois at Chicago |
| January 1999 – present | Medical Director, Chicago Metropolitan Easter Seals Therapeutic School |
| September 1998 – Present | Psychiatric Consultant to Evanston Township High School |
| August 1997 – February 2000 | Division Head of Child/Adolescent Psychiatry, Evanston Northwestern Healthcare |
| May 1997 – June 1999 | Psychiatric Consultant to Youth Campus (A DCFS contracting agency) |
| September 1992 – May 1993 | Psychiatrist Chairperson of the Physician Review Board for the City of Chicago, Department of Mental Health – 1992 |
| July 1994 – August 1997 | Assistant Director of Child and Adolescent Inpatient Services, University of Chicago |

**MEDIA**
1. October 26, 1994, Chicago Sun Times, TV-Violence Line Elusive.
2. November 6, 1994, Chicago Tribune, "Mental health tests for kids spark debate;" Screening: Testing would help parents, supporters say.
3. November 19, 1994, Chicago Tribune, Try Sandifer suspect as kid, experts say.  Louis Kraus testified, "Derrick Hardaway suffers from a *conduct disorder* that developed in his early adolescence because of family tensions, physical abuse and other problems."
4. February 25, 1997, Chicago Tribune, Leniency sought for teen convicted of killing Sandifer.
5. March 13, 1997, Chicago Tribune, Return girl slowly to mom, psychiatrist say.
6. March 30, 1997, Chicago Tribune, Student-Teacher contact is becoming a danger zone. Kraus was

quoted to say, "The students are drawn into the relationship because they idolize their teacher and often don't see anything wrong until much later. At that point they might feel depressed and used and have trouble forming relationships."

7. March 25, 1998, Chicago Tribune, 4 pupils, teacher die in schoolyard ambush.
8. March 25, 1998, Chicago Sun Times, Kids ambush kids; Shooting stuns school.
9. March 29, 1998, Violence is linked to genetics, early abuses that set patterns
10. April 6, 1998, Chicago Tribune, Teen smokers a pack short of a carton in wisdom department.
11. June 3, 1998, Toronto, Canada, American Psychiatric Association, The Daily Bulletin, Presidential Sessions on "A Time of Violence."
12. June 1998, Chicago Parenting, "Keeping rage from turning into tragedy."
13. August 14, 1998, Chicago Sun Times, Making Sense of kids' case.
14. August 14, 1998, Chicago Tribune, Young suspects sent home. Dr. Kraus testament was paramount in the 7-year-old being allowed to go home with his family.
15. Possley, M. and Puente, T., "Young Suspects Sent Home", Chicago Tribune, August 14, 1998
16. Kotlowitz, A., "The Unprotected", The New Yorker. February 8, 1999
17. March 7, 1999, Chicago Tribune, Aftermath an ordeal for parents, kids.
18. November 11, 1999, Northwest Herald, Boy who shot clerk sentenced.
19. February 23, 2000, Tribune Allied Health, Safety nets for teens.
20. April 9, 2000, Chicago Tribute, School provides unique antidote for depression.
21. January 30, 2001, Chicago Tribune, Files in Ryan Harris case shed new light. Disclosure of the results of the psychiatric interview changed interview process of minors.
22. December 7, 2001, Psychiatric News, AACAP Kraus was quoted "We certainly disagree with the Supreme Court ruling and believe the death penalty constitutes cruel and unusual punishment."
23. July 9, 2002, Psychiatric News, AMA Vows to Prevent Future Psychologist Prescribing Laws.
24. April 4, 2003, Study Questions Youths' Ability to Understand Trial Process, *Study Implications*.
25. July 18, 2003, Psychiatric News, Psychiatrist Wins AMA Leadership Post: *Psychiatry Scores in HOD*. Kraus argued successfully in favor of an amendment to a resolution asking that the AMA support comprehensive health education for female delinquent, including information on responsible sexual behavior and the prevention of sexually transmitted diseases and HIV/AIDS." Kraus also testified, "Medicaid reaches 44 million Americans, more than Medicare or any other form of health insurance and covers Americans who are among the poorest and most disadvantaged populations in the country."
26. February 13, 2004, Chicago, Metro North Shore, Abuse of cold medicine rising.
27. Tresniowski, A. Hewitt, B., "Escape from Hell", People Magazine. September 25, 2006
28. Reuters, "Experts say video games not an addiction in AMA Meeting", June 25, 2007
29. Neergaard, L. "Easy nondrug helps ADHD Kids", USA Today. September 3, 2007
30. Tanner, L. "Shock Treatment Sought for Autistic Man", USA Today. September 3, 2007
31. Reuters, "Antidepressant warnings scared parents, doctors", September 9, 2007
32. Fox News, "Study: Brains of ADHD Children Develop More Slowly than Brains of other Youngsters", November 13, 2007
33. Bynum, R., Stobbe, M., "Experts Dubious of Ga. 3rd- Grader Plot", Associated Press. April 2, 2008
34. October 31, 2008, The Wall Street Journal, Therapy, Antidepressants Ease Anxiety in Children.
35. Tanner, L., "Kids with ADHD on meds test better than peers", Associated Press. April 27, 2009
36. Tanner, L., "Jackson kids face hurdles coping with his death, universal trauma of losing a parent may be eased if stability can be offered", Associated Press. July 5, 2009
37. Fox News, "Psychiatrists say Blagojevich's choice to have daughters join him at court may be stressful", July 7, 2010
38. FOX – Judge Jeanine, "8-year Old Boy's Commitment to a Psychiatric Ward", February 19, 2011

39. CNN, Anderson Cooper 360, "KTH: Mass. School called 'house of horrors', May 24, 2012,
40. Fox News Chicago, "Beauty may no longer be in the eye of the beholder", May 10, 2012
41. CNN, Anderson Cooper 360, "Anderson Cooper Investigates Shocking RTC Treatment", June 4, 2012
42. Moran, M. "More research needed on SSRI's for treating Autism Disorders", Psychiatric News. Volume 47, Number 11. June 11, 2012
43. CNN, Anderson Cooper 360, "Crime and Punishment, The Sandusky Trial", June 12, 2012
44. NBC News Chicago, "How to Talk to Your Kids about Conn. Shooting", December 14, 2012
45. Niedowski, E., Tanner, L. "How to Talk to Your Kids about Conn. Shooting", Associated Press. December 15, 2012
46. CNN, Anderson Cooper 360, "Former Child Hostage Describes Captivity Underground", February 4, 2013
47. Fox News Chicago, "Violence has long term effects on children", August 12, 2013
48. England, C. "Helping young adults make the transition", Chicago Medicine Magazine, September 2013
49. Schmadeke, S., "State's youth prison system violates inmates' rights, experts say", Chicago Tribune. September 25, 2013
50. NBC News, "Black Box warning on antidepressants raised suicide attempt", July 18, 2014
51. FOX News, "How far should we go to discipline our kids", September 2014
52. FOX News, "Could a self-esteem booster turn your child into a narcissist?", March 2015
53. Al Jazeera America, "US Only Nation to Imprison Kids for Life," March 2015

## SCIENTIFIC ACTIVITIES
### a)  Grants:

| | |
|---|---|
| 2011-Present | Effects of memantine vs. placebo on motor planning and memory in children with autism spectrum disorders. $74,176 |
| 2010 | Rush Women's Board, Assessment of prevalence of Bipolar Disorder in adolescent population in a residential placement, $30,000 |
| April, 1999 | Department of Human Service, State of Illinois Grant – Bridges Program for Development of School and Home-based Therapeutic Services for Adolescents, $100,000 per year |
| March, 1998 | Evanston Northwestern Healthcare Auxiliary Grant for Development Of a Community-based Adolescent Mental Health and Substance Abuse Program, $1,000,000 |

### b)  Research

| | |
|---|---|
| 2011 – Present | Development of Research Program at the Rush AARTS Center |
| 1984 - 1986 | Research under direction of Max Harry Weil, Ph.D., Chairman, Department of Medicine, University of Health Sciences, The Chicago Medical School, on the reversal of academia during cardiopulmonary resuscitation |
| 1999 – 2001 | Outcomes research focusing on adolescent dual diagnosis; early diagnosis and intervention in a community based treatment program. |

### c)  Poster Presentations

Grunewald, S., Kraus, L., Youngkin, S., Wade, K. H., Forburger, N.,

9

Owley, T., Loftin, R., Fogg, L. & Soorya, L. (May 2014). *Access to care: Familial and racial variables associated with limited service access for individuals with ASD.* Poster presented at 2014 Annual International Meeting for Autism Research (IMFAR). Atlanta, GA.

Poster Presentation:  APA Meeting, Washington, DC "Monitoring Resident Supervision in Times of Change," May, 1992.

## SCHOLARSHIP

a) *Books and Chapters*

1. Thomas, C.R., Kraus, L.J. "Public Policy Implications of Research on Aggression and Antisocial Behavior", The Origins of Antisocial Behavior.  Oxford University Press, 2012.
2. Galatzer-Levy, R., Kraus, L., Galatzer-Levy, J., The Scientific Basis of Child Custody Decisions. **Cambridge Press**, 2009.
3. Kessler, C., Kraus, L, The Mental Health Needs of Young Offenders. **Cambridge Press**, 2007.
4. Geraghty, R., Kraus, L, Fink, P, "Assessing children's competence to stand trial and to waive Miranda rights: new directions for legal and medical decision-making in juvenile courts" in The Mental Health Needs of Young Offenders. **Cambridge Press**, 2007,
5. Kraus L, Sobel, H, "Post-adjudicatory assessment of youth" in The Mental Health Needs of Young Offenders. **Cambridge Press**, 2007.
6. Galatzer-Levy, R., Kraus, L.J., eds, The Scientific Study of Child Custody Decisions, **Wiley Press,** 1999.
7. Kraus, L, "Understanding the Relationship between Children and Caregivers" in The Scientific Basis of Child Custody Decisions, **Wiley Press**, Ed. Galatzer-Levy R. and Kraus, L 1999.
8. Leventhal, B. Kelman, J., Galatzer-Levy, R., Kraus, L., "Divorce, Custody, and Visitation in Mid-Childhood" in The Scientific Basis of Child Custody Decisions, **Wiley Press,** Ed. Galatzer-Levy R. and Kraus, L 1999.

b) *Peer Reviewed Publications*

1. 1988 Practice Parameter for "Child and Adolescent Forensic Evaluations", Kraus, L, JAACAP, Vol 50, No.12, Dec. 2011 pp1299-1312.
2. Geraghty, T.F., Kraus, L, "Treating the Mentally-Ill Offender: The Challenge of Creating an Effective, Safe and Just System," **The Journal of Criminal Law and Criminology**, Northwestern University School of Law 89 (1) Fall, 1998.
3. von Planta, M., Gluldipati, R., Weil, M.H., Kraus, L.J., Rackow, E., "Bicarbonate and Tromethamine (Tham) Buffers Fail to Improve Resuscitability During Porcine C.P.R.," **Federation Proceedings 46** (4), 1145, 1987
4. von Planta, M, Gudipati, R., Weil, M.H., Kraus, L.J., Rackow, E., "Effects of Tromethamine and Sodium Bicarbonate Buffers During Cardiac Resuscitation," **Journal of Clinical Pharmacology 28,** 594-599, 1987

c) *Other Publications*

1. Kraus, L., Arroyo, W. "Recommendations for Juvenile Justice Reform, Second Edition", American Academy of Child and Adolescent Psychiatry Committee on Juvenile Justice Reform. October 2005.
2. Kraus, L, Arroyo, W. Editors, "Recommendations for Juvenile Justice Reform", **Monograph**, October 2001, American Academy Child and Adolescent Psychiatry.

