UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------------ X
V.W., a minor, by and through his parent and        :
natural guardian DERECK WILLIAMS, et                :
al., on behalf of themselves and all others         :   16-CV-1150 (DNH) (DEP)
similarly situated,                                 :
                                                    :
                        Plaintiffs,                 :
                                                    :
            v.                                      :
                                                    :
EUGENE CONWAY, Onondaga County Sheriff,             :
in his official capacity, et al.                    :
                                                    :
                        Defendants.                 :
------------------------------------------------------------------ X
```

# SUPPLEMENTAL DECLARATION OF LOUIS J. KRAUS, MD, IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

I, Louis J. Kraus, pursuant to 28 U.S.C. § 1746, declare as follows:

1.  This declaration is submitted in support of the Plaintiffs' Motion for a Preliminary Injunction. If called upon to testify, I could and would do so competently as follows.

2.  I submitted a declaration, dated September 19, 2016, in support of Plaintiffs' Motion for Class Certification. I re-submit that declaration, and all of its attachments, (collectively "September 19 Declaration") as Exhibit 1 to this declaration in support of Plaintiffs' Motion for a Preliminary Injunction. I also supplement the September 19 Declaration with this declaration ("Supplemental Declaration") as described below.

3.  My qualifications are set forth in my September 19 Declaration. *See* September 19 Decl. ¶¶ 2-10. My Curriculum Vitae is attached thereto as Exhibit A.

4.  In addition to my involvement in this case that I outlined in paragraphs 11-17 of my September 19 Declaration, for the purpose of preparing this Supplemental Declaration, I reviewed a list of mental health staff (including their titles) at the Justice Center and eleven sets

of behavioral health records maintained by Justice Center staff for juveniles detained there, including the six named plaintiffs.[1]  I also reviewed data analysis prepared by Plaintiffs' counsel regarding the Sheriff's Office's use isolation for disciplinary purposes for juveniles.  The behavioral health records and the data analysis that I reviewed are listed in Exhibit 2.

5. I also reviewed several documents regarding the Syracuse City School District's ("District") education policies and practices in the Justice Center, declarations submitted by District officials, the latest Individualized Education Programs ("IEP") of named plaintiff's V.W. and R.C., as well as their uncompleted cell packets that they handed to Plaintiffs' counsel in September 2016.  The school records that I reviewed are listed in Exhibit 2.

6. In forming my opinions below, I relied on my review of the documents, observations of the facility, and evaluations of several juveniles.  I also relied on my academic and clinical experience, and the extensive body of literature regarding the psychiatric effects of solitary confinement, cognitive and behavioral development in adolescents, and juveniles in correctional settings, including those listed in Exhibit C to my September 19 Declaration.

7. My involvement and compensation is detailed in paragraphs 16 and 17 of my September 19 Declaration and remain unchanged.

---

[1] I reviewed behavioral health records for the six named plaintiffs and for M.S., C.B., R.P., D.D., and T.S.  I also reviewed medical records and behavioral records for M.S. that were not provided for the other juveniles.  These behavioral health records are listed in Exhibit 2. I understand that defendants may have additional behavioral health records for the six named plaintiffs and for M.S., C.B., R.P., D.D., and T.S. that were not provided to plaintiffs' counsel before the filing of plaintiffs' motion for a preliminary injunction.  I therefore qualify the opinions in this supplemental declaration by stating that, following my review of any additional behavioral health records, if I learn of anything that materially changes my opinions, I will submit a revised declaration reflecting those changes.

**OPINIONS AND BASES OF OPINIONS**

I. **THE SHERIFF'S OFFICE'S DISCIPLINARY ISOLATION POLICY EXPOSES JUVENILES TO A SUBSTANTIAL RISK OF SERIOUS HARM.**

8. It is my opinion that the Sheriff's Office's policy and practice of using isolation for disciplinary purposes (which from now on I refer to as "disciplinary isolation"), involving locking juveniles in a closed cell with minimal or no contact with their peers, removing them from their regular routines, and depriving them of meaningful social activities, education, and mental health treatment, is seriously harmful to juveniles as a group.

