UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
V.W., a minor, by and through his parent          :
and natural guardian DERECK WILLIAMS;             :
R.C., a minor, by and through his parent and      :
natural guardian SANDRA CHAMBERS;                 :
C.I., a minor, by and through his parent and      :
natural guardian VERTELL PENDARVIS;               :          16-CV-1150 (DNH) (DEP)
M.R., a minor, by and through his parent and      :
natural guardian KAREN RAYMOND;                   :
F.K., a minor, by and through his parent and      :
natural guardian KASHINDE                         :
KABAGWIRA; and J.P., a minor, by and             :
through his parent and natural guardian           :
ALISSA QUIÑONES; on behalf of                     :
themselves and all others similarly situated,     :
                              Plaintiffs,          :
                  vs.                              :
EUGENE CONWAY, Onondaga County Sheriff, :
in his official capacity; ESTEBAN GONZALEZ, :
Chief Custody Deputy of the Onondaga County       :
Justice Center, in his official capacity; KEVIN M. :
BRISSON, Assistant Chief Custody Deputy, in       :
his official capacity; and SYRACUSE CITY          :
SCHOOL DISTRICT,                                  :
                              Defendants.          :
                                                  :
                                                  :
                                                  :
-----------------------------------------------------------x

**DECLARATION OF BARRY ALAN KRISBERG, Ph.D.**

I, Barry Alan Krisberg, declare as follows:

1.     I submit this declaration in support of the Plaintiffs' Motion for a Preliminary Injunction. If called upon to testify, I could and would do so competently as follows.

## QUALIFICATIONS

2.     I am presently a Visiting Scholar at the Institute for Study of Societal Issues at the University of California Berkeley. Prior to being invited to be a Visiting Scholar, I was a Distinguished Senior Fellow and Lecturer-in-Residence at the Law School at U.C. Berkeley from 2010-2015 where I taught classes on Corrections Law and conducted research on a range of juvenile justice and adult corrections topics.

3.     I have served as an expert or a court monitor in a number of court-supervised efforts to reform conditions of youth corrections, including in cases seeking to end the use of disciplinary isolation against incarcerated youth in California (*G.F. v. Contra Costa County*, No. 13-cv-03667 (N.D. Cal. filed 2013) and *Farrell v. Brown*, No. RG03079344 (Cal. Superior Ct., Alameda County filed 2003)) and Illinois (*R.J. v. Jones*, No. 12-cv-07289 (N.D. Ill. filed 2012)). I have published numerous reports for the courts in these cases and have authored several academic articles about the process of reducing the abuse of young people in corrections facilities.

4.     I am regularly consulted by the United States Department of Justice on corrections issues, including investigations and reviews under the federal Civil Rights of Institutionalized Persons Act. These consultations in part involved the use of disciplinary isolation in the Marion County Juvenile Detention Center in Indiana, the women's section of the King County jail in Washington, and the N.A. Chaderjian Youth Correctional Facility in California.

5.      I have consulted New York state and local entities on best practices in responding to serious and violent juvenile offenders. In 2009, the New York State Office of Children and Family Services ("OCFS") retained me to analyze its secure facilities during a pending Civil Rights of Institutionalized Persons Act investigation, including to examine the impact of disciplinary isolation on safety of staff and incarcerated young people. In 2010, the Inspector General in New York State hired me to conduct an investigation of the OCFS facilities. In 2014, I was invited by the New York City Department of Correction to review its policies and practices pertaining to disciplinary isolation of juveniles on Rikers Island. I toured the adolescent unit of Rikers Island and met with the Commissioner and other top managers to discuss reform to the use of disciplinary isolation in that unit.

