# EXHIBIT A

# BARRY ALAN KRISBERG, Ph.D.
## CURRICULUM VITAE

## CURRENT POSITION:

2015- Present          Visiting Scholar, Institute for the Study of Societal Issues, UC Berkeley

## EDUCATION:

1971          University of Pennsylvania, Ph.D. (Sociology)
1968          University of Pennsylvania, M.A. (Criminology)
1967          University of Pennsylvania, B.A. (Sociology)

## PROFESSIONAL EXPERIENCE:

2016-Present          Member of the UC Criminal Justice and Health Consortium
2013-2015          Distinguished Senior Fellow, UC Berkeley Law School
2014- Present          Research Consultant North American Family Institute
2014-Present          Consultant to Annie E. Casey Foundation and the New York City DOC          2014- Present          Consultant Sacramento Ca Probation Department
2014-Present          Consultant Juvenile Innocence and Fair Sentencing Clinic, Loyola Law School
2014-Present          Advisor, Performance Based Standards Learning Institute
2014-Present          Expert Consultant Stanford Law School, Immigration Rights Clinic
2014-Present          Consultant to Plaintiffs' Attorneys in Doe et al. vs Michigan DOC
2013-Present          Expert Witness in People vs. Edel Gonzalez
2013-Present          Consultant to Disability Rights Advocates
2013 Present          Court Appointed Expert in R.J. versus Jones Consent Decree
2013-Present          Consultant, Federal Public Defender, Gilman vs. Brown
2010-2014          Consultant, N.Y. State Office of Children and Family Services
2011 –2013          Director of Research and Policy , Chief Justice Earl Warren Institute on Law and Social Policy, UC Berkeley Law School
2010 - 2011          Distinguished Senior Fellow, Berkeley Center for Criminal Justice,
2009 - 2010          Visiting Scholar, John Jay College
1983 - 2009          President, National Council on Crime and Delinquency (NCCD)
2004 - Present          Alameda County Superior Court Appointee, Farrell v. Cate Consent          Decree Monitor
2003 - Present          Lecturer in Residence, University of California, Berkeley School of Law
2003 - 2004          Head of Expert Panel, Review of the California Youth Authority re Farrell v. Cate
2002 - 2003          Consultant to the California Inspector General on the Youth Authority

**BARRY ALAN KRISBERG, Ph.D.**
Biographical Sketch, Page 2

| | |
|---|---|
| 2001 - Present | Adjunct Professor of Psychiatry, University of Hawaii |
| 1990 - 1995 | Faculty, National Judicial College |
| 1979 - 1983 | Research Director, NCCD |
| 1984 - 1987 | Adjunct Professor, Hubert Humphrey Institute of Public Affairs, University of Minnesota |
| 1977 - 1979 | Senior Research Associate, NCCD |
| 1971 - 1977 | Assistant Professor, School of Criminology, University of California, Berkeley |
| 1976 | Lead Consultant on Delinquency Prevention, National Commission on Standard and Goals for Juvenile Justice and Delinquency Prevention |

**PUBLICATIONS:**

2016 *(expected)* *"Reforming Youth Facilities*" in Peter Sturmey (editor), The Wiley Handbook of Aggression and Violence. Volume 3, Societal Interventions. New York: John Wiley and Sons.

2016 "*How Do You Eat an Elephant: Reducing Mass Incarceration in California One Small Bite at a Time",* Annals of the American Academy of Political and Social Science, vol. 664 pp. 136-154

2015   with Yitzhak Bakal, Paul DeMuro and Vincent Schiraldi, *Remembering  Jerome G. Miller: A Juvenile Justice Revolutionary,* The Crime Report, August 18, 2015.

2015 with Susan Marchionna and Christopher Hartney, *American Corrections: Concepts and Controversies*  Sage Publications, Thousand Oaks, CA

2014 "*Reforming the California Division of Juvenile Justice: Lessons Learned*" McGeorge Law Review, Volume 46; pp. 775-816, June 2014

2013   *Let's End "Lawlessness" in the Justice System*, The Crime Report , December 31, 2013

2014 *Progress of the Safety and Welfare Remedial Plan: R.J et al., vs Jones*, Berkeley: Earl Warren Institute, UC Berkeley Law School (Oct. 30, 2014)

2013   *Deukemejian Had it Right –rehab, not cells,* San Francisco Chronicle, September15, 2013

2013   *Without accountability for some state programs, it's like putting the money on the stump and running,* Sacramento Bee, August 30, 2013

**BARRY ALAN KRISBERG, Ph.D.**
Biographical Sketch, Page 3

2013   Comprehensive Report on Safety and Welfare issues: Farrell v Beard, Berkeley: UC Berkeley Law School (September, 13, 2013).

2013   Expert Report on Safety and Welfare issue: R.J et al., vs. Bishop, Berkeley: UC Berkeley Law School, September, 23, 2013

2013   *Reforming the California Division of Juvenile Justice: What's the End Game,* Federal Sentencing Reporter, Volume 25: No. 4, April 2013

2013, Review of Mays and Ruddell, *Do the Crime, Do the Time,*  Punishment and Society, Santa Barbara: Praeger, September, 2013

2013, Review of Miraslava Chavez-Garcia,  *States of Delinquency, Criminal Law and Criminal Justice Books,* Chicago: University of Chicago Press, April, 2013

2013 Review of Geoff Ward, *The Black Child-Savers,* Criminal Law and Criminal Justice Books Criminal Justice Books, Chicago: University of Chicago Press, July 2013.

2012 *Election 2012: Crime Policy at the Crossroads.* The Crime Report October, 2012

2012 *Finding Money in California Prisons,* Los Angeles Times, June 6, 2012.

2012    *JDAI Sites and States: An Evaluation of the Juvenile Detention Alternatives Initiative*, Chief Justice Earl Warren Institute on Law and Social Policy, University of California, Berkeley Law School, March , 2012.

2012: *California's Youth Prisons Nearing an End,* San Francisco Chronicle, February 1, 2012.

2012   *There is No Juvenile Crime Wave:  A Call to End the War Against Children* in To Build a Better Criminal Justice System, Marc Mauer, and Kate Epstein (Eds.), pp. 32-33, The                   Sentencing Project Research and Advocacy for Reform.

2011   *The Future of Juvenile Corrections* in Donna Bishop and Barry Feld, The Oxford Handbook of Juvenile Crime and Juvenile Justice, New York: Oxford University          Press (December 2011).

2011   *Getting the Genie Back in the Bottle: California's Prison Gulag,* Hogajushinop, Fujimoto Tetsuya Sensei Koki Kien Ronbunshu (pp. 5-31), Chuodaigakuhogakukai (October 2011).

2011   *Realignment: A Bold New Era in California Corrections* (with Eleanor Taylor-Nicholson),
          Chief Justice Earl Warren Institute on Law and Social Policy, University of California,              Berkeley School of Law (September 2011).

**BARRY ALAN KRISBERG, Ph.D.**
Biographical Sketch, Page 4

2011   *The Long and Winding Road: Juvenile Corrections Reform in California,* Chuo University            Law Review (May 2011).

2011   LA Times Op Ed by Barry Krisberg and Jeanne Woodford:  *Don't fear the Prison Decision*            (May 31, 2011).

2011   *Reducing Gang Violence through Reentry Services,* (with Abbie VanSickle), Municipal            Action Guide, The California Cities Gang Prevention Network (March 2011).

2010   *Where is the fire?  Immigrants and Crime in California* (with Veronica Smith), Berkeley            Center for Criminal Justice, University of California, Berkeley School of Law (October            2010).

2010   *California Progress Report:  Where is the Fire?*


2010   *A New Era in California Juvenile Justice:  Downsizing the State Youth Corrections*
        *System* (with Linh Vuong, Christopher Hartney, and Susan Marchionna), National Council on Crime and Delinquency and Berkeley Center for Criminal Justice, University of California, Berkeley School of Law (October 2010).

2010   *"The Extravagance of Imprisonment revisited"* (with Linh Vuong, Christopher Hartney, and Susan Marchionna) Judicature. (September – October 2010): Volume 94 Number 2, 70-80.

2010   The Crime Report: Your Complete Criminal Justice Source, *The Slow March to Justice for Children (May 31, 2010).*

2009   *Youth Violence Myths and Realities:  A Tale of Three Cities* (with Christopher Hartney, Angela Wolf, and Fabiana Silva) Oakland CA: National Council on Crime and Delinquency.

2009   *Youth in Gangs: Who Is at Risk?* (with Caroline Glesmann and Susan Marchionna) Oakland CA: National Council on Crime and Delinquency.

2009   *Special Report: Rebuilding the Infrastructure for At-risk Youth* (with Linh Vuong)
        Oakland CA: National Council on Crime and Delinquency.

2009   *Special Report: Breaking the Cycle of Abuse in Juvenile Facilities* (with Carolina Guzman and Linh Vuong) Oakland CA: National Council on Crime and Delinquency.

**BARRY ALAN KRISBERG, Ph.D.**
Biographical Sketch, Page 5

2009   *Reform Institutions for Youth in* Richard Shweder et al., (eds),  pp 810-812,
       The Child: An Encyclopedic Companion, Chicago, Illinois: University of Chicago
       Press.

2008   *University of San Francisco Law Review:  The Incarceration of Women in
       California* (with Angela Wolf, Barbara E. Bloom). (Summer 2008): Volume 43
       Number 1, pp. 139-170 (December 2008).

2008   *The Declining Number of Youth in Custody in the Juvenile Justice System* (with
       Antoinette Davis, Chris Tsukida, and Susan Marchionna),
       Oakland CA: National Council on Crime and Delinquency.

2008   *Accelerated Release: A Literature Review* (with Carolina Guzman and Chris
       Tsukida), Oakland CA: National Council on Crime and Delinquency.

2008   "The Politics of the War Against the Young" in Frampton, Lopez, and Simon
       (Eds.), *After the War on Crime: Race, Democracy, and a New Reconstruction*
       (pp. 187-206), New York: New York University Press.

2007   *"Continuing the Struggle for Justice: 100 Years of the National Council on
       Crime and Delinquency"* (with Susan Marchionna and Christopher Baird),
       Thousand Oaks, CA, Sage Publications

2006   "Rediscovering the Juvenile Justice Ideal in the United States"
       Comparative Youth Justice. (June 2006): 6-18.

2005   "Reforming Juvenile Justice" The American Prospect.  (September 2005): A2-
       A5.

2005    "Juvenile Offending" (with Angela Wolf), in Heilbrun, Sevin Goldstein, and
       Redding
        (Eds.), *Juvenile Delinquency* (pp. 67-84), New York: Oxford University Press.

2004        Book review of "Causes of Conduct Disorder and Juvenile Delinquency."
        Social Service Review 78 (September 2004): 520-522.

2004   *Juvenile Justice in Florida: What Kind of Future?*  (with Vanessa Patino, MPA),
       Oakland CA: National Council on Crime and Delinquency.

2004   *Redeeming Our Children: The Quest for the Juvenile Justice Ideal,* Woodland
       Hills, Sage Publications

2004   *Reforming Juvenile Justice Through Comprehensive Community Planning* (with
       Giselle Barry and Emily Sharrock), Oakland CA: National Council on Crime and
       Delinquency.

**BARRY ALAN KRISBERG, Ph.D.**
Biographical Sketch, Page 6

2003   "The End of the Juvenile Court: Prospects for Our Children" in Hawkins, Myers Jr., and Stone (Eds.), *Crime Control and Social Justice: The Delicate Balance* (pp. 93-105), Westport, CT: Greenwood.

2002   "The Role of Faith-Based Groups with High-Risk Youths" *Health and Spirituality Connection,* (Summer).

2002   "Should the Juvenile Court Survive?" in, Silverman, Thornberry, Cohen, and Krisberg (Eds.) *Crime and Justice at the Millennium,* Boston, MA: Kluwer Academic Publishers.

2002   *Crime and Justice at the Millennium* (with Robert Silverman, Terence P. Thornberry, and Bernard Cohen), Boston, MA: Kluwer Academic Publishers.

2001   "The Plight of Children Whose Parents Are in Prison" (with Carolyn Temin), Oakland, CA: National Council on Crime and Delinquency.

2001   "Juvenile Detention Alternatives Initiative Evaluation Report@ (with Sharon Jones, Madeline Wordes, and Judy Wallen), Oakland, CA: National Council on Crime and Delinquency.

2000   Advising Criminal Justice Policy Through Experimental Evaluations: Introduction@ (with Karl Schumann), *Crime and Delinquency*, Vol. 46:147-155.

2000   Advising Criminal Policy Β Are Experimental Evaluations Important?@ *Experimente in Stra. Frecht*, Bremen, Germany: Bremer Institut für Kriminalpolitik.

