UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
V.W., a minor, by and through his parent                   :
and natural guardian DERECK WILLIAMS;                      :
R.C., a minor, by and through his parent and               :        16-CV-1150 (DNH) (DEP)
natural guardian SANDRA CHAMBERS;                          :
C.I., a minor, by and through his parent and               :
natural guardian VERTELL PENDARVIS;                        :
M.R., a minor, by and through his parent and               :
natural guardian KAREN RAYMOND;                            :
F.K., a minor, by and through his parent and               :
natural guardian KASHINDE                                  :
KABAGWIRA; and J.P., a minor, by and                       :
through his parent and natural guardian                    :
ALISSA QUIÑONES; on behalf of                              :
themselves and all others similarly situated,             :
                                                           :
                              Plaintiffs,                   :
                                                           :
              vs.                                          :
                                                           :
EUGENE CONWAY, Onondaga County Sheriff,                    :
in his official capacity; ESTEBAN GONZALEZ,               :
Chief Custody Deputy of the Onondaga County               :
Justice Center, in his official capacity; KEVIN M.        :
BRISSON, Assistant Chief Custody Deputy, in               :
his official capacity; and SYRACUSE CITY                  :
SCHOOL DISTRICT,                                          :
                                                           :
                              Defendants.                   :
                                                           :
------------------------------------------------------------x

**DECLARATION OF WARDEN LEANDER PARKER**

I, Leander Parker, declare as follows:

1.      I submit this declaration in support of the plaintiffs' Motion for a Preliminary Injunction. If called upon to testify, I could and would do so competently as follows.

## BACKGROUND AND QUALIFICATIONS

2.      I am the Warden at the Youthful Offender Unit ("YOU") within the Central Mississippi Correctional Facility in Rankin County, Mississippi. The facility is part of the Mississippi Department of Corrections. I submit this testimony in my individual capacity and not as a state official.

3.      I have over 30 years of experience in leadership and management in juvenile correctional and probation settings, law enforcement practices, investigations, policy development, and public affairs. I began my career in 1981 as a correctional officer in an adult facility in Alabama. Although I spent the first five years of my career working in correctional institutions for adults, all of my experience since then has been in youth facilities or probation departments. I have worked in or managed eight different youth facilities in four states: Alabama, Georgia, Maryland, and Mississippi.

4.      I have previously been retained by the United States Department of Justice in two investigations into conditions at facilities housing youth. In Birmingham, Alabama, I was retained by the Department of Justice as part of an ongoing Civil Rights of Institutionalized Persons Act ("CRIPA") investigation into the treatment of juveniles in the Jefferson County Jail. In 2015, I visited that facility, which is an adult pretrial facility that houses juveniles charged as adults, and interviewed numerous residents and jail staff. I documented my interviews and discussed my findings with the federal investigators.

5.      In 2014, I was also retained by the Department of Justice when it was investigating a county detention center for youth in Scioto Ohio. For that case, I reviewed the written policies and records for the facility and made recommendations to the investigators, including ways in which the reliance on solitary confinement to discipline the residents could be eliminated.

6.      I have been invited to speak at several conferences regarding discipline and treatment of juveniles in correctional settings. In July 2016, I spoke at the National Juvenile Justice Network conference in Memphis, TN. My presentation was about eliminating the use of solitary confinement as punishment for juveniles. I also spoke about juveniles housed in adult facilities at the 2016 conference of the Mississippi Correctional Association. I have also spoken on a variety of other panels at conferences about juvenile corrections, including the Juvenile Detention Alternatives Initiative and the Peace Officers Association of Georgia's Mental Health Conference.

7.      I am on the advisory board of Stop Solitary for Kids, a national nonprofit that works to eliminate solitary confinement of youth in juvenile and adult facilities in the United States.

8.      My background and experience are set forth in more detail in my resume, which is attached as Exhibit A to this report. I have not testified at trial or by deposition in any case in the past four years, and I have not authored any publications in the previous ten years.

