UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

V.W., a minor, by and through his parent                 :
and natural guardian DERECK WILLIAMS;          :
R.C., a minor, by and through his parent and      :
natural guardian SANDRA CHAMBERS;                :
C.I., a minor, by and through his parent and        :
natural guardian VERTELL PENDARVIS;              :
M.R., a minor, by and through his parent and     :
natural guardian KAREN RAYMOND;                    :
F.K., a minor, by and through his parent and       :
natural guardian KASHINDE                                      :
KABAGWIRA; and J.P., a minor, by and             :
through his parent and natural guardian                 :
ALISSA QUIÑONES; on behalf of                           :
themselves and all others similarly situated,         :
                                                                                      :
                                    Plaintiffs,                                :
                                                                                      :
                    v.                                                             :
                                                                                      :
EUGENE CONWAY, Onondaga County Sheriff,  :
in his official capacity; ESTEBAN GONZALEZ,  :
Chief Custody Deputy of the Onondaga County  :
Justice Center, in his official capacity; KEVIN M. :
BRISSON, Assistant Chief Custody Deputy, in    :
his official capacity; and SYRACUSE CITY         :
SCHOOL DISTRICT,                                               :
                                                                                      :
                                    Defendants.                             :
------------------------------------------------------------x

**DECLARATION OF MICHELLE SHAMES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

16-CV-1150 (DNH) (DEP)

## DECLARATION OF MICHELLE SHAMES

I, Michelle Shames, declare pursuant to 28 U.S.C. § 1746:

1.  All facts stated in this declaration are true and correct to the best of my knowledge. If called upon to testify, I would do so competently as follows.

2.  I am the Data and Policy Analyst at the New York Civil Liberties Union (NYCLU). I hold a Master's Degree in Sociology from McGill University, where I received extensive statistical analysis training at the doctoral level.

**DATA SOURCES**

3.  For the purpose of this document, any use of the term "solitary confinement" refers to the special conditions of administrative segregation, lock in, and punitive segregation applied by the Sheriff's Office against detained youth.  "Incident" refers to a single disciplinary incident resulting in a solitary confinement sanction, even though multiple allegations of rule breaking may have been involved in the given incident. "Sanction days" refers to days on which an individual was scheduled to be in solitary confinement as the result of a disciplinary sanction, including days spent in administrative segregation while awaiting a hearing.

4.  All statistics presented in this declaration were calculated using data retrieved from the following sources:

    i.  Information on juveniles held in custody at the Onondaga County Justice Center was compiled using data the NYCLU obtained from the Onondaga County Sheriff's Office ("Sheriff's Office") through expedited discovery in the form of an excel spreadsheet that included inmate control numbers, sex, race, age and date of birth, designation, and discharge date of all of 16- and 17-year-olds who were admitted to the Onondaga County Justice Center between October 15, 2015 and November 15, 2016. To my understanding, this data was extracted from the Onondaga County Justice Center's admissions system by Deputy Patrick Lusk who transmitted it to plaintiffs' counsel via Kathleen M. Dougherty. This data can be viewed in the form in which it was received by my office in Exhibit A. For the purpose of presenting an annual snapshot that overlaps with the time span of solitary confinement data I was provided (referenced below in 4(ii)), only

2

admissions that that took place during the one-year period between October 19, 2015 and October 19, 2016 were analyzed.[1]

    a. The length of each stay in custody was calculated by subtracting the admission date from the discharge date.

    b. The number of total days in custody per juvenile was calculated by adding the number of days in custody of all admissions a given juvenile experienced during the above delineated one-year period.

ii.   Information on solitary confinement of 16- and 17-year-olds at the Onondaga County Justice Center was calculated using data on solitary confinement sanctions. To my understanding, this data was compiled by staff members of the Onondaga County Justice Center in the form of Excel spreadsheets that included inmate control numbers, race, special condition type, begin and end date, and a remarks section including charge details, incident report number, and disciplinary report number for all solitary confinement sanctions given to inmates aged 17 or younger between October 19, 2015 and December 1 2016. Chief Custody Deputy Esteban M. Gonzales arranged for these spreadsheets to be provided to the Alliance of Communities Transforming Syracuse (ACTS), a network of activists in Syracuse. Emily NaPier of ACTS forwarded these spreadsheets to Joshua Cotter at Legal Services of Central New York (LSCNY), co-counsel on this case. He then forwarded these spreadsheets to staff at my office. My understanding is

