UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

V.W., a minor, by and through his parent
and natural guardian DERECK WILLIAMS,
R.C., a minor, by and through his parent
and natural guardian SANDRA CHAMBERS,
C.I., a minor, by and through his parent
and natural guardian VERTELL PENDARVIS,
M.R., a minor, by and through his parent and
natural guardian KAREN RAYMOND,
F.K., a minor, by and through his parent and
natural guardian KASHINDE KABAGWIRA,
and J.P., a minor, by and through his parent
and natural guardian ALISSA QUIONES,

                Plaintiffs,

        -v-                       9:16-CV-1150

EUGENE CONWAY, Onondaga County
Sheriff in his official capacity, ESTEBAN
GONZALEZ, Chief Custody Deputy of the
Onondaga County Justice Center, in his
official capacity, KEVIN M. BRISSON,
Assistant Chief Custody Deputy, in his
official capacity, and SYRACUSE CITY
SCHOOL DISTRICT,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                       OF COUNSEL:

NEW YORK CIVIL LIBERTIES UNION     CHRISTOPHER T. DUNN, ESQ.
Attorneys for Plaintiffs               MARIKO HIROSE, ESQ.
125 Broad Street, 19th Floor         PHILIP L. DESGRANGES, ESQ.
New York, NY 10004               AADHITHI PADMANABHAN, ESQ.
                               MARIANA L. KOVEL, ESQ.

LEGAL SERVICES OF CENTRAL NEW YORK   JOSHUA T. COTTER, ESQ.
Attorneys for Plaintiffs               SAMUEL C. YOUNG, ESQ.
221 South Warren Street, Suite 300     SUSAN M. YOUNG, ESQ.
Syracuse, NY 13202

SANFORD, HEISLER LLP
Attorneys for Plaintiffs
1666 Connecticut Avenue NW, Suite 300
Washington, DC 20009

AIMEE KRAUSE STEWART, ESQ.

ONONDAGA COUNTY DEPARTMENT OF LAW
Attorneys for defendants Eugene Conway,
    Esteban Gonzalez, and Kevin M. Brisson
John H. Mulroy Civic Center
421 Montgomery Street, 10th Floor
Syracuse, NY 13202

CAROL L. RHINEHART, ESQ.

BOND, SCHOENECK LAW FIRM
Attorneys for defendant Syracuse City
    School District
One Lincoln Center
Syracuse, NY 13202

JONATHAN B. FELLOWS, ESQ.

HON. RICHARD S. HARTUNIAN
United States Attorney for the
    Northern District of New York
445 Broadway, Room 218
Albany, NY 12207

JOHN D. HOGGAN, JR., ESQ.
Ass't United States Attorney

UNITED STATES DEPARTMENT
    OF JUSTICE
Civil Rights Division, Special Litigation Section
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

KYLE SMIDDIE, ESQ.
ATTICUS LEE, ESQ.

NAACP - CNY CHAPTER LEGAL COMMITTEE
Attorneys for Amici Curiae
Colvin Station, P.O. Box 397
Syracuse, NY 13205

LANESSA L. OWENS, ESQ.

DAVID N. HURD
United States District Judge

# TABLE OF CONTENTS

I.     INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

II.    BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

       A.    The Justice Center. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6
       B.    The School District. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7
       C.    Discipline at the Jail. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8
       D.    Education in Solitary Confinement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8
       E.    Use of Solitary Confinement on Juveniles.. . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9
       F.    Plaintiffs' Experts.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10
             1.    Dr. Krisberg . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10
             2.    Warden Parker. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12
             3.    Dr. Kraus . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14
       G.    Government's Statement of Interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16
       H.    NAACP's Amici Brief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

III.   DISCUSSION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

       A.    Class Certification. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17
             1.    Numerosity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20
             2.    Commonality. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22
             3.    Typicality.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25
             4.    Adequacy of Representation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26
             5.    Rule 23(b).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27
             6.    Ascertainability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

       B.    Summary Judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

       C.    Preliminary Injunction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   34
             1.    Substantial Likelihood of Success. . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35
                   i.     Eighth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   36
                   ii.    Fourteenth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   42
                   ii.    Individuals with Disabilities Education Act. . . . . . . . . . . . . . . . . . .   44
             2.    Strong Showing of Irreparable Harm. . . . . . . . . . . . . . . . . . . . . . . . . . .   48
             3.    Public Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   49
             4.    Balance of Hardships. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   49

IV.    CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   50

## MEMORANDUM–DECISION and ORDER

## I. INTRODUCTION

The named plaintiffs[1] seek relief on behalf of themselves and a putative class of fellow 16- and 17-year-olds ("juveniles") being detained at the Onondaga County Justice Center (the "Justice Center" or "Jail") by defendants Onondaga County Sheriff Eugene Conway ("Sheriff Conway"), Chief Custody Deputy Esteban Gonzalez ("Deputy Gonzalez"), and Assistant Chief Custody Deputy Kevin Brisson ("Deputy Brisson") (collectively the "Onondaga County defendants"), each of whom is being sued here in their respective official capacities.

First, plaintiffs' class action complaint alleges declaratory and injunctive relief under 28 U.S.C. §§ 2201-02 and 42 U.S.C. § 1983 is necessary to put an end to the Onondaga County defendants' routine imposition of solitary confinement on juveniles at the Justice Center, a practice which allegedly violates the Eighth and Fourteenth Amendments.

Second, plaintiffs seek class relief against the Onondaga County defendants and defendant Syracuse City School District (the "School District"), which has contracted with the Justice Center to provide educational services, for allegedly denying juveniles in solitary confinement the minimum educational instruction guaranteed by state law in violation of the Fourteenth Amendment.

Third, plaintiffs seek relief against both the Onondaga County defendants and the School District (collectively "defendants") on behalf of a subclass of juvenile inmates with disabilities who are allegedly being systematically deprived of the procedural protections and

---

[1] The named plaintiffs are V.W., R.C., C.I., M.R., F.K., and J.P. Because they are minors, the parties refer to them by their initials in accordance with FED. R. CIV. P. 5.2(a).

special education services guaranteed to them by the Individuals with Disabilities Education Act, 20 U.S.C. §§ 140 et seq.

The parties have filed three motions: (1) plaintiffs have moved for class certification under FED. R. CIV. P. 23 and (2) a preliminary injunction under FED. R. CIV. P. 65, while the School District has moved for (3) summary judgment under FED. R. CIV. P. 56 on the basis that it is the Onondaga County defendants, not the School District, who bear sole responsibility for any of the constitutional or statutory violations alleged by plaintiffs.

In addition, the United States of America (the "Government") has submitted a statement of interest in this litigation under 28 U.S.C. § 517, and the Central New York Chapter of the National Association for the Advancement of Colored People (the "NAACP") has moved for leave to appear as amici curiae in support of plaintiffs' request for a preliminary injunction.

The parties exchanged limited discovery and the three motions were fully briefed, although the Onondaga County defendants did not submit an opposition to plaintiffs' motion for class certification. Oral argument was heard on Wednesday, February 15, 2017 in Utica, New York, where plaintiffs' motion for class certification and the NAACP's motion for leave to appear as amici were granted. Decision was reserved on plaintiffs' motion for a preliminary injunction and on the School District's motion for summary judgment.

## II. BACKGROUND

Plaintiffs have submitted a mountain of evidence in support of their request for the entry of a preliminary injunction. See Pls.' Mem. Supp. Prelim. Inj., ECF No. 46-33,

7-8 & nn.1-7 (detailing evidentiary submissions).[2]  In response, the Onondaga County defendants have submitted an affidavit from Deputy Gonzalez, ECF No. 62, and the School District has submitted declarations from David Tantillo, ECF No. 28-2, John A. Dittmann, Jr., ECF No. 28-3, and Signe Nelson, ECF No. 28-5.

All of these materials have been considered and the particularly relevant portions will be summarized below.  Notably, the parties did not press the need for an evidentiary hearing at oral argument, and an independent review of the submissions did not reveal any genuine disputes over the essential facts.  Matter of Defend H2O v. Town Bd. of the Town of E. Hampton, 147 F. Supp. 3d 80, 96-97 (E.D.N.Y. 2015) (discussing circumstances where an evidentiary hearing on a preliminary injunction is unnecessary).  Accordingly, while a few disputes over factual matters have been noted, their resolution is unnecessary in order to decide the present issues.

## A. The Justice Center

Opened in 1995, the Justice Center is a 671-bed correctional facility located in downtown Syracuse, New York and operated by the Onondaga County defendants.  It houses pre-trial detainees, convicted individuals serving prison sentences, and technical parole violators.  Although its primary function is to hold an adult inmate population, the Jail is also used to house approximately 30 juveniles at any one time.  Approximately 90% of these juveniles are pre-trial detainees, though some are already serving sentences.

The Justice Center operates under a "direct supervision" method, which places a single deputy in charge of a "housing pod" of 32 to 60 inmates.  Juvenile inmates are

---

[2]  Pagination corresponds to that assigned by CM/ECF.

typically housed in Pod 2A or 5A and, as a general matter, have access to "television, commissary, law library, a quest room or mini library, telephones, recreation, religious services, various programs including education, and visitation, which may include two one-hour contact visits per week." Gonzalez Aff. ¶¶ 9-12.

B. **The School District**

The School District bears primary responsibility for educating eligible inmates housed at the Justice Center in accordance with New York State law as well as for ensuring that juveniles with qualifying disabilities receive the special education services and other procedural protections to which they are entitled under the Individuals with Disabilities Education Act ("IDEA").