3. Kraus, L. "Standards for Juvenile Detention and Confinement Facilities", Recommendations for Juvenile Justice Reform, **Monograph**, October 2001.
4. Kraus, L. "Females in the Juvenile Justice System", Recommendations for Juvenile Justice Reform, **Monograph**, October 2001.
5. Kraus, L, Morris R. "Seclusion and Restraint Standards in Juvenile Corrections", Recommendations for Juvenile Justice Reform, **Monograph**, October 2001.
6. Kraus, L, "Tackling Juvenile Justice," **AACAP News**, Volume 31, Issue 2, March/April, 2000, pp. 75-76.

**PRESENTATIONS:**

Keynote Speaker, Eugene J-M.A. Thonar, PhD, Award Presentation, Rush University Medical Center, October 14, 2014

Grand Rounds, Rush University Medical Center, "Psychiatric Malpractice: Dos and Don'ts." May 21, 2014

**Chair,** AACAP Douglas B. Hansen, MD 39th Annual Review Course in Child and Adolescent Psychiatry, *Child and Adolescent Forensic Psychiatry*, Westin Chicago River North, Chicago, IL, March 22-23, 2014.

Autism, Behavioral Challenges and Complex Medical Needs (ABC) Conference, "Making Systems Work Across the Lifespan for Children with Special Needs," *Treatment and Advocacy for the Autistic Teen as they Transition into Adulthood*, Kraus, LJ, Palos Hills, IL November 22, 2013.
Illinois State Board of Education, Kraus, LJ,. **Keynote Speaker**, "The Complexity of Diagnosis and Behavior of Students Placed Residentially." November 7, 2013.

Illinois State Board of Education, Kraus, LJ,. "Juvenile Justice, Social Maladjustment and Associated Mental Health Disorder: How do we educate this difficult population and what do we do when they get out?" November 7, 2013.

7th Congress of Asian Society for Child and Adolescent Psychiatry & Allied Professions and 12th Biennial Conference of Indian Association for Child and Adolescent Mental Health; Kraus, LJ., **Chair,** "Cyberage and Child Mental Health." September 26, 2013, New Delhi, India.

12th Biennial Conference of Indian Association for Child and Adolescent Mental Health; Kraus, LJ., **Chair,** "Role in the Changing Landscape of Child and Adolescent Psychiatry and Mental Health," September 25, 2013, New Delhi, India.

12th Biennial Conference of Indian Association for Child and Adolescent Mental Health, Kraus, LJ., "DSM-V: Implications for Child and Adolescent Psychiatry," September 25, 2013, New Delhi, India.

Illinois Institute for Continuing Legal Education, IIT Chicago-Kent College of Law, "Cutting Edge Child Custody Symposium", *Professional Training and Requirements*, June 21, 2013.

Illinois Institute for Continuing Legal Education, IIT Chicago-Kent College of Law, "Cutting Edge Child Custody Symposium," *Point and Counterpoint: Adoption of Custody Evaluation Standards*, June 21, 2013.

American Psychiatric Association (APA) Annual Meeting Workshop; "A Career in Child and Adolescent Psychiatry: From a Developmental Perspective." San Francisco, CA May 22, 2013.

Office of Juvenile Justice and Delinquency Prevention in Collaboration with the National Center for Youth in Custody "The Impact of Isolation Practices in Confinement Facilities," National Webinar, April 3, 2013.

19th Judicial Circuit Child Representative/Guardian ad Litem Training, "Psychology of Child Development and Age Appropriate Visitation." College of Lake County, Grayslake, Illinois, September 12, 2012.

Abraxas Education Forums; "The Role of Child and Adolescent Psychiatry in Public and Private Special Education." Woodridge, IL March 30, 2012.

Learning Disabilities Association of America, 49th International Conference, "Dissecting a Bully: Interventions for the Bullied." February 22-25, 2012, Chicago, IL.

APA Annual Meeting, "Wayward Youth Revisited", May 17, 2011, Honolulu, Hawaii.

APA Annual Meeting, "Teen Bullying", May 17, 2011, Honolulu, Hawaii.

ISBA Chicago Regional Meeting (Effective Advocacy for Juveniles with Mental Health Needs) "Diagnosis and Treatment of Mental Health in the Juvenile Justice System", May 11, 2011.

American Academy of Child and Adolescent Psychiatry (AACAP) 57th Annual Meeting, "Variations in State Decisions on Custody" October 29, 2010, NY, NY.

AACAP 57th Annual Meeting, "Role of the Expert in Child & Adolescent Psychiatry Malpractice " October 29, 2010, NY, NY.

AACAP 57th Annual Meeting, "Advocacy for Children with Autism: How to Find the Right Services" October 29, 2010, NY, NY.

ISBA Family Law Section, Springfield, IL. "Custody Evaluations When Children Have Major Psychiatric Disorders", October15, 2010.

ISBA Family Law Section, Chicago, IL. "Custody Evaluations When Children Have Major Psychiatric Disorders", September 23, 2010.

DePaul University College of Law, "Juvenile Competency to Stand Trial and Understand Miranda", April 11, 2009.

Illinois State Bar Association (ISBA) and the Committee on Continuing Legal Education, Attorney Education in Child Custody and Visitation Matters, "Factoring a Child's Development into Custody and Visitation" November 21, 2008.

AACAP Members Forum, Practice Parameter for Child and Adolescent Forensic Evaluations, October 31, 2008.

55th Annual AACAP Meeting Chicago, "The Role of the Child Psychiatrist in Juvenile Competency" October 30, 2008.

Rush University Medical Center, Department of Pediatrics Grand Rounds, "Perspectives on Delinquency, Past and Present", August 12, 2008.

American Medical Association (AMA), "How has science impacted juvenile justice regarding competency, waiver hearings, adjudications, dispositions, and treatment (psychopharmacology)". Annual Meeting, Washington DC, July 2008.

Spring Midwest American Academy of Psychiatry and the Law (AAPL) Meeting, Chicago, IL, "Juvenile Competency to Stand Trial and Understand Miranda," Louis J. Kraus, MD, April 21, 2007.

National APA Meeting in San Diego, "Workshop on Juvenile Justice Presentation on Child Competency to Stand Trial and Understand Miranda. May 2007.

53rd Annual American Academy of Child & Adolescent Psychiatry, San Diego, CA, "The Psychiatrist's Role in Child Custody: A Mock Hearing," Louis J. Kraus, MD, October 28, 2006.

Rush University Medical Center, Department of Psychiatry Grand Rounds, "Capital Punishment for Teenagers – The Recent Supreme Court Decision Roper v Simmons: Discussion and Forensic Application of Current Neuroimaging Research on Teenagers ", April 20, 2005.

Cambridge Hospital, Department of Psychiatry Grand Rounds, "Juvenile Delinquency", September 2004

AACAP National Meeting, San Francisco – Symposium – "Addressing the Needs of Behavior Disordered Children Within the School System", San Francisco, CA, October 25, 2002.

University of Chicago – Workshop "Early Onset Bipolar Disorder", December 14, 2001.

Juvenile Justice Reform – Media Workshop, National AACAP meeting, Honolulu, Hawaii, October 2001.

Hephzibah Children's Association – Workshop "Child and Adolescent Psychiatric Diagnoses and Medications" September 28, 2001

A&E Television Broadcast on "Shattered Innocence - Fells Acres Abuse Case", August 8, 2001

15th Annual Statewide Forensic Conference, October 16-17, 2000 Loyola University Chicago, Illinois Department of Human Services

Speaking engagements at parent groups, managed care meetings, University of Chicago, the Department of Corrections and Probation

Media interviews on television, radio and in newspapers and various publications.

American Psychiatric Association – "Littleton – One Year Later, The Assessment of the Potentially Violent Child Within The School System," May 15, 2000.

Institute of Psychoanalysis, Conference on Youth and Violence, "Diagnosis and Treatment of Delinquents in a Maximum Security Youth Center,"  May 12, 2000

Evanston Northwestern Healthcare – Pediatric Grand Rounds,  "Connections Program – Development of a Community-Based Adolescent Alcohol and Drug Treatment Program," May 2, 2000.

Evanston Northwestern Healthcare – Pediatric Grand Rounds, "ADHD, Differential Diagnosis and Treatment" April 4, 2000.

New Trier High School – Peer Helping, "Adolescent Youth Violence," March 2, 2000.

Response Center, Skokie, IL, "Adolescent School Violence," February 16, 2000.

Chicago Bar Association Matrimonial Law Committee, "Physical, Mental and Emotional Abuse in Custody Cases," February 14, 2000.

Cook County Public Guardian's Office, "Domestic Violence and How It Affects Children," January 31, 2000.

Illinois Psychological Association, "Assessment of Violence in Children and Adolescents, November 11, 1999.

New Trier Township, "School Violence - Treatment and Community Intervention," May 12, 1999.
Shand Morahan Worksite Lunch Program, "Signs of ADD/ADHD and Possible Treatment," April 21, 1999.

Evanston Northwestern Healthcare Health watch Program, "Childhood Attention Deficit Disorder: Treatment Options," April 7, 1999.

Evanston Northwestern Healthcare, Department of Psychiatry, Professional Conferences, "School Violence," April 6, 1999.

The Warren Wright Adolescent Center, Stone Institute of Psychiatry, Northwestern Memorial Hospital, "Violence in Schools," November 6, 1998.

Institute for Women's Health, Evanston Northwestern Healthcare "Helping Kids Cope with Divorce," October, 1998.

Illinois Society of Child and Adolescent Psychiatry, "Juvenile Transfer Hearings – The Psychiatric Evaluation," October, 1998.

APA Meeting, Toronto, Ontario, Canada, "Treatment of Severe Delinquents in a Maximum Security Youth Center," June, 1998.

Evanston Northwestern Healthcare Pediatric Lecture Series, "The Continuum of Behavior Disorders," April, 1998.

Evanston Northwestern Healthcare Department of Psychiatry, Professional Conferences, "Transfer Hearings in Juvenile Court: Evaluation of Behavior Disordered Youth," January, 1998.

Evanston Northwestern Healthcare Department of Psychiatry, Professional Conferences, "The Use of Attachment Theory in Custody Evaluations," January, 1998.

Juvenile Justice Division of the Circuit Court of Cook County, "Psychiatric Assessments in Juvenile Justice Cases," June, 1997.

Chicago Bar Association-Juvenile Law Committee, "Utilizing Psychiatric Evaluations In Juvenile Justice Cases:

Transfer And Dispositional Hearings," February, 1997.

Genesis Schools/Illinois Association of Counsel for Children, "Helping Incarcerated Youth Overcome Delinquency and Mental Illness," December, 1996.

University of Chicago, Laboratory School Lower School Parents Association Lecture Series, "Is My Child's Behavior Normal?" November, 1995.

CAUSES - Illinois Masonic Hospital, "Attachment Theory In The Use Of Bonding Evaluations," September, 1995.

Illinois Probation and Court Services 1995 Annual Spring Conference, "Kids Killing Kids," March, 1995.

Grand Rounds: Columbus Hospital Department of Pediatrics.  "Delinquency, Etiology and Intervention," July, 1994.

Cook County Juvenile Court, Office of the Public Guardian.  "Munchausen By Proxy," July, 1994.

Columbus Hospital, Department of Pediatrics Grand Rounds,  "Delinquency, Risk Factors, and Interventions," July, 1994.

International Correctional Education Association Conference, Chicago " Attention Deficit Hyperactivity Disorder," May, 1993.

The American Psychoanalytic Association National Conference, New York, "Attachment Theory - Forensic Implications for Best Interest of the Child," December, 1993.

Poster Presentation:  APA Meeting, Washington, DC "Monitoring Resident Supervision in Times of Change," May, 1992.

The University of Health Sciences, The Chicago Medical School, "Effects of Tham and NaHCO3 on Acid Base Balance During CPR," 1984.


**EXPERT TESTIMONY AT TRIAL OR BY DEPOSITION IN THE PREVIOUS FOUR YEARS:**

**2016**
*DePalo v. DePalo*, 14 D 1488 (Circuit Court, Cook County) (deposition).
*Rea v. Rea*, 14 D 9277 (Circuit Court, Cook County) (deposition).