9. As I explain in greater depth in my September 19 Declaration, research shows that disciplinary isolation creates a substantial risk of serious harm to the social, psychological, and emotional development of juveniles as a group, especially for juveniles with mental illnesses. *See* September 19 Decl. ¶¶ 30-38; *see also* Ex. C to the September 19 Decl. As I also explain in my September 19 Declaration, the growing recognition of these dangers has led medical professional organizations including the American Medical Association ("AMA"), the American Academy of Child and Adolescent Psychiatry ("AACAP"), and the National Commission on Correctional Health Care ("NCCHC") to reject the use of disciplinary isolation for juveniles. *See* September 19 Decl. ¶¶ 37, 50-52.

10. Based on my review of data analysis provided to me by Plaintiffs' counsel, I find it shocking that the Sheriff's Office places juveniles in disciplinary isolation so frequently, especially for such lengthy sentences. The data analysis that I reviewed showed that for juveniles admitted in the Justice Center in the relevant one-year period and detained there for 6 days or more, the average length of stay was 59 days. Of the juveniles who spent 59 days or more at the jail, ninety-six percent were punished with disciplinary isolation. Of the juveniles who were detained at Justice Center for six days or more and placed in disciplinary isolation,

3

nearly half (44%) served more than 20 days in isolation. In my opinion, the Sheriff's Office's use disciplinary isolation is so contrary to well-known scientific and medical literature and the professional policies of the AMA, AACAP, and NCCHC that no ethical mental health professional could disagree that all juveniles punished with isolation in the Justice Center face a substantial risk of serious harm.

11.   For juveniles' with mental illnesses, the professional consensus regarding the danger they face in disciplinary isolation is best reflected in the accreditation standards for isolation in psychiatric hospitals. The Joint Commission, the major accrediting agency for psychiatric hospital systems, prohibits the use of seclusion for disciplinary purposes for adults and children. (A true and correct copy of this standard is attached to this declaration as Exhibit 3.) Seclusion is only permitted for the least amount of time possible for the immediate physical protection of an individual and only in situations where less restrictive interventions have been ineffective. *See id.* Because of the risks of seclusion, the standards require that a physician evaluate anyone in seclusion within one hour to ensure that their health and safety are not compromised by isolation. *See id.*

12.   When I assessed the six named plaintiffs in September 2016, I found that they all had preexisting mental illnesses, which is consistent with the jail's behavioral health records I reviewed for the six named plaintiffs. What was striking to me is that, based on my review of eleven sets of behavioral health records for juveniles, the Sheriff's Office places juveniles in disciplinary isolation in complete disregard of how their mental health histories makes them more vulnerable to the harms of isolation. Ten of the eleven sets of records I reviewed noted serious mental health concerns and mood disorders, ranging from bipolar disorder, Attention Deficit Hyperactivity Disorder ("ADHD"), anxiety disorders, unspecified major depression,

4

post-traumatic stress disorder ("PTSD"), and histories of inpatient treatment, self-harm, and suicide attempts. Some juveniles were on anti-psychotic and anti-anxiety medication before they came to the Justice Center.

13. Juveniles with such mental health histories, noted by the jail's own mental health staff, are likely to have a proclivity for self-harm and suicide when in isolation. Nonetheless, the Sheriff's Office placed them all in disciplinary isolation, putting the most vulnerable children in significant danger. This practice is cruel and completely contrary to professional norms like the Joint Commission standards.

## II. STAFF AT THE JUSTICE CENTER FAIL TO ADDRESS THE SUBSTANTIAL RISK OF HARM FOR JUVENILES IN DISCIPLINARY ISOLATION.

14. Based on my review of the eleven sets of behavioral records, it is my opinion that the lack of meaningful mental health treatment provided to juveniles confirms that the Sheriff's Office and its staff are failing to address the serious harm or substantial risk of serious harm that is correlated with the use disciplinary isolation for juveniles, especially those juveniles with mental health concerns.

15. Youth in disciplinary isolation at the Justice Center appear to be trapped in a terrible cycle: youth experience profound psychological distress in disciplinary isolation, seek help from mental health workers, receive no meaningful treatment services, are moved to a different isolation cell under suicide watch, and are released from that isolation cell and returned to disciplinary isolation after they deny feeling suicidal.