6.      I have also regularly consulted on the use of disciplinary isolation in other facilities across the country. In 2003, the Attorney General in California hired me to analyze the use of disciplinary isolation in the Behavior Management Units and Temporary Detention Units in the California Division of Juvenile Justice. I was also invited by the Texas Youth Commission and the Florida Department of Juvenile Justice to examine their policies and procedures pertaining to disciplinary isolation. I have also been retained by attorneys to review the policies and practices involving disciplinary isolation of juveniles in the Michigan Department of Corrections and in the Alaska prison system.

7.      In 1990, I was appointed by the California Legislature to the Blue Ribbon Commission on Inmate Population Management and have served on many statewide reviews of corrections over the past two decades. Some of these reviews involved the use of maximum security prisons and Special Housing Units in the California Department of Corrections and Rehabilitation.

8.      From 1983-2009, I was the President of the National Council on Crime and Delinquency. In that role I often testified before Congress and state legislatures about the best evidenced-based corrections policies.

9.      I have published four textbooks on juvenile justice and corrections, including *The Children of Ishmael* with James Austin (1978), *Reinventing Juvenile Justice* with James Austin (1993), *Juvenile Justice: Redeeming Our Children* (2005), and *American Corrections Concepts and Controversies* with Susan Marchionna and Christopher Hartney (2015).

10.     I have received many awards in the field of juvenile justice, including the American Society of Criminology's August Vollmer Award. This award recognizes individuals whose scholarship or professional activities have made outstanding contributions to justice or to the treatment or prevention of criminal or delinquent behavior.

11.     I am a member of the University of California Criminal Justice and Health Consortium that studies the mental health issues and reentry challenges created by disciplinary isolation in California prisons and jails.

12.     I have a Ph.D. in Sociology and a Master's degree in Criminology from the University of Pennsylvania. In addition to the academic appointments referenced above, I have served as an Assistant Professor of Criminology at the University of California, Berkeley, as well as Adjunct Faculty at the John Jay College of Criminal Justice, the University of Hawaii, and the Hubert Humphrey Institute at the University of Minnesota.

13.     I have included as <u>Exhibit A</u> the true and correct copy of my most recent *curriculum vitae* that lists all of my publications since 1976, including the past ten years. During the past four years, I testified in court or via deposition or declaration in *State of Alaska v. Thompson* (Alaska Superior Court, Third Judicial District, 2016); *Gilman v. Brown* (E.D. Cal.

4

2016); *R.J. v. Jones* (N.D. Ill., 2014 and 2015); *People v. Gonzales* (Los Angeles, Superior Court, 2013); *People v. Padillo* (Los Angeles County Superior Court, 2013); and *People v. Nortenos* (Alameda Superior Court, 2011).

## INVOLVEMENT IN THIS CASE

14.     In this case, I have been retained by the New York Civil Liberties Union Foundation and Legal Services of Central New York (together, "Plaintiffs' counsel") to provide professional services as an expert in connection with litigation challenging the use of disciplinary isolation on juveniles (16- and 17-year-olds) at the Onondaga County Patrick J. Corbett Justice Center (the "Justice Center"). The Justice Center is operated by the Onondaga County Sheriff's Office.

15.     For the purpose of preparing this declaration I reviewed a number of documents regarding the Justice Center provided to me by Plaintiffs' counsel, including the Sheriff's Office's policies, spreadsheets documenting the use of disciplinary isolation against juveniles, and disciplinary records of juveniles. The documents that I reviewed regarding the Justice Center are listed in Exhibit B.

16.     I also visited the Justice Center on October 31, 2016. While I was at the Justice Center, I observed the male juvenile pod (2A), other general population pods (5BGH1 and 3C), the Segregation Housing Units ("SHU") (5BSH2 and 5BSH3), the mental health unit (5C), the infirmary (5A), and the school. I was accompanied on the facility tour by counsel for Plaintiffs and for the Sheriff's Office, a photographer, and an officer employed by the Justice Center who answered questions about facility operations. After the facility tour I interviewed named plaintiffs R.C., C.I., and V.W. In forming my opinions below, I relied on my review of the documents, facts learned during the facility tour, and interviews with these juveniles.