1999   Substance Abuse and the Juvenile Justice System, Oakland, CA: National Council on Crime and Delinquency.

1999   A Comprehensive Approach to Reducing Youth Violence, Oakland, CA: National Council on Crime and Delinquency.

1998   A Blame Culture, *European Journal on Criminal Policy and Research*, 6:598-600.

1998   The Evolution of an American Institution, *Crime and Delinquency*, Vol. 44:5-8.

1998   The Impact of the Juvenile Justice System and Prospects for Graduated Sanctions in a Comprehensive Strategy@ (with James C. Howell, Ph.D.) in Rolf Loeber & David P. Farrington (Eds.) *Serious and Juvenile Offenders,* Thousand Oaks, CA: Sage Publications.

1997   *The Impact of the Justice System on Serious, Violent, and Chronic Juvenile Offenders*, San Francisco, CA: National Council on Crime and Delinquency.

**BARRY ALAN KRISBERG, Ph.D.**
Biographical Sketch, Page 7

1997    *Reducing Crime in America*, San Francisco, CA: National Council on Crime and Delinquency.

1997    De Debatte um Jugendgewalt in den USA in
           *Kinder- Und Jugend- Kriminalität in Deutschland,* Berlin, Germany.

1996    Rescuing Our Youth From the Tragedy of Violence, *Notes From the Field,* Jessie Ball Dupont Fund, No. 5.

1996    Should the Government Have a Major Role in Reducing Juvenile Crime? *Congressional Digest,* Volume 75 No. 8-9.

1995    *A Sourcebook: Serious, Violent, & Chronic Juvenile Offenders* (with James C. Howell, Ph.D.; J. David Hawkins, Ph.D.; and John J. Wilson, Esq.), Thousand Oaks,
           CA: Sage Publications.

1995    De schijn-oorlog tegen de misdaad@ in *Justitiële verkenningen,* Journal 21, No. 9.

1994    Distorted by Fear: The Make Believe War on Crime@ in *Social Justice: A Journal of Crime, Conflict and World Order,* Vol. 21, No.3, Thousand Oaks, CA: Sage Publications.

1994    *Images and Reality: Juvenile Crime, Youth Violence, and Public Policy* (with Michael Jones), San Francisco, CA: National Council on Crime and Delinquency.

1993    *Reinventing Juvenile Justice* (with James Austin), Newbury Park, CA: Sage Publications. Japanese edition: Sage Publications and Orion Literary Agency.

1993    "Juveniles in State Custody: Prospects for Community-Based Care of Troubled Adolescents" (with David Onek, Michael Jones, and Ira Schwartz), *Focus* (May).

1992    *Excellence in Adolescent Care: The Thomas O'Farrell Youth Center*, San Francisco, CA: National Council on Crime and Delinquency.

1992    *Juvenile Justice: Improving the Quality of Care*, San Francisco, CA: National Council on Crime and Delinquency.

1992    "Youth Crime and Its Prevention: A Research Agenda" in Ira M. Schwartz (ed.) *Juvenile Justice: The Policy Research Agenda for the 1990s*, Columbus, OH: The Ohio State University Press.

**BARRY ALAN KRISBERG, Ph.D.**
Biographical Sketch, Page 8

1992   *National Trends in Juvenile Confinement: 19791989,* (with Robert DeComo and Norma Herrera), Washington, DC: Office of Juvenile Justice and Delinquency Prevention.

1991   Louisiana Juvenile Justice at the Crossroads@ *(*with Peter Freed and Michael Jones), *Focus* (October).

1991   "Are You Now or Have You Ever Been a Sociologist," *Journal of Criminal Law and Criminology*, 82:141-155.

1991   *Juveniles Taken Into Custody Research Program: Report to the Nation,* (with Robert DeComo, Norma Herrera, Martha Steketee, and Sharon Roberts), Washington, DC: Office of Juvenile Justice.

1990   *Unlocking Juvenile Corrections* (with James Austin and Patricia Steele), San Francisco, CA: National Council on Crime and Delinquency.

1990   *Juveniles Taken Into Custody: Developing National Statistics* (with Terence P. Thornberry and James Austin), Washington, DC: Office of Juvenile Justice and Delinquency Prevention.

1990   "Juvenile Justice Reform: Then and Now," *Law and Social Inquiry* (December).

1989   *Demonstration of Post Adjudication Non-Residential Intensive Supervision Programs: Assessment Report* (with Orlando Rodriguez, Audrey Bakke, Deborah Neuenfeldt, and Patricia Steele), San Francisco, CA: National Council on Crime and Delinquency.

1988   "California's Juvenile Justice System in Turmoil" in John Kirlin (ed.) *California Policy Choices 1988,* Sacramento: School of Public Administration, University of Southern California.

1988   *Juvenile Justice Reform: The Bellwether States* (with John Blackmore and Marci Brown), Ann Arbor, MI: Center for Youth Policy, The University of Michigan.

1988   *The Juvenile Court: Reclaiming the Vision,* San Francisco, CA: National Council on Crime and Delinquency.

1988   "The Treatment of Violent Juvenile Offenders," *Newsletter of the American Psychological Association: Division 37*, Oklahoma City, OK: APA Division of Child, Youth, and Family Services.

1988   *San Francisco Jail Needs Assessment* (with associates), San Francisco, CA: National Council on Crime and Delinquency.

**BARRY ALAN KRISBERG, Ph.D.**
Biographical Sketch, Page 9

1988   *The Impact of Juvenile Court Sanctions* (with James Austin, Patricia Steele, and Karen Joe), San Francisco, CA: National Council on Crime and Delinquency.

1988   "Preventing and Controlling Violent Youth Crime: The State of the Art" with Ira Schwartz (ed.) *Violent Juvenile Crime*, Minneapolis, MN: Hubert Humphrey Institute of Public Affairs.

1987   "The Incarceration of Minority Youth" (with Ira Schwartz, Gideon Fishman, Zvi Eisikovitz, Edna Aultman, and Karen Joe), *Crime and Delinquency*, Vol. 33:2.

1986   "Juvenile Corrections: Is There a Future?" (with Allen Breed), *Corrections Today* (December).

1986   "The Watershed of Juvenile Justice Reform" (with James Austin, Ira Schwartz, and Paul Litsky), *Crime and Delinquency*, Vol. 32:5.

1986   *Juvenile Justice: The Vision and the Constant Star*, San Francisco, CA: National Council on Crime and Delinquency.

1985   "The Effectiveness of Supervised Pretrial Release" (with James Austin and Paul Litsky), *Crime and Delinquency*, Vol. 31:519-537.

1985   *Planning Study for the Colorado Division of Youth Services* (with James Austin and associates), San Francisco, CA: National Council on Crime and Delinquency.

1985   "Incarceration in the United States: The Extent and Future of the Problem" (with James Austin), *Annals*, 478:15-30.

1984   "Youth in Confinement: Justice by Geography" (with Ira Schwartz and Paul Litsky), *Journal of Research on Crime and Delinquency*, Vol. 21:153-181.

1984   "Dealing with Offenders: The California Prison Crisis" (with James Austin) in J. J. Kirlin and P. R. Winkler (eds.) *California Policy Choices, 1984*, Sacramento, University of Southern California, Public Affairs Center.

1984   *Rethinking Juvenile Justice: National Statistical Trends* (with Paul Litsky and Ira Schwartz), Minneapolis, MN: Hubert Humphrey Institute of Public Affairs.

1983   "Rethinking Juvenile Justice" (with Ira Schwartz), *Crime and Delinquency*, Vol. 29:333-364.

1983   *Evaluation of the Bail Reform Act of 1979* (with James Austin), Sacramento, CA: Office of Criminal Justice Planning.

1982   *Nevada Prison Masterplan* (with James Austin), San Francisco, CA: National Council on Crime and Delinquency.

**BARRY ALAN KRISBERG, Ph.D.**
Biographical Sketch, Page 10

1982   "Intended and Unintended Consequences of Juvenile Justice Reform in the
        United States@ (with James Austin), *Pravention Abweichendern Verhaltens*,
        Munich,
        Germany: Juventa-Verlog.

1982   "The Unmet Promises of Alternatives to Incarceration" (with James Austin),
        *Crime and Delinquency*, Vol. 28:374-409.

1981   *National Evaluation of Delinquency Prevention* (with associates),
        San Francisco, CA: National Council on Crime and Delinquency Research Center.

1981   "Wider, Stronger and Different Nets: The Dialectics of Criminal Justice
        Reform" (with James Austin), *Journal of Research on Crime and Delinquency*,
        Vol. 18:165-196.

1980   "Themes of Violence and Gang Youth," *Annales Internationales de Criminologie*,
        18:9-18.

1980   "The Utility of Process Evaluation: Crime and Delinquency Programs" in Malcolm
        Klein and Kathy Teilman (ed.) *Handbook of Criminal Justice Evaluation*,
        Newbury Park,
        CA: Sage Publications.

1980   *A New Correctional Policy for California* (with associates), Sacramento,
        CA: Joint Rules Committee, California Legislature.

1980   *Sourcebook on Alternatives to Incarceration in California* (with associates),
        Sacramento, CA: Joint Rules Committee, California Legislature.

1979   *Preliminary Report of the National Evaluation of Delinquency Prevention* (with
        associates), San Francisco, CA: National Council on Crime and Delinquency.

1978   *Pioneering in Delinquency Prevention: The California Experience* (with
        associates),
        San Francisco, CA: National Council on Crime and Delinquency.

1978   *The Children of Ishmael: Critical Perspectives on Juvenile Justice* (with James
        Austin); Palo Alto, CA: Mayfield Press.

1977   "Delinquency Prevention": a report of *Task Force on Juvenile Justice and
        Delinquency Prevention, National Commission on Standards and Goals*,
        Washington DC: Government Printing Office.

**BARRY ALAN KRISBERG, Ph.D.**
Biographical Sketch, Page 11

1976   *Changing Jails*: a pamphlet, San Francisco, CA: Northern California American Civil Liberties Union.

1976   *Preventing Delinquency: A Comparative Analysis of Theories* (ed.), Washington, DC: National Institute of Juvenile Justice and Delinquency Prevention.

1975   *Crime and Privilege*, Englewood Cliffs: Prentice-Hall.

1975   *The Gang and the Community: An Ethnographic Study of Twenty-Two Gang Leaders*, San Francisco, CA: R and E Associates.

1975   "Ethical Issues in Evaluating Criminal Justice Demonstration Projects" (with Paul Takagi) in Reidel and Chappel (eds.) *Evaluating Criminal Justice Programs*, New York, NY: Praeger.

1974   Review of H. P. Newton and E. Erikson's "In Search of Common Ground," *Issues in Criminology* (Fall).

1974   "Teaching the New Criminology,@ *Crime and Social Justice* (Fall).

1974   "The Politics of Delinquency Prevention: The Case of the Urban Leadership Training Program," *Social Policy* (July-August).

1974   "Gang Youth and Hustling: The Psychology of Survival," *Issues in Criminology* (Spring).

1974   "The Sociological Imagination Revisited," *Canadian Journal of Criminology and Corrections* (April).

1973   "Prediction in Criminology: An Appraisal of Research Methods," *Quaderni di Criminologia Clinica* (December and January).

1972   Review of Humphries' Tearoom Trade, *Issues in Criminology* (Winter).

1972   "Prison Legal Libraries: A Criminologist's View," *Prison Legal Libraries: Idea into Reality*, Berkeley, CA: School of Librarianship, University of California (April).

1971   *Urban Leadership Training: A Study of Twenty-Two Gang Leaders*, University of Pennsylvania, Dissertation.

**AWARDS:**

2011        Lifetime Achievement Award, Division of People of Color in Criminology American Society of Criminology

**BARRY ALAN KRISBERG, Ph.D.**
Biographical Sketch, Page 12

| | |
|---|---|
| 1999 | Jessie Ball duPont Fund Award |
| 1997 | Youth Link, The Singapore-America Experience<br>People's Association Youth Movement |
| 1996 | Twenty Years of Service<br>NCCD Board of Directors |
| 1993 | August Vollmer Award<br>American Society of Criminology |

**MEMBERSHIPS:**

- American Society of Criminology
- Division on People of Color and Crime, American Society of Criminology
- International Society of Criminology
- Juvenile Justice Committee International Association Chiefs of Police
- Past Chair of California Attorney General's Policy Advisory Committee on Research
- Past member, California Blue Ribbon Commission on Inmate Population Management
- Past President and Fellow, Western Society of Criminology

# EXHIBIT B

**EXHIBIT B:**

**LIST OF DOCUMENTS REVIWED REGARDING THE JUSTICE CENTER**

- Complaint
- Inmate Rule Book 2016
- CUS023 Inmate Discipline
- CUS 050 Segregation Housing
- CUS007 Inmate Grievances
- CUS021 Inmate Activities
- CUS27 Inmate Access to Telephones
- CUS041 Educational and Vocational Programs
- CUS044 Inmate Recreation
- CUS051 Mental Health Services
- CUS045 Religious Services
- CUS040 Inmate Labor and Industry Programs
- CUS047 Inmate Visitation
- CUS052 Health Services
- Custody Department- Onondaga County Sheriff's Office Website
- Inmate Management- Onondaga County Sheriff's Office Website
- Onondaga County Justice Center-- Onondaga County Sheriff's Office Website
- Juvenile Disciplinary Reports (late 2015)
- Justice Center Raw Data_With Names (Oct 2015-July 2016)
- Disciplinary Papers of A.J., A.M., A.G., C.I., C.C., F.K., J.P., M.R., R.C., T.S., V.W.
- Plaintiffs' Memorandum of Law in Support of Motion for Class Certification
- Signed and Redacted Declarations of R.C., V.W., C.I., M.R., F.K., J.P. in Support of Plaintiffs' Motion for Class Certification
- Declaration of Louis Kraus in Support of Plaintiffs' Motion for Class Certification
- Declaration of Michelle Shames in Support of Plaintiffs' Motion for Class Certification
- Letter from Josh Cotter to Esteban Gonzalez, Nov. 23, 2015.
- Letter Onondaga County Sheriff's Office to Josh Cotter, Dec. 7, 2015.
- Summary of Disciplinary Records Nov 2015.
- Summary of Disciplinary Records Dec 2015.