## MY INVOLVEMENT IN THIS CASE

9.      I understand that the Plaintiffs have filed this federal civil rights case challenging the use of disciplinary isolation for 16- and 17-year-olds held at the Onondaga County Justice Center ("Justice Center"). I have been retained to provide services as an expert and to express

my opinions about whether the Onondaga County Justice Center's solitary confinement policies and practices are reasonably calculated to restore facility discipline and security.

10.     In preparing this affidavit I reviewed the internal policies of the Justice Center as well as a variety of individual disciplinary records and summaries of those records, all of which are listed in <u>Exhibit B</u>. I understand that the Justice Center houses about 20-30 juveniles.

11.     On November 3, 2016, I toured the Justice Center with Mariana Kovel and Josh Cotter, counsel for Plaintiffs. A captain at the jail and Kathy Dougherty, counsel for the Sheriff's Office, guided the tour.

12.     During the tour, we visited the school, computer lab, male juvenile pod (2A), the Segregation Housing Unit ("SHU") (5BSH2 and 5BSH3), the mental health unit (5C), and the infirmary (3C). I stopped along the way to talk with staff and residents at the jail. In the 5B area I talked to C.B. and L.M, two 17-year-olds who had been sent to the SHU for fighting with each other. In 2A I talked to J.S., a 17-year-old who had been locked into his cell on the pod for yelling. I also conducted several longer interviews with named plaintiffs C.I. and V.K. This tour and these conversations, as well as my extensive experience outlined above and my review of the documents listed in Exhibit B, form the basis of my opinions set forth below.

13.     I am being compensated for this work at the rate of $137.50 per hour or $1,100 per day. My compensation is not dependent on my opinions or the outcome in this matter.

<u>**MY OPINIONS AND BASES OF MY OPINIONS**</u>

**I.   DISCIPLINARY ISOLATION OF JUVENILES IS NOT REASONABLY CALCULATED TO RESTORE FACILITY DISCIPLINE AND SECURITY**

14.     Based on over 30 years of experience in corrections, my opinion is that disciplinary isolation of juveniles is not reasonably calculated to restore facility discipline and security. I run a facility in Mississippi that houses juveniles convicted of violent crimes, and

4

because I have implemented a positive behavior management system, we almost never have to use any kind of room confinement. We never use solitary confinement like it is used at the Justice Center. We find that our facility is safer this way. When I visited the Justice Center I was surprised by the staff's reliance on lengthy disciplinary isolation sanctions. They are using disciplinary isolation for minor behavior and far too frequently overall. The conditions in the Segregated Housing Unit and the juvenile pod were very harsh and troubling. If the Justice Center implements a new model of positive discipline that eliminates the use of solitary confinement, they will find that the facility's safety and security will improve.

### My opinions are supported by my work history

15.     In forming my opinions set forth below, I relied on over thirty years of experience in corrections. The majority of this time has been spent with youth, including 16- and 17-year-olds, in correctional settings. Over my career I have worked with hundreds of juveniles and correctional staff.

16.     From 1985-1994, I worked in the Fulton County Juvenile Court, a county juvenile detention facility in Atlanta, Georgia. I started as a correction officer there. That facility relied on room confinement a lot when I started—the kids were in their cells by themselves most of the day. But the residents did not have toilets in their cells, and I was spending much of my time during the day letting them in and out of their cells one at a time to use the bathroom. I decided it would be simpler to keep them out in the recreation area more often than locked in. I got in trouble at first for letting them out of their cells too much. But right away kids on my shift started behaving more calmly than they had before. I saw an immediate behavior improvement—the more they stayed out of their room, the better they behaved. When they were locked in their cells they would be banging on the doors and cursing. When I brought them out and kept them out,

talked to them and engaged with them, they were remarkably well-behaved. This improvement in behavior led to my promotion at the facility. I was promoted to lieutenant, then counselor, and ultimately to assistant superintendent. I took the lessons I learned at this facility with me to every other facility I have worked in.