---

[1] 18 of the 427 admissions of juveniles that took place during this one-year period did not include discharge information because on the date the dataset was created, these individuals were still in custody. For calculations involving length of stay, these 18 admissions were attributed the discharge date of 11/16/2016, the date on which the dataset was compiled. As such, the true length of these 18 admissions is underestimated.

that all spreadsheets received are unaltered original documents that were prepared directly by Justice Center staff. This raw data, in the form that my office received it, can be viewed in Exhibits B through J of Emily NaPier's declaration. For the purpose of presenting an annual snapshot that overlaps with the time span of admission and discharge data I was provided (referenced above in 4(i)), only solitary confinement sanctions that that were imposed during the one-year period between October 19, 2015 and October 19, 2016 were analyzed in paragraphs 6 through 13 and 15 through 17.

    a. Days sanctioned: Number of days of solitary confinement sanctions for each juvenile was calculated by subtracting the start date from the end date of each sanction. If multiple sanctions given to the same individual had dates that overlapped, the days on which sanctions overlapped were counted only once. For example, if a juvenile incurred a five-day sanction that began on the ninth day of a 10-day sanction, the total number of sanction days was counted as 13 and <u>not</u> 15. Additionally, all sanctions reported in this dataset that were missing end-dates were counted as lasting only one day.

    b. Days served: It can be asserted with a high degree of certainty that the juveniles at the Onondaga County Justice Center served the entirety of the solitary sanctions they were given, unless they were discharged from the Justice Center prior to the end of a sanction[2]. Solitary sanction data from

---

[2] This assertion is based on the lack of any evidence to the contrary having been observed by or reported to plaintiffs' counsel by any of the named plaintiffs or other juveniles with whom they spoke.

paragraph 4(ii) was thus compared to discharge data from paragraph 4(i) in order to eliminate all days that were sanctioned but not served due to discharge from the Justice Center.

    c.  Incidents: Number of incidents per juvenile were identified using the incident report number. If more than one solitary sanction was associated with a single incident report number, these were counted as one sanction.

    iii.  Of the solitary confinement sanctions reported in the data explained in paragraph 4(ii), seven end-dates were missing for sanctions that were imposed upon the six named plaintiffs in this motion. In order to more accurately estimate the true duration of these sanctions, I analyzed disciplinary reports for only these seven sanctions, which the Sheriff's Office sent to my office through expedited discovery. The results of this additional analysis are discussed only in paragraphs 18 through 23 of this declaration.

5.  Each of the numerical statements below likely underestimates the true numbers associated with the use of solitary confinement sanctions against juveniles at the Justice Center, for two reasons:

    a.  The data described in paragraph 4(ii) does not reflect all instances where juveniles were held in solitary confinement. For example, on at least two occasions, NYCLU staff visiting the Justice Center's facilities observed juveniles who were held in solitary but who were not reflected in the data provided by the Center;

    b.  At least 15 of the solitary confinement sanctions reported by the Justice Center in the data described in paragraph 4(ii) did not include the sanctions' end-date and were thus counted as only one day. However, given the remarks associated with many of

5

these sanctions, there is a reasonable probability that the sanctions were in effect
longer than one day.

**GENERAL ANALYSIS**

6. In this section, I present statistics on (1) the population of 16- and 17-year-olds admitted
to the Onondaga County Justice Center between October 19, 2015 and October 19, 2016,
and (2) solitary confinement sanctions that were imposed on and served by 16- and 17-
year-olds admitted to the Onondaga County Justice Center between October 19, 2015 and
October 19, 2016.