To effect these responsibilities, the School District operates an "Incarcerated Education Program" at the Justice Center, which is staffed by 16 certified general education teachers, 4 certified special education teachers, and 1 school psychologist. According to School District personnel, new juvenile inmates who arrive at the Jail are screened with a basic educational assessment test and a disability questionnaire.

Beginning in 2013, the School District and the Onondaga County defendants entered into a Memorandum of Understanding ("MOU") intended to lay out the mechanics of how the School District's education program would operate inside the Justice Center. Under the MOU, the School District agreed to administer and supervise the required educational programming and, in turn, the Onondaga County defendants agreed to assume responsibility for security matters and to provide School District personnel with access to appropriate space for classroom instruction. The parties recently extended the MOU through June 2017.

## C. Discipline at the Jail

The Justice Center's disciplinary policies draw no distinction between adult and juvenile inmates. An inmate who does not behave in accordance with the rules and regulations published in the Jail's Inmate Handbook is subject to disciplinary action that includes several forms of "solitary confinement," a blanket term used here to include: (1) "lock-in," where an inmate is confined to either their own cell or to a cell in the Jail's Segregated Housing Unit ("SHU"); (2) "administrative segregation," where an inmate is placed in "lock-in" or the SHU in response to alleged misbehavior pending a disciplinary hearing, which can take up to 15 days to occur; or (3) "punitive segregation," an additional period of lock-in or SHU time imposed after a disciplinary hearing finally takes place.

Regardless of the label applied, solitary confinement at the Justice Center amounts to being locked in a minimally furnished cell measuring about 8 by 10 feet for approximately 23 hours a day. Juveniles in solitary confinement at the Jail are denied human contact—they must eat alone in their cells, are not permitted to talk to each other through the doors or in passing, and recreation, if any, is limited to 1 hour per day. They are also denied mental stimulus—they have no access to the radio or television and only limited access to reading materials. And they are deprived of *meaningful* mental health treatment—typically, "treatment" is limited to Jail staff occasionally asking juveniles whether they are feeling homicidal or suicidal, and a juvenile who admits to such thoughts is simply placed under a suicide watch.

## D. Education in Solitary Confinement

Juveniles in solitary confinement are not permitted to attend even the limited educational instruction provided by on-site School District personnel as part of the

Incarcerated Education Program.  Instead, teachers prepare and distribute "cell packets" to juveniles in solitary confinement.  These cell packets typically include newspaper clippings, crossword puzzles, and problem worksheets.  According to the School District, the contents of these packets are sometimes modified for juveniles who need special education services.  However, the School District admits that the Onondaga County defendants often block teachers from directly accessing juveniles being held in solitary confinement.  Consequently, no direct instruction is provided, cell packets are distributed only sporadically, and students in solitary confinement "rarely return completed cell packets" for grading, follow-up, or other meaningful evaluation.

### E.  Use of Solitary Confinement on Juveniles

According to plaintiffs, the Justice Center routinely imposes solitary confinement regardless of a juvenile's mental health history and even for minor misbehavior expected of juveniles, such as yelling or refusing to stop talking.  In fact, the Jail appears to rely primarily on isolation as the preferred method of discipline, with lesser sanctions being imposed in addition to, rather than in lieu of, solitary confinement.

Between October 19, 2015 and October 19, 2016, the Onondaga County defendants sanctioned 79 of the 131 juveniles held at the Justice Center with solitary confinement on at least one occasion.  Nearly half (44%) of the juveniles who received this sanction (including all six named plaintiffs) served 20 or more days.[3]  And of the 48 juveniles who were held at the Jail for longer than the 59-day average, nearly all (96%) were punished with solitary confinement at least once.

---

[3]  These rough figures are limited to only those juveniles held past an initial, five-day "reception period."

Notably, Deputy Gonzalez asserts "minor inmates" are "never subject to any form of solitary confinement."  But this appears to be a semantic distinction of his own creation, since the remainder of his affidavit details safety- and security-based justifications for imposing on the named plaintiffs and other juvenile inmates the various forms of disciplinary isolation contemplated by the Justice Center's Inmate Handbook and challenged by plaintiffs here.  See, e.g., Gonzalez Decl. ¶ 38 (explaining that his review of disciplinary records confirmed punishment was necessary "in all instances . . . for the safety of the inmates and staff and to retain institutional control").  For its part, School District personnel acknowledge in their declarations that disciplinary isolation of juveniles is a regular occurrence at the Jail.

## F.  **Plaintiffs' Experts**

Plaintiffs have submitted detailed declarations from three experts:  Barry Alan Krisberg, Ph.D., Louis J. Kraus, M.D., and Leander Parker, a Warden at the Central Mississippi Correctional Facility.  Each expert has visited the Justice Center, interviewed juveniles detained there, and reviewed relevant disciplinary policies and other documentation.  Neither the Onondaga County defendants nor the School District have submitted evidence to rebut any of these experts' findings.

### 1.  **Dr. Krisberg**[4]

Dr. Krisberg has extensive experience as an authority on juvenile justice and adult corrections.  A four-time published author in those fields, he holds a Ph.D. in Sociology as well as a Master's degree in Criminology from the University of Pennsylvania.  In terms of relevant academic experience, Dr. Krisberg is currently employed as a Visiting Scholar at the

---

[4]  This is only a brief summary of Dr. Krisberg's qualifications, observations, and conclusions.  His entire declaration, ECF No. 46-17, has been carefully reviewed and is incorporated in full here.

University of California, Berkeley.  He has also taught and researched corrections-related topics at Berkeley's law school, the University of Hawaii, and the University of Minnesota.

Beyond these academic settings, Dr. Krisberg has served in an expert capacity or as a court monitor in cases seeking to reform the conditions applied to youth in correctional settings in California and Illinois.  He has also consulted on Government investigations into the use of disciplinary isolation in the states of Indiana, Washington, and California.  Notably, Dr. Krisberg has also consulted for various New York state and local entities, including conducting a review of the disciplinary isolation practices at the Rikers Island Correctional Facility at the behest of the New York City Department of Corrections.

According to Dr. Krisberg, there is an emerging consensus among professional organizations in the corrections field that disciplinary isolation of juveniles should be eliminated because research shows that isolation is an ineffective disciplinary technique for restoring facility security and is in fact counterproductive to facility discipline and security.

As Dr. Krisberg explains, the prevailing professional opinion is that disciplinary isolation programs for juveniles should be replaced with a behavior management system that includes meaningful rewards for good behavior as well as a graduated system of sanctions for misbehavior.  He points out that facilities around the country have eliminated disciplinary isolation of juveniles without compromising facility discipline and security.

Dr. Krisberg visited the Justice Center in October of 2016, where he observed the male juvenile pod, other general population pods, the SHU, the mental health unit, the infirmary, and the school.  He also interviewed named plaintiffs R.C., C.I., and V.W.  Among other things, Dr. Krisberg notes that the Jail frequently imposes disciplinary isolation on juveniles in many instances that have nothing to do with "physically assaultive behavior."

Dr. Krisberg further notes that even in instances where Justice Center staff appeared to be responding to a risk of imminent danger, the current disciplinary policies permit staff to detain juveniles in isolation for long after the threat has dissipated. According to Dr. Krisberg, this is not reasonably calculated to restore facility discipline or security.

Dr. Krisberg opines that the conditions on the SHU are "deplorable" and considers them among the worst he has seen in his decades of touring facilities around the country. According to him, the SHU cells are "dark, filled with graffiti, and unhygienic" and emit an "odor of human waste." He also observed a "barren, cage-like structure" that passes for the SHU's recreation area.

Dr. Krisberg notes that juveniles in the SHU reported that they were not receiving any form of schooling or instruction. These juveniles also reported verbal and physical abuse by adult inmates who share the SHU space. And while Dr. Krisberg concedes that the cells on the juvenile pod were better lit and provided better recreational space, he confirmed these cells were similar in size to the cells in the SHU.

**2. Warden Parker**[5]

Warden Parker oversees the Youthful Offender Unit at the Central Mississippi Correctional Facility in Rankin County, Mississippi, a facility which houses juveniles convicted of violent crimes. He has over 30 years of experience in juvenile and adult corrections settings: all told, he has worked in, or managed, eight different youth facilities in Alabama, Georgia, Maryland, and Mississippi. Like Dr. Krisberg, Warden Parker has consulted on Government investigations into the treatment of juveniles in correctional facilities in Alabama

---

[5] This is only a brief summary of Warden Parker's qualifications, observations, and conclusions. His entire declaration, ECF No. 46-23, has been carefully reviewed and is incorporated in full here.

and Ohio.

Warden Parker visited the Justice Center in November of 2016, where he toured the school, the computer lab, the male juvenile pod, the SHU, the mental health unit, and the infirmary. He also spoke with juvenile inmates being held in the SHU as well as a juvenile who had been sanctioned with a "lock-in." The Warden also conducted interviews with named plaintiffs C.I. and V.K.

According to Warden Parker, the conditions in the SHU are "shockingly bad" and "some of the most horrible" he has ever seen: the cells were filthy, dark, and covered in graffiti. The Warden states that these conditions would *never* be tolerated in any of the various correctional facilities in which he has worked. Warden Parker also noted that one juvenile he spoke to had been sent to the SHU for cursing, and another seemed to have had "no meaningful contact with any adult" since he had arrival at the Jail several weeks before.

The Warden opines that Justice Center staff impose lengthy disciplinary isolation sanctions for minor behavior and "far too frequently overall." He asserts that conditions in the SHU and the juvenile pod are "very harsh and troubling." And although the Warden notes that he uses a "short-term version of room confinement" for juveniles in his own facility, he states that his review of disciplinary records from the Jail did not reveal even a single incident of misbehavior that, in his opinion, warranted the 23-hour disciplinary isolation frequently imposed by Jail officials.