**2015**
*Sworthout v. Robison*, 13 D 1542 (Circuit Court, Cook County) (deposition).
*Rubenstein v. Rubenstein*, 12 D 2303351 (Circuit Court, Cook County) (deposition).
*McKinley v. Doe*, 10 L 5691 (Circuit Court, Cook County) (deposition).
*Radassnau v. Radassnau* (215(a) evaluation), 13 D 182 (Circuit Court, Cook County) (deposition).

**2014**
*Dowd v. Strauss*, 08 D 10469 (Circuit Court, Cook County) (deposition, trial).

*Weinhouse v. Weinhouse*, 12 D 8800 (Circuit Court, Cook County) (trial).
*Miller v. Morgan*, ON L 143 (Circuit Court, Cook County) (deposition).
*Ring v. Ring*, 13 D 5580 (Circuit Court, Cook County) (deposition).
*Angel v. Segal*, 09 L 3496 (Circuit Court, Cook County) (deposition, trial).
*LaCrosse v. Veolia*, 12-CV-648 (State Court, Madison, Wisconsin) (deposition).

**2013**
*Burrows v. Burrows*, 10 D 7929 (Circuit Court, Cook County) (trial).
*Blakeslee v. Slade*, 10 D 9879 (Circuit Court, Cook County) (deposition, trial).
*Dukes v. Acadia*, 10 EV 011187C (Circuit Court, Cook County) (deposition).
*Angel v. Segal*, 09 L 3496 (Circuit Court, Cook County) (deposition).
*Sproston v. Gallee*, 12 D 11835 (Circuit Court, Cook County) (deposition).
*Bjork v. Beltran*, 09 L 83 (Circuit Court, Cook County) (deposition).
*Molina v. Morgan*, 07 L 009154 (Circuit Court, Cook County) (deposition).
*Rotter v. Rotter* (215(a) evaluation), 12 D 11835 (Circuit Court, Cook County) (deposition).

**2012**
*Green v. Kabota*, 09 CV 7290 (Circuit Court, Cook County) (opinion, deposition).
*Doe v. Cty Club Hills*, 2010 L 5691 (Circuit Court, Cook County) (opinion, deposition).

16

**EXHIBIT B**

**DOCUMENTS REVIEWED**

**Documents provided by Plaintiffs' Counsel:**

- Onondaga County Sheriff's Office Written Directive:
    - CUS 007 Grievances (dated 2/3/2012)
    - CUS 021 Inmate Activities (dated 9/16/2009)
    - CUS 023 Inmate Discipline (dated 11/8/2010)
    - CUS 027 Inmate Access to Telephones (dated 4/14/2014)
    - CUS 040 Inmate Labor and Industry Programs (dated 9/1/2010)
    - CUS 041 Educational and Vocational Programs (dated 12/4/2015)
    - CUS 044 Inmate Recreation (dated (5/18/2011)
    - CUS 045 Religious Services (dated 11/24/2009)
    - CUS 047 Inmate Visitation (dated 11/26/2014)
    - CUS 050 Segregation Housing (dated 11/13/2016)
    - CUS 051 Mental Health Services (dated 6/18/2014)
    - CUS 052 Health Services (dated 6/21/2011)
    - CUS 073 Sick Call (dated 2/28/2011)
- Onondaga County Justice Center Inmate Handbook, updated February 2016
- Education of Incarcerated Youth Program Plan, July 1, 2015–June 30, 2016
- Disciplinary forms for 36 juveniles who were placed in some form of solitary confinement for disciplinary purposes, with dates ranging from December 22, 2014 through January 4, 2016. Not every juvenile had all of the below forms, but the forms included:
    - Onondaga County Sheriff's Office Incident Reports, which describe the violation, incident type, and containing a narrative summary of the event;
    - Onondaga County Sheriff's Office Custody Department Inmate Misbehavior Report/Hearing Notices, which list violation charges, contain brief factual descriptions, and provide a date for a disciplinary hearing;
    - Onondaga County Sheriff's Office Custody Department Special Housing / Administrative Segregation Notice forms;
    - Onondaga County Sheriff's Office Custody Department Inmate Misconduct Resolution Reports, which list violations, contain brief factual descriptions,

provide total sanctions imposed, and contain an "agreement" to "plead guilty" to the violations;

- Handwritten Hearing Results forms, which list charges and sanctions imposed;

- Typewritten Hearing Reports, which list the charges, sanctions imposed, and contain a brief summary of the hearing; and

- Supplemental reports that were appended to these documents, such as Onondaga County Sheriff's Office Use of Force forms and Onondaga County Sheriff's Office Compliant SERT Move forms.

- Letter from Legal Services of Central New York to Esteban Gonzalez, Chief Custody Deputy of the Onondaga County Justice Center, November 23, 2015.

- Letter from Esteban Gonzalez to Legal Services of Central New York, December 7, 2015.

- An Excel sheet containing data about approximately 70 juveniles who were in punitive segregation, administrative segregation or lock-in between October 2015 and July 2016. This sheet contained their ICN number, race, the "special condition" begin and end dates, number of days they were in confinement, type of confinement, and "remark," which included charges. It is my understanding that this data was obtained from the Justice Center.

- Psychological Report and IEP of R.P. and F.K. (partial).

- Sample cell study packets.

**Other documents:**

- Website, Onondaga County Sheriff's Office, http://sheriff.ongov.net/.

**EXHIBIT C**

Publications relied on include:

1) Juvenile Justice Reform Committee of the American Academy of Child and Adolescent Psychiatry, *Solitary Confinement of Juvenile Offenders* (April 2012), http://www.aacap.org/aacap/policy_statements/2012/solitary_confinement_of_juvenile_offenders.aspx.

2) Press Release, American Medical Association, AMA Adopts New Policies to Improve Health of Nation at Interim Meeting (Nov. 11, 2014), http://www.ama-assn.org/ama/pub/news/news/2014/2014-11-20-ama-policies-improve-health-of-nation.page.

3) National Commission on Correctional Health Care, *Solitary Confinement (Isolation)* (adopted April 10, 2016), http://www.ncchc.org/solitary-confinement.

4) Louis J. Kraus, MD, CSAPH Report 8-A-16: Juvenile Justice System Reform (Resolution 2015-I-14) (2016) (unpublished Report of the AMA Council on Science and Public Health) (on file with author).

5) Kevin Whitley & John S. Rozel, *Mental Health Care of Detained Youth in Solitary Confinement and Restraint Within Juvenile Detention Facilities, in* CHILD AND ADOLESCENT CLINICS OF NORTH AMERICAN, ADJUDICATED YOUTH 71-80 (Louis J. Kraus, MD, ed., 2016).

6) Karen M. Abram, Linda A. Teplin, et al., *Posttraumatic Stress Disorder and Trauma in Youth in Juvenile Detention*, 61 ARCHIVES GEN. PSYCHIATRY 403, 403-10 (2004).

7) National Commission on Correctional Health Care, *Standards for Health Services in Juvenile Detention and Confinement Facilities* (2011).

8) Stuart Grassian, *Psychiatric Effects of Confinement*, 22 WASH. U. J.L. & POL'Y 325 (2006).

9) Linda A. Teplin, et al., *Psychiatric Disorders in Youth in Juvenile Detention*, 59 ARCHIVES GEN. PSYCHIATRY 1133, 1133-43 (2002).

10) Jay N. Giedd, et al., *Brain development during childhood and adolescence: a longitudinal MRI study*, 2 NATURE NEUROSCIENCE 861, 861-63 (1999).

11) Jay N. Giedd, et al., *Quantitative magnetic resonance imaging of human brain development: ages 4-18*, 6 CEREBRAL CORTEX 551, 551-59 (1996).

**EXHIBIT D**



AMERICAN ACADEMY OF
CHILD & ADOLESCENT
PSYCHIATRY
W W W . A A C A P . O R G

Search

Families and Youth | Medical Students and Residents | Member Resources
Resources for Primary Care | CME & Meetings

Sign In  My Profile  Publications  Donate  My Cart  About AACAP

# Solitary Confinement of Juvenile Offenders

## Quick Links

▷ Policy Statements by
   Topic

▷ Policy Statements By Year

**Approved by Council, April 2012**
To be reviewed by June 2017

By the Juvenile Justice Reform Committee

Solitary confinement is defined as the placement of an incarcerated individual in a locked room or cell with minimal or no contact with people other than staff of the correctional facility. It is used as a form of discipline or punishment.

The potential psychiatric consequences of prolonged solitary confinement are well recognized and include depression, anxiety and psychosis[1]. Due to their developmental vulnerability, juvenile offenders are at particular risk of such adverse reactions[2]. Furthermore, the majority of suicides in juvenile correctional facilities occur when the individual is isolated or in solitary confinement.

Solitary confinement should be distinguished from brief interventions such as "time out," which may be used as a component of a behavioral treatment program in facilities serving children and/or adolescents, or seclusion, which is a short term emergency procedure, the use of which is governed by federal, state and local laws and subject to regulations developed by the Joint Commission, CARF and supported by the National Commission of Correctional Healthcare (NCHHC), the American Correctional Association (ACA) and other accrediting entities.

The Joint Commission states that seclusion should only be used for the least amount of time possible for the immediate physical protection of an individual, in situations where less restrictive interventions have proven ineffective. The Joint Commission specifically prohibits the use of seclusion "as a means of coercion, discipline, convenience or staff retaliation." A lack of resources should never be a

rationale for solitary confinement.

The United Nations Rules for the Protection of Juveniles Deprived of their Liberty establish minimum standards for the protection of juveniles in correctional facilities. The UN resolution was approved by the General Assembly in December, 1990, and supported by the US. They specifically prohibit the solitary confinement of juvenile offenders. Section 67 of the Rules states:

"All disciplinary measures constituting cruel, inhuman or degrading treatment shall be strictly prohibited, including corporal punishment, placement in a dark cell, closed or solitary confinement or any other punishment that may compromise the physical or mental health of the juvenile concerned." In this situation, cruel and unusual punishment would be considered an 8th Amendment violation of our constitution[3].

Measurements to avoid confinement, including appropriate behavioral plans and other interventions should be implemented[4].

The American Academy of Child and Adolescent Psychiatry concurs with the UN position and opposes the use of solitary confinement in correctional facilities for juveniles. In addition, any youth that is confined for more than 24 hours must be evaluated by a mental health professional, such as a child and adolescent psychiatrist when one is available.

**References:**

1. Grassian, Stuart. "Psychiatric Effects of Solitary Confinement." Journal of Law and Policy. (2006): 325-383.

2. Mitchell, Jeff, M.D. & Varley, Christopher, M.D. "Isolation and Restraint in Juvenile Correctional Facilities." J.Am. Acad. Child Adolesc. Psychiatry, 29:2, March 1990.

3. Vasiliades, Elizabeth. "Solitary Confinement and International Human Rights: Why the U.S. Prison System Fails Global Standards." American University International Law Review 21, no. 1 (2005): 71-99.

4. Sedlak, Andrea, McPherson, Carla, Conditions of Confinement, OJJDP, May 2010.

Copyright ©2016 - American Academy of Child Adolescent Psychiatry. All Rights Reserved.          Contact Us | Disclaimer | Privacy Statement

Developed by Armstrong Enterprise Communication

**EXHIBIT E**



HOME | CONTACT | LOGIN | SHOP OUR CATALOG

Search Keywords

Accreditation and Facility Services | Health Professional Certification (CCHP) | Education and Conferences | Standards and Resources | Publications | About Us

Position Statements

Standards
- Jails and Prisons
- Juvenile Facilities
- Mental Health
- Opioid Treatment Programs

Standards Explained
- Standards Q&A
- Spotlight on the Standards

Guidelines, Management Tools, White Papers
- The Health Status of Soon-to-Be-Released Inmates
- Federal Clinical Guidelines
- Reference Works

# Solitary Confinement (Isolation)

SHARE/PRINT

‹ Back to Position Statements

## DEFINITION

Solitary confinement is the housing of an adult or juvenile with minimal to rare meaningful contact with other individuals. Those in solitary confinement often experience sensory deprivation and are offered few or no educational, vocational, or rehabilitative programs. Different jurisdictions refer to solitary confinement by a variety of terms, such as isolation; administrative, protective, or disciplinary segregation; permanent lockdown; maximum security; supermax; security housing; special housing; intensive management; and restrictive housing units. Regardless of the term used, an individual who is deprived of meaningful contact with others is considered to be in solitary confinement.