16. In my review of the eleven sets of behavioral records, I found that jail staff provided juveniles in disciplinary isolation with woefully inadequate supervision and assessment. In my opinion, juveniles in isolation should be assessed by a psychiatrist or psychologist (in other words, a doctor with a D.O., M.D., Psy. D., or Ph. D. degree) or a licensed

5

independent practitioner within one hour of being in isolation, similar to the Joint Commission standards, and followed up by a licensed mental health worker on a daily basis thereafter. Instead, based on these behavioral records, my understanding is that primarily social workers, and sometimes nurses, make rounds every three to four days during which they screen for individuals experiencing suicidal ideation. These records show that juveniles are kept in disciplinary isolation for weeks or months without ever seeing a psychiatrist or psychologist. This is a major failing on the part of the Sheriff's Office because psychiatrists and psychologists are better trained than social workers and nurses and thus better equipped at both recognizing mental distress or deterioration and determining the appropriate treatment.

17. When I toured the Justice Center, I personally observed a mental health worker making rounds and talking to a juvenile, and her conversation with the juvenile lasted just a couple minutes. The records show that there is no continuity of care for each individual—a different mental health worker may come on each visit. This is particularly troubling because juveniles in disciplinary isolation are likely to develop trust issues, and having to repeatedly encounter a new mental health worker impedes the development of therapeutic relationships and precludes productive counseling and therapy. Nearly weekly rounds conducted by different workers and lasting just a few minutes per juvenile falls far short of appropriate supervision for juveniles who face substantial risk of serious harm in isolation.

18. In my review of the behavioral health records, I also found no evidence in the records that jail staff provided meaningful treatment services to juveniles in disciplinary isolation, or even to juveniles under suicide watch. I found no evidence that juveniles in disciplinary isolation were given therapeutic services or meaningful counseling services. There were no notes regarding group therapy or one-on-one therapy sessions for any of the juveniles.

In fact, the records belie a total lack of individualized care for these children. From child to child, eight of the eleven sets of records I reviewed contained identical diagnoses: adjustment disorder, which is a short-term condition for people having difficulty coping with stress caused by a traumatic life event, like being incarcerated. They all contained stock phrases, recommending that each juvenile adjust to incarceration the same way: reading, talking to others, and self-referring (i.e., submitting a request to be seen by a mental health worker) when necessary. Some juveniles were told to talk to others as a coping mechanism while they were in disciplinary isolation and prohibited from doing so, showing how routine these stock phrases were thrown about with no consideration of the juvenile's circumstances. When youth self-refer, they appear to be given the same stock coping instructions to manage their stress.

19. It appears from the records that therapeutic services are not provided to juveniles anywhere in the Justice Center, not even in the behavioral health unit. For example, while in the jail's behavioral health unit, R.C. asked for "someone to talk to" and said "I need counseling." (A true and correct copy of a redacted excerpt of R.C.'s behavioral health records is attached to this declaration as Exhibit 4.)[2] R.C. had been in "the box" before, reported that since then he's only been sleeping 2 hours a day, and cried when he asked for counseling. *See id.* A mental health worker told R.C. that "psychotherapy is not offered in this environment." *See id.* Instead, the records indicate that the worker offered R.C. word search games to help him cope, which is neither counseling nor meaningful help for someone in need. *See id.* Three days later R.C. expressed suicide ideation.

20. The level of isolation and inadequate attention to juveniles' mental health needs consistently led to a substantial risk of serious harm. Eight of the eleven juveniles, at some

---

[2] Due to the sensitive nature of behavioral health records, I am only attaching as exhibits portions which I quote in this Supplemental Declaration.

7

point, reported suicidal ideation or intent. When juveniles express suicidal ideation or intent to mental health workers, they are brought to strip cells that are more barren than the conditions in disciplinary isolation. Once in these strip cells, juveniles are again left alone in their cell while a staff member keeps them under continual observation.