17.     I also relied on my professional experiences, including my experience in monitoring the dramatic reductions or elimination of disciplinary isolation as part of court-sanctioned consent agreements in the California Division of Juvenile Justice (*Farrell v. Brown*), the Illinois Department of Juvenile Justice (*R.J. v. Montgomery*), and the Contra Costa County Juvenile Hall in California (*G.F v. Contra County*). The Contra Costa County Juvenile Hall, like the Justice Center, is predominantly a pre-trial facility.

18.     I also relied on my knowledge of relevant research in this area, including knowledge acquired through academic study and review of research of others, including literature listed in <u>Exhibit C</u>.

19.     In most states in this country, children under the age of 18 who are awaiting trial are considered minors who must be held in juvenile detention facilities under the law. New York is an outlier in prosecuting all children over the age of 16 as adults and placing them in adult facilities like the Justice Center. The experiences of juvenile detention facilities are informative for analyzing the practices at the Justice Center, however, because such facilities manage juveniles in the same age range as the juveniles housed at the Justice Center. In order to maintain facility discipline and security, inmate behavior management practices should be driven by the maturity level of the youths being held—not by the legal distinctions drawn by state law on who is prosecuted as an adult.

20.     I understand that as the litigation progresses I will be reviewing additional documents and information regarding the Justice Center and the detained juveniles and that I will be providing additional services and opinions based on those documents and information.

21.     I am being compensated at the rate of $250 per hour (except $100 per hour for travel time) to prepare this declaration, and my compensation is not dependent on my opinions or the outcome in this matter.

<u>**OPINIONS AND BASES OF OPINIONS**</u>

**I.     DISCIPLINARY ISOLATION OF JUVENILES IS NOT REASONABLY CALCULATED TO RESTORE FACILITY DISCIPLINE AND SECURITY.**

22.     Based on my professional experiences and academic research, my opinion is that disciplinary isolation of juveniles is not reasonably calculated to restore facility discipline and security. I use the term disciplinary isolation here to mean a type of punishment in which the inmate is removed from his regular activity and recreation schedule and isolated from virtually any form of human contact other than corrections staff. This is sometimes referred to as restrictive housing, room confinement, or solitary confinement. The place of disciplinary isolation may be the inmates' own cell or a special administrative or segregated housing unit.

23.     Research shows that disciplinary isolation is an ineffective disciplinary technique for restoring discipline and security in a juvenile population because isolating a child does nothing to rehabilitate misbehaving youths or deter bad behavior or encourage better behavior. Removing a juvenile from meaningful contact with others does not help them understand *why* what they did was wrong, or help them apply those principles to their future behavior. The conditions of isolation also do not encourage juveniles to reflect on their behavior and change it in the future.

24.     In fact, research shows that disciplinary isolation of juveniles is counterproductive to facility discipline and security because it is likely to increase juveniles' frustration and anger. Placing youths in disciplinary isolation increases assaultive behavior in the facility. Youths held in disciplinary isolation for extended time periods have been observed to be very assaultive with

7

other inmates when they are returned to regular living units. (Deitch et al., 2009). One study of Texas juvenile corrections facilities found that referring juveniles to disciplinary isolation in response to misconduct correlated with an increase in misconduct. (Deitch, 2016).

25.     Disciplinary isolation of juveniles with pre-existing mental health conditions or extreme forms of trauma and post-traumatic stress disorder is particularly counterproductive to facility discipline and security. When those juveniles are held in disciplinary isolation without adequate medical attention or counseling they can become overly suspicious, even paranoid, and fear physical threats and intimidation by others. (Report of the Attorney General's National Task Force on Children Exposed to Violence, 2012). Some of these youths adopt an inmate culture that emphasizes the exploitation and victimization of others, which undermines facility safety.