# EXHIBIT C

**EXHIBIT C:**

**REFERENCES**

- Isami Arifuku et al., Special Report: Assessing the Enhanced Ranch Program of the Santa Clara County Probation Department (National Council on Crime & Delinquency 2010).

- Alexandra Cox, Juvenile Facility Responses to Organizational Change (State Univ. of N.Y. at New Paltz 2013).

- Paul Demuro, Towards Abolishing the Use of Disciplinary Isolation in Juvenile Institutions: Some Initial Ideas (Revised) (2014).

- Michele Deitch et al., From Time Out to Hard Time: Young Children in the Adult Criminal Justice System (Univ. of Tex. At Austin 2009).

- Michele Deitch, Desktop Guide to Quality Practice for Working with Youth in Confinement, National Institute of Corrections, *Establishing a Therapeutic Culture that Supports Behavior Management: Setting Behavioral Expectations for Youth and Staff,* (2016), http://www.desktopguide.info/?q=node/21.

- Leah E. Johnson et al.,*Youth Outcomes Following Implementation of Universal SW-PBIS Strategies in a Texas Secure Juvenile Facility*, 36.3 Education & Treatment of Children 135-145 (2013).

- Report of the Attorney General's National Task Force on Children Exposed to Violence (2012).

- U.S. Department of Justice, Report and Recommendations Concerning the Use of Restrictive Housing (2016).

# EXHIBIT D





## Extraordinary Reform in Ohio's Juvenile Justice System:
### *Providing Reliable Conditions for Helping Youth Change Their Lives*

The Ohio Department of Youth Services (DYS) has undergone extraordinary reform to more effectively serve youthful offenders and help them change their lives. When two class action lawsuits were settled in 2008, facilities were crowded, options for serving youth were limited, and treatment was questionable. The solution has been widespread reform efforts that have impacted every aspect of the department, including youth assessment and placement, treatment within the facilities, processes for release and reentry, and parole supervision. Along with juvenile courts, the agency now relies on a continuum of programs and interventions to serve youth closer to their families and in the least restrictive setting. The intensity of treatment and community supervision is now matched with a youth's risk to reoffend. As a result, the DYS average daily population has decreased from 1,555 youth in 2008 to an average of 460 today.

**Improving Safety**: The Path to Safer Facilities has increased preventative measures, enhanced meaningful activities for youth, revised intervention strategies to hold youth accountable, and eliminated the use of seclusion as a punishment. As a result, the rate of seclusion dropped 89% while the rate of violent acts decreased by 22% when comparing January-November 2014 to January-November 2015.
**Boosting Education and Workforce Training**: High-quality education, apprenticeships, career technical programs, and opportunities for college courses help youth catch up and complete education and prepare for today's workforce.
**Providing Quality Medical Care**: Youth receive comprehensive medical, dental, and nutritional care to address health problems and prevent issues from occurring. DYS provides continuity of care when youth are released back into the community.
**Caring for Youth with Mental Illness**: Treatment for high-risk and vulnerable populations, with a greater appreciation for Trauma-Informed Care ;youth are provided individualized treatment plans and evidence-based treatment services by a team of professionals.
**Ensuring Youth Rights**: Youth have access to counsel and the courts through the Legal Assistance Program and Public Defender's Office. A grievance process, Youth Councils, the Chief Inspector's Office, and a Tip Line provide youth with the opportunity to express concerns and make suggestions.
**Encouraging Family and Community Partnerships**: Family members, volunteers, and community partners are encouraged to participate in all aspects of treatment. DYS provides video conferencing and free transportation to the facilities to keep loved ones connected.
**Focusing on Reentry**: The release process prioritizes releasing youth when they are first legally eligible for release consideration. Youth and their families are active participants in individual reentry meetings, progress reviews, and transitional services to ensure continuity of services and programming.
**Prioritizing Quality Assurance**: DYS created an Office of Quality Assurance and Improvement to ensure that DYS offers a positive culture for youth and staff by improving processes, procedures and outcomes through transparency, data reporting, accountability and continuous improvement.

**Bottom Line**
Substantial improvements have been made, but there is always more work to do to further improve safety for youth and staff and strengthen programming. DYS is committed to not only sustain the progress that has been made, but also to build on effective strategies for youth to transform their lives and ultimately make a safer Ohio.

###

# EXHIBIT E



*Centennial*

*Continuing the Struggle for Justice*

**NCCD**

May  2010

# SPECIAL REPORT

## Assessing the Enhanced Ranch Program of the Santa Clara County Probation Department

Isami Arifuku

Antoinette Davis

Dana Linda

## Introduction

In 2006, the Santa Clara County Probation Department (SCCPD) changed its approach to serving youth in two of its juvenile justice programs—the William F. James Boys' Ranch and the Muriel Wright Center. The overarching objectives of the change were to provide specific therapeutic services to youth and families while maintaining a commitment to public safety. The new cognitive-behavioral model marks a vastly different structure and philosophy, patterned after the evidence-based program developed by the Missouri Division of Youth Services. The new model, entitled the Enhanced Ranch Program, targets youth heavily entrenched in the juvenile justice system and emphasizes positive, peer-based group interactions and a holistic approach to developing individual case plans. Specially trained teams of staff work with small groups of youth offenders. Teams function as therapeutic units that share the daily activities of life with youth and focus on their critical thinking, personal development, and group processes.

The Enhanced Ranch Program serves high-risk, high-need youth with gang affiliations, substance abuse issues, and significant criminal histories. This model was designed to improve outcomes for youth with extensive criminal histories by ensuring that they receive the most appropriate and purposeful services. The primary focus is to help youth internalize healthy behavior that will help them succeed.

In November, 2008, Santa Clara County Chief Probation Officer Sheila Mitchell, commissioned NCCD to evaluate the implementation of the Enhanced Ranch Program. In large part, this report presents the findings of a process evaluation—an analysis of the specific structure and practice instituted by the County. It also presents some preliminary outcomes for youth.

# Needs and Goals

The County changed its approach in part due to a 40% failure rate among wards in the ranches, a high number of incidents at the ranches, the feeling that the old Ranch Program did not promote the growth of detained youth, and a high recidivism rate. The issues faced by SCCPD were not atypical. In fact, their 60% success rate was better than what many juvenile probation departments in the US could claim. To move forward, the County assigned study groups in 2003-04 to explore model programs, sent a 20-person delegation to visit the Missouri program, and then approved $3.2 million to implement the model.

Outcomes sought by SCCPD were to improve successes and lower recidivism rates. Enhanced Ranch programming focused on developing the following:

- Critical thinking and reasoning skills, independent living skills, and self control.

- Anger management and conflict resolution abilities, skills to avoid drugs and gang intervention, communication and decision-making skills, and anti-criminal thinking patterns.

- Individual understanding and maturity to effectively utilize drug, alcohol, and relapse prevention counseling.

- Enhanced reading, writing, math, health, and science skills, with the intention to increase academic performance by one to two grade levels during confinement.

- Vocational skills to help youth obtain an apprenticeship or entry-level employment in construction, auto mechanics, welding, landscaping, horticulture, and computers.

- Family reunification skills.

To administer this program, SCCPD collaborated with a variety of agencies, including the County Office of Education, public health departments, local community-based organizations, and trade unions.

# Methods

Researchers collected a variety of data through site visits, interviews, document review, and focus groups with committed youth. Subjects of NCCD's interviews included residents of the ranches; the Chief Probation Officer and Deputy Chief of Santa Clara County; managers, supervisors, and counselors from James Ranch and the Wright Center; representatives from the courts, Board of Supervisors, District Attorney's and Public Defender's offices; and individuals representing the community-based organizations that provide services to youth at both facilities. In addition, an extract of probation data was obtained and analyzed to compare the Enhanced Ranch Program to the former Ranch Program it replaced.

NCCD assessed the overall operation of the Enhanced Ranch Program as of March, 2009, documented SCCPD's fidelity to the new model, and gauged the extent to which the program was operating as intended. Specific assessments included:

- The distinctions between the Enhanced Ranch Program and the Missouri Model.

- Whether the target population was being served.

- Whether the youth were participating in the prescribed programs and services.

- Whether program goals were well defined and understood by relevant parties.

- Whether the established program goals and objectives were being met.

- Other changes that resulted from the implementation of the Enhanced Ranch Program.

NOTE: All data in this report come from the Santa Clara County Probation Department.

An analytical model with five components—context, goals, identification, intervention, and linkages—structured the collection and analysis of data. NCCD researchers assessed the levels of consistency among these components.

## Context

The Missouri model was the program of choice for the County. Its implementation was shaped by many contingencies, organizational issues, and external forces, as well as by explicit policy and program changes encouraged by the Board of Supervisors, planning committees, SCCPD, community-based organizations, and others.

### Background

Between 2003 and 2006, Santa Clara County and its community partners engaged in Juvenile Detention Reform through a working partnership with the Annie E. Casey Foundation, the main goals of which were to reduce unnecessary youth incarceration and the disproportionate numbers of youth of color in the system. Key strategies were to base decisions on relevant data and to encourage partnerships among juvenile justice agencies, community-based organizations, and other governmental groups. By assessing data collection methods and the effectiveness of rehabilitation services, SCCPD recognized some of its accomplishments. Services to meet the basic needs of youth were in place at the facilities, as were a variety of programs oriented around personal growth, including vocational training, drug treatment, and AA. However, programming did not produce significant growth in youth. While incarcerated and after release, youth displayed the same destructive behavioral patterns that led them into the system; they routinely admitted to "doing their time" but not making changes. Indeed, the Ranch population showed high rates of recidivism, failures, and behavioral incidents.

## Goals

to determine the effectiveness of the Enhanced Ranch Program, the process evaluation explored the extent to which program goals were clearly formulated, were shared and understood by relevant players, and were capable of objective assessment.

> *We were proud of some of the good things that we were doing out there [at the ranches] but we felt that maybe it wasn't enough, and maybe we needed to look at another model.*
>
> *Deputy Chief Kathy Duque*

> *We used to say that 4 out of 10 youth were failing our program, but we had to kind of shift that focus because it really was our program—the way it was designed—that was actually failing 4 out of 10 youth.*
>
> *Sheila Mitchell, Chief Probation Officer, Santa Clara County*

SCCPD's primary goal for the Enhanced Ranch Program was to help youth identify and replace pro-criminal thinking and behavior with those that are prosocial, through active participation and successful completion of rehabilitative programming.

The program design was developed to provide:

- An appropriate assessment and re-assessment of youths' risks and needs.

- A behavior management program based on cognitive change.

- Comprehensive aftercare supervision and aftercare services as youth transitioned back to their homes and communities.

The Department also expected:

- A decrease in rule violations, fights, escapes, and other criminal behaviors inside and outside of institutions.

- An increase in impulse control and problem-solving skills among youth.

- Reductions in the severity of offenses and readmissions to facilities.

## Identifcation

Criteria for admission to the Enhanced Ranch program were clearly defined. This program was geared toward youth with significant criminal histories for whom other alternatives had been tried and for whom they had failed, including community-based rehabilitation programs. These youth could have had multiple felony or misdemeanor offenses and must have been appropriate for an open housing setting. The program did not accept youth with serious sex offenses, those with a history of severe violence, or those who required residential treatment for high-level mental health problems or drug or alcohol addictions.

Also, youth needed to have a family member who could participate in the program. Managers from the County's Juvenile Probation Services Department served as gatekeepers who reviewed each case before the recommendation for placement went to the judge. The advising probation officer had to justify the recommendation.

According to interviewees, the screening process helped to ensure that the correct youth—those with high-risk and high-need levels—were admitted to the program. Screening also helped the County reduce the wait time among applicants. In fact, the County admitted many of the high-risk offenders who would have been confined to the California Department of Juvenile Justice (DJJ) prior to SB 81 legislation.