17.     In 1994, I was hired by the state of Georgia as the Assistant Director of a 40-bed juvenile detention center in Decatur, Georgia (outside of Atlanta), and I was soon promoted to Director. I was subsequently transferred to a 70-bed juvenile detention center in Marietta, Georgia due to that facility's involvement in a Consent Decree regarding conditions of confinement and discipline. In Marietta, I provided leadership and program implementation that led to a successful completion of the Consent Decree, including implementing a new positive behavior management system that rewarded kids for good behavior and dramatically reduced the use of isolation as punishment. I discuss this system more fully in the paragraphs about my current facility, below.

18.     The state of Georgia entered a Memorandum of Agreement with the U.S. Department of Justice regarding the conditions of confinement for its juvenile justice system. Because of my successful leadership in Marietta, in 2001 I was promoted to Associate Director of the Metro Regional Youth Detention Center in Atlanta, Georgia's largest juvenile detention center (240 beds), located in Atlanta, Georgia. In order to comply with the DOJ agreement, I adapted the positive behavior management system used at Marietta for the larger facility, including a dramatic reduction in the length and frequency of disciplining the kids with isolation. After we implemented this new behavior management system, the safety and security in the facility improved.  Assaults significantly decreased.  Ultimately this disciplinary system was adapted and implemented in all juvenile detention centers statewide.

19.     In 2006, I was hired by the State of Maryland to manage a juvenile detention center in Montgomery County, Maryland. The Maryland facility was at the time under investigation by the U.S. Department of Justice through the Civil Rights of Institutionalized Persons Act. I implemented a positive behavior management system very similar to the ones I have implemented in Georgia. This system, along with other program components, led to a smooth and satisfactory review by the DOJ audit team. I have seen up close how strong programming and a responsive behavior management system have positive effects on the behavior of juvenile offenders and how those measures assist in significantly reducing the need for any kind of disciplinary isolation.

**My opinions are supported by my experience at the Youthful Offender Unit**

20.     I have led the Youthful Offender Unit in Pearl, Mississippi (outside of Jackson) since it opened. The Mississippi state legislature directed the state Department of Corrections to establish the YOU in 2012 after the state shut down the previous facility at the site because of a lawsuit over the conditions. I was hired at its inception as the facility's first warden.

21.     The YOU houses youths convicted and sentenced as adults who are ages 17 and under, along with some 18- and 19-year-olds deemed appropriate for the facility. The YOU can hold a maximum of 54 youths, but the unit has never reached maximum capacity. The average daily population of the unit is about 30 youths, similar to the Justice Center.

22.     The youths at the YOU have been sentenced for committing serious offenses like murder, armed robbery, aggravated assault, and sexual assault. Almost all of these boys are involved in gangs—Vice Lords, Crips, or something else. Despite the backgrounds of our residents, we do not use shackles within the facility and we do not use solitary confinement. We

find that we simply don't need to use harsh discipline in order to maintain safety and order in the YOU.

23.    Our policy expressly prohibits the use of solitary confinement against juveniles. It does allow us to put the youths on temporary room confinement sometimes, but there are strict limitations. First of all, we have a very wide range of other discipline available short of confining a kid to a cell. Because we operate a positive behavior management system, for minor misbehavior we can cut back the rewards that a child has been given. We find that this is a very effective way to prevent misbehavior from escalating. When, through violent or assaultive behavior, a juvenile becomes an immediate danger to other residents or to staff, we can put a resident into a confinement cell that is somewhat separated from the rest of the dorm. We can put a resident in room confinement for a few hours or a few days, depending on the nature of the incident.