7. The admissions and discharge data that I analyzed (described in paragraph 4(i)), showed
that 309 unique 16- and 17-year-olds were admitted to the Justice Center between
October 19, 2015 and October 19, 2016 on 427 separate admissions, 86 percent of which
were pre-trial.

8. According to solitary confinement sanction data that I analyzed (described in paragraph
4(ii)), 85 of the 309 16- and 17-year-olds admitted to the Onondaga County Justice
Center between October 19, 2015 and October 19, 2016 received solitary confinement
sanctions for at least 260 incidents. Together, these sanctions totaled 2,671 sanction days
in solitary confinement. Sanctions imposed include a 400 consecutive day and a 104
consecutive day sanction.

9. Upon admission to the Onondaga County Justice Center, juveniles are placed on a special
reception status for the first five days of their stay, the majority of which is spent in their
cell. Excluding admissions for which juveniles were released prior to the end of this five-
day reception period, 131 unique 16- and 17-year-olds, were admitted to the Justice
Center between October 19, 2015 and October 19, 2016 on 162 distinct occasions for six

days or more. Of these 162 admissions, 106, or 65 percent, were pre-trial. Of these 131 juveniles, 94 (72 percent) were Black, 32 (24 percent) were white, and the remainder were American Indian, unidentified, or other. The average length of these 162 admissions was 59 days.

10. According to the solitary confinement sanction data that I analyzed (described in paragraph 4(ii)), of the 131 unique 16- and 17-year-olds who were admitted to the Justice Center between October 19, 2015 and October 19, 2016 and whose admissions lasted six days or more, 79 juveniles, or 60 percent, received at least one solitary confinement sanction. These 79 juveniles received a total of 251 sanctions that together totaled 2,638 sentenced sanction days, at least 2,104 of which were served. The average for these 131 juveniles was 26.6 solitary sanction days served per juvenile.

11. Of the 79 juveniles who had an admission at the Justice Center of 6 or more days and received at least one solitary sanction day, 20 (or 25%) were given between 1 and 5 total solitary sanction days, 23 (or 29%) were given between 6 and 19 total solitary sanction days, and 36 (or 46%) were given a total of 20 or more solitary sanction days (see table and figure 2 of Exhibit C). In terms of solitary sanction days served, 21 juveniles (or 27%) served between 1 and 5 total solitary sanction days, 23 (or 29%) served between 6 and 19 total solitary sanction days, and 35 (or 44%) served a total of 20 or more solitary sanction days (see table and figure 3 of Exhibit C).

12. According to the solitary confinement sanction data that I analyzed (described in paragraph 4(ii)), of the 79 juveniles who had a stay at the Justice Center for six or more days between October 19 2015, and October 19 2016, and who received at least one solitary confinement sanction, an average of 15 unique juveniles per month received at

least one solitary confinement sanction and an average of 20 incidents per month were sanctioned with solitary confinement (see figures 4 and 5 of Exhibit D). November and December 2015, the months for which the plaintiffs' counsel conducted a review of discipline records, discussed in Maria Rafael's declaration (see paragraph 13), are therefore slightly below this average.

13. Forty-eight 16- and 17-year-olds were admitted to the Onondaga County Justice Center between October 19, 2015 and October 19, 2016 for a length of stay that spanned 59 consecutive days or more, 46 of whom, or 96 percent, received at least one solitary sanction (see table 1 of Exhibit B).

14. According to the solitary confinement sanction data that I analyzed (described in paragraph 4(ii)), between September 21, 2016 and December 1, 2016, 23 unique juveniles received at least one solitary sanction.

**EDUCATIONAL INSTRUCTION**

15. The following calculations regarding number of days of educational instruction are based upon the assumption that (1) as of their 15th day in custody, incarcerated juveniles are entitled to receive three hours of education for every day they are in custody that is a school day in the Syracuse City School District, and (2) while juveniles are in solitary confinement they do not receive these three hours of education, which I understand from plaintiffs' counsel the Syracuse City School District has admitted.

16. Based on the assumptions stipulated in paragraph 19, admissions and discharge data from the Justice Center (explained in point 4(i)) reflected that of the 309 individuals admitted between October 19, 2015 and October 19, 2016, 88 unique 16- and 17-year-olds who

were in custody for at least 15 consecutive days were eligible to receive a total of 3,650 days of educational instruction, averaging 41 days per juvenile.