Warden Parker further opines that, even for fighting or violence, the "Justice Center is sending kids to solitary confinement in a manner that will surely create less safety and security in the jail, and not more." In sum, Warden Parker concludes that "the frequency and length of time that youths at the Justice Center were sent to 23-hour isolation was not

reasonably calculated to restore facility discipline and security."

### 3. **Dr. Kraus**[6]

Dr. Kraus is Professor and Chief of Child and Adolescent Psychiatry at Rush University Medical Center in Chicago, Illinois.  He is also the Psychiatric Director at the Sonia Shankman Orthogenic School, a residential treatment program for children and adolescents with serious emotional issues.  In addition to these institutional responsibilities, he also assesses and treats children and adolescents in a private practice setting.

Dr. Kraus has worked with juveniles in various correctional settings for over 26 years, including 9 years as the treating psychiatrist at the Illinois Maximum Security Youth Center in Joliet, Illinois.  And like Dr. Krisberg and Warden Parker, Dr. Kraus has consulted on Government investigations into the discipline of youth in corrections settings and has served as a court-appointed monitor responsible for supervising the reform of juvenile mental health services in correctional facilities in Illinois and Arizona.  Dr. Kraus also possesses extensive experience in the field of special education:  for the past 22 years, he has participated in the development and implementation of individualized education programs for students with IDEA-qualifying disabilities and has testified in various settings on IDEA issues.

Dr. Kraus visited the Justice Center in September of 2016, where he evaluated ten juveniles being held there, a number which includes all six named plaintiffs.  At that time, four were in SHU, one was in "lock-in," three were on the juvenile pod, and two were in behavioral health units.  Each 40- to 60-minute evaluation consisted of a clinical interview, a mental

---

[6] This is only a brief summary of Dr. Kraus's qualifications, observations, and conclusions.  His entire supplemental declaration, ECF No. 46-13, as well as his original declaration, ECF No. 5-2, have been carefully reviewed and are incorporated in full here.

health status exam, and a depression screening.

Dr. Kraus also toured the juvenile wing, the behavioral health units, the SHU, and reviewed the School District's education policies and practices as they pertain to the Justice Center. Importantly, he also reviewed the individualized education programs in place for named plaintiffs V.W. and R.C. as well as the cell packets they had in their possession.

According to Dr. Kraus, nine of the ten juveniles he interviewed have spent time in the SHU and most have also spent time in "lock-in" in their cells in the juvenile wing. Dr. Kraus notes that juveniles in lock-in and the SHU may be housed "within sight and sound" of adults at the Justice Center and, consequently, some juveniles have reported being verbally abused or sexually harassed by the adults.

Dr. Kraus further notes that although Justice Center policy states that "no form of solitary confinement is used anywhere," the *reality* of the Jail's practices is "synonymous" with the definition of "solitary confinement" both as he understands the term and as that term has been adopted by professional organizations in the corrections field. According to Dr. Kraus, solitary confinement puts juveniles at a substantial risk of serious harm to their social, psychological, and emotional development.

As he explains, solitary confinement perpetuates, worsens, or even in some cases precipitates mental health concerns that can lead to long-term and often permanent changes in adolescent brain development. Further, solitary confinement also poses serious risks of suicidal ideation—almost all suicides in the juvenile correctional settings occur in some type of isolation.

According to Dr. Kraus, the level of isolation and consistently inadequate degree of attention being paid to juveniles' mental health needs being experienced by juvenile inmates

at the Justice Center poses serious risks of precisely this sort of lasting psychological harm.  In fact, records show that juveniles at the Jail who reported suicidal ideation or intent were brought to barren "strip cells" and did not receive any meaningful therapeutic services. In Dr. Kraus's opinion, juveniles will recant these reports simply so they can get out of isolation and have a chance to return to the general population.[7]

Dr. Kraus also concluded that the School District provides inadequate special education instruction and services for juveniles with disabilities that qualify under the IDEA.  Dr. Kraus reviewed "cell packets" provided to V.W. and R.C. and compared them to the IEPs in place for these juveniles.  In his opinion, the cell packets were not tailored to these juveniles' IEPs; "in fact, the cell packets were not even tailored to their grade levels."

### G.  Government's Statement of Interest

Although the Government takes no official position on the pending litigation, its submission is strongly supportive of plaintiffs' position on the solitary confinement issue.

First, the Government points out that the Supreme Court has recently emphasized the particular developmental vulnerabilities of youthful offenders.  Second, the Government draws attention to instances in which it has exercised its own statutory authorization to institute civil actions to address issues related to the use of solitary confinement of juveniles in detention centers in New York, Alabama, Mississippi, Maryland, and Ohio.

Third, the Government offers data that backs up Dr. Kraus's opinions—the still-developing brains of juveniles face increased susceptibility to lasting damage from the imposition of solitary confinement.   Fourth, the Government states that in the last year the

---

[7]  Notably, Deputy Gonzalez claims that many juveniles who initially reported suicidal ideation to mental health staff at the Justice Center later admitted those reports were made for other reasons.

Federal Bureau of Prisons has ended the practice of allowing solitary confinement for juveniles.

Finally, the Government explains that it has since promulgated non-binding "Guiding Principles" intended as best practices for state and local correctional facilities. As relevant here, these guiding principles indicate juveniles should not be placed in restrictive housing at all and should only be separated from others on a temporary basis in emergency circumstances.

### H. NAACP's Amici Brief[8]

The NAACP's brief draws attention to the same emerging scientific consensus stressed by plaintiffs' experts as well as the same body of relevant case law set forth by the Government in its statement of interest. In addition, the NAACP's brief identifies additional data tending to show that disciplinary isolation is disproportionately meted out to juveniles of color. As the NAACP's brief explains, "[r]acial disparities have long persisted where authorities have greater discretion in punishment."

## III. DISCUSSION

### A. Class Certification

A district court enjoys broad discretion when it comes to resolving questions of class certification because it "is often in the best position to assess the propriety of the class and has the ability, . . . , to alter or modify the class, create subclasses, and decertify the class

---

[8] "It is well-established that a district court has broad discretion to grant or deny an appearance as amicus curiae in a given case." Picard v. Greiff, 797 F. Supp. 2d 451, 452 (S.D.N.Y. 2011). Here, the NAACP's proposed submission offers data on how solitary confinement practices like the ones at issue in this litigation disproportionately affect juveniles of color. Accordingly, this motion was granted at oral argument. See, e.g., Citizens Against Casino Gambling in Erie Cty. v. Kempthorne, 471 F. Supp. 2d 295, 311 (W.D.N.Y. 2007) (citation omitted) ("The usual rationale for amicus curiae submissions is that they are of aid to the court and offer insights not available from the parties.").

whenever warranted." Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd., 262 F.3d 134, 139 (2d Cir. 2001) (collecting cases).

However, because the class action device is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only," Califano v. Yamasaki, 442 U.S. 682, 700-01 (1979), "[a] party seeking class certification must *affirmatively* demonstrate [its] compliance with the Rule." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 351 (2011) (emphasis added) ("Rule 23 does not set forth a mere pleading standard.").

Accordingly, "the district court is required to make a 'definitive assessment of Rule 23 requirements, notwithstanding their overlap with merits issues,' and must resolve material factual disputes relevant to each Rule 23 requirement." Brown v. Kelly, 609 F.3d 467, 476 (2d Cir. 2010) (quoting In re Initial Pub. Offerings Sec. Litig., 471 F.3d 24, 41 (2d Cir. 2006) ("In re IPO").[9]

First, Rule 23 requires a party seeking certification to demonstrate that:

(1)    the class is so numerous that joinder of all members is impracticable;

(2)    there are questions of law or fact common to the class;

(3)    the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)    the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a).

---

[9] Of course, at this early stage the merits should be considered only to the extent they overlap with Rule 23's inquiry. Dukes, 564 U.S. at 351 ("Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped.").

Second, the Rule requires a party to satisfy at least one of three additional requirements:

> (1) prosecuting separate actions by or against individual class members would create a risk of:
>
> > (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
> >
> > (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;
>
> (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or
>
> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

FED. R. CIV. P. 23(b).

Finally, courts have written a third, "implied requirement" into the Rule: a party seeking certification must demonstrate that the proposed class is "ascertainable." Sykes v. Mel Harris & Assocs., LLC, 285 F.R.D. 279, 287 (S.D.N.Y. 2012). Under this additional element, "[a]n identifiable class exists if its members can be ascertained by reference to objective criteria." Stinson v. City of N.Y., 282 F.R.D. 360, 367 (S.D.N.Y. 2012) (quoting In re Fosamax Prods. Liab. Litig., 248 F.R.D. 389, 395 (S.D.N.Y. 2008)).

In sum, "[c]lass certification is appropriate where the proposed class meets, by a

preponderance of the evidence following a court's 'rigorous analysis,' the requirements of Rule 23(a) and the proposed class constitutes one of the types of classes enumerated in Rule 23(b)." <u>Stinson</u>, 282 F.R.D. at 367 (citation omitted).

Plaintiffs seek to certify (1) a class composed of "[a]ll 16- and 17-year-olds who are now or will be incarcerated at the Onondaga County Justice Center" as well as (2) a subclass of "[a]ll 16- and 17-year-olds with disabilities, as defined by the [IDEA], who are now or will be incarcerated at the Onondaga County Justice Center, who are in need of special education and related services." Pls.' Mem. Supp. Class Cert., ECF No. 5-1, 18.