## INTRODUCTION

In recent years, there has been increasing controversy over the use of solitary confinement in the nations' jails, prisons, and juvenile detention centers. Many national and international organizations have recognized prolonged solitary confinement as cruel, inhumane, and degrading treatment, and harmful to an individual's health. In its position statement on **Correctional Health Professionals' Response to Inmate Abuse**, NCCHC declares:

1. Correctional health professionals' duty is to the clinical care, physical safety, and psychological wellness of their patients.
2. Correctional health professionals should not condone or participate in cruel, inhumane, or degrading treatment of inmates.

This position statement has been developed to assist health care professionals in addressing the use of solitary confinement in the facilities in which they work.

## BACKGROUND

Over the last 25 to 30 years, there has been a marked increase in the use of solitary confinement in the United States. A report based on Bureau of Justice Statistics data estimated that approximately 80,000 inmates are held in some form of isolation in state and federal prisons on any given day.[1] Isolation can last for periods of time ranging from days to years, even decades. It can occur in "supermax" prisons and in special housing units within jails and prisons.

Adults and juveniles can be placed in solitary confinement for a variety of reasons, including (1) punishment for not following rules (sometimes as minor as failure to obey an order or talking back); (2) concerns related to the safety of staff or other inmates, such as the management of known or suspected gang members; (3) their own protection (such as for sex offenders or individuals who are transgender or sexually vulnerable); and (4) clinical or therapeutic reasons. In many cases, individuals with mental health problems who have difficulty conforming to facility rules, but are not violent or dangerous, end up being housed in these units. Continued misconduct related to their underlying mental health issues, which is often exacerbated by their isolation, can result in their being held in solitary confinement indefinitely.

It is well established that persons with mental illness are particularly vulnerable to the harms of solitary confinement. As a result, federal courts have repeatedly found the solitary confinement of the mentally ill to be unconstitutional[2], and in 2012, the American Psychiatric Association adopted a policy opposing the "prolonged" segregation of prisoners with serious mental illness, which it defined as longer than 3 to 4 weeks.[3]

The inherent restriction in meaningful social interaction and environmental stimulation and the lack of control adversely impact the health and welfare of all who are held in solitary confinement.[4,5,6,7,8] While there is a school of thought that suggests that solitary confinement in facilities that meet basic standards of humane care has relatively little adverse effect on most individuals' mental or

physical health[9,10], this is not the view of most international organizations. The World Health Organization (WHO), United Nations, and other international bodies have recognized that solitary confinement is harmful to health. The WHO notes that effects can include gastrointestinal and genitourinary problems, diaphoresis, insomnia, deterioration of eyesight, profound fatigue, heart palpitations, migraines, back and joint pains, weight loss, diarrhea, and aggravation of preexisting medical problems.[11] Even those without a prior history of mental illness may experience a deterioration in mental health, experiencing anxiety, depression, anger, diminished impulse control, paranoia, visual and auditory hallucinations, cognitive disturbances, obsessive thoughts, paranoia, hypersensitivity to stimuli, posttraumatic stress disorder, self-harm, suicide, and/or psychosis. Some of these effects may persist after release from solitary confinement. Moreover, the very nature of prolonged social isolation is antithetical to the goals of rehabilitation and social integration.

These consequences are especially harmful to juveniles whose brains are still developing and those with mental health problems. In 2012, a task force appointed by the U.S. attorney general concluded:

> Nowhere is the damaging impact of incarceration on vulnerable children more obvious than when it involves solitary confinement.... Juveniles experience symptoms of paranoia, anxiety, and depression even after very short periods of isolation. Confined youth who spend extended periods isolated are among the most likely to attempt or actually commit suicide. One national study found that among the suicides in juvenile facilities, half of the victims were in isolation at the time they took their own lives, and 62 percent of victims had a history of solitary confinement.[12]

Psychologically, children are different from adults, making their time spent in isolation even more difficult and the developmental, psychological, and physical damage more comprehensive and lasting. They experience time differently—a day for a child feels longer than a day to an adult—and have a greater need for social stimulation.[13,14,15,16] The American Academy of Child and Adolescent Psychiatry has concluded that, due to their "developmental vulnerability," adolescents are in particular danger of adverse reactions to prolonged isolation and solitary confinement.[17]

In a report to the United Nations Human Rights Committee, Juan Méndez, U.N. special rapporteur on torture and cruel, inhuman, and degrading treatment, concludes that juveniles, given their physical and mental immaturity, should never be subjected to solitary confinement. He states that the imposition of solitary confinement of any duration on juveniles is cruel, inhuman, and degrading treatment and violates both the International Covenant on Civil and Political Rights and the Convention against Torture. He asserts "given their diminished mental capacity and that solitary confinement often results in severe exacerbation of a previously existing mental condition," the imposition of solitary confinement, of any duration, on persons with mental disabilities is cruel, inhuman, or degrading treatment and also violates the Covenant and the Convention.[18]

The United Nations Standard Minimum Rules for the Treatment of Prisoners (the Mandela Rules) state that solitary confinement should be prohibited in cases involving children and in the case of adults with mental or physical disabilities when their conditions would be exacerbated by such measures.[19]

International standards established by the United Nations Rules for the Treatment of Women Prisoners and Non-Custodial Measures for Women Offenders state that pregnant women should never be placed in solitary confinement as they are especially susceptible to its harmful psychological effects.[20] In addition, placing these women in isolation impedes their access to necessary and timely prenatal care.[21]

The U.N. special rapporteur further asserts that solitary confinement is a harsh measure that may cause serious psychological and physiological adverse effects on individuals regardless of their specific conditions. He finds solitary confinement to be contrary to one of the essential aims of the penitentiary system, which is to rehabilitate offenders and facilitate their reintegration into society. He recommends a complete ban on prolonged or indefinite solitary confinement, citing 15 days as the starting point of prolonged solitary confinement because, after that, "some of the harmful psychological effects of isolation can become irreversible."[22] The Mandela Rules affirm that solitary confinement "shall be used only in exceptional cases as a last resort, for as short a time as possible and subject to independent review...." They specifically prohibit indefinite and/or prolonged (defined as a time period in excess of 15 consecutive days) solitary confinement, or placement in a dark or constantly lit cell, noting that these conditions amount to "torture or other cruel, inhuman or degrading treatment or punishment."[23]

By virtue of working in facilities where security and control, rather than the health and well-being of their patients, are the priorities, health professionals working in correctional facilities are often faced with ethical dilemmas. The participation of health care staff in actions that may be injurious to an individual's health is in conflict with their role as caregivers. This is especially true when they are called on to determine whether a patient is physically and psychologically well enough to be placed in solitary confinement. By doing so, health care providers become participants in the process of solitary confinement. Both the United Nations and the WHO are opposed to such involvement on ethical grounds. The U.N. has stated that it is a contravention of medical ethics for health care staff, particularly physicians:

> To certify, or to participate in the certification of, the fitness of prisoners or detainees for any form of treatment or punishment that may adversely affect their physical or mental health and which is not in accordance with the relevant international

instruments, or to participate in any way in the infliction of any such treatment or punishment which is not in accordance with the relevant international instruments.[24]

The WHO states health care staff should never participate in enforcing any sanctions or in the underlying decision-making process, as this is not a medical act, and:

> Doctors may frequently be approached when the sanction considered is solitary confinement. Solitary confinement has clearly been shown to be injurious to health. In cases where it is still enforced, its use should be limited to the shortest time possible. Thus, doctors should not collude in moves to segregate or restrict the movement of prisoners except on purely medical grounds, and they should not certify a prisoner as being fit for disciplinary isolation or any other form of punishment. Prisoners who are placed in isolation should be evaluated initially and periodically for acute mental illness, drug or alcohol withdrawal and injuries. If these are identified, prisoners should have access to prompt and effective treatment. Doctors should not certify fitness for isolation.[25]

At the same time, health care staff must ensure that those in solitary confinement have access to and receive needed clinical care. As stated in the European Prison Rules (2006):

> Medical practitioners or qualified nurses should not be obliged to pronounce prisoners fit for punishment but may advise prison authorities of the risks that certain measures may pose to the health of prisoners. They would have a particular duty to prisoners who are held in conditions of solitary confinement for whatever reason: as a result of their "dangerousness" or their "troublesome" behaviour; in the interests of a criminal investigation; at their own request. Following established practice, (see for example Rule 32.3 of the UN Standard Minimum Rules for the Treatment of Prisoners) such prisoners should be visited daily. Such visits can in no way be considered as condoning or legitimising a decision to put or to keep a prisoner in solitary confinement. Moreover, medical practitioners or qualified nurses should respond promptly to request for treatment by prisoners held in such conditions or by prison staff....[26]

The WHO also states:

> Once a sanction is enforced, doctors must follow the prisoner being punished with extreme vigilance. It is well-established that solitary confinement constitutes an important stressor and risk, notably of suicide. Doctors must pay particular attention to such prisoners and visit them regularly of their own initiative, as soon as possible after an isolation order has taken effect and daily thereafter, to assess their physical and mental state and determine any deterioration in their well-being. Furthermore, doctors must immediately inform the prison management if a prisoner presents a health problem.[27]

While correctional health care providers often encounter obstacles in the performance of their duties, there are specific challenges to the provision of health care to individuals in solitary confinement. Solitary confinement often makes it more difficult for patients to access care. Many facilities require that individuals in solitary confinement be shackled and accompanied by two officers when they are out of their cells. Many times, they must be body searched upon leaving and returning to their cells. As a result, health care staff may decide to perform their evaluations at cell-front, through bars or slots in the doors, either for their own or the patient's ease. Alternatively, clinical encounters may occur with the patient in a metal cage or behind a glass partition. Even when patients are taken to the medical clinic for evaluation, they often remain in restraints with custody officers in close proximity. Such arrangements are not respectful of an individual's dignity, interfere with privacy and confidentiality, and hamper or prevent the clinician from performing an adequate evaluation.

# POSITION STATEMENT

The following principles are to guide correctional health professionals in addressing issues about solitary confinement.

1. Prolonged (greater than 15 consecutive days) solitary confinement is cruel, inhumane, and degrading treatment, and harmful to an individual's health.

2. Juveniles[28], mentally ill individuals, and pregnant women should be excluded from solitary confinement of any duration.

3. Correctional health professionals should not condone or participate in cruel, inhumane, or degrading treatment of adults or juveniles in custody.

4. Prolonged solitary confinement should be eliminated as a means of punishment.

5. Solitary confinement as an administrative method of maintaining security should be used only as an exceptional measure when other, less restrictive options are not available, and then for the shortest time possible. Solitary confinement should never exceed 15 days. In those rare cases where longer isolation is required to protect the safety of staff and/or other inmates, more humane conditions of confinement need to be utilized.

6. Correctional health professionals' duty is the clinical care, physical safety, and psychological wellness of their patients.

7. Isolation for clinical or therapeutic purposes should be allowed only upon the order of a health care professional and for the shortest duration and under the least restrictive conditions possible, and should take place in a clinically designated and supervised area.

8. Individuals who are separated from the general population for their own protection should be housed in the least restrictive conditions possible.