21.     According to the records, none of the juveniles placed under suicide watch received any meaningful therapeutic services. Five out of the eight juveniles who reported suicidal ideation never saw a psychiatrist or psychologist. There was no evidence of group therapy or one-on-one therapy sessions. There was no evidence of any meaningful counseling. The records reflect no meaningful individualized treatment plan to get the youth back to a place where he is safe to return to general population. Mental health staff use the Columbia screening tool for suicide risk, but there is no documentation that they provide meaningful follow-up to the screening. Based on what I've read in the documents, no immediate psychiatric intervention takes place. There is no reasonable clinical assessment of the etiology (i.e., the causes) of the suicidal ideations. There is no evaluation for hospitalization. There is no indication of any aftercare or step-down plan to get the child back into a place where he is safe to return to the juvenile unit. In my opinion, all of these are necessary components of evaluating and treating youth who express suicidal ideation, and from the records, none of these services exist at the Justice Center.

22.     Without appropriate treatment to help the child return to general population, the only apparent way for juveniles to get out of isolation in suicide watch is to recant their initial suicidal ideations. The records indicate that nearly every youth under suicide watch was released only after they recanted their initial suicidal thoughts. Juveniles who have expressed suicidal ideation before are at a much higher risk for experiencing those same thoughts again. But mental

health workers appeared to consistently minimize the juvenile's suicidal ideations or examples of distress that would corroborate their suicidal ideations, like expressions of feeling "stressed" or "depressed," or a significant loss of weight. A psychiatrist or psychologist may have caught these warning signs and understood that a juvenile's willingness to threaten suicide is a signal of serious mental health concerns and real trauma not to be minimized. Apparently, the mental health workers believed that each of these children has the same malingering pathology that would cause them to lie about suicidal ideation—an assessment that I, as a medical doctor, find implausible. It is especially implausible because the medical literature is unanimous in showing that isolation increases the risk of suicide for juveniles.

23. It is my opinion that these threats of self-harm and suicide needed to be addressed through appropriate psychiatric intervention. The need for immediate intervention is especially acute because, in many cases, the youth have preexisting serious mental health disorders. Because the best predictor of someone's present behavior is past behavior, the juveniles who have a history of suicidal threats or behaviors or a diagnosis of a prior mental health disorder, such as a major depression, should be carefully evaluated for mental health risks and risks of self-harm. Of the eleven records I reviewed, at least two of the juveniles reported one prior incidence of self-harm or suicidal ideation. One of the juveniles had a history of trying to hang himself, which is one of the most common ways that youth in corrections commit suicide.

24. For the youths I evaluated, it is my opinion that they truly experienced suicidal ideation, and later minimized or recanted their thoughts of suicide. Based on my interviews of several juveniles, it is my belief that this could have been driven by a desire to get out of the horrendous conditions in the behavioral health unit, or by embarrassment and pride.

25. For example, M.R. reported that he "exaggerated" his suicidality but also reported losing 25 pounds—about 17% of his bodyweight—despondency, anxiety, and trouble falling asleep at night. (A true and correct copy of a redacted excerpt of M.R.'s behavioral health records is attached to this declaration as Exhibit 5.) Those are all signs of major depression. He also indicated a fear of being shot, which might signal PTSD from a prior traumatic experience outside the jail. According to his records, M.R. was never seen by a medical doctor for his suicidal ideation. In my opinion, the lack of attention to M.R.'s and other juveniles' serious mental health concerns left them exposed to additional harmful effects of disciplinary isolation, including a high risk of suicide and self-harm.

26. The Sheriff's Office's system of inadequate care where youth are placed in isolation causing trauma and suicidal ideation, then placed in another form of isolation completely devoid of meaningful treatment, puts youth at a much higher risk of morbidity and mortality.

### III. Juveniles With Disabilities In Disciplinary Isolation Are Being Harmed Because They Are Denied Special Educational Instruction.

27. Based on my review of the District's policies and the IEPs and cell packets of V.W. and R.C., I find the absolute lack of special education instruction for juveniles with qualifying disabilities under the IDEA in disciplinary isolation to be extremely concerning.