**A.     There Is an Emerging Professional Consensus That Disciplinary Isolation of Juveniles Is Not Reasonably Calculated to Restore Facility Discipline and Security.**

26.     My opinion above is supported by the emerging consensus among professional organizations in the corrections field. Reflecting this consensus, a wide variety of professional groups have urged that facilities eliminate the disciplinary isolation of juveniles, including the American Correctional Association, the National Commission on Correctional Health Care, the Council of Juvenile Corrections Administrators, the Juvenile Detention Alternatives Initiative, the Performance-based Standards project, the National Council on Juvenile and Family Court Judges, the Campaign for Youth Justice, and the National Council on Crime and Delinquency. The U.S. Department of Justice has also recommended ending the use of disciplinary isolation for juveniles. (U.S. Department of Justice Report and Recommendations Concerning the Use of Restrictive Housing, 2016).

27.     The prevailing professional opinion is that the practice of disciplinary isolation of juveniles should be replaced with a behavior management system that combines a system of

8

meaningful rewards for good behavior with a graduated system of sanctions for misbehavior. (Deitch, 2016; DeMuro, 2014). This type of system has been adopted by various models for managing juveniles, including the Performance-based Standards of the Council of Juvenile Corrections Administrators, the Positive Behavior Interventions & Supports framework, the Missouri model, the Sanctuary model used by New York's OCFS, and the Core Correctional Practices of the University of Cincinnati's Corrections Institute. There is consensus that such a system is effective for managing youth behavior, while disciplinary isolation is counterproductive to safety for the reasons described above.

28.     A system of meaningful rewards for good behavior promotes positive reinforcement and encourages good behavior. Potential rewards for good behavior include snacks, movies, verbal praise, eligibility for additional work assignments, access to games, or access to additional phone calls or commissary privileges. Some facilities have implemented a point-based incentive system in which the juvenile can earn points for good behavior, working up to a reward. It is well understood that positive reinforcement and encouragement can produce more durable behavior management than harsh penalties. (Johnson et al., 2013).

29.     A graduated system of sanctions for misbehavior requires correctional officers to manage juveniles by using an appropriate level of sanction that is responsive to the severity of misconduct. The sanction used must be tailored to the misconduct so that the sanction provides an opportunity for the youth to reflect on their behavior. The goal of discipline should not be punitive and instead must be geared towards changing the youth's behavior in the future. The sanction must be applied immediately after the misconduct to be effective because juveniles respond best to immediacy. The more time that passes between the misbehavior and the sanction, the less the juvenile will be able to connect the two and learn from the experience.

30.     Under a graduated system of sanctions, minor violations of facility rules by juveniles are managed through lower-level sanctions like verbal counseling, participation in mediation, apology letters, temporary loss of privileges (such as commissary, telephone, or TV privileges) and ratcheting back of the rewards earned for good behavior. Counseling does not mean ordering the youths to stop the misbehavior; it means a conversation with the youths as to why certain behavior is not desirable or productive and whether there are other options for behavior.

31.     More serious violations are managed through temporary isolation from the general population, or "separation," which gives the juvenile time to "cool down" and the facility a tool to protect life and safety. Separation does not necessarily have to involve locking a youth into a room. For instance, a youth can be separated from the general population and told to walk around in a separate area such as a library or another recreation area. While the youths are separated, they should be in virtually constant interaction with staff, and mental health professionals must be utilized to assess the psychological status of the young person. Importantly, separation should never involve the denial of basic education, recreation, and other services. Separation should not be utilized for administrative convenience. In rare cases of serious and repeat violations, some juveniles may require longer-time separation from general population with intensive mental health interventions, but such separation should entail access to regular programming, extensive human contact, and intensive mental health services.

32.     In addition to these components of a behavior management system endorsed by a consensus of professionals, experts in the field agree on the importance of preventing misbehavior in juveniles through effective staff training, appropriate staffing levels, environmental factors, the use of small groups within the units, appropriate classification, gang

management, highly structured daily schedules with programming, and youth empowerment. (Deitch, 2016; DeMuro, 2014; Arifuku et al., 2010).