> *One of the things about the old program is that staff were the boundaries, so when they weren't around or when the youth left the Ranch, their boundaries remained behind. With this program, our minors are able to internalize their own boundaries and do the right thing because it's the right thing to do, not because they are avoiding punishment—I think this is critical.*
>
> *Mike Simms, James Ranch Manager*

## Intervention

The Enhanced Ranch Program was designed to be holistic and therapeutic—concentrating on proactive models of rehabilitation rather than reactive models of correction. The services are intended to promote prosocial skills, critical thinking, self control, anti-criminal thought patterns, and positive relationships. Clear-cut rules and structure helped youth internalize their own boundaries.

Community and interagency partnerships enhanced the delivery of services to affiliated youth and families. However, youth relationships with staff were the most vital component. Line staff engaged and developed one-on-one relationships with youth in their care. The small staff-to-youth ratios and cognitive program modality facilitated these relationships and processes.

## Implementation of the Core Program Elements

Eleven interlocking and complementary core elements framed Santa Clara County's Enhanced Ranch Program:

1. Staff development and coaching
2. Treatment
3. Family atmosphere
4. Group process
5. Small staff-to-youth ratios
6. Family participation
7. Personal enhancement opportunities
8. Extended lengths of stay for youth
9. Relationship building
10. Education
11. Aftercare programs

The following table summarizes some of the key differences between the corrections emphasis of the previous Ranch Program and the rehabilitation emphasis of the Enhanced Ranch Program.

## Table 1: Correction vs. Rehabilitation Model

| Correction Model | | Rehabilitation Model |
|---|---|---|
| Locked facility with external controls | → | Open facility with only those controls necessary to ensure public safety |
| Limited services | → | Continuum of services |
| Relationship between staff and youth is limited or often nonexistent | → | Staff relationship with youth is encouraged and expected |
| Staff are correctional or institutional officers | → | Staff are counselors |
| Family and community are often seen as the problem | → | Family and community are considered partners and part of the solution |
| Program has many rules and regulations | → | Program has rules, regulations, and structure |
| Program staff force youth to comply and follow rules and regulations | → | Program staff help youth internalize their own boundaries |
| Rules and boundaries are reinforced by staff | → | Rules and boundaries are reinforced by youth and peers |
| Result is behavior compliance | → | Result is cognitive change and development |
| A youth's behavior improves because of correctional structure, restrictions, and limitations | → | A youth's behavior improves because of internalized boundaries and cognitive change |

### 1. Staff Development and Coaching

SCCPD managers saw utility in the programming and expected all of their staff to follow the program modules. Even the well educated staff of SCCPD benefitted from the standard 96 hours of intensive classroom instruction in the Cognitive Based Treatment (CBT) model, followed by on-site coaching and mentoring by Missouri Youth Services Institute (MYSI) staff. The latter component proved to be essential. Further, SCCPD staff were trained how to train other staff.

### 2. Treatment

All youth were assessed within three weeks of entering a ranch facility. The Multidisciplinary Team (MDT)—probation counselors, mental health staff, substance abuse counselors, school counselors, parents, and youth—evaluated relevant case information and developed the treatment plan. Adherence by youth to the treatment plan was mandatory. Treatment included substance abuse counseling and individual and family therapy.

> *All of our ranch counselors are highly skilled and have college degrees. Most became counselors for the simple fact that they wanted to make a difference in the lives of youth. This new program model will empower them to make that difference. The program will allow them to put their education and training to use—it will allow them to provide programming that can change the life direction of our youth, which in turn will change their lives.*
>
> *Deputy Duke*

### 3. Family Atmosphere

Treatment pods for 10 to 12 youth created a smaller, personalized living space and supported the level of privacy and safety that is considered ideal for group interaction. Each pod had a central meeting area furnished like a large family room, with carpeting, soft furniture, and artwork done by the youth.

### 4. Group Process

The group process and counseling supported the personal development of each youth. Youth were encouraged to actively talk out personal problems within the group. Consistent and daily communication among pod members and counselors addressed both collective and individual issues. Counselors referred to this active form of discourse as "circling up." Although challenging and time consuming, both counselors and youth residents noted that circling up helped youth deal with personal and group issues.

### 5. Small Staff-to-Youth Ratios

The small staff-to-youth ratio at the ranch facilities helped the counselors get to know and bond with each youth. The low ratio allowed staff to actually supervise and counsel youth rather than just monitor their behavior.

> *We learn how to communicate with others and learn how to respect each other—like respect each other's space. You are in a pod with 12 people, and it may be people you don't like or people you don't know, but you learn how to work together. It's not necessarily talking, but learning how to work with them. Like when you get a job when you get out, you might not like the person, but you will still have to work with him.*
>
> *James Ranch Youth*

### 6. Family Participation

Because family participation was vital to the Enhanced Ranch Program, youth were pre-screened to ensure that a family advocate—a relative, caretaker, or legal guardian—was willing and available to participate. If an appropriate family connection could not be identified, SCCPD searched for an alternative person or placement.

> *The boys seem to have ways to work out their aggression through physical activities like playing basketball, but the girls seem to need to discuss, blame, point fngers, and then work through it.*
>
> *Manager Wegl*

> *They don't let you just go to your room and say forget it, I don't want to deal with you. You got to work on it until you work it out and that means you can be in group for two hours.*
>
> *Female Ranch Youth*

### 7. Personal Enhancement Opportunities

A variety of activities including competitive sports and vocational and employment training enhanced personal and interpersonal development. The recreational activities improved cognitive skills, communication, leadership, and teamwork. The vocational and employment training provided exposure to professional etiquette and responsibilities.

### 8. Extended Length of Stay

The program includes a six to eight month stay in custody, followed by six months of supervised aftercare. It was planned to be long enough for youth to develop the necessary tools to reintegrate back into their families and communities.

Despite stakeholder concerns about the additional one to two months of program length and the cost associated with it, SCCPD wanted to do a better job; the intention was not to lock up youth for longer periods but to reduce recidivism—to have fewer youth cycling through the system.

> *To implement this program to its fullest capacity, the Department needed staff to work different hours. You can't build a relationship and bond with youth working ten days a month.*
>
> *SCCPD Manager*

### 9. Relationship Building

Experts note that the one-on-one relationship between youth and line staff was a key element in successful outcomes. Consistent interaction built trust and helped youth to be more receptive to group discussions. One facilities manager reported that staff knew every single child they worked with personally. Youth simply seemed to work a little harder because they saw that the counselors really cared.

> *I gave the requirements to the managers and empowered them to f gure out the shift schedules that they believed would work well with the program and also take staff needs into consideration. And the schedule that they came up with better meets the needs of the youth, program and staff.  It has increased communication between POD staff teams, improved the consistency of the treatment approach for the youth, and enhanced our treatment team's ability to meet and discuss case plans in detail.*
>
> *Deputy Duque*

> *I never really experienced a lot of the programs that are here, like the yoga and Zumba. This is a whole new experience for me, but at the same time, it gets me thinking that there are other things out there that I can try and do instead of just the same thing all day.*
>
> *Focus Group Participant*

### 10. Education

Blue Ridge School was operated by the Santa Clara County Office of Education and served students at both ranch facilities. School attendance was mandatory. The Office of Education provided 300 minutes per day of classroom instruction, compared to the state mandate of 240.

> *Most of the students at the Ranch have very high need levels—many are emotionally disturbed and need special resources and a lot of one-on-one time to do their work.*
>
> *Ranch Teacher*

### 11. Aftercare Programs

After youth successfully served their in-custody commitment, they moved to the aftercare phase, which shifted the program focus toward family involvement and reunification and included interim home visits by staff.

Table 2:

| Custodial Components | | | | Aftercare Components | |
|---|---|---|---|---|---|
| Level 1 | Level 2 | Level 3 | Level 4 | Phase 1 | Phase 2 |
| Orientation | Core Program Activities | Family Reunifcation Planning | Reentry and Aftercare Preparation | Pre-release | Continued Aftercare |
| 1 month | 2-3 months | 2 months | 1 month | 2.5 months | 3.5 months |

## Program Levels

The treatment phase of the Enhanced Ranch Program had two key components: custodial and aftercare. Custodial services included the first four levels of the program, wherein a resident's privileges and responsibilities increased as she or he progressed along the continuum of mandated services. Aftercare began when youth were released from custody to transition back into their families and communities. The levels offered structure and a way to quantify the goals for youth and their success in meeting those goals.

**Level 1** was the orientation phase and lasted approximately one month. Youth residents and their families were oriented to all aspects of the program, admittance and assessment tests to identify risk factors were administered, and a case plan—a guide for treatment—was developed by the MDT. Youth learned the rules of the program, their readiness for change, how to trust program counselors, and how to feel safe in their new environment. Level 1 youth had very limited privileges.

**Level 2** encompassed core program activities and lasted two to three months. Youth were required to participate in programs as specified in their case plans. They prepared for later home visits (Level 3) by focusing on self-improvement and family dynamics. Goals included learning to identify destructive behavior patterns, to control impulsive behavior, and to develop proactive decision making. Youth accomplished this by adopting objectives related to school, work, programs, and family, and through counseling focused on specific issues such as gang involvement, substance abuse, self control,

and family dysfunction. Level 2 youth participated in vocational training, recreational sports, and work crews at off-site locations.

**Level 3** focused on family reunification and lasted approximately two months. Before weekend furloughs began, the youth and family participated in three or more family counseling sessions with probation counselors. Additionally, probation counselors must have deemed the home environment and family structure acceptable for visitation. Youth built on Level 2 skills, developing appropriate boundaries, learning to take care of themselves, forming healthy relationships, and setting positive personals goals. They accomplished these objectives in part through counseling that focused on self-reflection and alternative behaviors. Youth could receive privileges such as phone calls, field trips, sports programs, special jobs, and weekend furlough eligibility.

**Level 4** prepared youth for the transition to aftercare service and family reunification or placement. Youth were expected to have developed leadership skills and to have become role models for their lower-level peers. They moved away from dependence on staff to a healthier understanding and practice of interdependence. This was accomplished through peer guidance, strategy-sharing, and counseling focused on reintegrating into home, work, school, and community environments. Developing healthy networks in the community was a key element of success beyond the program. Each resident received a post test, a Risk Avoidance, Protective, and Resiliency Asset assessment, and a review of treatment plan goals to determine advancement to aftercare and appropriate services.

## Aftercare

Following custody, aftercare lasted six months and incorporated two components—Phase 1: Pre-release and Phase 2: Continued Aftercare. During aftercare, youth had to comply with all court orders and attend programs and counseling as specified by the MDT. Noncompliance could lead to additional weeks of supervision or a return to the Ranch or Juvenile Hall.

**Phase 1** was a 10-week pre-release program in which youth were monitored by the aftercare counselor. Pre-release was intended to be part of a gradual process that still provided youth much structure and supervision. Youth had to comply with a stringent curfew, check in with the aftercare counselor by phone each night, and physically meet with him or her at least weekly.

> *You really get the feeling when you go out there that the people who work there like the kids. Of the Probation Counselors, another Judge agreed. I think they really care and I think they're working hard to make those programs work.*
>
> *Santa Clara County Judge*

**Phase 2** began after completion of the 10-week pre-release program, when youth moved to the second phase of aftercare, which was less restrictive. Instead of aftercare counselors, youth are monitored by ranch probation officers. As in pre-release, they were still obligated to attend programs and to engage with counselors and a therapist for the duration of aftercare. Returning home often proved to be a very difficult transition even under the best circumstances, and many youth returned to tough neighborhoods and challenging family structures.

> *The first 30 days of aftercare is like being on house arrest. You cannot leave your parents' supervision. You can go to school, work and programs by yourself but when it comes to free time, or social outings, you need to be with your mom or dad or legal guardian.*
>
> *Ranch Youth*

## Linkages

SCCPD partnered with a variety of agencies and community-based allies to provide a diverse set of programs intended to help youth develop cognitive skills that enabled them to successfully reintegrate back into family and community. The relationships among the partners were important to the success of the project, including the following:

- General agreement on the program's purpose and the resulting ability to target appropriate clients

- Staff–youth bonding

- Youth-to-youth interpersonal relationships

A key asset of the Enhanced Ranch Program was strong relationships between the staff, courts, community-based organization, schools, and youth. Participants in the courts established a collective understanding of who qualified as an appropriate client for the program, which led to better outcomes for more youth.

> *Some of them have wanted to stay and some of their parents have wanted them to stay and said this is a better situation for you while you are growing in this situation than it is to be back out again and tempted. But probably more than anything it gives them a sense of self worth. And the kids tell me that as well.*
>
> *Board of Supervisors President Kniss*

Interviewees emphasized that a high level of interaction between representatives from probation, mental health, community organizations, and the courts fed discussions of system issues. The institutional support that the Enhanced Ranch Program received at all levels reflected positively on the program and allowed it to continue to move forward.