24.    Room confinement is exclusively used for assaultive behavior—anything less than that is punished with alternative discipline. A youth can be placed in his cell for a "time out" or "cool-down" period of up to two hours—we find that many kids calm down very quickly, given the chance to reflect on their behavior. The only people who can put a youth in confinement for longer periods are myself and the Captain of Security, who also serves as second in charge. If a youth is going to be in room confinement for longer than a few hours, there must first be a mental health assessment and a hearing held within 24 hours with an opportunity for him to present witnesses. Our policy caps periods of room confinement at a maximum of 72 hours. We are more likely to sentence a youth to a single day than to three full days, and, as I describe below, even one full day is rare.

25.     Room confinement at the YOU is not 23 hours of isolation. Instead, mental health staff meets with a youth immediately after he is put in room confinement to talk about the incident, why it happened, and what the youth could have done differently. Kids who have room confinement spend four hours outside of their cell every weekday from 8 AM to 12 PM to receive educational services. Afterward they get at least one hour of recreation (and usually more than that). They are then allowed to shower. Showers do not have time limitations. Thus, in practice youths on room confinement generally receive around six hours out of their cell every day. Moreover, youths in room confinement retain their full right to visits and phone calls. Cutting them off from their family support would be totally counterproductive to safety and security of the facility. In fact, I encourage them to have visitors when they have been disciplined. I find that when I talk to the visiting parents, I get a very notable improvement in their kids' behavior.

26.     In practice, we use room confinement far less than our policies allow. Between January and April of this year, we only had six incidents where we confined a youth, following the strict restrictions referenced above. In June, July, and August, we did not place a single youth in room confinement. In September and October we had five incidents that included room confinement. In November, two kids got into a fight with each other and they each spent less than 24 hours in room confinement—and that was the only use of confinement for that month.

27.     Our focus is on reducing isolation—if kids are acting out, we want them to talk about the situation and what led to it and we will offer solutions. If the resident is confronting other individuals, we work on resolving these conflicts. This mediation or follow-up technique reduces the occurrence of the same type of incident and assists with getting to the root of the problem. That kind of help can come from our social workers, counselors, teachers, and even our

security staff. We have a small facility—the highest number of kids we ever housed there was around 45 youths—but we have a full-time psychologist, four social workers, two alcohol and drug counselors, and a psychiatrist who's there 10 hours a week.

28.    We would never use room confinement for normal, immature behavior such as name-calling, cursing, shouting, or even minor acts of vandalism such as graffiti. We have other ways to respond to low-level misbehavior. In my experience, if you put kids in isolation for low level misbehavior they usually immediately start acting even worse than before.

29.    Instead of room confinement, we manage our youths through a positive behavior management system that rewards youths for good behavior. We also provide robust programming to keep the youths engaged, including educational services, vocational training, mental health services, art and music therapy programs, and yoga and meditation offered by volunteer groups from the community. We also use discipline that is related to the misbehavior—for instance, if a resident draws graffiti on the wall, he must clean it up (or paint over it if it does not wash off).

30.    All residents are given a point card with four levels. For everything they do, from waking up in the morning, making their beds, going to school, interacting in school, and so on, they get points. Two times a week, they can spend their points at the "point store," where they can buy "name-brand" personal hygiene items, snacks that cannot be purchased through the facility canteen, radios, headphones, and so on. Since 1998, I've worked in eight different youth facilities, and I've always taken this behavior management system with me; the system has been complimented by program auditors and garnered successful results in each state. Here in Mississippi, youth can have points taken away if we need to discipline them.

31.     To make sure that officers don't abuse that point system with the kids, a staff member regularly reviews any situation where a kid's points were reduced, and ensures that a hearing is conducted if necessary. We don't arbitrarily take points away; we make sure the punishment is fair and aligned with the behavior management system guidelines.

32.     We also have systems in place to make sure that kids can complain if they need to. We have a grievance process, and locked boxes on the walls throughout the facility into which inmates can put completed grievance forms or written notes into so that kids can vent. We also make sure that they have free access to staff—including me—if they have a concern or a problem.