17. Of these 88 Juveniles, 68 (or 77%) served some amount of time in solitary. These 68 juveniles were eligible for a total of 3,220 days of educational instruction, between 897 and 1,030 days of which were served in solitary[3].

**SOLITARY CONFINEMENT OF NAMMED PLAINTIFFS**

18. The solitary confinement sanction data that I analyzed (explained in paragraph 4(ii)), reflected that R.C. was sanctioned for a total of 4 incidents from October 19, 2015 to December 1, 2016 and that he served a total of 39 sanction days of solitary confinement. Solitary confinement sanction data from disciplinary reports (described in paragraph 4(iii)) reflected that R.C. was sanctioned and served a total of 60 sanction days of solitary confinement.

19. The solitary confinement sanction data that I analyzed (explained in paragraph 4(ii)), reflected that C.I. was sanctioned for a total of 9 incidents from October 19, 2015 to December 1, 2016 and that he served a total of 59 sanction days of solitary confinement. Solitary confinement sanction data from disciplinary reports (described in paragraph 4(iii)) reflected that C.I. was sanctioned and served a total of 83 sanction days of solitary confinement.

---

[3] A range is provided for the total number of education eligible days that juveniles spent in solitary because 1,030 might slightly overestimate the true amount of time due to a lack of information about the start time of sanctions. For example, an individual might have been placed on administrative segregation orders after an incident occurring in the late afternoon of a school day, in which case this day is counted as a school day in solitary. However, in reality, this juvenile might have attended classes that day but in the morning. In order to account for this potential overestimation, I computed a second number, in which I subtracted the first day of each solitary sentence. The total number of education eligible days served in solitary, not including the first day of each sanction, was 897 days. The true number of education eligible days served in solitary thus falls somewhere between 897 and 1,030 days.

20. The solitary confinement sanction data that I analyzed (explained in paragraph 4(ii)),
    reflected that F.K. was sanctioned for a total of 3 incidents from October 19, 2015 to
    December 1, 2016 and that he served a total of 28 sanction days of solitary confinement.
    Solitary confinement sanction data from disciplinary reports (described in paragraph
    4(iii)) reflected that F.K. was sanctioned and served a total of 49 sanction days of solitary
    confinement.

21. The solitary confinement sanction data that I analyzed (explained in paragraph 4(ii)),
    reflected that J.P. was sanctioned for a total of 3 incidents from October 19, 2015 to
    December 1, 2016 and that he served a total of 15 sanction days of solitary confinement.
    Solitary confinement sanction data from disciplinary reports (described in paragraph
    4(iii)) reflected that J.P. was sanctioned and served a total of 36 sanction days of solitary
    confinement.

22. The solitary confinement sanction data that I analyzed (explained in paragraph 4(ii)),
    reflected that M.R. was sanctioned for a total of 8 incidents from October 19, 2015 to
    December 1, 2016 and that he served a total of 59 sanction days of solitary confinement.
    Solitary confinement sanction data from disciplinary reports (described in paragraph
    4(iii)) reflected that M.R. was sanctioned and served a total of 91 sanction days of
    solitary confinement.

23. The solitary confinement sanction data that I analyzed (explained in paragraph 4(ii)),
    reflected that V.W. was sanctioned for a total of 14 incidents from October 19, 2015 to
    December 1, 2016 and that he served a total of 160 sanction days of solitary confinement.
    Solitary confinement sanction data from disciplinary reports (described in paragraph

4(iii)) reflected that V.W. was sanctioned and served a total of 169 sanction days of

solitary confinement.

I certify under penalty of perjury that the foregoing is true and correct.

Dated:  December 20, 2016
        New York, New York

                                    _Michelle Shames_
                                    Michelle Shames
                                    Data and Policy Analyst
                                    New York Civil Liberties Union Foundation
                                    125 Broad St., 19th Fl.
                                    New York, NY 10004