This motion was granted during the February 15, 2017 hearing. As explained there, neither the Onondaga County defendants nor the School District have meaningfully opposed plaintiffs' request for class certification. For its part, the Onondaga County defendants have not submitted *any* opposition. And as for the School District, its summary judgment filing simply invites the Court to grant summary judgment in its favor before issuing a ruling on the class certification question. The School District's invitation is declined for reasons that will be made clear later in this decision.

Nevertheless, because a party seeking class certification must *affirmatively* demonstrate compliance with Rule 23's requirements, the relevant findings are based on plaintiffs' submissions in support of this motion and are set forth below.

## 1. **Numerosity**

The first element requires plaintiffs to demonstrate that "the class is so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1).

This inquiry is "not strictly mathematical" but rather requires a court to "take into account the context of the particular case, in particular whether a class is superior to joinder

based on other relevant factors including: (i) judicial economy, (ii) geographic dispersion, (iii) the financial resources of class members, (iv) their ability to sue separately, and (v) request for injunctive relief that would involve future class members." Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co., Inc., 772 F.3d 111, 120 (2d Cir. 2014) (citing Robidoux v. Celani, 987 F.2d 931, 936 (2d Cir. 1993)). In other words, "[t]he numerosity requirement in Rule 23(a)(1) does not mandate that joinder of all parties be impossible—only that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate." Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, LLC, 504 F.3d 229, 244-45 (2d Cir. 2007).

Plaintiffs have clearly carried their burden on this element. As an initial matter, both the class and the subclass, even considered individually, exceed forty members. Morgan Stanley & Co., Inc., 772 F.3d at 120 ("Numerosity is presumed for classes larger than forty members."). With respect to the class, plaintiffs' uncontested submissions, based primarily on data produced by the Onondaga County defendants, indicates that at least 86 different juveniles were placed in solitary confinement between October 1, 2015 and August 31, 2016. With respect to the subclass, plaintiffs' uncontested submissions, based on a review of New York State Education Department records, indicate that the Jail held 58 juveniles with an IDEA-qualifying disability during the 2014-15 school year.

In addition, the contextual factors also weigh heavily in favor of certification. For instance, plaintiffs' class and subclass include all future juvenile pre-trial detainees at the Justice Center, the sort of revolving population that makes joinder of individual members a difficult proposition. See, e.g., Clarkson v. Couglin, 783 F. Supp. 789, 797 (S.D.N.Y. 1992) ("The class action device is particularly well-suited in actions brought by prisoners due to the

'fluid composition' of the prison population . . . [and] generally tend[s] to be the norm in actions such as this.").

And while the class members will obviously share the same geographic area, the ability of any one individual member of the class or the subclass to maintain an individual suit will necessarily be limited by the simple reality that they are being detained as part of the criminal justice process.  Cf. Redmond v. Bigelow, 2014 WL 2765469, at *3 (D. Utah June 18, 2014) (acknowledging that individual members of a putative class of prisoners would face myriad practical difficulties in maintaining individual suits because they "enjoy very little freedom in their daily lives" such as the fact they "are not at liberty to meet and confer with counsel without permission" from prison authorities).

Finally, litigating this suit as a class action promotes judicial economy, since it avoids multiple individual suits that raise the same issues and seek the same relief—an end to solitary confinement for juveniles being held at the Justice Center, and an end to the deprivation of education and special education services attendant to that treatment.  Cf. Williams v. Conway, 312 F.R.D. 248, 251 (N.D.N.Y. 2016) (McAvoy, J.) (certifying class of present and future deaf and hearing-impaired prisoners at the Justice Center).  Accordingly, plaintiffs have demonstrated by a preponderance of the evidence that the class and the subclass are sufficiently numerous such that joinder of all members is impracticable.

## 2. **Commonality**

This element requires plaintiffs to demonstrate there "are questions of law or fact common to the class."  FED. R. CIV. P. 23(a)(2).

Importantly, this "does not require all questions of law or fact to be common," and "even a single common question will suffice."  Sykes, 285 F.R.D. at 286; see also Marisol A.

v. Giuliani, 126 F.3d 372, 377 (2d Cir. 1997) ("The commonality requirement is met if plaintiffs' grievances share a common question of law or of fact."); Trief v. Dun & Bradstreet Corp., 144 F.R.D. 193, 198 (S.D.N.Y. 1992) ("Commonality does not mandate that all class members make identical claims and arguments, only that common issues of fact or law affect all class members.").

"The common question must lend itself to 'classwide resolution' such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" Sykes, 285 F.R.D. at 286 (quoting Dukes, 564 U.S. at 350). Importantly, "factual differences in the claims of the class do not preclude a finding of commonality." Id. at 287 (citation and internal quotation marks omitted). Rather, what matters is "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." Id. at 286 (citation and internal quotation marks omitted).

Plaintiffs have met their burden on this element as well. Among other things, plaintiffs allege that the Onondaga County defendants and the School District have applied a common course of unlawful conduct to the members of the class and subclass, that the Onondaga County defendants acted with deliberate indifference to the substantial risk of serious harm posed by certain aspects of that common course of conduct, and that the School District and the Onondaga County defendants have collectively deprived plaintiffs of the education, special services, and related procedural protections to which they are entitled.

The common answers to these questions will drive the resolution of the litigation—whether defendants' conduct violates the Constitution or federal law, and whether defendants should therefore be enjoined from engaging in that course of conduct. See, e.g., Williams, 312 F.R.D. at 253 (finding commonality requirement satisfied based on "jail's

alleged failure to provide class members with services for the deaf and hearing-impaired"
because these grievances share a common question of law or fact and arise from the same
course of events); Butler v. Suffolk Cty., 289 F.R.D. 80, 98 (E.D.N.Y. 2013) ("Whether the
County was aware of and deliberately indifferent to the conditions at the [jail] is a common
question subject to class-wide resolution."); McGee v. Pallito, 2015 WL 5177770, at *4 (D. Vt.
Sept. 4, 2015) (finding "common issue" of whether prison officials' policy amounted to
deliberate indifference and observing that "common questions" pertinent to the individual
class members "frame the ultimate question of whether the Defendants' policy violates the
Constitution, such that they should be enjoined from implementing it"); see also Parsons v.
Ryan, 754 F.3d 657, 681 (9th Cir. 2014) (observing that "numerous courts have concluded
that the commonality requirement can be satisfied by proof of the existence of systemic
polices and practices that allegedly expose inmates to a substantial risk of harm").

Plaintiffs' subclass meets the commonality requirement for substantially the same
reasons.  In particular, plaintiffs allege the School District's policy of only sporadically
delivering "cell packets" in lieu of direct instruction and, relatedly, defendants' alleged failure
to conduct manifestation determinations prior to imposing discipline of a certain duration,
amounts to the systemic deprivation of individualized special education services in violation
of the IDEA.  See, e.g., R. A-G ex rel. R.B. v. Buffalo City. Sch. Dist. Bd. of Educ., 2013 WL
3354424, at *10 (W.D.N.Y. July 3, 2013) ("Buffalo City Sch. Dist.") (permitting district-wide
class certification of IDEA-qualifying students because alleged violations are "systemic, not
individual"), aff'd sub nom. R.A.G. ex rel. R.B. v. Buffalo City Sch. Dist. Bd. of Educ., 569 F.
App'x 41 (2d Cir. 2014) (summary order) (noting the IDEA's exhaustion requirement "was no
barrier to class certification" where "Plaintiffs allege systemic failures . . . [occurring] as a

matter of District policy").

In sum, plaintiffs have demonstrated by a preponderance of the evidence that there are questions of law or fact common to the class and the subclass.

### 3. **Typicality**

This requirement is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3).

"Rule 23(a)(3) is satisfied when each class member's claim arises from the same course of events, and each class member makes similar arguments to prove the defendant's liability." Stinson, 282 F.R.D. at 370-71 (citation omitted). "When the same unlawful conduct was directed at or affected both the named plaintiffs and the prospective class, typicality is usually met." Id. at 371. Generally speaking, minor variations in the fact patterns underlying the individual claims will not preclude a finding of typicality unless there are "unique defenses" that threaten to become the focus of the litigation. See Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 59 (2d Cir. 2000).

Plaintiffs have carried their burden on this element for substantially the same reasons as set forth above—the members of the class and subclass share the same legal arguments because their claims are based on the common application of certain challenged policies. Sykes, 285 F.R.D. at 287 ("The commonality and typicality requirements of Rule 23(a) tend to merge such that similar considerations inform the analysis for both prerequisites."); see also e.g., Butler, 289 F.R.D. at 99 (finding typicality satisfied where, for example, "whether exhaustion should be excused because administrative remedies were unavailable . . . is a question common to all members of the class"). Accordingly, plaintiffs have demonstrated by a preponderance of the evidence that the claims or defenses of the

representative parties are typical of the claims or defenses of the class and the subclass.

### 4. **Adequacy of Representation**

This requirement is satisfied if "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4).

"[T]he adequacy requirement is twofold:  the proposed class representative must have an interest in vigorously pursing the claims of the class, and must have no interests antagonistic to the interests of other class members." Denney v. Deutsche Bank AG, 443 F.3d 253, 268 (2d Cir. 2006).  In addition, class counsel must be "qualified, experienced and able to conduct the litigation." Baffa, 222 F.3d at 60.

This inquiry "serves to uncover conflicts of interest between the parties and the class they seek to represent." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625 (1997).  "Not every conflict, however, precludes a finding of adequacy." Sykes, 285 F.R.D. at 287.  "The conflict that will prevent a plaintiff from meeting the Rule 23(a)(4) prerequisite must be fundamental, and speculative conflict should be disregarded at the class certification stage." Id. (citation omitted).