9. Health staff must not be involved in determining whether adults or juveniles are physically or psychologically able to be placed in isolation.

10. Individuals in solitary confinement, like other inmates, are entitled to health care that is consistent with the community standard of care.

11. Health care staff should evaluate individuals in solitary confinement upon placement and thereafter, on at least a daily basis. They should provide them with prompt medical assistance and treatment as required.

12. Health care staff must advocate so that individuals are removed from solitary confinement if their medical or mental health deteriorates or if necessary services cannot be provided.

13. Principles of respect and medical confidentiality must be observed for patients who are in solitary confinement. Medical examinations should occur in clinical areas where privacy can be ensured. Patients should be examined without restraints and without the presence of custody staff unless there is a high risk of violence. In situations where this cannot occur, the patient's privacy, dignity, and confidentiality should be maintained as much as possible. If custody staff must be present, they should maintain visual contact, but remain at a distance that provides auditory privacy.

14. Health care staff should ensure that the hygiene and cleanliness of individuals in solitary confinement and their housing areas are maintained; that they are receiving sufficient food, water, clothing, and exercise; and that the heating, lighting, and ventilation are adequate.

15. Adults and juveniles in solitary confinement should have as much human contact as possible with people from outside the facility and with custodial, educational, religious, and medical staff.

16. Appropriate programs need to be available to individuals in confinement to assist them with the transition to other housing units or the community, if released from isolation to the community.

17. In systems that do not conform to international standards, health care staff should advocate with correctional officials to establish policies prohibiting the use of solitary confinement for juveniles and mentally ill individuals, and limiting its use to less than 15 days for all others.

**Adopted by the National Commission on Correctional Health Care Board of Directors**
**April 10, 2016**

## NOTES

1. Shames, A., Wilcox, J., & Subramanian, R. (May 2015). **Solitary confinement: Common misconceptions and emerging safe alternatives**. Vera Institute of Justice.

2. See, e.g., Madrid, 889 F. Supp. at 1265-66; Ruiz v. Johnson, 37 F.Supp.2d 855, 915 (S.D. Tex. 1999), 243 F.3d 941 (5th Cir. 2001), adhered to on remand, 154 F.Supp.2d 975 (S.D. Tex. 2001).

3. American Psychiatric Association. (December 2012). **Position statement on segregation of prisoners with mental illness**.

4. Scharff Smith, P. (2006).**The effects of solitary confinement on prison inmates: A brief history and review of the literature**. *Crime and Justice*. 34(1), 441-528.

5. Haney, C. (January 2003). **Mental health issues in long-term solitary and "supermax" confinement**, *Crime & Delinquency (49)*1, 124-156.

6. Grassian, S. (1983). **Psychopathological effects of solitary confinement**. *American Journal of Psychiatry*, 140, 1450-1454.

7. Grassian, S. (2006). **Psychiatric effects of solitary confinement**. *Washington University Journal of Law & Policy*, 22, 325-383.

8. Kaba, F., et al. (2014). **Solitary confinement and risk of self-harm among jail inmates**. *American Journal of Public Health*, 104(3), 442-447.

9. Clements, C. B., et al. (2007). **Systematic issues and correctional outcomes: Expanding the scope of correctional psychology**. *Criminal Justice and Behavior*, 34, 919-932.

10. Gendreau, P., & Goggin, C. (2014). Practicing psychology in correctional settings. In I. B. Weiner & R. K. Otto (Eds.), *The handbook of forensic psychology* (4th ed.). Hoboken, NJ: Wiley.

11. World Health Organization. (2014). **Prisons and health** (p. 28).

12. Department of Justice. (December 2012). **Report of the Attorney General's National Task Force on Children Exposed to Violence**.

13. Steinberg, L., et al. (2009). **Age differences in future orientation and delay discounting**. *Child Development. 80*, 28-44.

14. Woolard, J., Odgers, C., Lanza-Kaduce, L., & Daglis, H. (2005). **Juveniles within adult correctional settings: Legal pathways and developmental considerations.** *International Journal of Forensic Mental Health. 4*(1), 1-18.

15. Laible, D., Carlo, G., & Raffaelli, M. (2000). **The differential relations of parent and peer attachment to adolescent adjustment.** *Journal of Youth and Adolescence. 29*(1), 45-59.

16. Arredondo, D. E. (2004). **Principles of child development and juvenile justice information for decision-makers.** *Journal of the Center for Families, Children & the Courts.*

17. American Academy of Child & Adolescent Psychiatry. (April 2012). **Solitary confinement of juvenile offenders** (Policy Statement).

18. Méndez, J. (2011). **Torture and other cruel, inhuman or degrading treatment or punishment**. Interim report of the Special Rapporteur of the Human Rights Council on torture and other cruel, inhuman or degrading treatment or punishment (p. 21).

19. United Nations. (May 2015). **United Nations standard minimum rules for the treatment of prisoners (the Mandela Rules)** (Rule 45).

20. United Nations. (2010). **United Nations rules for the treatment of women prisoners and non-custodial measures for women offenders (the Bangkok rules)**.

21. ACLU Foundation. (2014). **Worse than second-class: Solitary confinement of women in the United States**

22. United Nations. (May 2015). **United Nations standard minimum rules for the treatment of prisoners (the Mandela Rules)** (p. 13).

23. Op. cit. (Rules 43 & 44)

24. United Nations Office of the High Commissioner for Human Rights. (1982). **Principles of medical ethics relevant to the role of health personnel, particularly physicians, in the protection of prisoners and detainees against torture and other cruel, inhuman or degrading treatment or punishment**.

25. World Health Organization. (2007). Health in prisons: A WHO guide to the essentials in prison health (p. 36).

26. Council of Europe. (2006). **Commentary to recommendation rec(2006) 2 of the Committee of Ministers to Member States on the European Prison Rules**.

27. Op. cit., p. 13.

28. Stop Solitary for Kids. (2016). **Stop Solitary for Kids** (Position Statement).

## ADDITIONAL RESOURCES

1. National Commission on Correctional Health Care. (2012). **Correctional health professionals' response to inmate abuse** (Position Statement).

2. American Public Health Association. (November 2013). **Solitary confinement as a public health issue** (Policy Statement).

3. Shalev. S. (2008). **Sourcebook on solitary confinement**, London: Mannheim Centre for Criminology. London School of Economics.

4. Metzner. J. (2015). **Mental health considerations for segregated inmates**.



Accreditation and Facility Services

Health Care Professional Certification (CCHP)

Education and Conferences

Standards and Guidelines

Publications

About Us

Contact Us

Buyer's Guide

Advertising and Sponsorship

Shop Our Catalog

facebook   twitter   Linkedin   You Tube   blogtalkradio

© Copyright 2016     Privacy/Legal · Sitemap
NCCHC

**EXHIBIT F**

AMA | Membership | JAMA Network | AMA Store



AMERICAN MEDICAL ASSOCIATION

Search

House of Delegates    Physicians    Residents    Medical Students    Patients    Media

Home    Membership    Resources    Education    Advocacy    Publications    News    AMA Store    About AMA

News » 2014 AMA Press Releases and Statements » AMA Adopts New Policies to Improve Health of Nation at Interim Meeting

## News

AMA Wire®

Media Contact Information

AMA Press Releases and Statements

AMA Strategic Plan

AMA Initiatives

AMA in the Media

AMA Videos

AMA Speeches

AMA Newsletters

Subscribe to Newsletters

2014 AMA Press Releases and Statements

▶ AMA Adopts New Policies to Improve Health of Nation at Interim Meeting

Upcoming AMA Events

A    A

## AMA News Room

search news        Search News

**2016    2015    2014**

Nov. 11, 2014

## AMA Adopts New Policies to Improve Health of Nation at Interim Meeting

**For immediate release:**
Nov. 11, 2014

DALLAS - The American Medical Association (AMA), the premier national physician organization in the country, gathered physician and medical student leaders representing all aspects of medicine during its Interim Meeting and today voted to adopt new policies on emerging health care topics.

The AMA's House of Delegates is the policy-making body at the center of American medicine, bringing together an inclusive group of physicians, medical students and residents representing every state and medical field. Delegates work in a democratic process to create a national physician consensus on emerging issues in public health, science, ethics, business and government to continually provide safer, higher quality and more efficient care for patients and communities.

The policies adopted by the House of Delegates today include:

**AMA Bolsters Response to Urgent Epidemics Affecting the U.S.**
New policy adopted today calls on the AMA to continue serving as a trusted source of information and education for physicians, health professionals and the public on urgent epidemics, including the Ebola virus. The new AMA policy also strongly supports the health care workers and U.S. military members responding to the Ebola epidemic in affected countries, and recognizes the need for improved public health infrastructure and surveillance in Ebola-ravaged countries.

"Continued volunteer efforts of nurses, physicians, and other health care workers are fundamental to international efforts to contain and end the Ebola outbreak at its source," said AMA President Robert M. Wah, M.D. "It is critical that we support and protect U.S. health professionals who are working on the frontlines to bring this public health threat under control."

One key directive in the new policy calls on the AMA to provide leadership by collaborating with public health officials to provide medical expertise on guidance that would help ensure that the nation's health system is adequately prepared to respond to this public health epidemic.

In recent weeks, the AMA has provided an Ebola Resource Center for the public and physicians on our website to serve as a hub of science-based information from top national and international sources including the CDC, WHO and JAMA.

**Curbing Solitary Confinement of Juveniles in Correctional Facilities**
The AMA today called for correctional facilities to halt the isolation of juveniles in solitary confinement for disciplinary purposes. The new policy supports restricting the use of isolation in juvenile correction facilities for only extraordinary circumstances.

"Recognizing the harmful physical, emotional and psychological impact of solitary confinement can have on the health of prisoners, the AMA will oppose solitary confinement as a punishment in juvenile correctional facilities," said AMA

AMA Adopts New Policies to Improve Health of Nation at Interim Meeting

Board Member William E. Kobler, M.D. "These facilities should restrict the use of isolation procedures to occasions when there is an acute risk to the health and safety of the juvenile or others."

The policy also stresses that the isolation of juveniles for clinical or therapeutic purposes must be conducted under the supervision of a physician.

## Medicaid Expansion Options and Alternatives

Believing that all patient should have access to the care they need, the AMA is concerned about the high number of low-income adults who remain uninsured in states that have opted not to expand their Medicaid programs. A new AMA policy passed today encourages policymakers at all levels to focus their efforts on working together to identify realistic coverage options for adults currently in the coverage gap, even if states choose not to adopt the Medicaid expansion outlined in the Affordable Care Act. The policy encourages states that are not participating in Medicaid expansion programs to develop waivers that support expansion plans that best meet the needs and priorities of their low income adult populations. Further, the AMA encourages the Centers for Medicare and Medicaid Services to approve waivers that are consistent with the goals and spirit of expanding insurance coverage. The policy also urges that states use a transparent process for evaluating the success of their efforts to expand access to care and to report the results annually on their Medicaid websites.

"The AMA is sensitive to state concerns about expanding Medicaid in a traditional manner, but we believe they must find ways to expand health insurance coverage to their uninsured populations, especially as coverage disparities continue to grow between expansion and non-expansion states," said AMA Immediate Past Board Chair, David O. Barbe, M.D. "We encourage states that would otherwise reject the opportunity to expand their Medicaid programs to develop expansion waivers that help increase coverage options for their low income adult residents."

## Sobriety Checkpoints

Every two-hours, three people are killed in alcohol-related highway crashes, according to the Bureau of Transportation Statistics. Sobriety checkpoints have been proven to substantially reduce alcohol-related crashes, which is why the AMA adopted a new policy today to support the increased use of legal and constitutional sobriety checkpoints and advocate with state medical societies to overturn bans on the use of them to deter driving under the influence.

"Sobriety checkpoints are one of the National Highway Traffic Safety Administration's primary recommendations for reducing drunk driving, and this new policy will help increase the use of these checkpoints to save lives," said AMA Board Member Mary Anne McCaffree, M.D.