28. As I explain in my September 19 Declaration, research shows that 60 to 70 percent of juveniles in detention facilities have an underlying mental illness. *See* September 19 Decl. ¶ 57. These juveniles typically have underlying learning disabilities and other educational struggles, which is why many have IEPs before placement into correctional facilities. *See id.*

29. I understand that the defendants have a Memorandum of Understanding under which the District is supposed to provide education to juveniles detained at the Justice Center. I

reviewed the District's policies, and it is my opinion that, without providing special educational instruction or assistance to juveniles with IEPs, the defendants cannot meet the basic educational needs of juvenile's qualifying disabilities under the IDEA. Direct special educational instruction or assistance is necessary to resolve the difficulties juveniles with IEPs have with reading comprehension, understanding math concepts, and being organized. As I explain in my September 19 Declaration, juveniles with qualifying disabilities under the IDEA need specialized instruction and accommodations in order to access education. *See id.*

30. I have been informed by Plaintiffs' counsel that the two cell packets I reviewed are the only ones in counsels' possession that are clearly identified as cell packets. R.C. and V.W. handed these packets to Plaintiffs' counsel in September 2016.

31. In my opinion the cell packets that the District provided to V.W. and R.C. do not count as education, much less special education. As explained above, the defendants could not meet the basic educational needs of these juveniles without providing direct specialized instruction or assistance. But the District failed to even take minimal steps to attempt to educate these children because the cell packets for V.W. and R.C. were not tailored to their IEPs; in fact, the cell packets were not even tailored to their grade levels.

32. I reviewed each cell packet given to V.W. and R.C. and compared each one to the IEPs of V.W. and R.C. In my opinion, to the extent these two cell packets reflect the District's general practice, they indicate that the District is systemically failing to modify the cell packets of juveniles with qualifying disabilities under the IDEA. Based on my review of the cell packets and the accompanying IEPs, I do not believe anyone from the District ever looked at these juvenile's IEPs prior to compiling the cell packet.

33. According to the IEP of R.C., dated July 19, 2016, he has an educational eligibility of Emotional Disturbance. He requires special education instruction in all core classes, individual counseling service and a variety of other special education services. R.C. reads at the second grade level and his math ability is approximately at the third grade level.

34. Though R.C. reads at approximately the second grade level, the reading material in his cell packet is minimally at a junior high school reading level. In my opinion, it would be difficult if not impossible for R.C. to read the materials in the cell packet, especially without direct instruction or assistance from a special education teacher. R.C.'s math ability is approximately at the third grade level, and, in my opinion, R.C. would be unable to meaningfully complete any of the math work included in the cell packet I reviewed.

35. According to the IEP of V.W., dated January 17, 2016, V.W. has an educational eligibility of Specific Learning Disability in Reading and Math. He requires both direct and indirect consultant teacher services for English Language Arts and Math. According to V.W.'s IEP, he also requires numerous supplementary aids and services or program modifications, including but not limited to use of a graphic organizer, use of a calculator and re-teaching of materials. According to V.W.'s IEP, he also "requires intensive reading intervention." These accommodations are necessary so that V.W.'s basic education needs can be met.

36. In my opinion, the reading level in the cell packet given to V.W. is well above his academic level, and he would be unable to meaningfully read and understand it, especially without the assistance of a special education teacher. There is a significant amount of math work included in V.W.'s cell packet. In my opinion, the level of the math work included in V.W.'s cell packet is well above his grade and ability level. In my opinion, V.W. could not complete the

math in his cell packet without direct teacher instructions and accommodations, like the use of a calculator, which I understand is not permitted in the Justice Center's Segregated Housing Unit.

37.     There is simply no evidence to suggest that the cell packets have been modified in any way to address these juveniles' special education needs as described in the IEPs of R.C. or V.W.

38.     What is so alarming about the defendants' failure to provide special education instruction or assistance to juveniles with qualifying disabilities under the IDEA is that these children have the highest level of need and are the most vulnerable.  They have a higher failure rate than other juveniles and a higher dropout rate.  They should be receiving the most educational help, but the defendants' are giving them no special educational instruction.

39.     Juveniles with qualifying disabilities under the IDEA who are denied educational instruction are being harmed.  Juveniles who are detained in disciplinary isolation will be released without any educational progress.  They then continue with the same learning deficits, and fall further behind educationally.  The older a juvenile gets without progressing, the less likely it is that they will graduate high school or obtain their GEDs because they are more likely to drop out.

I certify under penalty of perjury that the foregoing is true and correct.

Dated: December 14, 2016
       Syracuse, New York

                                        Louis J. Kraus, MD
                                        Chief, Child and Adolescent Psychiatry
                                        Rush University Medical Center