**B.   Many Facilities Have Eliminated The Disciplinary Isolation of Juveniles Without Compromising Facility Discipline and Security.**

33.   My opinion and the professional consensus that disciplinary isolation of juveniles is not reasonably calculated to restore facility discipline and security is also supported by the experiences of facilities that have eliminated the use of disciplinary isolation without compromising facility discipline and security. Indeed, reforms in these facilities led to more positive outcomes for facility discipline and security.

34.   For example, I am familiar with the reforms at the Contra Costa County Juvenile Hall, a county pre-trial detention facility in California, because I was appointed by the federal court to monitor a consent decree involving the excessive use of disciplinary isolation there (*G.F. v. Contra Costa County*). In that lawsuit, the County submitted proposed policy and procedural revisions to reduce the use of disciplinary isolation for young people in its juvenile hall. These reforms have now been implemented in certain units within the facility. The use of isolation from the general population in those units is close to zero and those who are separated from the general population get intensive services. In those units, there has been a significant decline in any kind of disciplinary incidents.

35.   I have also been personally involved in the court-supervised efforts to restrict the use of disciplinary isolation in state facilities in California (*Farrell v. Brown*) and Illinois (*R.J. v. Jones*). I was the court appointed monitor in these cases. In both instances the cases were resolved via consent agreements, and the court approved detailed remedial plans. In California, the court and the parties have all agreed that the state juvenile corrections agency has met all of its requirements. In Illinois, the court agreed that a remedial plan to reform the isolation of youth

11

was adequate, and the Illinois Department of Juvenile Justice is actively pursuing implementation of these new policies and practices.

36.     These very positive developments are laudable since historically the use of disciplinary isolation in both states was excessive, harsh, and appeared to violate a number of state and federal laws.

37.     In the entire California state juvenile system, the number of youths in restricted housing was less than 30 out of approximately 600 in the system in the first months of 2016— down from nearly 400 youths in lockup units per day a decade ago. Detailed procedures are in place regarding the restrictive housing units, and even those youths who are transferred to restrictive housing units for assaulting others or other very serious disciplinary misconduct spend most of their day out of their rooms and receive the full range of educational, recreational, and counseling services.

38.     In Illinois, there has been a drop in both the number of youths in isolation and the duration of their stays. Youths who must be isolated are returned to their regular rooms and generally return to regular programming in less than one hour. Isolation from the general population for up to 24 hours requires mandatory medical and mental health reviews and staff check in with the isolated youths at least every 15 minutes.

39.     Both California and Illinois are committed to providing all mandated educational and other services to young people that must be temporarily isolated from the general population.

40.     In both states, the population of state youth corrections facilities is composed of very serious and violent offenders. Top state managers and facility administrators in California and Illinois observe that the amount of violence and the number of staff assaults have not increased due to the reduced utilization of disciplinary isolation.

41.     The positive reforms in California and Illinois have also been observed in state and local facilities in Ohio, Mississippi, Louisiana, and the Santa Clara County Probation Department. These facilities have reduced the isolation of youths without compromising the security of the facility. In Ohio, for example, the Department of Youth Services announced that its reforms, which included the elimination of the use of disciplinary isolation, resulted in a 22% decrease in the rate of violent acts in its facilities over a one-year period (comparing January-November 2014 to January-November 2015). (A true and correct copy of this announcement is attached as Exhibit D). In the Santa Clara County Probation Department, the total number of disciplinary incidents dropped by almost three-quarters comparing the time period before and after the 2006 reforms based on the Missouri model. (A true and correct copy of the study of the Santa Clara County Probation Department reforms is attached as Exhibit E.)