> *The counselors are there for you. I've never had that.*
>
> *Wright Center Youth*

Interviews with individuals who were not a part of the staff noted the overall support demonstrated by staff toward youth and by youth toward one another. Staff showed a commitment to the Enhanced Ranch Program and a willingness to adjust to the new model and actively invest in the youth they served.

Program participants expressed the perception that staff really cared about the youth and provided more one-on-one support than staff in other programs they had experienced.

> *I like the idea of the pod, the ranch moving as a unit…[I]f someone's having a bad day, doesn't mean we're all going to have a bad day, but we're all going to help out to move this young woman along.*
>
> *Aftercare Specialist*

> *I think they really are able to lean on each other and, since everybody's goal is to succeed in this program, they are kind of able to lean on each other in a positive way.*
>
> *Probation Counselor*

In focus groups, youth indicated that the level of care and support displayed by their counselors was more obvious than they had experienced in other programs.

The interviews also revealed positive relationships among youth in the Enhanced Ranch Program, and some felt that the pod system supported these relationships.

One observation was that youth at higher levels in the program tended to watch over the lower-level participants; Level 4 participants acted as "junior staff" through their leadership and experience in the program.

Thus, the mutual support offered by all individuals and divisions in contact with the Enhanced Ranch Program worked to effectively facilitate the implementation of the program.

> *That's been my biggest frustration, is the wait to get kids out there. By the time they get out there you know they're pretty burned from having been in the Hall for a long time. And I think it sort of hardened that position that you, know, "Nobody can f x me."*
>
> *Juvenile Court Judge*

## Challenges

There were differences of opinion expressed about the length of the Enhanced Ranch Program. One counselor expressed doubts that a stay of six months could really impact a youth's life, while a defense attorney felt that the length of the program was excessive.

Implementation of the Enhanced Ranch Program initially resulted in a growing number of youth on the waitlist to enter the Ranch. With some troubleshooting, the wait time for youth improved by March of 2009. After that point, youth waiting for placement received their Ranch Orientation while in Juvenile Hall.

> *More beds discourages all of us from really focusing on the other programs in the community and all the other alternatives that are out there.*
>
> *Juvenile Court Judge*

At the Wright Center, girls had a longer waiting period than boys. Some felt that adding more beds, although an option, may have shifted the focus away from other opportunities and alternatives.

# *Characteristics of Program Residents*

Data from two cohorts were analyzed for this report. Cohort 1 consisted of youth committed to the Old Ranch Program between April, 2005, and March, 2007—499 youth. Cohort 2 consisted of the youth committed to the new Enhanced Ranch Program between September, 2007, and February, 2009—291 youth, reflecting a reduction in bed capacity.

## Figure 1: Gender of Cohort 2



## Figure 2: Race/Ethnicity of Cohort 2



## Figure 3: Age of Ranch Residents by Cohort

Cohort 1



Cohort 2



## Most Serious Sustained Offense Type

The Enhanced Ranch Program served youth with very serious charges. Approximately 40% of Cohort 2 youth were committed to a facility due to a felony crime against a person—first degree burglary, felony threat, felony assault, kidnapping, and felony sex offenses. In comparison, only 30% of Cohort 1 was committed to the Ranch for this offense category. As noted earlier, the Enhanced Ranch Program admitted many of the high-risk offenders who, prior to SB 81 legislation, would have been confined to DJJ.

### Figure 4: Most Serious Sustained Offenses that Resulted in Confnement of Ranch Residents



### Table 3:  Offense Category Details

| Offense Category | Included Offenses |
|---|---|
| Drug and Alcohol | Driving under the inf uence, drug possession and sales |
| Crimes Against Persons – Felony | Robbery, f rst degree burglary, felony threat, felony assault, felony domestic violence, kidnapping, and felony sex offense |
| Crimes Against Persons – Other | Misdemeanor assault, f ghting, misdemeanor domestic violence, misdemeanor sex offenses, other misdemeanor against people |
| Other Crimes | Escapes, traff c violations, and other felonies |
| Property Crimes | Second degree burglary, possession of stolen property, auto theft, grand theft, arson, vandalism, and possession of theft and burglary tools |
| Violation of Probation, Failure to Appear | Violation of probation, failure to obey order, and Ranch failures |

## Outcomes

One of the primary questions related to this evaluation was whether the program resulted in better outcomes for youth. For each cohort, researchers looked at new probation violations and arrests for youth in the Ranch Program and within one year after leaving the program.

The reduction in the number of behavioral incidents at the Ranch facilities such as gang-related fights, gang activity, disruptive conduct, and possession of contraband was another outcome of interest identified by SCCPD. The Deputy Chief noted a significant reduction in gang-related incidents at both facilities. The probation department continued to collect data and evaluate outcomes from the Enhanced Ranch participants.

Figure 5: Outcome Measures



### Figure 6: Number of Youth Committed to Ranch Programs and Exiting Ranch Program



Population of youth at Ranch = youth committed to Ranch program during specified time. For Cohort 1 (April 2005 to March 2007, N=499) and for Cohort 2 (September 2007 to February 2009, N=291).

*Population exiting Ranch = youth had a date indicating that he/she "exited the ranch to aftercare."

### Table 4: Reported Incidents at Ranch Facilities by Cohort

| Offense Category | Cohort 1 | Cohort 2 |
|---|---|---|
| Total Number of Incidents | 4,647 | 1,294 |
| Number of Unique Individuals | 475 | 262 |
| Average Number of Incidents per Individual | 9.8 | 4.9 |
| Range per Individual | 1-65 | 1-46 |

## Conclusion

After determining that it was not doing all it could to help the youth in its care, the Santa Clara County Probation Department tried a new approach and instituted the Enhanced Ranch Program. To improve upon its 40% failure rate, county officials adopted a version of a holistic approach, based on the Missouri model and tailored to Santa Clara County. The new rehabilitative program put an emphasis on real, cognitive behavioral change rather than mere compliance with rules. It stressed an open facility with a home-like atmosphere, where the staff were counselors rather than guards, the family was an active participant, and the rules were enforced by youth leaders.

An analysis of the County's implementation of the core elements of the program revealed a high level of integrity and fidelity to the model. In addition, the youth in the Enhanced Ranch Program had improved outcomes over their counterparts in the previous Ranch Program with respect to behavioral incidents and fights during detention. There were also reduced probation violations and new arrests during and after completion of the program.

The process and outcomes for youth in Santa Clara County prior to the Enhanced Ranch Program were not unusual for the nation's juvenile justice departments. There appears to be much to be learned and gained from new, holistic approaches to rehabilitation of youth in detention. A fully detailed outcome evaluation of this ongoing program could reveal much useful information.



**National Council on Crime and Delinquency**

1970 Broadway, Suite 500  •  Oakland, CA 94612
tel 510/208-0500  •  fax 510/208-0511  •  nccd-crc.org

# EXHIBIT F

# APPENDIX C

# CONTRA COSTA COUNTY JUVENILE HALL

# BEHAVIOR MANAGEMENT SYSTEM

**THE CONTRA COSTA COUNTY JUVENILE HALL BEHAVIOR MANAGEMENT SYSTEM (BMS)**

The Contra Costa County Juvenile Hall (CCCJH) Behavior Management System (BMS) is a multi-level system that is designed to increase desired behaviors through the use of reinforcements and decrease unwanted behaviors through a menu of appropriate sanctions.  The system is designed around Core Correctional Practices, which includes principles of effective interventions and follows best practice guidelines of effective reinforcement and sanctioning of behavior.

DESCRIPTION

The Behavior Management System (BMS) works on the basis that the staff, through behavioral interventions, will shape the youths' behavior by providing a structured reinforcement and sanction process.  Every staff member is responsible to the youth, the program, and him/herself to help the youth make the transition to a pro-social lifestyle. The BMS is intended to support appropriate unit behavior and focuses on long-term change. Within the BMS, every staff person is considered to be an agent of change.  The use of reinforcements and sanctions will assist in shaping the youths' behaviors as well as their values and belief systems.

The BMS is designed to utilize several principles of effective reinforcement/sanctions, relying especially on two of the primary principles:  immediacy and consistency.  The BMS will provide staff with the ability to reinforce and sanction behavior in a timely fashion, while also providing opportunities to reinforce long-term positive change.  The BMS will provide staff with the structure to shape youths' behaviors, but it is up to the staff to follow that structure consistently to help guide the youth to make the transition from delinquency to responsible citizenship.



**TABLE OF CONTENTS**

**The Behavior Management System**................................................................... **4**

**Responding to Positive Behavior** .................................................................. **5**

    The Reinforcement System .................................................................  5

    Verbal Praise ...................................................................................  6

        Effective Use of Reinforcement.............................................  6

    Star Incentives................................................................................  7

    The Point System............................................................................  9

    The Weekly Incentives ................................................................... 14

    The Monthly Incentive....................................................................16

**Responding to Negative Behavior**............................................................... **17**

    Effective Use of Authority ............................................................. 17

    Effective Use of Disapproval .......................................................... 17

Core Correctional Intervention: Thinking Report ............................................... 18

Core Correctional Intervention: Behavior Chain............................................... 20

Core Correctional Intervention: Cost Benefit Analysis................................... 21

**School Intervention**............................................................................................. **22**

Classroom Level Intervention ........................................................... 22

Breaks ................................................................................................ 22

Time Away From The Classroom .................................................... 23

School Suspension ............................................................................ 24

School Refusal .................................................................................. 25

School Intervention/Removal Continuum ...................................... 26

**Sanctioning Negative Behavior** .......................................................... **27**

Sanctioning Grid ............................................................................... 27

Level 1 (Low Level) Misconduct ......................................... 27

Level 2 (Moderate) Misconduct .......................................... 28

Level 3 (Serious/Dangerous) Misconduct ........................... 29

Loss of Privilege (LOP) .................................................................. 31

**Attachment 1: Behavior Intervention Model (School)**............................................ **32**

## The Behavior Management System

The Behavior Management System begins with addressing behavior when it is occurring.  The system is designed to build upon the youth's immediate behavior.  If a youth behaves in a pro-social manner, s/he will have an opportunity to "earn points" and in turn will be supported in his/her phase, motion, or level advancement, depending on whether the minor is placed in a treatment program or detention unit.  If s/he does not behave pro-socially, this will affect both immediate reinforcers and progress in the program. To understand the BMS, first we need to look at the process in which immediate behavior is addressed through the use of reinforcements and sanctions.

The staff's job is to **monitor behavior** and respond to the behavior by **issuing a reinforcement or sanction**, depending on whether the behavior is positive or negative.  Youth who exhibit positive behavior throughout the day with minimal negative behavior will **earn points and star incentives.**  Youth that consistently exhibit positive behavior will be eligible for **weekly and monthly incentives**.





## Responding to Positive Behavior

Reinforcements are used to increase wanted or positive behaviors.  In turn, reinforcements must be delivered as close to the time the behavior was observed.  Likewise, the staff person using the reinforcement should be specific regarding the behavior that is being reinforced.  Also, the reinforcement must be something the youth desires.

The following section outlines the star and incentive system, structured ways in which youth are to be reinforced.

## The Reinforcement System

The Reinforcement System is designed to provide opportunities to shape youths' behavior throughout the days, weeks, and months.  The system is designed to allow for staff to deliver reinforcements in the moment (low level) with structure in place to ensure that the delivery of these reinforcements is maintained.

The overall structure of the reinforcement system will be comprised of Verbal Praise, Star Chart and Point System that include daily, weekly, and monthly incentives.

1) Verbal Praise:  Any staff person at any time can provide verbal acknowledgement to a youth that he has done well.  This can also be done during daily review meetings/orientations.

2)  Star Incentives:  Youth are eligible for a daily, weekly, and monthly incentive based upon meeting personal/treatment goals throughout the day.

3) Point System: Provides youth with an opportunity to earn daily points to purchase weekly incentive items.  Monthly point totals will determine youth's eligibility for monthly incentives.

**Verbal Praise**

Verbal praise is extremely important in shaping or modifying behavior.  Verbal praise is designed to use the relationship between staff and youth to increase a specific, desired behavior.

*Guidelines:*

Verbal praise should be used immediately and often.  As staff identifies youth exhibiting pro-social behaviors, s/he should acknowledge those behaviors by providing verbal praise.  The following guidelines from Core Correctional Practices will increase the effectiveness of verbal reinforcement:



### <u>Steps to Effective Use of Reinforcement</u>

    1.) Identify the behavior to be reinforced.
    2.) Immediately tell the person what behavior you liked.
    3.) Tell the person why you liked the behavior
    4.) Discuss the short and long term benefits of the behavior.

*Example:*

"I really liked how you _____ because _____.

Right now, how do you think this behavior has or will help?

Tell me how it might have any long term benefits for you?

*Quick Tips:*

Steps 1 and 2 should occur **every time** you reinforce a youth.  Always give the reinforcer as soon as you see the behavior (or know about the behavior) and always be specific about what you are reinforcing.

Step 3 should occur as much as possible by helping youth to feel good about their achievement, however big or small.