33.     As a leader, I monitor what the staff do and provide support, because incidents will happen, and I need to be able to provide coaching to staff to help them de-escalate situations without the use of room confinement. We keep track of incidents, the number of assaults, where they occurred, what time of day, and which staff person was involved. I monitor that data with key staff, and we look at ways to improve. We debrief and talk about incidents, and if their numbers are high—more than two incidents a month—I, along with the Captain of Security, offer suggestions, solutions, and coach staff members on how to respond differently.

34.     When we developed the program at the Youthful Offender Unit, one of the key areas I wanted to focus on was education. After all, that's one reason why many of our residents get in trouble in the first place: they're not going to school. So we have a very good, accredited school—and in terms of quality, the education services provided are comparable to the services in the community. All juveniles who are not on room confinement must go to school from 8:00am-3:00pm.

35.     We also train our staff to work with youths in a productive manner. Working with young people is very different from working with adults—they're still developing and capable of enormous change. Their issues also tend to be more complex. First, we are careful to choose correctional staff who are good with working with adolescents. When I hire employees, I look for someone who has the ability to sit down with a kid, de-escalate a situation, and talk it through. Usually, people think you should look for a big strong officer capable of putting a male or female in their rooms. Those are good to have, but I'm really looking for officers with good communications skills who know how to de-escalate a situation. I wouldn't want to hire someone who locked a kid up every time they had a problem. All new staff members at the YOU receive forty hours of training specific to working with youths, including courses on youth brain development, de-escalation techniques, and mental health training. Staff are required to go through this training every six months.

36.     Our approach works despite the fact that almost every kid in the unit is involved in a gang. You have to be aware of (and make staff aware of) their gang affiliations and pay attention when they say they cannot do certain things, like eat right next to each other in the cafeteria. As long as staff members provide strong direction, gang affiliation does not become an issue. Members of rival gangs may not be able to walk right next to each other on the way to the gym, but once they get there, they interact just fine. We also look out for who in the facility is a "leader" within their gang and we work closely with them to use their strength to help us raise the expectations for their peers' behavior. If a disagreement breaks out, or turns into a fight, leaders will jump in before my staff. Peer pressure can actually be redirected to discourage these kinds of fights. We find that if we work with the leaders we can improve everyone's behavior.

37.     We have very low levels of violence at the YOU. This summer we went several months in a row with no violence at all in the unit.

## II. DISCIPLINARY ISOLATION OF JUVENILES AT THE JUSTICE CENTER IS NOT REASONABLY CALCULATED TO RESTORE FACILITY DISCIPLINE AND SECURITY

38.     Based on my experience as described above, review of the policies of the Sheriff's Office, and visit of the Justice Center, it is my opinion that the Sheriff's Office's policies and practices of using solitary confinement on juveniles at the Justice Center are not reasonably calculated to restore facility discipline and security.

39.     When I reviewed the records provided to me by plaintiffs' counsel, I was surprised at how frequently the Justice Center uses solitary confinement to punish minor behavior. I was also very surprised that kids were going to lock-in and SHU for so many days and weeks at a time for minor violations. Even for allegations of fights or violence, the Justice Center is sending kids to solitary confinement in a manner that will surely create less safety and security in the jail, and not more.

40.     I also reviewed the summaries of two months' worth of disciplinary records. These summaries were created by Maria Rafael, a paralegal working for plaintiffs' counsel (they are listed in Exhibit B), and when reviewing them I did not see a single incident of misbehavior where I would have sent the resident to 23-hour solitary confinement. While I do use my short-term version of room confinement for kids who get into fights, I would never put a kid away in a cell for weeks on end, even for a violent fight. In my opinion, the frequency and length of time that youths at the Justice Center were sent to 23-hour isolation was not reasonably calculated to restore facility discipline and security.

41.     My first impressions were reinforced when I arrived for the visit at the jail. The facility's current environment, including the lack of programming and services, is not conducive to serving juvenile offenders or promoting safety and security.