"In order to defeat class certification, there must be a showing of a genuine conflict between the proposed class representative's interests and those of the other members of the class, and only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status." Stinson, 282 F.R.D. at 371 (quoting in part Hirschfeld v. Stone, 193 F.R.D. 175, 183 (S.D.N.Y. 2000) (internal citation and quotation marks omitted).

Plaintiffs have carried their burden on this element.  As discussed above, the representatives of the class and the subclass have been subjected to the same common

course of treatment by the same officials on the basis of the same policies. Each named plaintiff has expressed a clear desire to seek prospective injunctive relief from these policies, a benefit that will inure to juveniles detained at the Justice Center in the future.

Further, class counsel have extensive litigation experience in the class action context and in effectively seeking classwide injunctive relief in federal forums. See, e.g., Peoples v. Annucci, 180 F. Supp. 3d 294, 308 (S.D.N.Y. 2016) (Scheindlin, J.) (approving class settlement in litigation brought by New York Civil Liberties Unions and observing that "[t]his litigation, and the way it has been handled by all of the attorneys, is the best example of the power of impact litigation to redress conditions that affect the most vulnerable members of our society"); Williams, 312 F.R.D. at 254 (finding this element met and certifying class of pre-trial detainees at Jail in litigation brought by Legal Services of Central New York). Accordingly, plaintiffs have demonstrated by a preponderance of the evidence that the representative parties will fairly and adequately protect the interests of the class and the subclass.

### 5. **Rule 23(b)**

Plaintiffs also satisfy this requirement. They rely on Rule 23(b)(2), which applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2).

"The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." Dukes, 564 U.S. at 360.

Here, the members of the class and the subclass would benefit from the same

remedy—an order enjoining defendants from application of the policies and practices resulting in the deprivations at issue. Dukes, 564 U.S. at 360 ("Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class."). Accordingly, plaintiffs have met their burden on this element.

### 6. **Ascertainability**

Plaintiffs have also satisfied this requirement. The members of both the class and the subclass are readily identifiable pursuant to objective criteria, including but not limited to the records maintained by the Onondaga County defendants and the School District. In sum, plaintiffs have affirmatively demonstrated their compliance with the requirements for class certification.

### B. **Summary Judgment**

Next, the School District has moved for summary judgment in an attempt to avoid any further direct involvement in this litigation. According to the School District, it does not, and cannot, bear responsibility for any of conditions at the Justice Center.

First, the School District contends that the only reason juveniles in solitary confinement receive "cell packets" in lieu of direct instruction is because the Onondaga County defendants refuse to permit School District personnel any direct access to juveniles in solitary. Second, the School District claims that its intake processes at the Jail include appropriate screening mechanisms to identify juveniles entitled to special education services. Third, the School District claims plaintiffs have failed to administratively exhaust their IDEA claims.

Generally speaking, the entry of summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56(c)); see also Anderson, 477 U.S. at 247.

A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248; see also Jeffreys v. City of N.Y., 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

The moving party bears the initial burden of demonstrating that there is no genuine issue of material fact to be decided with respect to any essential element of the claim. Anderson, 477 U.S. at 250 n. 4. The failure to meet this burden warrants denial of the motion. Id. However, in the event this initial burden is met, the opposing party must then show, through affidavits or otherwise, that there is a material issue of fact for trial. Id. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party. Jeffreys, 426 F.3d at 553. In sum, summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted); see also Anderson, 477 U.S. at 250 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

Plaintiffs oppose the School District's early bid for a ruling on the merits by pointing out that formal discovery has not even begun and asserting they should be given an opportunity to test the accuracy of the School District's claim of blamelessness before it

should be excused from this matter.

Plaintiffs contend there is a genuine need for discovery into the question of causation: "the issue of which policies and practices - - the School District's or the Sheriff's [Office defendants] or both - - caused the [ ] violations" at issue. According to plaintiffs, there is also a need for discovery into what efforts, if any, the School District took to overcome the Onondaga County defendants' stonewalling, since sustained inaction by policymakers in the face of known violations can give rise to liability as well.

In fact, plaintiffs assert that even taking the School District at its word should not give rise to summary judgment in its favor at this juncture, since the School District has failed to demonstrate that the Onondaga County defendants' alleged interference, even if it should prove to be the sole cause of the violations, somehow operates to absolve the School District from its *shared* legal responsibility under the relevant governing laws. And as for exhaustion, plaintiffs assert that it may be excused where, as here, a party challenges "systemic" violations of the IDEA.

When a party seeks to take advantage of the safety valve found in Rule 56(d) to resist summary judgment on the ground that it needs to conduct discovery in order to defeat the motion, "the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." FED. R. CIV. P. 56(d).

"In our Circuit, a nonmovant seeking additional discovery in the face of a pending summary judgment motion must submit an affidavit including 'the nature of the uncompleted discovery; how the facts sought are reasonably expected to create a genuine issue of material fact; what efforts the affiant has made to obtain those facts; and why those efforts

were unsuccessful.'" <u>DePaola v. City of N.Y.</u>, 586 F. App'x 70, 71 (2d Cir. 2014) (summary order) (quoting <u>Paddington Partners v. Bouchard</u>, 34 F.3d 1132, 1138 (2d Cir. 1994)); <u>see also Lunts v. Rochester City Sch. Dist.</u>, 515 F. App'x 11, 13 (2d Cir. 2013) (summary order).

In light of these considerations, the School District's motion for summary judgment must be denied. As the above recitation makes clear, summary judgment is a procedural mechanism typically employed *after* the completion of discovery. Indeed, "[o]nly in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery." <u>Hellstrom v. U.S. Dep't of Veterans Affairs</u>, 201 F.3d 94, 97 (2d Cir. 2000); <u>see also Trebor Sportswear Co., Inc. v. The Limited Stores, Inc.</u>, 865 F.2d 506, 511 (2d Cir. 1989) ("The nonmoving party should not be 'railroaded' into his offer of proof in opposition to summary judgment.").

Of course, "you cannot use discovery to find out whether you have a claim." <u>Gene Codes Forensics, Inc. v. City of N.Y.</u>, 812 F. Supp. 2d 295, 308 (S.D.N.Y. 2011); <u>see also DePaola</u>, 586 F. App'x at 71 ("[A] party may not use Rule 56(d) as a means of finding out whether it has a case."). Therefore, even when a Rule 56(d) motion satisfies the necessary requirements, "a district court may refuse to allow additional discovery 'if it deems the request to be based on speculation as to what potentially could be discovered'—that is, a mere fishing expedition." <u>Cont'l Cas. Co. v. Marshall Granger & Co., LLP</u>, 921 F. Supp. 2d 111, 127 (S.D.N.Y. 2013) (quoting <u>Seneca Beverage Corp. v. Healthnow N.Y., Inc.</u>, 200 F. App'x 25, 27 (2d Cir. 2006) (summary order)); <u>see also Legends Are Forever, Inc. v. Nike, Inc.</u>, 58 F. Supp. 3d 197 (N.D.N.Y. 2014) (Kahn, J.) ("[A] district court may refuse a party's request for additional discovery if the party has had ample time in which to pursue the discovery that it now claims is essential.").

But those concerns are inapplicable here. "There is a critical distinction . . . between cases where a litigant opposing a motion for summary judgment requests a stay of that motion to conduct *additional* discovery and cases where that same litigant opposes a motion for summary judgment on the ground that it is entitled to an opportunity to *commence* discovery" with respect to their claims. Crystalline H20, Inc. v. Orminski, 105 F. Supp. 2d 3, 7 (N.D.N.Y. 2000) (McAvoy, J.).

First, plaintiffs have submitted an affidavit in compliance with our Circuit's mandate explaining that discovery in this case has thus far been limited to their request for a preliminary injunction. See Cotter Decl., ECF No. 42-1. Among other things, it attests that plaintiffs will seek to depose various, high-ranking School District personnel to test the assertion that there is no causal relationship between any action or inaction attributable to the School District and any of the alleged violations.

Plaintiffs also attest that they will seek information concerning what efforts, if any, the School District has taken to educate juveniles in solitary confinement and how those efforts have allegedly been stymied by the Onondaga County defendants. According to plaintiffs, information gained during this process will bear on plaintiffs' IDEA claims as well as their Fourteenth Amendment claims. As the affidavit also explains, plaintiffs have not yet had an opportunity to obtain any of this information because it is not within the scope of discovery initially authorized for the limited purpose of briefing the preliminary injunction.

Despite its continued protestations to the contrary, these outstanding discovery issues and the other material identified by plaintiffs in their Rule 56(d) affidavit do in fact bear on claims of allegedly systemic violations that are viable, and may even ultimately prove successful, against the School District for reasons that will be explained in greater detail

below.  See, e.g., Miller v. Wolpoff & Abramson, L.L.P., 321 F.3d 292, 303 (2d Cir. 2003)

("The nonmoving party must have had the opportunity to discover information that is

essential to his opposition to the motion for summary judgment.").

Considerations of basic fairness also counsel against granting the School District's

motion at this juncture.  The Statement of Undisputed Material Facts on which the School

District relies to establish its initial burden of demonstrating its *prima facie* entitlement to

judgment as a matter of law relies almost entirely on three declarations.

These three declarations come from David Tantillo, one of the full-time special

education teachers employed by the School District as part of its Incarcerated Education

Program, John A. Dittman, Jr., the Principal of the School District's alternative education

program center, and Signe Nelson, the School District's "Incarcerated Education

Coordinator."  The sum and substance of each of these declarations support the School

District's contention that the blame for these alleged violations lies at the feet of the

Onondaga County defendants.