## FSMB State Licensing Compact

In an effort to make it easier for physicians to obtain licenses in multiple states while providing access to safe, quality care, the AMA adopted policy supporting an interstate compact developed by the Federation of State Medical Boards (FSMB).

Under the new policy, the AMA will work with medical associations, FSMB, and other interested stakeholders to ensure expeditious adoption of the compact and the creation of an Interstate Medical Licensure Commission. Through the licensure process, state medical boards assure that physicians are qualified - reviewing their education, training, character, and professional and disciplinary histories. In order to protect the interest of patients and their safety when medical services are provided either in-person or via telemedicine, we must maintain physician accountability, which requires state oversight.

"At least 10 state medical boards have adopted the compact, which streamlines the licensing process for physicians seeking licenses in multiple states and increases patient access to telemedicine services and we encourage more states to sign on to the compact so that we can ensure standards of care are maintained, whether treatment is provided in-person or via telemedicine," said AMA President-elect Steven J. Stack, M.D.

## Coordination with Pharmacists to Improve Immunization Rates

With data showing that less than half of adults over age 18 received an influenza vaccine last year, the AMA today adopted policy encouraging efforts to increase immunization rates in the U.S.

The new AMA policy recognizes the current role of pharmacists in vaccinating target populations that lack access to a medical home or that are otherwise unlikely to receive immunizations through physician practices. The policy affirms that health professionals who administer vaccines have shared responsibilities to ensure that vaccination administration is documented in the patient medical record and calls on physicians and pharmacists, as a part of the healthcare delivery team, to work together in the community to encourage patients to follow-up with a primary care physician to ensure continuity of care.

"It is important that we ensure patients have access to the care they need when they need it, especially access to preventive care like immunizations," said AMA Board Member William E. Kobler, M.D. "By complementing the efforts of physicians with the work of health professionals in other health settings to deliver vaccines, we have the ability to increase immunization rates, address vaccine-preventable illnesses and improve health outcomes."

AMA Adopts New Policies to Improve Health of Nation at Interim Meeting

# # #

Media Contact:
AMA Media and Editorial
Office: (312) 464-4430
Email: media@ama-assn.org

Follow AMA on Twitter and Facebook.

Tweet

---

**AMA Publications**

AMA Wire®

AMA Newsletters

The JAMA Network

JAMA (The Journal of the American Medical Association)

JAMA Cardiology

JAMA Dermatology

JAMA Facial Plastic Surgery

JAMA Internal Medicine

JAMA Neurology

JAMA Oncology

JAMA Ophthalmology

JAMA Otolaryngology— Head & Neck Surgery

JAMA Pediatrics

JAMA Psychiatry

JAMA Surgery

AMA Journal of Ethics

**AMA Membership**

Join / Renew Your Membership

AMA Preferred Provider Offers and Services

Contact the AMA

**AMA Affiliates**

AMA Alliance

AMA Foundation

AMA Insurance

Copyright 1995-American Medical Association All rights reserved.
Contact Us | Advertise with Us | Terms of Use | Privacy Policy | Code of Conduct | Accessibility Statement | Sitemap

**EXHIBIT G**

United Nations                                                      **A/RES/45/113**



**General Assembly**

Distr. GENERAL

14 December 1990

ORIGINAL:
ENGLISH

A/RES/45/113
68th plenary meeting
14 December 1990

45/113.  United Nations Rules for the Protection of Juveniles
         Deprived of their Liberty

The General Assembly,

   Bearing in mind the Universal Declaration of Human Rights, the
International Covenant on Civil and Political Rights, the Convention against
Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment and the
Convention on the Rights of the Child, as well as other international
instruments relating to the protection of the rights and well-being of young
persons,

   Bearing in mind also the Standard Minimum Rules for the Treatment of
Prisoners adopted by the First United Nations Congress on the Prevention of
Crime and the Treatment of Offenders,

   Bearing in mind further the Body of Principles for the Protection of All
Persons under Any Form of Detention or Imprisonment, approved by the General
Assembly by its resolution 43/173 of 9 December 1988 and contained in the
annex thereto,

   Recalling the United Nations Standard Minimum Rules for the
Administration of Juvenile Justice (The Beijing Rules),

   Recalling also resolution 21 of the Seventh United Nations Congress on
the Prevention of Crime and the Treatment of Offenders, in which the Congress
called for the development of rules for the protection of juveniles deprived
of their liberty,

   Recalling further that the Economic and Social Council, in section II of
its resolution 1986/10 of 21 May 1986, requested the Secretary-General to
report on progress achieved in the development of the rules to the Committee
on Crime Prevention and Control at its tenth session and requested the Eighth
United Nations Congress on the Prevention of Crime and the Treatment of
Offenders to consider the proposed rules with a view to their adoption,

   Alarmed at the conditions and circumstances under which juveniles are
being deprived of their liberty world wide,

   Aware that juveniles deprived of their liberty are highly vulnerable to

abuse, victimization and the violation of their rights,

Concerned that many systems do not differentiate between adults and juveniles at various stages of the administration of justice and that juveniles are therefore being held in gaols and facilities with adults,

1.   Affirms that the placement of a juvenile in an institution should always be a disposition of last resort and for the minimum necessary period;

2.   Recognizes that, because of their high vulnerability, juveniles deprived of their liberty require special attention and protection and that their rights and well-being should be guaranteed during and after the period when they are deprived of their liberty;

3.   Notes with appreciation the valuable work of the Secretariat and the collaboration which has been established between the Secretariat and experts, practitioners, intergovernmental organizations, the non-governmental community, particularly Amnesty International, Defence for Children International and Radda Barnen International (Swedish Save the Children Federation), and scientific institutions concerned with the rights of children and juvenile justice in the development of the United Nations draft Rules for the Protection of Juveniles Deprived of their Liberty;

4.   Adopts the United Nations Rules for the Protection of Juveniles Deprived of their Liberty contained in the annex to the present resolution;

5.   Calls upon the Committee on Crime Prevention and Control to formulate measures for the effective implementation of the Rules, with the assistance of the United Nations institutes on the prevention of crime and the treatment of offenders;

6.   Invites Member States to adapt, wherever necessary, their national legislation, policies and practices, particularly in the training of all categories of juvenile justice personnel, to the spirit of the Rules, and to bring them to the attention of relevant authorities and the public in general;

7.   Also invites Member States to inform the Secretary-General of their efforts to apply the Rules in law, policy and practice and to report regularly to the Committee on Crime Prevention and Control on the results achieved in their implementation;

8.   Requests the Secretary-General and invites Member States to ensure the widest possible dissemination of the text of the Rules in all of the official languages of the United Nations;

9.   Requests the Secretary-General to conduct comparative research, pursue the requisite collaboration and devise strategies to deal with the different categories of serious and persistent young offenders, and to prepare a policy-oriented report thereon for submission to the Ninth United Nations Congress on the Prevention of Crime and the Treatment of Offenders;

10.  Also requests the Secretary-General and urges Member States to allocate the necessary resources to ensure the successful application and implementation of the Rules, in particular in the areas of recruitment, training and exchange of all categories of juvenile justice personnel;

11.  Urges all relevant bodies of the United Nations system, in particular the United Nations Children's Fund, the regional commissions and specialized agencies, the United Nations institutes for the prevention of crime and the treatment of offenders and all concerned intergovernmental and non-governmental organizations, to collaborate with the Secretary-General and to take the necessary measures to ensure a concerted and sustained effort within their respective fields of technical competence to promote the application of the Rules;

12.   Invites the Sub-Commission on Prevention of Discrimination and Protection of Minorities of the Commission on Human Rights to consider this new international instrument, with a view to promoting the application of its provisions;

13.   Requests the Ninth Congress to review the progress made on the promotion and application of the Rules and on the recommendations contained in the present resolution, under a separate agenda item on juvenile justice.

ANNEX
United Nations Rules for the Protection of Juveniles
Deprived of their Liberty

I.  FUNDAMENTAL PERSPECTIVES

1.   The juvenile justice system should uphold the rights and safety and promote the physical and mental well-being of juveniles.  Imprisonment should be used as a last resort.

2.   Juveniles should only be deprived of their liberty in accordance with the principles and procedures set forth in these Rules and in the United Nations Standard Minimum Rules for the Administration of Juvenile Justice (The Beijing Rules).  Deprivation of the liberty of a juvenile should be a disposition of last resort and for the minimum necessary period and should be limited to exceptional cases.  The length of the sanction should be determined by the judicial authority, without precluding the possibility of his or her early release.

3.   The Rules are intended to establish minimum standards accepted by the United Nations for the protection of juveniles deprived of their liberty in all forms, consistent with human rights and fundamental freedoms, with a view to counteracting the detrimental effects of all types of detention and to fostering integration in society.

4.   The Rules should be applied impartially, without discrimination of any kind as to race, colour, sex, age, language, religion, nationality, political or other opinion, cultural beliefs or practices, property, birth or family status, ethnic or social origin, and disability.  The religious and cultural beliefs, practices and moral concepts of the juvenile should be respected.

5.   The Rules are designed to serve as convenient standards of reference and to provide encouragement and guidance to professionals involved in the management of the juvenile justice system.

6.   The Rules should be made readily available to juvenile justice personnel in their national languages.  Juveniles who are not fluent in the language spoken by the personnel of the detention facility should have the right to the services of an interpreter free of charge whenever necessary, in particular during medical examinations and disciplinary proceedings.

7.   Where appropriate, States should incorporate the Rules into their legislation or amend it accordingly and provide effective remedies for their breach, including compensation when injuries are inflicted on juveniles. States should also monitor the application of the Rules.

8.   The competent authorities should constantly seek to increase the awareness of the public that the care of detained juveniles and preparation for their return to society is a social service of great importance, and to this end active steps should be taken to foster open contacts between the juveniles and the local community.

9.   Nothing in the Rules should be interpreted as precluding the application of the relevant United Nations and human rights instruments and standards, recognized by the international community, that are more conducive to ensuring

the rights, care and protection of juveniles, children and all young persons.

10.  In the event that the practical application of particular Rules contained in sections II to V, inclusive, presents any conflict with the Rules contained in the present section, compliance with the latter shall be regarded as the predominant requirement.

## II.  SCOPE AND APPLICATION OF THE RULES

11.  For the purposes of the Rules, the following definitions should apply:

   (a)  A juvenile is every person under the age of 18.  The age limit below which it should not be permitted to deprive a child of his or her liberty should be determined by law;

   (b)  The deprivation of liberty means any form of detention or imprisonment or the placement of a person in a public or private custodial setting, from which this person is not permitted to leave at will, by order of any judicial, administrative or other public authority.

12.  The deprivation of liberty should be effected in conditions and circumstances which ensure respect for the human rights of juveniles. Juveniles detained in facilities should be guaranteed the benefit of meaningful activities and programmes which would serve to promote and sustain their health and self-respect, to foster their sense of responsibility and encourage those attitudes and skills that will assist them in developing their potential as members of society.

13.  Juveniles deprived of their liberty shall not for any reason related to their status be denied the civil, economic, political, social or cultural rights to which they are entitled under national or international law, and which are compatible with the deprivation of liberty.

14.  The protection of the individual rights of juveniles with special regard to the legality of the execution of the detention measures shall be ensured by the competent authority, while the objectives of social integration should be secured by regular inspections and other means of control carried out, according to international standards, national laws and regulations, by a duly constituted body authorized to visit the juveniles and not belonging to the detention facility.

15.  The Rules apply to all types and forms of detention facilities in which juveniles are deprived of their liberty.  Sections I, II, IV and V of the Rules apply to all detention facilities and institutional settings in which juveniles are detained, and section III applies specifically to juveniles under arrest or awaiting trial.

16.  The Rules shall be implemented in the context of the economic, social and cultural conditions prevailing in each Member State.