42.     These successful reductions in the use of disciplinary isolation of juveniles have been achieved through the implementation of the types of reforms outlined above in paragraphs 27-32. For example, the Contra Costa County Juvenile Hall, following the University of Cincinnati's Core Correctional Practices model, developed the behavior management system a true and correct copy of which is attached as Exhibit F. In addition to crafting a clear behavior management plan, the various facilities that have reduced the use of disciplinary isolation adopted other reforms, including improved staff training, better security and housing classification, reduced living unit size, enriched educational, vocational, recreational, and treatment programming, and, in some cases, increased and specialized staffing in high-risk units.

## II. THE USE OF DISCIPLINARY ISOLATION OF JUVENILES AT THE JUSTICE CENTER IS NOT REASONABLY CALCULATED TO RESTORE FACILITY DISCIPLINE AND SECURITY.

43.     Based on my visit to the Justice Center and my review of its policies and practices relating to the disciplinary isolation of juveniles, as well as my professional experiences and academic research described above, my opinion is that the Onondaga County Sheriff's Office's use of disciplinary isolation to punish juveniles for their misbehavior—whether described as "lock-in," or "administrative segregation" or "punitive segregation"—is not reasonably calculated to restore facility discipline or security.

44.     First, the policy of the Sheriff's Office allows disciplinary isolation to be imposed as punishment for any and all rules infractions regardless of safety concerns raised. (Inmate Rule Book at 4-14). In reviewing the summary of two months of disciplinary incidents from November and December 2015 provided by counsel, I was struck by how many of the misbehavior punished with disciplinary isolation did not have to do with physically assaultive behavior. Imposing disciplinary isolation to punish verbal misconduct that does not pose an imminent danger, such as yelling and cursing and other fairly typical adolescent behavior, is not reasonably calculated to restore facility discipline or security because disciplinary isolation will simply agitate and frustrate the juveniles more. Verbal misconduct by juveniles that does not present imminent danger is more effectively de-escalated and decompressed by the lower-level sanctions described in paragraph 30, especially counseling. Simply ordering the juvenile to stop the misbehavior, however, as the Justice Center staff appear to do, is not a productive form of counseling.

45.     Second, even where misconduct creates imminent danger, the policy of the Sheriff's Office allows officers to keep juveniles in isolation long after the threat has dissipated –

including for up to 15 business days in so-called "administrative segregation" while awaiting a disciplinary hearing. (Inmate Rule Book at 14). Again, keeping juveniles in isolation after safety concerns have dissipated is not reasonably calculated to restore facility discipline or security because such isolation will simply agitate and frustrate the juveniles more. A more effective way to manage misbehavior that poses imminent danger is to temporarily separate the juvenile for the time that it takes for the juvenile to cool down, as described in paragraph 31. This period of time needed to assure safety should be measured in hours, not days or weeks. This separation can be combined with other sanctions as described in paragraph 30, and the disciplinary hearing to determine the appropriate sanction must occur as soon as possible given that juveniles respond to immediacy.

46.     Finally, the conditions of disciplinary isolation of juveniles at the Justice Center do nothing to reinforce positive behavior or create the conditions under which the juveniles can reflect on and improve their behavior. By treating juveniles like animals, the Justice Center is conveying the message that they are expected to behave like animals.

47.     The conditions in the SHU are deplorable; they were amongst the worst that I had seen in my decades of touring correctional facilities. The unit had an odor of human waste and was approaching bedlam with echoes of inmates yelling from their cells when I visited. Attached as Exhibit G are photographs that fairly and accurately represent the SHU at the time of my visit.

48.     The SHU cells are dark, filled with graffiti, and unhygienic. The people I saw in the SHU cells did not seem to have books, photos, or any personal items with them. Attached as Exhibit H are photographs that fairly and accurately represent one of the SHU cells at the time of my visit.

49.     The recreation area in the SHU is a barren, cage-like structure devoid of exercise equipment. Attached as <u>Exhibit I</u> are photographs that fairly and accurately represent the cage-like recreation area at the time of my visit.