Steps 4 will likely not occur every time you offer a youth verbal praise.  However, staff members will use these steps regularly during each shift, especially during times when youth have made good pro-social choices that will clearly benefit them once they leave the facility.  These are perfect opportunities to discuss with youth how their good choices will help them in the future.

***Responsibilities:***

It is the responsibility of **all staff** to provide frequent verbal praise.  Verbal praise should be given to **every** youth.  Think of yourself as a behavioral technician whose job it is to observe youth behavior and reinforce youth when you see behavior that you'd like to see continue. Lastly, be aware that some youth may initially be resistant to receiving verbal praise.

## Star Incentives

***What is the Star Chart?***



The Star Chart is a powerful way to:

1. Reward residents for practicing new social skills
2. Encourage positive/pro-social behavior
3. Discourage negative/anti-social behavior
4. Serve as a visual aid in helping keep residents motivated about their daily success

On a weekly basis, each resident and their assigned counselor will identify personal/treatment goals for the resident to accomplish. The chart acknowledges that residents are working on changing/improving their behaviors and making                                                      progress towards defined goals.  The star chart will be posted on the unit bulletin board and the results will also be captured on the daily point sheets (no point value).  The Star Chart will be in the format of a monthly calendar.  Staff will issue a star on the chart for each day that the resident successfully meets their personal/therapeutic goals. Residents must meet their goals during both the am/pm shifts to earn a star.  The resident's counselor, with input from other staff members, will be responsible for developing goals with the residents.  These goals may vary on a weekly basis.

Examples of goals are as follows:

- A minor regularly is removed from school for arguing with the teacher.  His goal is to not argue with the teacher or get removed from school.  He receives a star each day he fulfills this criteria.
- A minor regularly refuses to attend treatment groups.  His goal is to attend all assigned treatment programs.  He receives a star every day he attends all assigned treatment groups.

***Star Chart Incentives***:

- 1 star daily- youth will receive recognition of goal achievement in the morning orientation
- 7 stars from Monday to Sunday- youth will receive 1 low level incentive item or a free phone call (10 minute limit and only eligible after their court matter has been adjudicated)

***Superstar Incentive:***

- 25 stars in a month- Youth will earn their own personal laundry bag to have their clothes washed in when reaching superstar the first time.  Upon reaching Superstar status the second and third time, youth will earn colored socks.  Upon reaching Superstar status for the fourth and fifth time, youth will earn underwear.   Upon reaching Superstar status the sixth time, youth will earn a Henley-style shirt in the color of the unit they are assigned to.  Youth may lose Star Chart clothing incentives when subject to level three sanctions.
- Names will be entered into a raffle for random prizes and residents will be given a certificate of achievement.

***Guidelines and Responsibilities:***

- On a weekly basis, resident and resident's individual counselor will identify personal/treatment goal that the resident must accomplish. The goal should be transferrable to all shifts. For example, the goal should not be "Resident will not be removed from class.", because residents do not go to school during PM shift. Rather focus on the behavior that often results in school removal, for example, "Resident will be respectful and immediately respond to directives from staff without argument."
- 
- AM, PM, and Graveyard Staff will document accomplishment of Star Goal on Point Sheet.
- 
- Daily Review will be conducted by AM staff to review progress on Star Chart goal. Verbally praise residents for progress toward goal, no matter how small.
- 
- Graveyard Staff will put star on individual star charts at end of shift.
- 
- Graveyard staff will document the result of each student's goal accomplishment for AM and PM shift on a list. The list will be given to AM staff with results for Daily Review meeting.

# The Point System

The Point System is based on staff providing points to the youth for engaging in pro-social behaviors and meeting daily expectations.

***Guidelines:***

Probation counselors on each shift are responsible for documenting points for each resident.  Points should be captured on the Incentive Point Sheet/Case Notes maintained in the Incentive Binder on each living unit.  Anytime a resident doesn't earn points, or exceeds expectations, in a particular category or categories, then the reasons shall be documented and explained in the Case Notes section of the Incentive Point Sheet/Case Notes.  More extensive documentation regarding the behavior, if required, should be written in the resident's adjustment record.  The Case Notes section should reflect that an entry was made in the adjustment record.  Resident related documentation can be summoned to court, so case note and adjustment record entries must be descriptive; no acronyms.

Residents will be designated as Gold, Silver, or Bronze levels depending on the amount of points they earn for the week.  If a resident obtains 4's during all school blocks, and earns all of their points on the unit, they will score 133. In order to become GOLD, they must earn one "2" on the unit by "exceeding defined expectations".

Positive reinforcement is significantly more effective then negative reinforcement. Be sure to give residents 2's when you observe them doing something positive, pro-social, or heading in the direction that a resident should be going. (Meet the resident's where they are at.) At the same time we need to hold residents accountable for their behavior. We are aiming to obtain a bell shaped curve, representative of unit behavior, where the majority of residents are Silver.  It should not be the case that all residents are Bronze and Silver, so seek out the opportunity to give residents credit for being pro-social. We need to create a culture that is positively reinforcing, as well as addressing and correcting poor behavior.

Graveyard shift staff assigned to each living unit will calculate daily points and formulate a list of all resident scores to be posted for the following morning.

At the end of the week (Monday), AM counselors will distribute Incentive Order Sheet showing purchase items.  Incentive items will be delivered on movie night or on a specific shift designated by the unit supervisor. The order form showing purchased items will be attached to the items delivered.  If there is a discrepancy between the youth's points and the official record, the Unit Supervisor I will investigate.

Graveyard staff will be responsible for updating point balances to determine the residents appropriate Level (Bronze, Silver, or Gold)

It is the responsibility of the youth to maintain possession of all incentive items.  If the youth lends/shares any incentive items with another youth, both youth will lose the item plus incentive privileges for 1 week.  Youth are required to consume all edible purchases by the end of the day the item is received.

**The Incentive Point Sheet**

**AM Shift:**

Youth have opportunity to earn points during school.

**1.) School**
   Students begin each school block with ZERO points.  Points are earned based upon demonstration of Behavioral Expectations.

   0  =  Did not meet any Expectations
   1  =  Below Minimal Expectations
   2  =  Meet Minimal Expectations (Meet SOME expectations)
   3  =  Meet Most Expectations (Meet MOST expectations or ALL expectations

with average effort)

4  =  Meet Expectations

**12 Total Points Possible to earn per school day.**

<u>**School Behavioral Expectations**</u>

1.) **Classroom Rules & Procedures:**
Each classroom has their own classroom rules and procedures created by the teacher that must be adhered to.

2.) **Respect Staff:**
   a.  Listening to school staff and following directions.
   b.  Responding to directives, correction, and instruction in a timely manner.
   c.  Using appropriate language (e.g. no swearing or name calling)
   d.  Being honest
   e.  Demonstrating polite behaviors
   f.  Using pro-social skills during a disagreement or advocating for self.

3.) **Respect Peers:**
   a.  Treating others with respect.
   b.   Showing good manners; being courteous and polite
   c.   Using pro-social language (verbal and nonverbal).
   d.  Showing consideration toward other people.
   e.  Be open-minded and tolerant to other's differences, opinions, beliefs, customs, and heritage.
   f.  Respect others property.
   g.  Pro-socially handle arguments or conflict.

4.) **Self-Regulation:**
   a.  Demonstrates uses of coping strategies to regulate emotions
   b.  Non-threatening body posture and language.
   c.  Taking responsibility for actions and consequences (avoid blaming others)

5.) **Focus in Classroom**
   a.  Student arrives to class prepared and ready to learn.
   b.  Student will demonstrate focus, pay attention, and complete work
   c.  Student's words and conversations are school focused and related to the topic.
   d.   Student's body posture is upright and alert.

**School Point Sheet**

MT. McKINLEY- Behavior Points

Date: _____

Unit: _____        Teacher: _____

| | Name | DOB | P1 | P2 | P3 | Total |
|---|---|---|---|---|---|---|
| 1 | | | | | | |
| 2 | | | | | | |
| 3 | | | | | | |
| 4 | | | | | | |
| 5 | | | | | | |
| 6 | | | | | | |
| 7 | | | | | | |
| 8 | | | | | | |
| 9 | | | | | | |
| 10 | | | | | | |
| 11 | | | | | | |
| 12 | | | | | | |
| 13 | | | | | | |
| 14 | | | | | | |
| 15 | | | | | | |
| 16 | | | | | | |
| 17 | | | | | | |
| 18 | | | | | | |
| 19 | | | | | | |
| 20 | | | | | | |
| 21 | | | | | | |
| 22 | | | | | | |
| 23 | | | | | | |
| 24 | | | | | | |
| 25 | | | | | | |
| 26 | | | | | | |
| 27 | | | | | | |
| 28 | | | | | | |
| 29 | | | | | | |
| 30 | | | | | | |

**Point Rubric**

0  =  Did not meet any Expectations

1  =  Below Minimal Expectations

2  =  Meet Minimal Expectations (Meet SOME expectations)

3  =  Meet Most Expectations (Meet MOST expectations or ALL expectations with average effort)

4  =  Meet Expectations

**0=** If Students receives Behavior Referral and does not return to class or Suspended

**1=** If Students receives Behavior Referral and return to class during same block without incident.

*Anytime a student doesn't earn points during

**Behavior Expectations**

1.) Follow classroom rules and procedures

2.) Respect Staff

3.) Respect Peers

Note: If a resident is absent in any given block for legitimate reason, their point values will be averaged so they are not penalized for this period of time.

**AM & PM Shifts:**

Youth have opportunity to earn points in the following areas during both the AM & PM Shift.

**1.) Rules**

  Follow the Unit and Facility rules.

**2.) Staff Interaction**
   a. Listening to staff and following directions.
   b. Responding to directives, correction, and instruction immediately.
   c. Using appropriate language (e.g. no swearing or name calling)
   d. Being honest
   e. Demonstrating polite behaviors
   f. Using pro-social skills during a disagreement or advocating for self.

**3.) Peer Interaction**
   a. Treating others with respect.
   b.  Showing good manners; being courteous and polite
   c.  Using pro-social language (verbal and nonverbal).
   d. Showing consideration toward other people.
   e. Be open-minded and tolerant of other's differences, opinions, beliefs, customs, and heritage.
   f. Respect others property.
   g. Pro-socially handle arguments or conflict.

**4.) Hygiene/ Grooming**
   Youth are expected to participate in hygiene and daily grooming routines. Youth are

   expected to maintain appropriate clothing and wear them according to the unit rules.

**5.) Room Appearance**
   Youth are expected to participate in daily room upkeep

   routines.  Including but not limited to: folding bedding, toilet flushed, clean sink, no

contraband, no trash, allowed number of books, letters, pictures, bedding, no tagging or writing on wall or county property.

**6.) Star Goal: Person/Treatment**
Goals will be developed to address individuals criminogenic, social, emotional, and/or behavior needs.  This area is used to determine whether youth earned their star during each shift.  There is no point value for this section.

**Weekly Point Sheet & Case Notes**

| Name:            Counselor: | | | | | | | |
|---|---|---|---|---|---|---|---|
| Date: | | | | | | | |
| **GRAVEYARD Shift** | **Mon.** | **Tues.** | **Wed.** | **Thurs.** | **Fri.** | **Sat.** | **Sun.** |
| 1.) Graveyard Point | | | | | | | |
| **AM** | **Mon.** | **Tues.** | **Wed.** | **Thurs.** | **Fri.** | **Sat.** | **Sun.** |
| 1.)  School | | | | | | | |
| 2.)  Rules | | | | | | | |
| 3.)  Staff Interaction | | | | | | | |
| 4.)  Peer Interaction | | | | | | | |
| 5.)  Hygiene/Grooming | | | | | | | |
| 6.)  Room Appearance | | | | | | | |
| **TOTAL POINTS FOR AM** | | | | | | | |
| **PM** | **Mon.** | **Tues.** | **Wed.** | **Thurs.** | **Fri.** | **Sat.** | **Sun.** |
| 1.)  Rules | | | | | | | |
| 2.)  Staff Interaction | | | | | | | |
| 3.)  Peer Interaction | | | | | | | |
| 4.)  Hygiene/Grooming | | | | | | | |
| 5.)  Room Appearance | | | | | | | |
| **TOTAL POINTS FOR PM** | | | | | | | |
| **TOTAL POINTS DAILY** | | | | | | | |
| Star Goal: | | | | | | | |
| Star Goal Met (No Point Value) | | | | | | | |

Grading Scale:                                   Graveyard:

0= Did not meet expectations          0= Did not meet expectations

1= Met Expectations                        1= Met expectations

2= Exceeded Expectations

(* If a resident did not meet expectations, or exceeded expectations, please indicate why/how below or on reverse)

| **CASE NOTES:** |
|---|
|  |
|  |
|  |

|  |
|---|
|  |
|  |

## The Weekly Incentives

The weekly incentives are based on the points earned for one week.  Beginning each Monday, a youth may use points s/he has earned to purchase weekly incentives that will be made available on the living unit's assigned movie night.  In addition, based upon point accumulation, residents are eligible for later bedtime for the week. Residents will be designated as Gold, Silver, or Bronze Level based upon the total number of points earned for that week (Mon-Sunday).  Youth who earn 122 points or less will be considered at Bronze level, but will not be eligible for commissary.