42.     The conditions in the SHU were some of the most horrible I have ever seen. The cells there are filthy. One cell I went into was so dark that for a while I thought it was painted black (it's actually dark green). The walls are completely covered in graffiti. One of the juveniles I spoke to in the SHU was in 23-hour isolation for cursing—placed in a tiny, dark room with the lights broken. This isolation is not for the safety of himself or other kids. This is pure punishment. The juvenile had to store all his belongings on the dirty floor. He had almost no reading material and nothing to do all day. The bed and linen were dirty. The clothing in the SHU was dirty—there's no way they're washing clothes every week. These conditions would never be tolerated in my facility, or in any of the facilities I have worked in.

43.     One juvenile we talked to in the SHU, L.M., seemed like he had had no meaningful contact with any adult since he had arrived at the jail several weeks before I met him. He was still wearing the first pair of underwear that he had gotten—nobody had given him a change of underwear. The practice seemed to be that if the dirty clothes are not outside of the confinement cell, the officers make no attempt to obtain the dirty clothing from the juvenile. It is hard for a juvenile to ensure that dirty clothes will be outside of the door since he/she has basically no control of when the door is opened. This is a child: he needed much more structure than he was getting.

44.     The juveniles' recreation in the SHU is just a cage with nothing to do but be alone to stand there and stare: this is plainly not "recreation." If the officials are thinking, "Treat him this bad and he'll never come back," they are wrong. The harsher you treat an individual, the

more likely they'll return to the box because you are teaching him the lesson that he cannot be trusted to be among his peers. If you invest in making a positive experience for the juveniles, and build them up, then they can actually begin to improve themselves. As correctional officials, we are ultimately responsible to ensure that kids who are released have a transition plan and never come back.

45.     Although the conditions in the SHU were shockingly bad, I also toured the juvenile pod and I believe that the use of lock-in (23-hour confinement) in the juvenile pod is also doing nothing to help discipline and security in the jail. The cells on the juvenile pod are almost as small as the ones in the SHU.

46.     We witnessed J.S., a juvenile in the pod, standing at the door of his locked cell and screaming at the top of his lungs. When I went over to him, I asked why he was upset. He had recently been given a "Lock In" sanction in his cell because the guard had accused him of yelling. He insisted that he had not been the one yelling in the original incident, although the guards did not want to hear his complaint. It was clear no staff member had actually talked to him or tried to de-escalate his anger. He was upset because he had filled out a grievance form and was waving it in his window. He said the guards were refusing to pick up his grievance. When he went into his rage, nobody came over to him. Just walking over there and listening to him would have resolved the problem, and it would have prevented all the banging and kicking on the door. J.C. continued yelling while I was interviewing another kid in the pod and I overheard a guard loudly threatening him with additional penalties from his desk across the pod. This is no way to de-escalate an angry child. Afterwards, I heard from plaintiffs' counsel that J.C. was sent to the SHU because of that yelling. A kid should never be placed in isolation for his words. He should only be put into room confinement if he shows through his actions that he

poses an immediate threat to the safety of himself or others, and then only for a short period of time to defuse the threat.

47.     If the Justice Center continues to lock youths in a cell for all misbehavior, the only thing that policy will do is to make the kids more aggressive. This is because being locked down doesn't mean a whole lot—it doesn't teach them anything the kids can use when they're not locked up. And they act out in the first place because they're uncomfortable in their environment. They feel unsafe, in part because they are always under threat of being thrown into a cell for 23 hours a day, and they respond by trying to "man up," which may include acting violent to show power and control over their environment. Solitary confinement is thus not reasonably calculated to restore facility discipline and security, and is counterproductive.

### III. DISCIPLINARY ISOLATION OF JUVENILES AT THE JUSTICE CENTER CAN BE ELIMINATED WHILE ADVANCING FACILITY DISCIPLINE AND SECURITY

48.     My opinion is that the Onondaga County Justice Center does not need to be using solitary confinement in the SHU or the juvenile pod. Instead, it can implement a series of simple reforms that will dramatically cut the amount of time the kids are confined to their cells while also improving safety and order in the jail. I have seen these reforms implemented in facilities during my career, and they *increase* safety and reduce misbehavior.