But plaintiffs have not yet been given an opportunity to test the veracity of the

"undisputed" facts set forth in these declarations—among other things, they have not yet had

an opportunity to depose any of these individuals.  That is not how the truth-testing feature of

our adversary system of litigation is generally thought to work best.  See, e.g., Am. Home

Assur. Co v. ZIM JAMAICA, 418 F. Supp. 2d 537, 550 (S.D.N.Y. 2006) ("A deposition is,

perhaps, the best method of assessing [declarant's] credibility and discovering additional

facts [relevant to the litigation]."); G-I Holdings, Inc. v. Baron & Budd, 2002 WL 31251702, at

*5 (S.D.N.Y. Oct. 8, 2002) (deferring consideration of a summary judgment motion where the

version of facts set forth by defendants had not yet been subject to cross-examination

through a deposition and collecting cases).

In sum, "Rule 56(d) is intended as a safeguard against premature grants of summary judgment and should generally be applied with a spirit of liberality." Lego A/S v. Best–Lock Constr. Toys, Inc., –F.R.D.–, 2017 WL 194284, at *14 (D. Conn. Jan. 18, 2017). With that liberal spirit firmly in mind, the School District's motion for summary judgment is denied.

## C. Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right." Gen. Mills, Inc. v. Chobani, LLC, 158 F. Supp. 3d 106, 114 (N.D.N.Y. 2016) (quoting Winter v. Nat'l Res. Def. Council, Inc., 555 U.S. 7, 24 (2008)). "The party seeking the injunction carries the burden of persuasion to demonstrate, 'by a clear showing,' that the necessary elements are satisfied." Reckitt Benckiser Inc. v. Motomco Ltd., 760 F. Supp. 2d 446, 452 (S.D.N.Y. 2011) (quoting Mazurek v. Armstrong, 520 U.S. 968, 972 (1997)).

As a general matter, the party seeking preliminary relief must show: "(1) a likelihood of irreparable harm; (2) either a likelihood of success on the merits or sufficiently serious questions as to the merits plus a balance of hardships that tips decidedly in their favor; (3) that the balance of hardships tips in their favor regardless of the likelihood of success; and (4) that an injunction is in the public interest." Gen. Mills, Inc., 158 F. Supp. 3d at 115; see also Chobani, LLC v. Dannon Co., Inc., 157 F. Supp. 3d 190, 199 (N.D.N.Y. 2016).

However, in cases like this one, where the movant is not seeking to restore the *status quo ante* but rather requesting an order that commands an affirmative act or mandates a specific course of conduct, a heightened standard applies: this type of preliminary injunction should issue *only* "upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary

relief." Cacchillo v. Insmed, Inc., 638 F.3d 401, 406 (2d Cir. 2011) (citation omitted); see also N.Y. ex rel. Schneiderman v. Actavis PLC, 787 F.3d 638, 650 (2d Cir. 2015) (requiring a "clear" or "substantial" likelihood of success as well as a "strong showing" of irreparable harm); N.J. v. New York, 872 F. Supp. 2d 204 (E.D.N.Y. 2011) ("This higher standard is particularly appropriate when a plaintiff seeks a preliminary injunction against a government body such as a school district.").

"In the prison context, a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of [ ] prisons." Fisher v. Goord, 981 F. Supp. 140, 167 (W.D.N.Y. 1997) (citing Farmer, 511 U.S. at 846-47). Under the Prison Litigation Reform Act ("PLRA"), preliminary injunctive relief in any civil action with respect to prison conditions must be narrowly drawn, extend no further than necessary to correct the harm, and be the least intrusive means necessary to correct that harm. See 18 U.S.C. § 3626(a)(2)). In considering a request for injunctive relief, a court must give "substantial weight" to any adverse impact on public safety or the operation of a criminal justice system the relief might have. § 3626(a)(1)(A).

### 1. Substantial Likelihood of Success

Plaintiffs assert three claims: first, they allege the Onondaga County defendants' routine use of solitary confinement on juveniles violates the Eighth and Fourteenth Amendments; second, they allege the Onondaga County defendants and the School District deny juveniles in solitary confinement the minimum educational instruction guaranteed by state law in violation of the Fourteenth Amendment; and third, they allege the Onondaga County defendants and the School District deprive juveniles with IDEA-qualifying disabilities of the special education services and other procedural protections to which they are entitled.

### i. Eighth Amendment

As a general matter, a convicted prisoner is obligated to pursue relief for allegedly unconstitutional conditions under the Cruel and Unusual Punishment Clause of the Eighth Amendment while a pre-trial detainee's claim is properly brought under the Due Process Clause of the Fourteenth Amendment.  This distinction makes sense, because "the State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilty in accordance with due process of law."  City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983).

In recent years, this has been a distinction without an analytical difference because, as the Second Circuit held in Caiozzo v. Koreman, 581 F.3d 63, 72 (2d Cir. 2009), "[c]laims for deliberate indifference to a . . . serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment."

Plaintiffs correctly point out a bit of uncertainty about the continued vitality of Caiozzo's holding in light of the Supreme Court's recent decision in Kingsley v. Hendrickson, 135 S. Ct. 2466, 2475 (2015), which held that, at least in the context of an excessive force claim, the Fourteenth Amendment grants broader protections to pre-trial detainees than the Eighth Amendment standard that applies to those already convicted of crimes:  a pre-trial detainee need only show the use of force was *objectively* unreasonable.  See, e.g., Moran v. Livingston, 155 F. Supp. 3d 278, 287 & n.1 (W.D.N.Y. 2016).

Out of caution, plaintiffs apply the more demanding (but more inclusive) Eighth

Amendment standard here.[10] See City of Revere, 463 U.S. at 244 (observing that a pre-trial detainee's rights are "at least as great as the Eighth Amendment protections available to a convicted prisoner").

"A claim for violations of the Eighth Amendment requires (1) an 'objectively sufficiently serious . . . denial of the minimal civilized measure of life's necessities' and (2) a 'sufficiently culpable state of mind' on the part of the responsible official." Willey v. Kirkpatrick, 801 F.3d 51, 66 (2d Cir. 2015) (quoting Farmer v. Brennan, 511 U.S. 825, 832 (1994)).

The objective element requires a plaintiff to "show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health," Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013), which includes the risk of serious damage to one's "physical and mental soundness." LaReau v. MacDougall, 473 F.2d 974, 978 (2d Cir. 1972).

Importantly, "there is no' static test' to determine whether a deprivation is sufficiently serious; '[t]he conditions themselves must be evaluated in light of contemporary standards of decency.'" Jabbar v. Fischer, 683 F.3d 54, 57 (2d Cir. 2012) (quoting Blissett v. Coughlin, 66 F.3d 531, 537 (2d Cir. 1995)). As relevant here, prisoners may not be exposed "to conditions that 'pose an unreasonable risk of serious damage to [their] future health.'" Id. (quoting Phelps v. Kapnolas, 308 F.3d 180, 185 (2d Cir. 2002) (per curiam)).

---

[10] Yesterday, the Second Circuit resolved this uncertainty by explicitly overruling Caiozzo. See Darnell v. City of N.Y., No. 15-2870, slip op. at 41-42 (2d Cir. Feb. 21, 2017) (holding that "deliberate indifference" should be defined *objectively* when a pre-trial detainee brings a claim for a due process violation under the Fourteenth Amendment). However, given the lack of a full briefing on this issue and the generally time-sensitive nature of a party's request for a preliminary injunction, plaintiffs' Eighth Amendment analysis will be adopted for present purposes, a decision which essentially operates to give defendants the benefit of a more demanding standard. However, in the event this litigation proceeds beyond this stage, the Court will entertain appropriate briefing on this issue.

The subjective element requires a plaintiff to show "that the defendant acted with more than mere negligence." Farmer, 511 U.S. at 835. "To constitute deliberate indifference, '[t]he prison official must know of, and disregard, an excessive risk to inmate health or safety.'" Walker, 717 F.3d at 125 (quoting Jabbar, 683 F.3d at 57); see also Lapierre v. Cty. of Nassau, 459 F. App'x 28, 29 (2d Cir. 2012) (summary order) ("Subjectively, the official charged with deliberate indifference must have acted with the requisite state of mind, the equivalent of criminal recklessness").

For instance, "[e]vidence that the risk was 'obvious or otherwise must have been known to a defendant' may be sufficient for a fact finder to conclude that the defendant was actually aware of the risk." Walker, 717 F.3d at 125 (quoting Brock v. Wright, 315 F.3d 158, 164 (2d Cir. 2003)). In addition, conduct that is not "reasonably calculated to restore prison discipline and security" may also be considered. Trammell v. Keane, 338 F.3d 155, 163 (2d Cir. 2003); see also Crawford v. Cuomo, 796 F.3d 252, 257-58 (2d Cir. 2015) (drawing distinction between good-faith efforts to maintain or restore discipline and conduct undertaken for the purpose of causing harm).

Plaintiffs are substantially likely to succeed on the merits of this claim. First, their submissions clearly demonstrate that juveniles face an objectively sufficiently serious risk of harm from the solitary confinement practices at the Justice Center. Second, plaintiffs have identified substantial, compelling evidence in support of a finding that the Onondaga County defendants are specifically aware of, and have consciously chosen to disregard, the serious risk of harm posed by the Justice Center's solitary confinement practices as they relate to juveniles.

As plaintiffs' experts establish and the Government' statement of interest emphasizes,

there is a broad consensus among the scientific and professional community that juveniles are psychologically more vulnerable than adults.  See, e.g., Graham v. Florida, 560 U.S. 48, 68 (2010) ("[D]evelopments in psychology and brain science continue to show fundamental differences between juvenile and adult minds."); Roper v. Simmons, 543 U.S. 551, 569 (2005) (recognizing the "comparative immaturity and irresponsibility of juveniles").