## III.  JUVENILES UNDER ARREST OR AWAITING TRIAL

17.  Juveniles who are detained under arrest or awaiting trial ("untried") are presumed innocent and shall be treated as such.  Detention before trial shall be avoided to the extent possible and limited to exceptional circumstances. Therefore, all efforts shall be made to apply alternative measures.  When preventive detention is nevertheless used, juvenile courts and investigative bodies shall give the highest priority to the most expeditious processing of such cases to ensure the shortest possible duration of detention.  Untried detainees should be separated from convicted juveniles.

18.  The conditions under which an untried juvenile is detained should be consistent with the rules set out below, with additional specific provisions as are necessary and appropriate, given the requirements of the presumption of innocence, the duration of the detention and the legal status and

circumstances of the juvenile.  These provisions would include, but not
necessarily be restricted to, the following:

    (a)  Juveniles should have the right of legal counsel and be enabled to
apply for free legal aid, where such aid is available, and to communicate
regularly with their legal advisers.  Privacy and confidentiality shall be
ensured for such communications;

    (b)  Juveniles should be provided, where possible, with opportunities to
pursue work, with remuneration, and continue education or training, but should
not be required to do so.  Work, education or training should not cause the
continuation of the detention;

    (c)  Juveniles should receive and retain materials for their leisure and
recreation as are compatible with the interests of the administration of
justice.

### IV.  THE MANAGEMENT OF JUVENILE FACILITIES
#### A.  Records

19.  All reports, including legal records, medical records and records of
disciplinary proceedings, and all other documents relating to the form,
content and details of treatment, should be placed in a confidential
individual file, which should be kept up to date, accessible only to
authorized persons and classified in such a way as to be easily understood.
Where possible, every juvenile should have the right to contest any fact or
opinion contained in his or her file so as to permit rectification of
inaccurate, unfounded or unfair statements.  In order to exercise this right,
there should be procedures that allow an appropriate third party to have
access to and to consult the file on request.  Upon release, the records of
juveniles shall be sealed, and, at an appropriate time, expunged.

20.  No juvenile should be received in any detention facility without a valid
commitment order of a judicial, administrative or other public authority.  The
details of this order should be immediately entered in the register.  No
juvenile should be detained in any facility where there is no such register.

#### B.  Admission, registration, movement and transfer

21.  In every place where juveniles are detained, a complete and secure record
of the following information should be kept concerning each juvenile received:

    (a)  Information on the identity of the juvenile;

    (b)  The fact of and reasons for commitment and the authority therefor;

    (c)  The day and hour of admission, transfer and release;

    (d)  Details of the notifications to parents and guardians on every
admission, transfer or release of the juvenile in their care at the time of
commitment;

    (e)  Details of known physical and mental health problems, including drug
and alcohol abuse.

22.  The information on admission, place, transfer and release should be
provided without delay to the parents and guardians or closest relative of the
juvenile concerned.

23.  As soon as possible after reception, full reports and relevant
information on the personal situation and circumstances of each juvenile
should be drawn up and submitted to the administration.

24.  On admission, all juveniles shall be given a copy of the rules governing
the detention facility and a written description of their rights and
obligations in a language they can understand, together with the address of

the authorities competent to receive complaints, as well as the address of public or private agencies and organizations which provide legal assistance. For those juveniles who are illiterate or who cannot understand the language in the written form, the information should be conveyed in a manner enabling full comprehension.

25.  All juveniles should be helped to understand the regulations governing the internal organization of the facility, the goals and methodology of the care provided, the disciplinary requirements and procedures, other authorized methods of seeking information and of making complaints, and all such other matters as are necessary to enable them to understand fully their rights and obligations during detention.

26.  The transport of juveniles should be carried out at the expense of the administration in conveyances with adequate ventilation and light, in conditions that should in no way subject them to hardship or indignity. Juveniles should not be transferred from one facility to another arbitrarily.

C.  Classification and placement

27.  As soon as possible after the moment of admission, each juvenile should be interviewed, and a psychological and social report identifying any factors relevant to the specific type and level of care and programme required by the juvenile should be prepared.  This report, together with the report prepared by a medical officer who has examined the juvenile upon admission, should be forwarded to the director for purposes of determining the most appropriate placement for the juvenile within the facility and the specific type and level of care and programme required and to be pursued.  When special rehabilitative treatment is required, and the length of stay in the facility permits, trained personnel of the facility should prepare a written, individualized treatment plan specifying treatment objectives and time-frame and the means, stages and delays with which the objectives should be approached.

28.  The detention of juveniles should only take place under conditions that take full account of their particular needs, status and special requirements according to their age, personality, sex and type of offence, as well as mental and physical health, and which ensure their protection from harmful influences and risk situations.  The principal criterion for the separation of different categories of juveniles deprived of their liberty should be the provision of the type of care best suited to the particular needs of the individuals concerned and the protection of their physical, mental and moral integrity and well-being.

29.  In all detention facilities juveniles should be separated from adults, unless they are members of the same family.  Under controlled conditions, juveniles may be brought together with carefully selected adults as part of a special programme that has been shown to be beneficial for the juveniles concerned.

30.  Open detention facilities for juveniles should be established.  Open detention facilities are those with no or minimal security measures.  The population in such detention facilities should be as small as possible.  The number of juveniles detained in closed facilities should be small enough to enable individualized treatment.  Detention facilities for juveniles should be decentralized and of such size as to facilitate access and contact between the juveniles and their families.  Small-scale detention facilities should be established and integrated into the social, economic and cultural environment of the community.

D.  Physical environment and accommodation

31.  Juveniles deprived of their liberty have the right to facilities and services that meet all the requirements of health and human dignity.

32.  The design of detention facilities for juveniles and the physical environment should be in keeping with the rehabilitative aim of residential

Case 9:16-cv-01150-DNH-DEP   Document 5-2   Filed 09/23/16   Page 60 of 66

treatment, with due regard to the need of the juvenile for privacy, sensory stimuli, opportunities for association with peers and participation in sports, physical exercise and leisure-time activities. The design and structure of juvenile detention facilities should be such as to minimize the risk of fire and to ensure safe evacuation from the premises. There should be an effective alarm system in case of fire, as well as formal and drilled procedures to ensure the safety of the juveniles. Detention facilities should not be located in areas where there are known health or other hazards or risks.

33. Sleeping accommodation should normally consist of small group dormitories or individual bedrooms, account being taken of local standards. During sleeping hours there should be regular, unobtrusive supervision of all sleeping areas, including individual rooms and group dormitories, in order to ensure the protection of each juvenile. Every juvenile should, in accordance with local or national standards, be provided with separate and sufficient bedding, which should be clean when issued, kept in good order and changed often enough to ensure cleanliness.

34. Sanitary installations should be so located and of a sufficient standard to enable every juvenile to comply, as required, with their physical needs in privacy and in a clean and decent manner.

35. The possession of personal effects is a basic element of the right to privacy and essential to the psychological well-being of the juvenile. The right of every juvenile to possess personal effects and to have adequate storage facilities for them should be fully recognized and respected. Personal effects that the juvenile does not choose to retain or that are confiscated should be placed in safe custody. An inventory thereof should be signed by the juvenile. Steps should be taken to keep them in good condition. All such articles and money should be returned to the juvenile on release, except in so far as he or she has been authorized to spend money or send such property out of the facility. If a juvenile receives or is found in possession of any medicine, the medical officer should decide what use should be made of it.

36. To the extent possible juveniles should have the right to use their own clothing. Detention facilities should ensure that each juvenile has personal clothing suitable for the climate and adequate to ensure good health, and which should in no manner be degrading or humiliating. Juveniles removed from or leaving a facility for any purpose should be allowed to wear their own clothing.

37. Every detention facility shall ensure that every juvenile receives food that is suitably prepared and presented at normal meal times and of a quality and quantity to satisfy the standards of dietetics, hygiene and health and, as far as possible, religious and cultural requirements. Clean drinking water should be available to every juvenile at any time.

### E.  Education, vocational training and work

38. Every juvenile of compulsory school age has the right to education suited to his or her needs and abilities and designed to prepare him or her for return to society. Such education should be provided outside the detention facility in community schools wherever possible and, in any case, by qualified teachers through programmes integrated with the education system of the country so that, after release, juveniles may continue their education without difficulty. Special attention should be given by the administration of the detention facilities to the education of juveniles of foreign origin or with particular cultural or ethnic needs. Juveniles who are illiterate or have cognitive or learning difficulties should have the right to special education.

39. Juveniles above compulsory school age who wish to continue their education should be permitted and encouraged to do so, and every effort should be made to provide them with access to appropriate educational programmes.

40.  Diplomas or educational certificates awarded to juveniles while in detention should not indicate in any way that the juvenile has been institutionalized.

41.  Every detention facility should provide access to a library that is adequately stocked with both instructional and recreational books and periodicals suitable for the juveniles, who should be encouraged and enabled to make full use of it.

42.  Every juvenile should have the right to receive vocational training in occupations likely to prepare him or her for future employment.

43.  With due regard to proper vocational selection and to the requirements of institutional administration, juveniles should be able to choose the type of work they wish to perform.

44.  All protective national and international standards applicable to child labour and young workers should apply to juveniles deprived of their liberty.

45.  Wherever possible, juveniles should be provided with the opportunity to perform remunerated labour, if possible within the local community, as a complement to the vocational training provided in order to enhance the possibility of finding suitable employment when they return to their communities.  The type of work should be such as to provide appropriate training that will be of benefit to the juveniles following release.  The organization and methods of work offered in detention facilities should resemble as closely as possible those of similar work in the community, so as to prepare juveniles for the conditions of normal occupational life.

46.  Every juvenile who performs work should have the right to an equitable remuneration.  The interests of the juveniles and of their vocational training should not be subordinated to the purpose of making a profit for the detention facility or a third party.  Part of the earnings of a juvenile should normally be set aside to constitute a savings fund to be handed over to the juvenile on release.  The juvenile should have the right to use the remainder of those earnings to purchase articles for his or her own use or to indemnify the victim injured by his or her offence or to send it to his or her family or other persons outside the detention facility.

F.   Recreation

47.  Every juvenile should have the right to a suitable amount of time for daily free exercise, in the open air whenever weather permits, during which time appropriate recreational and physical training should normally be provided.  Adequate space, installations and equipment should be provided for these activities.  Every juvenile should have additional time for daily leisure activities, part of which should be devoted, if the juvenile so wishes, to arts and crafts skill development.  The detention facility should ensure that each juvenile is physically able to participate in the available programmes of physical education.  Remedial physical education and therapy should be offered, under medical supervision, to juveniles needing it.

G.   Religion

48.  Every juvenile should be allowed to satisfy the needs of his or her religious and spiritual life, in particular by attending the services or meetings provided in the detention facility or by conducting his or her own services and having possession of the necessary books or items of religious observance and instruction of his or her denomination.  If a detention facility contains a sufficient number of juveniles of a given religion, one or more qualified representatives of that religion should be appointed or approved and allowed to hold regular services and to pay pastoral visits in private to juveniles at their request.  Every juvenile should have the right to receive visits from a qualified representative of any religion of his or her choice, as well as the right not to participate in religious services and

freely to decline religious education, counselling or indoctrination.

### H.  Medical care

49.  Every juvenile shall receive adequate medical care, both preventive and remedial, including dental, ophthalmological and mental health care, as well as pharmaceutical products and special diets as medically indicated.  All such medical care should, where possible, be provided to detained juveniles through the appropriate health facilities and services of the community in which the detention facility is located, in order to prevent stigmatization of the juvenile and promote self-respect and integration into the community.

50.  Every juvenile has a right to be examined by a physician immediately upon admission to a detention facility, for the purpose of recording any evidence of prior ill-treatment and identifying any physical or mental condition requiring medical attention.