50.     The juveniles reported that they were not getting school or any form of one-on-one instruction while in the SHU. Based on their statements interaction with mental health staff appeared to be exceedingly short and not designed to facilitate any assessment or positive interaction. In addition, the juveniles reported not feeling safe in the SHU because of verbal and physical abuse by adult inmates who live in the same unit. These conditions do not help build better behavior.

51.     Although the juvenile pod at least had better lighting, less graffiti, and better recreational space than the SHU, the cells are similar in size to the SHU cells. Attached as <u>Exhibit J</u> are photographs that fairly and accurately represent the cells in the juvenile pod at the time of my visit.

52.     Only one officer was on staff at the juvenile pod to interact with and manage youths' behavior although there are 56 cells in the pod. The so-called "law library" on the pod also did not have a single book, legal or otherwise, for the juveniles to read; at the time of our visit it was full of laundry. As with the SHU cells, disciplinary isolation of juveniles in their cells does nothing to reinforce positive behavior or create the conditions under which the juveniles can reflect on their misbehavior in a productive way.

**III.    THE SHIERIFF'S OFFICE CAN SAFELY ELIMINATE DISCIPLINARY ISOLATION OF JUVENILES WITHOUT COMPROMISING FACILITY DISCIPLINE AND SECURITY.**

53.     It is my opinion that the Sheriff's Office can and should safely and successfully eliminate its use of disciplinary isolation by following the professional consensus outlined above and the blueprint of reforms implemented in other jurisdictions. The Sheriff's Office should

16

commit to eliminating disciplinary isolation of juveniles as soon as possible for the safety of the facility, its employees, and all juveniles who are housed there.

54.     In order to safely and successfully eliminate the use of disciplinary isolation, the Sheriff's Office should replace the current disciplinary system with a comprehensive behavior management system of the type described in paragraphs 27-31.

55.     The Sheriff's Office should also take necessary steps to implement and support the behavior management plan that it develops. This includes increasing staffing, mandating training for staff, assessing housing risks and needs and making structural changes as necessary, and reducing idleness at the facility by ensuring that juveniles are engaging in programming and structured activities.

56.     First, increasing staffing at the Justice Center will be particularly important because staff must be able to work directly with youths and identify and resolve problems in order to properly implement the behavior management plan. The current staff-to-youth ratio at the Justice Center is one staff for the entire juvenile pod, which can hold up to 56 juveniles. Best practices for staff-to-youth ratios are 1 staff person to every 8 to 10 youths. (Deitch, 2016). The Prison Rape Elimination Act (PREA) standards mandates that by October 2017, juvenile facilities maintain staff-to-youth ratios of 1 to 8 during waking hours and 1 to 16 during sleeping hours. 28 C.F.R. § 115.313(c).

57.     Second, adequate staff training will be necessary to implement a behavior management plan. This should include training on the new behavior management system and on crisis management, conflict resolution, adolescent development, and de-escalation.

58.     Third, appropriate housing classification is a key component for a facility to effectively deploy its behavior management plan. Youths should be classified at intake based on

individual risk to commit violence as well as vulnerability to violence. (Deitch, 2016). This classification should facilitate decisions regarding housing and staffing.  Effective implementation of classification at the Justice Center may require investing in physical modifications so that there are two or more general living areas for the juveniles. Having multiple general living areas will allow the facility to separate youths based on their classification.

59.     Finally, structured activity and programming are essential to reducing idleness. Most violence occurs when youths are idle. (Deitch, 2016). Education is of course the primary vehicle for structured activity for incarcerated youths, but additional programming for after-school hours and weekends can be arranged by inviting volunteers from the community. Youths must also have access to recreation and large-muscle exercise as part of their daily routine. (Deitch, 2016). Addressing the problem of idleness is likely to have a significant impact in maintaining facility discipline and security.

I certify under penalty of perjury that the foregoing is true and correct.

Dated:    December ___6,  2016
          Berkeley,  California

Barry Alan Krisberg, Ph.D.