### *Weekly Incentives*

| LEVEL | TOTAL POINTS | SPENDABLE POINTS | BEDTIME |
|---|---|---|---|
| Bronze | 123-127 | 5 | 8:30 PM |
| Silver | 128-133 | 10 | 9:00 PM |
| Gold | 134-217 | 15 | 9:30 PM |

### *Point Breakdown*

33 total points possible per day (Mon,Tues, Thurs, and Fri)

29 total points possible per day Wednesdays (no 3rd block)

21 total points possible per day (Sat-Sun)

203 total points possible for the whole week

### *How the points are rated…*

SCHOOL DAYS:  55% School (12 possible points per day) *

                        45% Probation (10 possible points per day)

PM SHIFTS AND WEEKENDS: Probation (10 possible points per shift)

GRAVEYARD: (1 possible point)

 *Since there is no 3rd block on Wednesday the point totals were reduced by 5 points. Also, when a youth misses school due to a non-disciplinary reason, their points will be totaled using the average points from the blocks of school attended. On days when there is no school, the point total will be adjusted by 15 points per school day i.e. five day holiday totals 75 points will be adjusted.

**POINT INCENTIVES**

| BRONZE /LOW LEVEL | Cost (Points) | Quantity |
|---|---|---|
| Red Vines | 5 | 5 |
| Toothpaste | 5 | 1 |
| Granola Bar | 5 | 1 |
| Fruit Roll ups | 5 | 1 |

| | | |
|---|---|---|
| Animal Crackers | 5 | 1 |

(Bronze, Silver, and Gold eligible to purchase)

| SILVER/MODERATE LEVEL | Cost (Points) | Quantity |
|---|---|---|
| Gummi Bears Small | 5 | 1 |
| Rice Krispy Treat | 5 | 1 |
| Soda | 5 | 1 |
| Hot Chips | 5 | 1 |
| Cards to send home | 5 | 2 |
| Deodorant | 5 | 1 |

(Silver and Gold eligible to purchase)

| GOLD/HIGH LEVEL | Cost (Points) | Quantity |
|---|---|---|
| Body Wash | 5 | 1 |
| Hair Gel/Grease | 5 | 1 |
| Shampoo | 5 | 1 |
| Conditioner | 5 | 1 |
| Lotion | 5 | 1 |
| Cup of Noodles | 5 | 1 |
| Gummi Bears (large) | 5 | 1 |
| Hair Brush | 5 | 1 |
| Hair Extensions | 5 | 1 |
| Popcorn | 5 | 1 |

| | | |
|---|---|---|
| Hair Extensions (1 package) | 5 | 1 |
| Wave Cap | 5 | 1 |
| Pick TV Channel and seat for one Free play | 5 | 1 |

(Gold eligible to purchase)

**The Monthly Incentive**

"GOLD YOU GO"

The Monthly Incentive Recognition Program is a way to increase desired behavior from residents for an extended period of time.  It is also a way to recognize residents that are working hard to cooperate and maintain appropriate behavior.  All residents are eligible to participate in the GOLD YOU GO incentive program, if you meet the following criteria:

- Receive 3 Gold status weeks in a month
- You may receive only 1 Silver status week in a month to still be eligible

If a resident receives a Bronze status week in a month, you will not be able to participate in the GOLD YOU GO incentive program.

Residents who qualify for the GOLD YOU GO incentive program will receive 1 or more of the following activities:

- Pizza Party (First Friday of the Month)
- Ice Cream Party (First Friday of the Month)
- Movie Night with Nachos (first Movie of the Month)
- Gym/Playfield activity  (Selected by Residents)(First Saturday of the Month)
- Tamalpais Visit (First Saturday of the Month)

## Responding to Negative Behavior

Similar to reinforcements, effective research based strategies and interventions are used by staff in response to youth's negative behaviors.  Use of Core Correctional Practices and interventions should be applied consistently and in a timely fashion to have the best effect.  The reason to apply a sanction is to shape youths' behavior.  Staff should utilize the strategies and interventions provided below in response to mild or moderate negative behavior.

## Steps to Effective Use of Authority

### (Directive/Gain Compliance)

1.)     Be direct and specific concerning your demands, using a normal voice.

2.)     State the specific choices and the consequences of these choices.

3.)     Provide respectful guidance toward compliance.

4.)     Praise compliance or enforce consequences.

**Examples:**

1.)     I'm going to ask that you stop yelling at whomever you're talking to on the phone.

2.)     If you speak respectfully to the person you're talking to, you may finish your call; if you continue to yell, I'm going to ask that you hang up, if you choose not to hang up, your choice will result in a moderate sanction.

3.)     You've been managing stressful situations well the last two weeks, so I know you can get control of this situation.

4.)     I appreciate you choosing to finish your call in a more respectful way or/I am disappointed you did not end your phone call and I will issue a sanction.

## Steps to Effective Use of Disapproval

### (Address a Violation that has occurred)

1.)     Identify the behavior to be punished.

2.)     Immediately tell the person what behavior you disliked.

3.)     Tell the person why you disliked the behavior

4.)     Discuss the short and long term consequences of the behavior.

5.)     Model an alternative pro-social behavior.

6.)     Consider pairing the disapproval with a sanction.


**Examples:**

"It was not appropriate that you _____ because _____.


Right now, how do you think this behavior has or could hurt you?

How can continuing the behavior cause any problems for you down the road?

Let's discuss what you could have done instead, and how that would have looked (thoughts and behavior).

You will be given 1 hour of LOP for this behavior."

## Core Correctional Interventions: Thinking Report

Youth who engage in negative behaviors may be asked to complete a Thinking Report. The benefits of the Thinking Report are:

1.) Helping the youth and staff become familiar with high-risk patterns
2.) Support in the development of plans for avoiding/managing negative behavior
    a.  Not thinking on the spot
3.) Develop skills needed to avoid/manage negative behavior
4.) Opportunity to provide self-reinforcement
5.) Armed with information to stop chain of events from a relapse into criminal behavior

Name: _____   Date: _____

### Thinking Report

Situation:

Thoughts:
1.
2.
3.
4.
5.
6.
7.
8.
9.
10.

Feelings:

Attitudes and Beliefs:

National Institute of Corrections
Thinking for a Change

Lesson 9

Use New Thinking
Supplemen

Handout 9-1 – Homework
2

**Core Correctional Interventions: Behavior Chain**

The Behavior Chain is a helpful tool for identifying the "Thought-Behavior Link." The Behavior Chain helps the youth and staff members identify antecedents/triggers that preceded a thought or behavior. The goal is to determine if there is a pattern of risky situations that seem to trigger the problem behaviors. The Behavior Chain also tells us what thoughts/beliefs/value systems drive the behavior. It also helps the youth identify their emotional response to risky situations. Lastly, this tool allows the youth to reflect upon the consequences as a result of the behavior, both positive and negative.



## Core Correctional Interventions: Cost-Benefit Analysis

The Cost-Benefit Analysis provides an opportunity for the youth to weigh the short-term and long-term costs and benefits to target behavior/options.  During this activity youth identify the positive reinforcement for the anti-social and pro-social acts (e.g. money, power, lack of responsibilities) and the negative consequences (e.g. negative impact on relationships, not school credits earned, life goals), then examine the outcomes between the anti-social and pro-social charts.

**COST-BENEFIT ANALYSIS**

Behavior:_____

CONSEQUENCES

| | + | - |
|---|---|---|
| Short Term Consequences | | |
| Long-Term Consequences | | |

# School Intervention

**Classroom Level Interventions**

In addition to utilizing CCP Strategies (e.g. effective reinforcement, effective disapproval, and effective authority), when inappropriate behaviors occur in the classroom, the classroom staff (including teachers, instructional assistants, and special education teachers), respond with the lowest level intervention possible.  The following interventions are relatively unobtrusive, quick and easily implemented, they distract little from the actual teaching and learning process. They are recognized as effective evidenced based strategies for mild forms of inappropriate behavior.

a. Planned Ignoring
b. Proximity control
c. Signal interference
d. Interest boosting
e. Direct appeal to values
f. Support through humor
g. Support through restructuring
h. Removing distraction objects
i. Redirecting identifying the problem
j. Avoid power struggles
k. Opportunities for break inside classroom
l. Opportunities for incentives and privileges

Teachers are the lead in the classroom during instructional time.  They lead support staff in the classroom to meet the student's academic and behavioral goals.  Each teacher will work with his/her staff (e.g. instructional assistants, special education teacher) to determine procedures and protocols for addressing student behavior in the classroom including but not limited to:

a. Provision of least restrictive interventions
b. Coordination and communication to administer a Break or Time Away for the students.
c. Coordination for reintegration into the classroom after successful completion of time away.

## Breaks

A Break is a preventative intervention that allows the student a brief (5 min or less) opportunity to leave the classroom to self-regulate. Breaks are teacher driven and include IEP Breaks, which can be student driven. School staff will inform probation staff which students have preapproved breaks that can taken/given without loss of privilege. Frequency and duration of breaks will be communicated to unit staff. While the student is on break, probation staff will verbally or nonverbally prompt students to utilize self-regulation strategies and assess the readiness of the student to return to the classroom setting. Student will break in location deemed appropriate by staff. If the student requests to go to their

room, follow Resident Requested Separation Policy. If the student's behavior escalates and becomes a safety issue, Separation Policy and Sanction Grid will be followed.

### Time Away From The Classroom

If a student demonstrates level 1 or 2 misconduct that results in a Behavioral Referral, Probation Counselors will facilitate the Time Away process.  Time Away is given so that students have an opportunity to think about their inappropriate behavior and refocus before returning to class. Time Away is not intended to be a punishment, but a time to process thoughts, feeling and behaviors. Residents will be engaged with CCP interventions, which may include Cognitive Behavior assignments to be completed before returning to class (usually reserved for more serious behavior infractions).  The should be as brief as possible, allowing residents to return to class when refocused and/or de-escalated.

Time Away Procedures are as follows:

1.) Immediate Response:
   a. Give student brief period (15 min or less) to use strategies to calm down or gain emotional control.  Prompt student to use strategies.

   b. Once student is calm, the Probation Counselor will choose an appropriate CCP intervention to engage the student. This can be verbal or using intervention worksheet. Consider the residents mental health status and other disabilities when determining appropriate intervention. The resident will be required to complete the intervention/assignment before returning to class.  The Probation Counselors will determine when a resident is able to return to class and communicate this with the teacher.  Ideally, the resident will be allowed to return to class after they are calm and complete the assignment.   Residents will be able to earn 1 school point for that school block if they maintain emotional control, complete the intervention and return to class. For

   ***Completed Thinking Reports and Behavior Chains should be turned into the unit supervisor for review.  After supervisor review, completed assignments will be placed in resident's file.***

   c. Benefits or objectives of Time Away From School Process
      i. Help the student become aware of inappropriate behavior.  If they know what to change, it is much easier to change that behavior.
      ii. Provide an opportunity to show the staff that they can act appropriately
      iii. Allow the student the option of returning to the classroom instead of having major consequences for a minor mistake.
      iv. Allow the students to identify appropriate alternative to the behavior which earned the Time Away.
      v. Allow time for the student to decide whether appropriate behavior might be a better choice.

d.   If the student refuses to complete the Time Away process, they will be informed of the consequences according to the sanction grid. Staff will introduce and work through a CCP intervention to reintegrate the resident into school as quickly as possible.

e.   If the student's negative behavior escalates and becomes a safety issue, the

Separation Policy and Sanction Grid will be followed.

**<u>Extended Time Away From The Classroom</u>**

If a student demonstrates level 2 or 3 misconduct that results in a Behavior Referral, or has returned to class after a Time Away and continues to engage in misconduct, student is subject to Extended Time Away, that should not exceed 2 school blocks. Extended Time Away requires an Incident Report to be submitted by school staff. Once the student is removed from the classroom, Probation Staff will follow the same Time Away Procedures as outlined above. However, student will remain outside of the classroom on the unit for the duration to time determined by school staff. During the extended Time Away, students will engage in CCP Intervention, school work, or other activities deemed appropriate by staff. Students are not eligible for school points for the duration on the Extended Time Away. If the student's negative behavior escalates to a safety issue the sanction grid will be followed.

***Time Away Follow-up and Monitoring:***

a.   The teacher must meet with the student prior to the third Behavioral Referral/Time Away in order to help the student/resident consider ways to remain involved in school activities, rather than engaging in behaviors that will result in a school removal.

b.   Following the third Behavioral Referral the student/resident will meet with a school administrator to discuss behavior and assess for intervention needs.

c.   Chronic need for Time Away may result in referral to the Multidisciplinary Team, Student Study Team, and/or IEP Team. See Attachment 1 for Behavior Intervention Model Flowchart.