### Change Disciplinary Structure; Eliminate SHU Sentences and Reduce Room Confinement

49.     The Justice Center should develop a new discipline policy that (1) eliminates all use of the SHU for juveniles (2) eliminates the use of disciplinary isolation, and (3) allows for very limited use of room confinement for juveniles in the pod when they pose an immediate threat to the safety of himself or others, and then only for a short period of time to defuse the threat. The policy should ensure that alternative disciplinary measures are always utilized before

room confinement. Some examples of other disciplinary options are: time out; reassignment to another area of the pod; mediation; assignment to work details; privilege suspension; restrictions; and supportive counseling. The discipline policy should be clear that solitary confinement may not ever be used. If room confinement is used, it must be imposed by a higher level staff and only after other interventions have been exhausted. The policy should ensure that any period of room confinement is kept to as short a duration as possible. Staff should never be using confinement for nonviolent or minor misbehavior. A resident who is threatening himself or others should be first placed in a cell for only a few hours to calm down and in no event should a juvenile be placed in room confinement for a period of time that could harm the child. Unlike solitary confinement, a resident in room confinement should never be totally isolated: he should be allowed out for several hours per day for school, recreation, and social interaction. The resident's improved behavior should result in early release from room confinement and this should be stated in policy; I have found that this policy greatly improves behavior.

50.     All facility rules should be clearly explained to residents at intake and reviewed periodically during the resident's stay. The facility should impose a standardized orientation process during the intake period; clear, posted program rules for each resident as well as a handbook that contains the same and other program information; a prompt disciplinary hearing process (including the right of the accused to call witnesses), conducted by a fair and impartial hearing officer or committee; fair and appropriate sanctions for major and minor rule violations that are documented and included in the resident handbook; and program schedules posted so that the resident is aware of where he is supposed to be at any given time. Acting out and misbehavior will be reduced when the resident has more information about his/her environment and understands the rules and the consequences for rule violations.

51.     Supportive counseling and other treatment services should be provided regularly during any period of room confinement. The policy should specifically state that prior to a sentence to room confinement, there must be an inquiry and documentation by a mental health professional stating that room confinement is not contraindicated for the resident. Residents should receive access to in-person educational services while on room confinement and should be allowed full recreation, shower, and visitation privileges.

52.     There are a wide range of alternative disciplinary sanctions that could be imposed instead of solitary confinement. An effective positive behavior management system should be implemented that is designed to assist residents in improving their decision-making processes and making better choices. Program rules should be clear, emphasizing the rights of residents and consequences for violations. The behavior management system should reward good behavior, academic performance, and positive attitudes. The system should help residents develop an awareness of the consequences of personal actions and the importance of self-control. These measures are helpful toward developing an awareness of the consequences of poor choices and for not accepting personal responsibility for negative behavior.

53.     The Justice Center should consider investing in physical modifications to the juvenile pod so that it includes open areas for juveniles to be sent away from the main common space for a short "time out" period prior to resorting to room confinement. These time-outs may be imposed when a resident would need to reflect, calm down, and regain control of his/her behavior. The area should be supervised by staff and conducive to having a calming effect on the resident. Having two areas inside the pod will also help staff to separate residents who are having a hard time getting along with each other without resorting to the use of room confinement.

**Reduce Idleness**

54.    Kids need activities to fill their day. The kids that I saw at the Justice Center have too much idle time; they are spending hours just lying around in a filthy room. They appeared to be very bored, and bored kids will act up. They are not being fed any progressive programming that would keep them sharp. They did have a TV in the pod but that is not enough for stimulation. Some of the juveniles said they went to school 3 hours a day but from my conversations I do not believe that all of them attend regularly. They were low energy, and they were completely disengaged from any positive interactions with staff. These kids spend a tremendous amount of time locked in a room for no reason.