And the Supreme Court has continued to stress that these fundamental differences are consequential in the Eighth Amendment context.  See, e.g., Miller v. Alabama, 132 S. Ct. 2455 (2012) (observing that youth "is a moment and condition of life when a person may be most susceptible to influence and to psychological damage").  For instance, the Court has forbidden the imposition of the death penalty on juveniles, Roper, 543 U.S. at 578, concluded that juveniles cannot be sentenced to life without parole for offenses short of homicide, Graham, 560 U.S. at 82, and held that, even in cases of homicide, juveniles cannot be subjected to a mandatory sentencing scheme that automatically imposes a sentence of life without parole.  Miller, 132 S. Ct. at 2475.

Plaintiffs persuasively analogize the circumstances at issue in this case to numerous examples from around the country where courts have found that the imposition of solitary confinement violated the constitutional rights of *adult* inmates with mental conditions.  As plaintiffs' evidentiary submissions demonstrate, many of the juveniles in the plaintiff class suffer from similar, pre-existing mental conditions.

And as for all members of the class, plaintiffs' submissions further establish that the risks posed here are even greater, given that *juveniles* share the same increased vulnerability to long-term, or even permanent, psychological damage.  Cf. Peoples v. Annucci, 180 F. Supp. 3d 294, 299 (S.D.N.Y. 2016) ("After even relatively brief periods of

solitary confinement, inmates have exhibited systems such as . . . hallucinations, increased anxiety, lack of impulse control, severe and chronic depression, . . . sleep problems, and depressed brain functioning.").  Further, the federal government and at least 21 states have prohibited the use of disciplinary isolation for juveniles (and in fact, the State of New York has also largely eliminated the practice).  Cf. Graham, 560 U.S. at 62 (considering "national consensus" in determining "contemporary values" of society).

Plaintiffs have also identified significant evidence demonstrating that the Onondaga County defendants have been on notice of the specific risks of serious risk of harm from these practices through personal meetings with juvenile advocacy groups, prior litigation on this issue, complaints from parents, and even their own continued observations.  And as plaintiffs point out, these allegedly unconstitutional practices have continued unabated despite this pending litigation.  Farmer, 511 U.S. at 846 (permitting court to consider "developments that postdate the pleadings and pretrial motions" when considering subjective culpability).

Further, plaintiffs have identified substantial data from other jurisdictions as well as their own experts showing that the use of disciplinary confinement on juveniles is not *reasonably* calculated to restore prison safety and, even when it is, disciplinary isolation at the Justice Center continues long after any safety concerns had been abated.  Deputy Gonzalez's conclusory assertion that solitary confinement was required "in all instances [ ] for the safety of the inmates and staff and to retain institutional control" does not shield the Jail's policies and practices from scrutiny.  To the contrary, the Onondaga County defendants' repeated insistence that the continued practice of imposing solitary confinement on juveniles is borne of penological necessity—made in the face of a mounting consensus pointing in the

opposite direction—strongly informs the conclusion that the imposition of such disciplinary isolation is not *reasonably* calculated to restore safety in these circumstances and, in fact, represents conscious disregard of the substantial risks posed on the juvenile class.

In opposition to all of this, the Onondaga County defendants contend plaintiffs have failed to comply with the administrative exhaustion requirements found in the PLRA, which provides, in relevant part, that: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

Of course, failure to exhaust is an affirmative defense and therefore "inmates are not required to specifically plead or demonstrate exhaustion in their complaints." Jones v. Bock, 549 U.S. 199, 216 (2007). And even assuming the named plaintiffs failed to exhaust their administrative remedies, "exhaustion may be excused if: (1) administrative remedies were unavailable; (2) the defendants forfeited the defense or acted in such a way as to estop them from raising it; or (3) 'special circumstances' justify non-exhaustion." Butler, 289 F.R.D. at 93 (quoting Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004)).

As the Supreme Court recently explained, "an administrative procedure is unavailable when, (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Ross v. Blake, 136 S. Ct. 1850, 1859 (2016). Plaintiffs' class complaint alleges that administrative remedies were unavailable to the plaintiff class, with Justice Center staff consistently refusing to provide grievance forms, ignoring grievances, and in some cases throwing grievances in the trash. Compl. ¶¶ 56, 77, 8-88, 97-98, 107-08, 116, 124. The

Onondaga County defendants have failed to rebut these allegations. Accordingly, plaintiffs have made a clear and persuasive showing on this element.

### ii. **Fourteenth Amendment**

"In a § 1983 suit brought to enforce procedural due process rights, a court must determine (1) whether a property interest is implicated, and, if it is, (2) what process is due before the plaintiff may be deprived of that interest." Singh v. Joshi, 152 F. Supp. 3d 112, 124 (E.D.N.Y. 2016) (quoting Nnebe v. Daus, 644 F.3d 147, 158 (2d Cir. 2011)).

"An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" Singh, 152 F. Supp. 3d at 124 (quoting Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985)). "'The formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings,' but an opportunity to be heard remains the Due Process Clause's 'root requirement.'" Id. (quoting Boddie v. Connecticut, 401 U.S. 371, 378-79 (1971)).

Plaintiffs assert a constitutionally protected property interest in receiving a certain amount of minimum education under New York's Education Law. Plaintiffs contend the cell packets distributed by the School District in lieu of actual educational instruction are delivered on an inconsistent basis and, in all cases, are an inadequate substitute for direct instruction. The Onondaga County defendants rely on the Second Circuit's decision in Handberry v. Thompson, 446 F.3d 335, 353 (2d Cir. 2006), to assert that plaintiffs do not have a property interest in "any particular educational conditions" and therefore any Fourteenth Amendment claim must fail.

"In order for a benefit to qualify as a property interest, the person claiming it must have

a 'legitimate claim of entitlement' to the benefit, rather than a mere 'unilateral expectation of it."  Handberry v. Thompson, 446 F.3d 335, 353 (2d Cir. 2006) (quoting Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972)).  "In determining whether a party has a legitimate claim to a benefit, 'we look to the statutes and regulations governing the distribution of benefits.'"  Id. (quoting Kapps v. Wing, 404 F.3d 105, 113 (2d Cir. 2005)).  In other words, a property interest exists where "the relevant statutes and regulations 'meaningfully channel [ ] official discretion by mandating a defined administrative outcome.'"  Id. (quoting Sealed v. Sealed, 332 F.3d51, 56 (2d Cir. 2003)).

As it turns out, Handberry does seem to provide an answer to this threshold question.  There, a class of inmates claimed that New York City's jail system deprived them of the educational services to which they were entitled under state and federal law.  446 F.3d at 338.  Eventually, the district court entered an injunction in favor of the plaintiff-inmates and the defendant-officials appealed.  Id. at 338-39.

In considering a similar procedural due process claim as the one pressed by plaintiffs here, the Second Circuit acknowledged that New York's Education Law "treats youths who are incarcerated differently than those who are not."  Handberry, 446 F.3d at 353 (citing N.Y. Educ. Law § 3202(7)).  The Court then examined the relevant regulations before concluding that § 3202(7) could not be understood to create a "legitimate claim of entitlement" to "anything more than an education while incarcerated that is not 'wholly unsuited' to the legislature's goals."  Id. at 355.

But as the Court in Handberry also went on to emphasize, the plaintiff-inmates there had already conceded "that the defendants have provided the minimum number of hours required" by New York State regulations.  446 F.3d at 355.  In fact, Handberry specifically

*affirmed* the district court's entry of an injunction in that case "on the basis of the due process clause of the Fourteenth Amendment" insofar as it "ensur[ed] that the defendants continue to provide the regulatory minimum of fifteen hours per week of instruction." Id.

That regulatory minimum is precisely what plaintiffs seek here. There appears to be no reasonable dispute that the decision to place a juvenile in solitary confinement occurs immediately and without any procedural protection. And although both defendants insist otherwise, plaintiffs have submitted a significant amount of persuasive evidence indicating that the cell packets that are *sometimes* distributed to juveniles who have been relocated to disciplinary isolation fall far short of the regulatory minimum of fifteen hours per week of instruction. Accordingly, plaintiffs have demonstrated at this juncture that they are substantially likely to succeed on the merits of this claim.

### iii. Individuals with Disabilities Education Act

Originally enacted in 1975, the purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).

"The IDEA offers federal funds to States in exchange for a commitment: to furnish a 'free appropriate public education'—more concisely known as a FAPE—to all children with certain physical or intellectual disabilities." Fry v. Napoleon Cmty. Schs., 580 U.S. –, No. 15-497, slip op. at 2 (2017). "As defined in the Act, a FAPE comprises 'special education and related services'—both 'instruction' tailored to meet a child's 'unique needs' and sufficient 'supportive services' to permit the child to benefit from that instruction.' Id. (citations omitted).

The IDEA applies to both a Local Educational Agency ("LEA") like the School District as well as a correctional facility like the Justice Center. 34 C.F.R. §§ 300.2(b)(1)(ii)-(iii). And with specific, limited exceptions for children with disabilities "who are *convicted* as adults under State law and incarcerated in adult prisons," all age-eligible students with disabilities are entitled to a FAPE. Compare 34 C.F.R. §§ 300.101-102, with 34 C.F.R. § 300.324(d)(1) (emphasis added).

The IDEA provides myriad procedural and substantive protections for qualifying children, two of which are relevant here. First, plaintiffs contend the cell packets distributed to members of the subclass in solitary confinement fail to satisfy the IEP requirements of the IDEA, the primary method by which educational instruction and related support services are tailored to a qualifying student's needs. 20 U.S.C. § 1414(d); see also Honig v. Doe, 484 U.S. 305, 311 (1988).