51.  The medical services provided to juveniles should seek to detect and should treat any physical or mental illness, substance abuse or other condition that may hinder the integration of the juvenile into society.  Every detention facility for juveniles should have immediate access to adequate medical facilities and equipment appropriate to the number and requirements of its residents and staff trained in preventive health care and the handling of medical emergencies.  Every juvenile who is ill, who complains of illness or who demonstrates symptoms of physical or mental difficulties, should be examined promptly by a medical officer.

52.  Any medical officer who has reason to believe that the physical or mental health of a juvenile has been or will be injuriously affected by continued detention, a hunger strike or any condition of detention should report this fact immediately to the director of the detention facility in question and to the independent authority responsible for safeguarding the well-being of the juvenile.

53.  A juvenile who is suffering from mental illness should be treated in a specialized institution under independent medical management.  Steps should be taken, by arrangement with appropriate agencies, to ensure any necessary continuation of mental health care after release.

54.  Juvenile detention facilities should adopt specialized drug abuse prevention and rehabilitation programmes administered by qualified personnel. These programmes should be adapted to the age, sex and other requirements of the juveniles concerned, and detoxification facilities and services staffed by trained personnel should be available to drug- or alcohol-dependent juveniles.

55.  Medicines should be administered only for necessary treatment on medical grounds and, when possible, after having obtained the informed consent of the juvenile concerned.  In particular, they must not be administered with a view to eliciting information or a confession, as a punishment or as a means of restraint.  Juveniles shall never be testees in the experimental use of drugs and treatment.  The administration of any drug should always be authorized and carried out by qualified medical personnel.

### I.  Notification of illness, injury and death

56.  The family or guardian of a juvenile and any other person designated by the juvenile have the right to be informed of the state of health of the juvenile on request and in the event of any important changes in the health of the juvenile.  The director of the detention facility should notify immediately the family or guardian of the juvenile concerned, or other designated person, in case of death, illness requiring transfer of the juvenile to an outside medical facility, or a condition requiring clinical care within the detention facility for more than 48 hours.  Notification should also be given to the consular authorities of the State of which a foreign juvenile is a citizen.

57.   Upon the death of a juvenile during the period of deprivation of liberty, the nearest relative should have the right to inspect the death certificate, see the body and determine the method of disposal of the body.  Upon the death of a juvenile in detention, there should be an independent inquiry into the causes of death, the report of which should be made accessible to the nearest relative.  This inquiry should also be made when the death of a juvenile occurs within six months from the date of his or her release from the detention facility and there is reason to believe that the death is related to the period of detention.

58.   A juvenile should be informed at the earliest possible time of the death, serious illness or injury of any immediate family member and should be provided with the opportunity to attend the funeral of the deceased or go to the bedside of a critically ill relative.

J.   Contacts with the wider community

59.   Every means should be provided to ensure that juveniles have adequate communication with the outside world, which is an integral part of the right to fair and humane treatment and is essential to the preparation of juveniles for their return to society.  Juveniles should be allowed to communicate with their families, friends and other persons or representatives of reputable outside organizations, to leave detention facilities for a visit to their home and family and to receive special permission to leave the detention facility for educational, vocational or other important reasons.  Should the juvenile be serving a sentence, the time spent outside a detention facility should be counted as part of the period of sentence.

60.   Every juvenile should have the right to receive regular and frequent visits, in principle once a week and not less than once a month, in circumstances that respect the need of the juvenile for privacy, contact and unrestricted communication with the family and the defence counsel.

61.   Every juvenile should have the right to communicate in writing or by telephone at least twice a week with the person of his or her choice, unless legally restricted, and should be assisted as necessary in order effectively to enjoy this right.  Every juvenile should have the right to receive correspondence.

62.   Juveniles should have the opportunity to keep themselves informed regularly of the news by reading newspapers, periodicals and other publications, through access to radio and television programmes and motion pictures, and through the visits of the representatives of any lawful club or organization in which the juvenile is interested.

K.   Limitations of physical restraint and the use of force

63.   Recourse to instruments of restraint and to force for any purpose should be prohibited, except as set forth in rule 64 below.

64.   Instruments of restraint and force can only be used in exceptional cases, where all other control methods have been exhausted and failed, and only as explicitly authorized and specified by law and regulation.  They should not cause humiliation or degradation, and should be used restrictively and only for the shortest possible period of time.  By order of the director of the administration, such instruments might be resorted to in order to prevent the juvenile from inflicting self-injury, injuries to others or serious destruction of property.  In such instances, the director should at once consult medical and other relevant personnel and report to the higher administrative authority.

65.   The carrying and use of weapons by personnel should be prohibited in any facility where juveniles are detained.

## L.  Disciplinary procedures

66.  Any disciplinary measures and procedures should maintain the interest of safety and an ordered community life and should be consistent with the upholding of the inherent dignity of the juvenile and the fundamental objective of institutional care, namely, instilling a sense of justice, self-respect and respect for the basic rights of every person.

67.  All disciplinary measures constituting cruel, inhuman or degrading treatment shall be strictly prohibited, including corporal punishment, placement in a dark cell, closed or solitary confinement or any other punishment that may compromise the physical or mental health of the juvenile concerned.  The reduction of diet and the restriction or denial of contact with family members should be prohibited for any purpose.  Labour should always be viewed as an educational tool and a means of promoting the self-respect of the juvenile in preparing him or her for return to the community and should not be imposed as a disciplinary sanction.  No juvenile should be sanctioned more than once for the same disciplinary infraction.  Collective sanctions should be prohibited.

68.  Legislation or regulations adopted by the competent administrative authority should establish norms concerning the following, taking full account of the fundamental characteristics, needs and rights of juveniles:

   (a)  Conduct constituting a disciplinary offence;

   (b)  Type and duration of disciplinary sanctions that may be inflicted;

   (c)  The authority competent to impose such sanctions;

   (d)  The authority competent to consider appeals.

69.  A report of misconduct should be presented promptly to the competent authority, which should decide on it without undue delay.  The competent authority should conduct a thorough examination of the case.

70.  No juvenile should be disciplinarily sanctioned except in strict accordance with the terms of the law and regulations in force.  No juvenile should be sanctioned unless he or she has been informed of the alleged infraction in a manner appropriate to the full understanding of the juvenile, and given a proper opportunity of presenting his or her defence, including the right of appeal to a competent impartial authority.  Complete records should be kept of all disciplinary proceedings.

71.  No juveniles should be responsible for disciplinary functions except in the supervision of specified social, educational or sports activities or in self-government programmes.

## M.  Inspection and complaints

72.  Qualified inspectors or an equivalent duly constituted authority not belonging to the administration of the facility should be empowered to conduct inspections on a regular basis and to undertake unannounced inspections on their own initiative, and should enjoy full guarantees of independence in the exercise of this function.  Inspectors should have unrestricted access to all persons employed by or working in any facility where juveniles are or may be deprived of their liberty, to all juveniles and to all records of such facilities.

73.  Qualified medical officers attached to the inspecting authority or the public health service should participate in the inspections, evaluating compliance with the rules concerning the physical environment, hygiene, accommodation, food, exercise and medical services, as well as any other aspect or conditions of institutional life that affect the physical and mental health of juveniles.  Every juvenile should have the right to talk in

confidence to any inspecting officer.

74.  After completing the inspection, the inspector should be required to submit a report on the findings.  The report should include an evaluation of the compliance of the detention facilities with the present rules and relevant provisions of national law, and recommendations regarding any steps considered necessary to ensure compliance with them.  Any facts discovered by an inspector that appear to indicate that a violation of legal provisions concerning the rights of juveniles or the operation of a juvenile detention facility has occurred should be communicated to the competent authorities for investigation and prosecution.

75.  Every juvenile should have the opportunity of making requests or complaints to the director of the detention facility and to his or her authorized representative.

76.  Every juvenile should have the right to make a request or complaint, without censorship as to substance, to the central administration, the judicial authority or other proper authorities through approved channels, and to be informed of the response without delay.

77.  Efforts should be made to establish an independent office (ombudsman) to receive and investigate complaints made by juveniles deprived of their liberty and to assist in the achievement of equitable settlements.

78.  Every juvenile should have the right to request assistance from family members, legal counsellors, humanitarian groups or others where possible, in order to make a complaint.  Illiterate juveniles should be provided with assistance should they need to use the services of public or private agencies and organizations which provide legal counsel or which are competent to receive complaints.

### N.  Return to the community

79.  All juveniles should benefit from arrangements designed to assist them in returning to society, family life, education or employment after release. Procedures, including early release, and special courses should be devised to this end.

80.  Competent authorities should provide or ensure services to assist juveniles in re-establishing themselves in society and to lessen prejudice against such juveniles.  These services should ensure, to the extent possible, that the juvenile is provided with suitable residence, employment, clothing, and sufficient means to maintain himself or herself upon release in order to facilitate successful reintegration.  The representatives of agencies providing such services should be consulted and should have access to juveniles while detained, with a view to assisting them in their return to the community.

### V.  PERSONNEL

81.  Personnel should be qualified and include a sufficient number of specialists such as educators, vocational instructors, counsellors, social workers, psychiatrists and psychologists.  These and other specialist staff should normally be employed on a permanent basis.  This should not preclude part-time or volunteer workers when the level of support and training they can provide is appropriate and beneficial.  Detention facilities should make use of all remedial, educational, moral, spiritual, and other resources and forms of assistance that are appropriate and available in the community, according to the individual needs and problems of detained juveniles.

82.  The administration should provide for the careful selection and recruitment of every grade and type of personnel, since the proper management of detention facilities depends on their integrity, humanity, ability and professional capacity to deal with juveniles, as well as personal suitability for the work.

83.  To secure the foregoing ends, personnel should be appointed as professional officers with adequate remuneration to attract and retain suitable women and men.  The personnel of juvenile detention facilities should be continually encouraged to fulfil their duties and obligations in a humane, committed, professional, fair and efficient manner, to conduct themselves at all times in such a way as to deserve and gain the respect of the juveniles, and to provide juveniles with a positive role model and perspective.

84.  The administration should introduce forms of organization and management that facilitate communications between different categories of staff in each detention facility so as to enhance co-operation between the various services engaged in the care of juveniles, as well as between staff and the administration, with a view to ensuring that staff directly in contact with juveniles are able to function in conditions favourable to the efficient fulfilment of their duties.

85.  The personnel should receive such training as will enable them to carry out their responsibilities effectively, in particular training in child psychology, child welfare and international standards and norms of human rights and the rights of the child, including the present rules.  The personnel should maintain and improve their knowledge and professional capacity by attending courses of in-service training, to be organized at suitable intervals throughout their career.

86.  The director of a facility should be adequately qualified for his or her task, with administrative ability and suitable training and experience, and should carry out his or her duties on a full-time basis.

87.  In the performance of their duties, personnel of detention facilities should respect and protect the human dignity and fundamental human rights of all juveniles, in particular, as follows:

   (a)  No member of the detention facility or institutional personnel may inflict, instigate or tolerate any act of torture or any form of harsh, cruel, inhuman or degrading treatment, punishment, correction or discipline under any pretext or circumstance whatsoever;

   (b)  All personnel should rigorously oppose and combat any act of corruption, reporting it without delay to the competent authorities;

   (c)  All personnel should respect the present Rules.  Personnel who have reason to believe that a serious violation of the present Rules has occurred or is about to occur should report the matter to their superior authorities or organs vested with reviewing or remedial power;

   (d)  All personnel should ensure the full protection of the physical and mental health of juveniles, including protection from physical, sexual and emotional abuse and exploitation, and should take immediate action to secure medical attention whenever required;

   (e)  All personnel should respect the right of the juvenile to privacy, and in particular should safeguard all confidential matters concerning juveniles or their families learned as a result of their professional capacity;

   (f)  All personnel should seek to minimize any differences between life inside and outside the detention facility which tend to lessen due respect for the dignity of juveniles as human beings.