**<u>School Suspension</u>**

a.   When students are suspended from school they will not attend class for the duration of the suspension.  The school administrator will determine if the student will

receive other educational services while suspended.

b.  Suspended students will be separated from school attendance and will be subject to sanctions according to the level of misconduct that resulted in the suspension.

c.  Probation will provide therapeutic programming and activities for these residents to participate in during the suspension period.  Teachers may provide students with work to complete during suspension period. Students will work independently on the unit. Suspended students are not eligible for school points for the duration of the suspension period.

## School Refusal

a.  When students refuse to attend school or requests to leave the classroom, probation and school staff will utilize Effective Disapproval and/or other CCP Intervention to help the student identify the positive and negative consequences for refusing school. The teacher must meet with the student prior to the third day of school refusal in order to prompt the student/resident to consider ways to remain involved in school activities, rather than staying in their room.

b.  School refusing students are choosing to separate from group activities (e.g. attending school). These residents may be subject to sanctions and not earn school points or credits. Probation will follow the policies and procedures for Resident Requested Room Separation.

c.  Following the third day of school refusal the student/resident will meet with a school administrator to discuss their reasons for refusal and assess for intervention needs.

d.  Chronic School Refusal may result in referral to the Multidisciplinary Team, Student Student Team, and/or IEP Team.

**SCHOOL INTERVENTION/REMOVAL CONTINUUM**

**Student behavior will be matched to the level of appropriate intervention and removal on the continuum listed below.**

LEAST RESTRICTIVE

**Goal: Remain in Class**

Classroom staff will utilize CCP strategies and other effective evidenced based strategies for mild forms of inappropriate behavior. Student utilizes strategies to self-regulate in the

**Break**

A Break is a preventative intervention that allows the student a brief (5 min or less) opportunity to leave the classroom to self-regulate. Probation staff will verbally or nonverbally prompt students to utilize self-regulation strategies and assess the

**Time Away**

If a student's demonstrated level 1 or 2 misconduct that results in a Behavioral Referral, Probation Counselors will facilitate the Time Away process. Time Away should last about 15 minutes. It is given so that students have an opportunity to think about their inappropriate behavior and refocus and/or de-escalate

**Extended Time Away**

If a student demonstrates level 2 or 3 misconduct that results in a Behavior Referral, or has returned to class after a Time Away and continues to engage in level 1 or 2 misconduct, student is

**Suspension**

Students may be suspended for any misconduct that falls under suspendable violations in California education code of conduct. If a student's misconduct is serious and warrants separation

**Expulsion**                                    **MOST RESTRICTIVE**

Students may be expelled if their behavior falls under the

Similar to reinforcements and use of CCP strategies, sanctions are used by staff to shape youths' behavior.  Sanctions should be applied consistently and in a timely fashion to have the best effect.  The reason to apply a sanction is to address unwanted behavior effectively.  Staff should follow the sanctioning grid when applying a sanction to a behavior.

# Sanctioning Grid

The following represents the behaviors that are connected to the sanctions.  Sanctions are designed to match the level of an inappropriate behavior and responsivity issues, such as residents with disabilities, will be factored into this process.

### Level 1 (Low Level) Misconduct

Level 1 Misconduct is minimally disruptive to facility/programs.  These behaviors will be considered low level infractions, but still warrant accountability measures.  Staff will handle these infractions using the lowest level appropriate sanction.

### Level 1 Misconduct:

- Using inappropriate, disrespectful language
- Possession of low level contraband. (i.e. extra books, extra clothing, etc. )
- Failure to follow proper hygiene practices (i.e. comb hair, brush teeth, etc.)
- Failure to obtain permission before moving from one area of the unit to another
- Discussing court cases with others
- Failure to keep hands behind your back during group movements
- Shirt tucked in at all times within the building (except courtyard, gym, with staff permission)
- Talking or excessive noise during group movement, mealtime/bedtime, quiet time etc.
- Touching others/this is a no touch facility (e.g. displays of affection, horseplay, etc.)
- Low level vandalism/damage to county property
- Misuse of intercom
- Failure to keep room clean
- Purposely disrupting juvenile hall activities
- Improper wearing of county issued clothing
- Failure to raise hand to be excused during meals
- Talking  between tables during meals when the group is directed to be quiet
- Exchanging food
- Failure to comply with low level sanction

### Level 1 Sanctions:

Verbal counseling/redirecting should always be considered as the first option by staff.  The following is an approved list of consequences for level 1 misconduct:

1. May not earn points
2. Worker eligibility
3. Choice for activity
4. Room assignment change
5. Seating change (meal, school, or couches)
6. Entry into adjustment record
7. Temporary (one shift) level change
8. LOP status for phone use

### Level 2 (Moderate) Misconduct

Level 2 Misconduct is more serious or intense than level 1 misconduct and/or disruptive to the facility/program.  There should be an attempt by staff to handle this misconduct using the least restrictive appropriate sanction.  Staff will document and submit all level 2 misconduct on a special incident report with an appropriate recommendation to the building supervisor for approval.

**Level 2 Misconduct:**

- Defiant and threatening language
- Refusing to participate in activities, programming, or school
- Bullying/harassment/intimidation
- Provoking a conflict, taunting or teasing of another person
- Sexual harassment
- Exposing self/indecent exposure
- Taking/stealing the property of another
- Failure to comply during an emergency
- Room refusal (delayed compliance; does not result in code)
- Crossing the red line w/o permission
- Any gang related activity (w/the exception of violence)
- Unauthorized possession of medication
- Possession of tobacco
- Possession of contraband (pencils/pens, sexually explicit photographs)
- Cheating in school
- Gambling
- Interfering  with security check (e.g. covering window, hiding)
- Door banging/creating a disturbance while in room (e.g. screaming, yelling)
- Lying when formally questioned by staff
- Failure to comply with a moderate level sanction
- Moderate level vandalism

**Level 2 Sanctions:**

The following is an approved list of consequences for level 2 misconduct:

- May not earn points
- Worker eligibility
- Room assignment change
- Seating change (meal, school, or couches)
- Entry into adjustment record
- Temporary (one day) level change
- Level 2 Loss of Privilege (LOP) for 2-5 hours (no participation in group activities part or all)
- Reflective essay
- LOP status for phone use

### Level 3 (Serious/Dangerous) Misconduct

Level 3 Misconduct is an immediate danger to facility/programs.  These behaviors are considered high risk behaviors and can result in separation for the safety/security of the institution and possibly new law violations.  Staff will document and submit all level 3 misconduct on a special incident report with an appropriate recommendation to the building supervisor for approval.

### Level 3 Misconduct:

- Battery on peer, institutional staff, school staff or medical personnel
- Possession of dangerous contraband (i.e. weapons, drugs, alcohol)
- Credible threat of violence in which there is an imminent risk of harm
- Aggressive physical contact
- Any organized or premeditated activity which can or result in violence
- Room refusal (resulting in an emergency code being initiated)
- Any attempt to incite the group to commit an act of non-compliance or violence
- Romantic/sexual actions between minors
- Sexual battery
- Extortion- forcing another's actions through force, threat, or intimidation
- Fighting
- Refusal to follow staff directions/instructions where  the refusal results in a security issue
- Escape or escape attempt
- Failure to comply with a high level sanction
- High level Vandalism

### Level 3 Sanctions:

Sanctions shall take into consideration any aggravating/mitigating circumstances, such as resident's disabilities.  The seriousness of the misconduct, the degree of harm to victim(s), and the imminent risk to the safety of others, the minor, and the institution as well as the minor's mental health history should be considered.  Level 3 Misconduct may result in the resident being separated in their room until the imminent threat subsides.

Level 3 Sanctions will include a reduction to Bronze level, and may include any combination of the Level 1 and/or 2 Sanctions, in addition to:

- May not earn points
- Worker eligibility
- Room assignment change
- Seating change (meal, school, or couches)
- Entry into adjustment record
- Reflective essay
- Level 3 Loss of Privilege (LOP) for up to 3 days (no participation in group activities part or all)
- Loss of Star Chart clothing incentives
- Probation/law violation and/or restitution
- School suspension
- LOP status for phone use

**_Guidelines:_**

- Sanctions are delivered according to the level 3 sanctions grid category.
- Level 1 and Level 2 sanctions are to be applied at the time of the infraction by any staff person.
- Level 3 sanctions are determined by the staff person observing/responding to the security threat and the Building Supervisor with Juvenile Hall administration review actions taken.
- The staff who witnessed the behavior must inform the youth of their assigned sanctions. The immediate sanction and recommendation must be documented in a Special Incident Report.
- Staff should not undermine the sanction by relaying to the youth that the sanction is "no big deal".  Instead, staff should encourage youth to complete sanctions and help the youth in making better choices in the future.

**_Responsibilities:_**

All staff members are responsible for monitoring and addressing behaviors.

The staff person that observes the behavior is responsible for ensuring that the behavior is documented.

The Unit Supervisor or designated supervisor is responsible for tracking sanctions.

If residents fail to comply with assigned sanctions, they will be subject to additional sanctions.

Youth may grieve or request to have the Unit Supervisor review any sanction or sanction level used.

Anytime a youth receives a Level 3 sanction, they will be reduced to a Bronze level.  In order for that youth to regain a higher level, they must earn the points in the same manner afforded to all youth (by earning the necessary points throughout the week).

**Loss of Privilege (LOP)**

Purpose-loss of privilege (LOP) will be a sanction used to address Moderate to High level resident misconduct.  Youth who will receive LOP will not participate in regular recreational programming and will remain in the defined LOP area.  This area will generally be the tables located in the dining area.

The LOP sanction will be correlated to the misconduct, being either Moderate or High according to the sanction grid.

Youth serving a LOP sanction for moderate and high level misconduct will start by completing any CCP interventions, educational assignments, or CBT assignments.  Completed interventions and assignments will be reviewed by staff and discussed with the youth.  Longer LOP periods, such as may be given for high level misconduct, may require several CCP interventions, educational or CBT assignments over the course of the LOP period.  Youth who refuse to participate in or complete their assignments may result in additional sanctions.  Remaining LOP time will be spent doing quiet activities in the designated area. Options for large muscle activities will also be provided in the LOP area.

Attachment 1: School Behavior Intervention Model

## BEHAVIOR INTERVENTION MODEL

| | |
|---|---|
| **TIER 3**<br><br>**Intensive**<br>**Intervention** | **STUDENT STUDY TEAM  MEETING (SST) or IEP Meeting**<br><br>Review/Revise ILP/IEP & Transition Goals<br>Review/Revise Behavior Intervention Plan<br>Consider Functional Behavioral Assessment<br>Consider Social-Emotional- Behavioral Assessment<br>**(After 10 days of Suspension/Removal/Refusal)** |
| | **STUDENT STUDY TEAM  MEETING (SST) or IEP Meeting**<br><br>Review/Revise ILP/IEP & Transition Goals<br>Add Behavior Intervention Plan<br>Continued Interagency Collaboration<br>**(Prior to 10 days of Suspension/Removal/Refusal)** |

| | |
|---|---|
| **TIER 2**<br><br>**Strategic**<br>**Intervention** | **STUDENT STUDY TEAM  MEETING (SST) or IEP Meeting**<br><br>Review/Revise ILP/IEP & Transition Goals<br>Review/Revise/Add Functionally-Behavior Goal<br>Interagency Collaboration<br>**(Following 7 days of Suspension/Removal/Refusal)** |
| | **SCHOOL ADMINISTRATOR-TEACHER-PC-STUDENT CONFERENCE**<br><br>Review/Revise ILP/IEP & Transition Goals<br>Add Behavior Goal<br>**(Following 5 days of Suspension/Removal/Refusal)** |
| | **SCHOOL ADMINISTRATOR-TEACHER-PC-STUDENT CONFERENCE**<br><br>Review/Revise ILP/IEP & Transition Goals<br>Add Behavior Contract<br>**(Following 3 days of Suspension/Removal/Refusal)** |

| | |
|---|---|
| **TIER 1**<br><br>**Classroom Level/**<br><br>**Universal**<br>**Intervention**<br><br>**Tier 1**<br>**Intervention**<br>**Provided to ALL**<br>**Students** | **TEACHER-PC-STUDENT CONFERENCES**<br><br>Review rules & expectations & discuss behavior strategies<br><br>**(Prior to 3 days of Suspension/Removal/Refusal)** |
| | **CLASSROOM LEVEL/UNIVERSAL INTERVENTIONS**<br>Highly Structured Scaffolded Classrooms<br>Low student to Staff Ratio<br>Accommodation Planning<br>Embedded Character-Based Literacy<br>Positive Behavior Support and Strategies<br>ILP & Transition Goals<br>Teacher-Student Conferences |



**Moving**
**Through the**
**Tiers**

Student's
discipline data
is frequently
monitored and
progress is
documented in
the student's
Individual
Learning Plans,
and Transition
Plans.