55.    There was very little reading material. I saw basically no newspapers or magazines anywhere in the facility. Most of the bookshelves seemed empty. The jail's library resources should be expanded. I saw absolutely no games for them to play. No playing cards, checkers, or dominoes. Speaking from my experience, if kids are properly supervised, they will enjoy playing games to combat boredom and they will not gamble or fight during the games. I saw very few pencils and pens and no art supplies or other creative materials.

56.    The juvenile pod had a lot of space, which gives it a lot of potential for programming and service delivery. But they are not using the space well. I didn't even see a schedule where you can track or monitor what they're doing. The kids are not looking forward to anything. When a kid has nothing to look forward to they have no reason to modify their behavior.

57.    The officials told us that kids have recreation time every day. But it looked to me like they get very little real recreation. The juveniles *never once* get to go outside while they are incarcerated at the Justice Center. All of their recreation is indoors. I was surprised that the

basketball hoops had no nets. That sends a message of disrespect to the kids: "we don't even care enough to spend $2 on a net for you." These kids need space where they can jump and run and do large-muscle exercise. Research and best practices have demonstrated that a variety of healthy and vigorous activities and services enhance safety and security measures within the facility and contribute to the well-being of the resident and staff. When juveniles are engaged in activities and positive interactions with staff, they are less likely to act out, while also improving their social development skills.

58.     Of course, the primary programming service that the facility can and must provide to juveniles is education. Educational services should provide adequate regular, special, and vocational education services. An educational curriculum, screening and testing that reasonably meets the needs of each youth and that is compliant with applicable laws should be developed. Unless a juvenile is an active, imminent threat to staff, there is no reason to cut him off from face to face instruction. Punishing a juvenile by eliminating his access to education is totally counterproductive and not related to safety or security. Education policies should be developed that describe and provide guidelines to staff ensuring that residents receive in-person educational services even when they misbehave.

**Staffing Concerns**

59.     The facility leadership and management should be open and clear to their staff about the goal of eliminating segregation and minimizing room confinement through making expectations known to all staff. Staff training should focus on the use of alternatives to cell confinement.

60.     The staff I spoke to at the Justice Center did not seem to realize the importance of juveniles being involved in daily activities. They did not seem to understand that juveniles still

have developing minds and need to have positive interactions with adults. The staff needs juvenile-specific training so that they can be ready to handle the special needs of youth such as impulsivity, behavior problems, physical disabilities, preexisting mental health issues and vulnerability to developing new mental health problems. It was clear from talking to them that they had not received any such training.

61.     Another very serious problem is understaffing. Juveniles require more staff than adults; a staffing analysis should be completed to ensure adequate coverage. The jail's leadership said that no matter how many juveniles there were in the pod (there were 56 cells there), they could only ever have one staff person on site to supervise. That is inadequate to address the needs of the juveniles. Staffing ratios for direct care staff should be increased in the juvenile pod to ensure staff can provide direct and engaged supervision; reduce negative and acting-out behavior; and intervene and/or address disruptive behavior or conflicts.

62.     The practices of recruiting, retaining and training staff should be aligned with the goal of eliminating segregation and minimizing room confinement. The Sheriff's Office should look for staff that have developed or can adapt a temperament that will allow them to be firm and fair and not dependent on harsh, outdated institutional control methods. The Sheriff should aim to hire staff that wants to make a difference in the lives of the kid. Working with youth requires specific training to provide staff with the skills to meet the special needs of the population. Training emphasizing conflict resolution and working with youth should be provided to staff. The staff training has to consistently stress that youths process information differently and react with much more impulsivity than adults.

I certify under penalty of perjury that the foregoing is true and correct.


Dated: December 14, 2016
       Pearl, Mississippi

                                              *Leander Parker*
                                              Leander Parker