Second, plaintiffs contend the routine use of solitary confinement on the subclass in response to behavioral issues occurs in violation of the "manifestation hearing" requirement of the IDEA, which requires a determination regarding whether the "behavior that gave rise to the violation" is causally related to the child's qualifying disability before any "change in placement that would exceed 10 school days" can take place. 20 U.S.C. § 1415(k). Even where a change in placement is appropriate, the education provider must continue to provide the services necessary to "enable the child to continue to participate in the general education curriculum, although in another setting, and to progress toward meeting the goals set out in the child's IEP." 20 U.S.C. § 1415(k)(1)(i).

Plaintiffs have demonstrated they are substantially likely to succeed on the merits of both of these claims. As an initial matter, a review of the applicable regulations strongly

indicates that the School District and the Justice Center jointly share the obligation to provide a FAPE to qualifying students.  20 U.S.C. § 142(a)(12); 9 N.Y.C.R.R. § 7070.3.

For its part, the Onondaga County defendants' 10-page opposition memorandum does not address the underlying issues but instead simply points the finger at the School District, asserting that Justice Center officials "do not determine individual education plans for [ ] minor inmates, and have no knowledge of what they contain."  Of course, this response completely fails to grapple with the compelling evidence submitted by plaintiffs demonstrating that the Onondaga County defendants frequently block the distribution of the cell packets.

The School District also tries to defeat these claims by asserting plaintiffs have failed to administratively exhaust them.  "It is well settled that the IDEA requires an aggrieved party to exhaust all administrative remedies before bringing a civil action in federal or state court."  J.S. ex rel. N.S. v. Attica Cent. Schs., 386 F.3d 107, 112 (2d Cir. 2004), cert. denied, 544 U.S. 968 (2005); 20 U.S.C. § 1415(i)(2)(A).  "The exhaustion requirement 'prevents courts from undermining the administrative process and permits an agency to bring its expertise to bear on a problem as well as to correct its own mistakes.'" Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist., 288 F.3d 478,k 487 (2d Cir. 2002) (quoting Heldman v. Sobol, 962 F.2d 148, 159 (2d Cir. 1992)).

However, "exhaustion is excused in cases where:  (1) it would be futile to use the administrative due process procedures; (2) an agency has adopted a policy or pursued a practice of general applicability that is contrary to law; or (3) defendants allegedly failed to implement services specified or otherwise clearly stated in a student's IEP."  Buffalo City Sch. Dist., 2013 WL 3354424, at *7.  "These exceptions are grounded in the legislative history of IDEA, which recognized that there would be cases where exhaustion would be

either legally or practically futile." Id. (citation omitted).

"The futility exception is particularly relevant in actions, such as the one at hand, that allege systemic violations of the procedural rights accorded by IDEA." Buffalo City Sch. Dist., 2013 WL 3354424 at *8 (citation omitted). "Systemic violations are exempted from the exhaustion requirement because they 'are often the result of implemented policies and procedures, and administrative hearing officers do not have the ability to alter already existing policies.'" Id. (quoting S.W. by J.W. v. Warren, 528 F. Supp. 2d 282, 294 (S.D.N.Y. 2007)). "Indeed, because claims of generalized violations . . . lend themselves well to class action treatment,' exempting such claims from the individual administrative review process achieves the goal of promoting efficiency." Id. (internal citation, citation, and internal quotation marks omitted).

Exhaustion is excused in this case. Contrary to how the School District would prefer to frame this issue, plaintiffs allege systemic violations of the IDEA resulting from the inadequate services and protections afforded to qualifying juveniles placed in solitary confinement. The School District cannot just point to the existence of the MOU and insist it is blameless because plaintiffs are not challenging the formal, written policy set forth in the MOU. Rather, plaintiffs are challenging the School District's real-world policy, which they allege to be a complete failure to deliver on the black letter promises of the MOU. Cf. Cash v. Cty. of Erie, 654 F.3d 324, 334 (2d Cir. 2011) (acknowledging in the Monell context that policies can be "pronounced or tacit and reflected in either action or inaction"). Indeed, if the mere existence of a written policy that conformed to legal requirements always served to trump a defendant's actual conduct, a vast range of state and federal laws would be rendered toothless by savvy lawyering. After considering all of the arguments and evidence

in the record, plaintiffs are substantially likely to succeed on the merits of this claim.

### 2. **Strong Showing of Irreparable Harm**

"The showing of irreparable harm is perhaps the single most important prerequisite for the issuance of a preliminary injunction." Weinstein v. Krumpter, 120 F. Supp. 3d 289, 297 (E.D.N.Y. 2015) (citation and internal quotation marks omitted). "The concept of irreparable harm has been described 'as certain and imminent harm for which a monetary award does not adequately compensate.'" Donohue v. Mangano, 886 F. Supp. 2d 126, 149-50 (E.D.N.Y. 2012) (quoting Wisdom Import Sales Co. v. Labatt Brewing Co., 339 F.3d 101, 113-14 (2d Cir. 2003)).

Plaintiffs have made such a showing here. "First, as a general matter, there is a presumption of irreparable harm when there is an alleged deprivation of constitutional rights." Donohue, 886 F. Supp. 2d at 150. In addition, plaintiffs have submitted substantial, convincing evidence that the Onondaga County defendants' continued use of solitary confinement on juveniles puts them at serious risk of short- and long-term psychological damage, and that the related deprivation of education services by both defendants hinders important aspects of their adolescent development. See, e.g., New York, 872 F. Supp. 2d at 214 ("[I]nterruption of a child's schooling causing a hiatus not only in the student's education but also in other social and psychological developmental processes that take place during the child's school, raises a strong possibility of irreparable injury." (citation omitted)); Cosgrove v. Bd. of Educ. of Niskayuna Cent. Sch. Dist., 175 F. Supp. 2d 375, 392 (N.D.N.Y. 2001) (McAvoy, J.) ("It is almost beyond dispute that wrongful discontinuation of a special education program to which a student is entitled subjects that student to actual irreparable harm."). Accordingly, this element weighs in favor of granting a preliminary injunction.

### 3. **Public Interest**

The public interest generally supports a grant of preliminary injunctive relief where, as here, a plaintiff has demonstrated a substantial likelihood of success on the merits and a strong showing of irreparable harm. This interest is particularly strong where the rights to be vindicated are constitutional in nature. Ligon v. City of N.Y., 925 F. Supp. 2d 478, 541 (S.D.N.Y. 2013) ("[T]he public interest lies with the enforcement of the Constitution.").

Plaintiffs have submitted substantial, compelling evidence to rebut Deputy Gonzalez's conclusory assertion that safety and security provide an overriding justification for the policy and practice at issue in this case. Plaintiffs have also clearly shown that juveniles in solitary confinement only sporadically receive cell packets in lieu of the regulatory minimum hours of educational instruction contemplated by New York State law. Plaintiffs have convincingly demonstrated that the cell packets, when they are actually distributed to juveniles, are wholly insufficient for both the average juvenile class member as well as the members of the subclass who qualify for additional educational support under the IDEA. Accordingly, the public interest is served by the grant of a preliminary injunction.

### 4. **Balance of Hardships**

To be sure, the Onondaga County defendants have a strong interest in maintaining safety and security at the Justice Center. A careful review of Deputy Gonzalez's affidavit makes clear that he believes these duties will become more difficult in some measure if the Jail's solitary confinement practices are restricted as they pertain to juveniles. But invoking safety and security does not provide corrections officials with *carte blanche* to deprive incarcerated youth of the guarantees promised by federal law. As discussed above, plaintiffs have submitted compelling evidence from Warden Parker and Dr. Krisberg that rebuts

Deputy Gonzalez's conclusory assertion that safety and security are legitimately served by the current practices. Accordingly, the balance of hardships favors the grant of a preliminary injunction.

## V. <u>CONCLUSION</u>

Plaintiffs have affirmatively demonstrated compliance with Rule 23's requirements and therefore the motion for class certification has been granted. Conversely, the School District has failed to establish that summary judgment is warranted at this early stage of the litigation, therefore its motion will be denied. Finally, because plaintiffs have shown a substantial likelihood of success on the merits of their claims and have also demonstrated that the other factors weigh in their favor, their request for a preliminary injunction will be granted.

Therefore, it is

ORDERED that

1. Plaintiffs' motion for class certification is GRANTED;

2. Defendant Syracuse City School District's motion for summary judgment is DENIED;

3. Plaintiffs' motion for a preliminary injunction is GRANTED;

4. The Onondaga County defendants, their agents, servants, employees, and officers, and all other persons in active concert or participation with them and who receive actual notice of this preliminary injunction, by personal service or otherwise, are hereby IMMEDIATELY ENJOINED AND RESTRAINED, pending the final determination of this action, from imposing 23-hour disciplinary isolation on juveniles at the Justice Center;

5. The Onondaga County defendants and the School District shall IMMEDIATELY afford all eligible juveniles the educational instruction to which they are entitled under New

York State's laws and regulations;

      6. The Onondaga County defendants and the School District shall IMMEDIATELY afford all juveniles with qualifying disabilities under the IDEA with the special education services and other procedural protections to which they are entitled; and

      7. Discipline imposed on juveniles by the Onondaga County defendants must include meaningful social interaction with others, including other juveniles, and no discipline may be imposed that directly harms a juvenile's psychological condition.

      IT IS SO ORDERED.

_____
United States District Judge

Dated: February 22, 2017
       Utica, New York.